KASSRA P. NASSIRI (215405)
(knassiri@nassiri-jung.com)
NASSIRI & JUNG LLP
47 Kearny Street, Suite 700
San Francisco, California 94108
Telephone: (415) 762-3100
Facsimile: (415) 534-3200

MICHAEL J. ASCHENBRENER (277114)
(mja@aschenbrenerlaw.com)
ASCHENBRENER LAW, P.C.
795 Folsom Street, First Floor
San Francisco, CA 94107
Telephone: (415) 813-6245
Facsimile:  (415) 813-6246


Attorneys for Plaintiffs Gaos and Italiano

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| PALOMA GAOS and ANTHONY ITALIANO, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE INC., a Delaware Corporation,<br><br>Defendant. | Case No. 5:10-cv-04809-EJD<br><br>CLASS ACTION<br><br><br>**STIPULATION AND [PROPOSED] ORDER FOR CONSOLIDATION OF CLASS ACTIONS** AS MODIFIED BY THE COURT<br>Date:<br>Time:<br>Place:     Courtroom 1, 5th Floor<br>Judge:    Hon. Edward J. Davila |

1    The Parties in both *Gaos v. Google Inc.*, 5:10-cv-4809-EJD, and *Priyev v. Google Inc.*,

2   5:13-cv-0093-LHK, hereby submit the following stipulation and proposed order to consolidate

3   the two actions.  The *Gaos* and *Priyev* actions are both class actions brought against Google,

4   alleging, *inter alia*, similar claims and overlapping proposed classes.  The Parties agree that

5   consolidation of the actions is appropriate, and the Parties move for an order consolidating the

6   cases on the following terms:

7                              <u>CONSOLIDATION OF RELATED CASES</u>

8        1.      Pursuant to Fed. R. Civ. P. 42(a), these cases are hereby consolidated into Civil

9   Action No. 5:10-cv-4809-EJD for pretrial proceedings before this Court. The consolidated action

10  shall be captioned: "<u>In re Google Referrer Header Privacy Litigation.</u>"

11       2.      All related actions that are subsequently filed in, or transferred to, this District

12  shall be consolidated into this action for pretrial purposes.  This Order shall apply to every such

13  related action, absent order of the Court. A party that objects to such consolidation, or to any

14  other provision of this Order, must file an application for relief from this Order within thirty (30)

15  days after the date on which a copy of the order is mailed to the party's counsel, pursuant to

16  Paragraph 7, <u>infra.</u>

17       3.      This Order is entered without prejudice to the rights of any party to apply for

18  severance of any claim or action, for good cause shown.

19                              <u>MASTER DOCKET AND CAPTION</u>

20       4.      The docket in Civil Action No. 5:10-cv-4809-EJD shall constitute the Master

21  Docket for this Action.

22       5.      Every pleading filed in the consolidated action shall bear the following caption:

STIPULATION AND [PROPOSED] ORDER                        10-cv-4809-EJD
FOR CONSOLIDATION OF CLASS ACTIONS

1

2

3

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

4

5

6

7

8

In re GOOGLE REFERRER HEADER PRIVACY
LITIGATION

_____

This Document Relates To:

Master File No. 5:10-cv-04809-EJD

CLASS ACTION

9

10      6.      The file in Civil Action No. 5:10-cv-4809-EJD shall constitute a Master File for

11  every action in the consolidated action. When the document being filed pertains to all actions, the

12  phrase "All Actions" shall appear immediately after the phrase "This Documents Relates To:".

13  When a pleading applies only to some, not all, of the actions, the document shall list,

14  immediately after the phrase "This Documents Relates To:", the docket number for each

15  individual action to which the document applies, along with the last name of the first-listed

16  plaintiff in said action (e.g., "No. C-[low-number action] (Doe))."

17      7.      The parties shall file a Notice of Related Cases pursuant to Civil L.R. 3-12

18  whenever a case that should be consolidated into this action is filed in, or transferred to, this

19  District. If the Court determines that the case is related, the clerk shall:

20              a.      place a copy of this Order in the separate file for such action;

21              b.      serve on plaintiff's counsel in the new case a copy of this Order;

22              c.      direct that this Order be served upon defendant in the new case; and,

23              d.      make the appropriate entry in the Master Docket.

24      8.      Any counsel of record for a party in this action who is not a member of the Bar of

25  this District is hereby admitted to practice pro hac vice in this action.

26

27

28

STIPULATION AND [PROPOSED] ORDER
FOR CONSOLIDATION OF CLASS ACTIONS

10-cv-4809-EJD

PLEADINGS AND MOTION

9.     Defendant is not required to respond to the complaint in any action consolidated into this action, other than a consolidated complaint or a complaint designated as the operative complaint.

10.     Plaintiffs shall file a consolidated complaint as an exhibit to this Stipulation, which shall become the operative complaint when the Court orders these matters consolidated. The consolidated complaint shall be the operative complaint and shall supersede all complaints filed in any of the actions consolidated herein.

11.     Defendant shall respond to the consolidated complaint within sixty (60) days after service, unless otherwise agreed upon by the parties. If defendant files any motions directed at the consolidated complaint, the opposition and reply briefs shall be filed within thirty days and forty-five days, respectively, of that response, unless otherwise agreed upon by the parties.

12.     The parties shall serve all papers on each other by email, unless otherwise agreed upon by the parties.

Respectfully submitted,

Date:  April 26, 2013             NASSIRI & JUNG LLP


                                  By:  /s/ Kassra P. Nassiri
                                  Kassra P. Nassiri
                                  *Counsel for Plaintiffs Gaos & Italiano*

Date:  April 26, 2013             ASCHENBRENER LAW, P.C.


                                  By: /s/ Michael Aschenbrener
                                  Michael Aschenbrener
                                  *Counsel for Plaintiffs Gaos & Italiano*


Date:  April 26, 2013             PROGRESSIVE LAW GROUP LLC


                                  By: /s/ Ilan Chorowsky
                                  Ilan Chorowsky
                                  *Counsel for Plaintiff Priyev*

Date:  April 26, 2013                    O'MELVENY & MYERS LLP

                                         By: /s/ Randall W. Edwards
                                         Randall W. Edwards
                                         *Counsel for Defendant Google in* Gaos

Date:  April 26, 2013                    MAYER BROWN LLP

                                         By: /s/ Edward D. Johnson
                                         Edward D. Johnson
                                         *Counsel for Defendant Google in* Priyev

THE FOREGOING STIPULATION IS APPROVED AND IS SO ORDERED AS FOLLOWS:

Before consolidation, the clerk shall relate case numbers 5:10-cv-04809 EJD and
5:13-cv-00093 LHK and reassign the latter to the undersigned.  The clerk shall then
administratively close case number 5:13-cv-00093 once reassigned.  The pending motion to
dismiss filed in case number 5:10-cv-04809 EJD (Docket Item No. 44) is TERMINATED AS
MOOT in light of the forthcoming consolidated complaint.

DATED:    April 30, 2013

                                         EDWARD J. DAVILA
                                         United States District Judge

STIPULATION AND [PROPOSED] ORDER                                10-cv-4809-EJD
FOR CONSOLIDATION OF CLASS ACTIONS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FILER'S ATTESTATION**

Pursuant to Civil L.R. 5-1 (i), the undersigned attests that concurrence in the filing of this document has been obtained from each of the other signatories.

Dated: April 26, 2013                                    NASSIRI & JUNG LLP

By: _/s/ Kassra P. Nassiri_____
Kassra P. Nassiri

STIPULATION AND [PROPOSED] ORDER                              10-cv-4809-EJD
FOR CONSOLIDATION OF CLASS ACTIONS

# EXHIBIT A

1   KASSRA P. NASSIRI (215405)
    knassiri@nassiri-jung.com
2   NASSIRI & JUNG LLP
    47 Kearny Street, Suite 700
3   San Francisco, California 94108
    Telephone: (415) 762-3100
4   Facsimile: (415) 534-3200

5   MICHAEL J. ASCHENBRENER (277114)
    mja@aschenbrenerlaw.com
6   ASCHENBRENER LAW, P.C.
    795 Folsom Street, First Floor
7   San Francisco, California 94107
    Telephone: (415) 813-6245
8   Fax: (415) 813-6246

9
    ATTORNEYS FOR PLAINTIFFS AND THE PUTATIVE CLASS
10  *Additional Counsel listed on Signature Page*

11              **UNITED STATES DISTRICT COURT**

12            **NORTHERN DISTRICT OF CALIFORNIA**

13                    **SAN JOSE DIVISION**

14  In re GOOGLE REFERRER HEADER        )  Case No. 5:10-CV-4809-EJD
15  PRIVACY LITIGATION                  )
                                        )
16  _____ )  **CONSOLIDATED COMPLAINT**
                                        )
17                                      )
    This Document Relates To: All Actions )  CLASS ACTION
18                                      )
                                        )
19                                      )  JURY TRIAL DEMANDED
                                        )
20  _____

21

22

23

24

25

26

27

28

---

CONSOLIDATED COMPLAINT                                    10-cv-4809-EJD

Plaintiffs Paloma Gaos, Anthony Italiano, and Gabriel Priyev (collectively "Plaintiffs") bring this suit on behalf of themselves and all others similarly situated, and make the following allegations on information and belief, except as to allegations pertaining to Plaintiffs, which are based on their personal knowledge:

## INTRODUCTION

1.      Plaintiffs bring this class action complaint against Google Inc. ("Google") for storing and intentionally, systematically and repeatedly divulging its users' search queries and histories to third parties via "Referrer Headers." This practice adversely impacts billions of searches conducted by millions of consumers.

2.      Google, the largest search engine in the United States, has repeatedly touted the numerous ways in which it protects user privacy, particularly with regard to the terms that consumers search for using the company's search engine. Over protests from privacy advocates, however, Google has consistently and intentionally designed its services to ensure that user search queries, which often contain highly-sensitive and personally-identifiable information ("PII"), are routinely transferred to marketers, data brokers, and sold and resold to countless other third parties.

3.      The user search queries disclosed to third parties contain, without limitation, users' real names, street addresses, phone numbers, credit card numbers, social security numbers, financial account numbers and more, all of which increases the risk of identity theft. User search queries also contain highly-personal and sensitive issues, such as confidential medical information, racial or ethnic origins, political or religious beliefs or sexuality, which are often tied to the user's personal information.

4.      In many instances, the information contained in disclosed search queries does not directly identify the Google user. Through the reidentification (explained below) or deanonymizing of data, however, the information contained in search queries can and, on information and belief, are associated with the actual names of Google users. Computer

science academics and privacy experts are calling for the reexamination of privacy concerns in light of the growing practice and power of reidentification.

5.      Google has acknowledged that search query information alone may reveal sensitive PII. And Google has demonstrated that it could easily stop disclosing search query information to third parties, without disrupting the effectiveness of its service to its users, if it wished to do so. But because the real-time transmission of user search queries increases Google's profitability, it chooses not to utilize the demonstrated technology that would prevent the disclosure of its users' PII.

6.      Moreover, in October 2011, Google confirmed that it is, in effect, selling individual user search queries to advertisers.  In October 2011, Google started proactively scrubbing user search queries from the information it passes on to third parties when some users click on regular, organic search results, but would continue sending search queries to third parties when all users click on paid listings. While this is, in a way, a small win for privacy advocates, it also demonstrates just how valuable the search queries are to Google and others: Google no longer gives away this precious data for free, but will do so when it gets paid for it.

## PARTIES

7.      Plaintiff Paloma Gaos is a resident of San Francisco County, California. Plaintiff has at all material times been a user of Google's search engine services.

8.      Plaintiff Anthony Italiano is a resident of Pasco County, Florida. Plaintiff has at all material times been a registered Google Accounts user and a user of Google's search engine services.

9.      Plaintiff Gabriel Priyev is an individual and a citizen of the State of Illinois. Plaintiff has at all material times been a registered Google Accounts user and a user of Google's search engine services, at different times in California and Illinois.

10.      Defendant Google Inc. ("Google") is a Delaware corporation that maintains its headquarters in Mountain View, Santa Clara County, California. Google conducts

business throughout California and the nation from California. Google makes and implements all relevant decisions, including those at issue in this case, in California. Its Terms of Service and Privacy Policy were decided on and implemented in California.

## JURISDICTION AND VENUE

11.     This Court has personal jurisdiction over Google because (a) a substantial portion of the wrongdoing alleged in this complaint took place in this state, (b) Google is authorized to do business here, has sufficient minimum contacts with this state, and/or otherwise intentionally avails itself of the markets in this state through the promotion, marketing and sale of products and services in this state, and (c) in its Terms of Service, to which all Google Account holders who use Google Search, including Plaintiffs, must purportedly assent, Google consents to the personal jurisdiction of this Court:

> The laws of California, U.S.A., excluding California's conflict of laws rules, will apply to any disputes arising out of or relating to these terms or the Services. All claims arising out of or relating to these terms or the Services will be litigated exclusively in the federal or state courts of Santa Clara County, California, USA, and you and Google consent to personal jurisdiction in those courts.

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 2702 and 18 U.S.C. § 2707. This Court has supplemental jurisdiction over the California state law claims pursuant to 28 U.S.C. § 1367.

13.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (c). A substantial portion of the events and conduct giving rise to the violations of law complained of herein occurred in this District.

## INTRADISTRICT ASSIGNMENT

14.     Pursuant to Civil Local Rule 3-2(e), this case shall be assigned to the San Jose Division.

## STATEMENT OF FACTS

**A.     Google's Dominance in Search**

15.     "Searching" is one of the most basic activities performed in the Internet. Most everyone with access to the Internet uses search engines to find information on the Internet. When using a search engine, users formulate a search query using keywords and phrases reflecting the information sought by the user. The search engine then matches the search query with websites matching the query and provides a list of those matching websites to the user. The user clicks on the link in the resulting list and is redirected to the website containing the sought-after information.

16.     Google's core service centers on its proprietary search engine. Google runs millions of servers in data centers around the world and processes over one billions user-generated search requests every day. On information and belief, Google is the most-used search engine in the world and enjoys a market share of over 50% in the United States.

17.     Google generates substantial profits from selling advertising. The revenue it generates is derived from offering search technology and from the related sale of advertising displayed on its site and on other sites across the web. On information and belief, nearly 95% of Google's revenue is derived from its advertising programs, with total advertising revenues estimated at $28 billion in 2010, $36.5 billion in 2011, and $43.7 billion in 2012. Google has implemented various innovations in the online advertising market that helped make it one of the biggest advertising platforms in the world.

18.     Google AdWords is Google's main advertising product and source of advertising revenue. The AdWords program allows advertisers to select a list of words that, when entered by users in a search query, trigger their targeted ads. When a user includes words that match an advertiser's selections within a search query, paid advertisements are shown as "sponsored links" on the right side of the search results screen. Accordingly, much of Google's advertising revenue depends directly on the search queries that its users run on Google search.

19.     Using technology from its wholly-owned subsidiary DoubleClick, Google can also determine user interests and target advertisements so they are relevant to their context

and the user that is viewing them. Google's Analytics product allows website owners to track where and how people use their website, allowing in-depth research to get users to go where you want them to go.

20.     Third-party search engine optimization ("SEO") companies help businesses design their websites so that users conducting internet search using search engines like Google get search results containing their business at or near the top of the search results page. SEOs accomplish this task by ensuring that a business's relevant pages are designed to work with Google's search algorithms. Google has a symbiotic relationship with SEOs. Google wants relevant results at the top of their search results page, and SEOs want their customers' relevant webpages to appear at the top of Google's search results. To the extent that SEOs are successful in getting their clients' relevant pages to appear at or near the top of Google's search results page, users are more likely to return to Google next time they want to search for information on the internet. And the more people use Google for search, the more revenue Google derives from its advertising business.

21.     Google Web History is a free service Google provides to users of Google Search. A user's search queries, search results and/or Referrer Headers form a substantial part of what Google's Terms of Service identify or define as the user's "Web History," which Google stores for users by default.

22.     Google Analytics is a free service Google provides to those who manage websites. Analytics allows website managers to see detailed search query and search results reports including user Web History information or search terms.  Such information provides valuable business intelligence to third-party website owners, particularly those who buy advertising on Google.com or with Google Adwords.

**B.     Google's Privacy Promises**

23.     Leading thinkers in the privacy community have long argued that consumers

CONSOLIDATED COMPLAINT                                          10-cv-4809-EJD

"treat the search [engine] box like their most trusted advisors. They tell the Google search box what they wouldn't tell their own mother, spouse, shrink or priest."[1] Peer reviewed academic studies confirm this fact, particularly regarding the use of search engines to look up sensitive health information.[2]

24.     Google has always recognized that user trust is paramount to its search business success. To that end, Google adopted "Don't be evil" as its motto, and Google states that its Code of Conduct is one of the ways it puts that motto into practice.[3] Google's Code of Conduct recognizes that it is "asking users to trust [it] with their personal information. Preserving that trust requires that each of us respect and protect the privacy of that information. Our security procedures strictly limit access to and use of users' personal information."[4]

25.     Because Google's success depends on gaining the trust of its users, Google's Privacy Policy sets forth representations intended to foster the safety and privacy protection offered by Google's search services. As of October 14, 2005, Google's Privacy Policy[5] stated as follows:

> Google only shares personal information with other companies or individuals outside of Google in the following limited circumstances:

---

[1] Christopher Ketchum & Travis Kelly, The Cloud Panopticon (April 9, 2010), http://www.theinvestigativefund.org/investigations/rightsliberties/1274/the_cloud_panopticon (last visited October 24, 2010).

[2] Gunther Eysenbach and Christian Köhler, How do consumers search for and appraise health information on the world wide web? Qualitative study using focus groups, usability tests, and in-depth interviews, BMJ 2002; 324:573, available at http://www.bmj.com/cgi/content/full/324/7337/573.

[3] Google's Code of Conduct, http://investor.google.com/corporate/code-of-conduct.html (last visited April 26, 2012).

[4] Id.

[5] Google's October 14, 2005 Privacy Policy, http://www.google.com/intl/en/privacy_archive_2005.html (last visited April 26, 2012).

- We have your consent. We require opt-in consent for the sharing of any sensitive personal information.

- We provide such information to our subsidiaries, affiliated companies or other trusted businesses or persons for the purpose of processing personal information on our behalf. We require that these parties agree to process such information based on our instructions and in compliance with this Policy and any other appropriate confidentiality and security measures.

- We have a good faith belief that access, use, preservation or disclosure of such information is reasonably necessary to (a) satisfy any applicable law, regulation, legal process or enforceable governmental request, (b) enforce applicable Terms of Service, including investigation of potential violations thereof, (c) detect, prevent, or otherwise address fraud, security or technical issues, or (d) protect against imminent harm to the rights, property or safety of Google, its users or the public as required or permitted by law.

26.     In October 2010, Google defined in its Privacy Center FAQ "Personal information" as "information that [the user] provide[s] to us which personally identifies you, such as your name, email address or billing information, or other data which can be reasonably linked to such information by Google" and "Sensitive Information" as "information we know to be related to confidential medical information, racial or ethnic origins, political or religious beliefs or sexuality and tied to personal information. As of April 2012, Google no longer defines "Personal Information" at all in its Privacy Center FAQ.

27.     Google also stated in its October 14, 2005 Privacy Policy that "We may share with third parties certain pieces of *aggregated, non-personal information*, such as the number of users who searched for a particular term, for example, or how many users clicked on a particular advertisement. Such information does not identify you individually."[6] Google defined "aggregated, non-personal information" as "information that is recorded about users and *collected into groups* so that it no longer reflects or references an individually

---

[6] Google's October 14, 2005 Privacy Policy, supra, n.5 (emphasis supplied).

1  identifiable user."[7]

2      28.     Google's privacy policy was unchanged until October 3, 2010, when it was

3  revised to exclude any statement about how Google shares search queries with third parties.

4  The representations that Google shares information only in "limited circumstances" remained

5  unchanged.

6      29.     On March 1, 2012, Google implemented a new, singular privacy policy for all

7  Google products.[8] While the new policy has broad implications for how Google shares user

8  data internally, Google makes the following representations regarding how it shares data with

9  third parties:[9]

10

11  **Information we share**

12  We do not share personal information with companies, organizations and individuals
    outside of Google unless one of the following circumstances apply:

13  • **With your consent**

14  We will share personal information with companies, organizations or individuals
15  outside of Google when we have your consent to do so. We require opt-in consent
    for the sharing of any sensitive personal information.

16  • **With domain administrators**

17  If your Google Account is managed for you by a domain administrator (for
18  example, for Google Apps users) then your domain administrator and resellers who
    provide user support to your organization will have access to your Google Account
19  information (including your email and other data). Your domain administrator may
20  be able to:

21      o  view statistics regarding your account, like statistics regarding applications
           you install.
22      o  change your account password.

23

24  [7] Google's October 14, 2005 Privacy FAQs,
    http://web.archive.org/web/20070113102317/www.google.com/intl/en/privacy_faq.html (last
25  visited October 24, 2010) (emphasis supplied).

26  [8] http://www.google.com/intl/en/policies/privacy/ (last visited April 26, 2012).

27  [9] *Id.*

28

CONSOLIDATED COMPLAINT                    8                        10-cv-4809-EJD

- o  suspend or terminate your account access.
- o  access or retain information stored as part of your account.
- o  receive your account information in order to satisfy applicable law, regulation, legal process or enforceable governmental request.
- o  restrict your ability to delete or edit information or privacy settings.

Please refer to your domain administrator's privacy policy for more information.

- **For external processing**

We provide personal information to our affiliates or other trusted businesses or persons to process it for us, based on our instructions and in compliance with our Privacy Policy and any other appropriate confidentiality and security measures.

- **For legal reasons**

We will share personal information with companies, organizations or individuals outside of Google if we have a good-faith belief that access, use, preservation or disclosure of the information is reasonably necessary to:

- o  meet any applicable law, regulation, legal process or enforceable governmental request.
- o  enforce applicable Terms of Service, including investigation of potential violations.
- o  detect, prevent, or otherwise address fraud, security or technical issues.
- o  protect against harm to the rights, property or safety of Google, our users or the public as required or permitted by law.

We may share aggregated, <u>non-personally identifiable information</u> publicly and with our partners – like publishers, advertisers or connected sites. For example, we may share information publicly to show trends about the general use of our services.

If Google is involved in a merger, acquisition or asset sale, we will continue to ensure the confidentiality of any personal information and give affected users notice before personal information is transferred or becomes subject to a different privacy policy.

30.     Google makes similar representations about the privacy of its users' search queries on its video "Privacy Channel" on YouTube. In October 2010, Google showcased a video on its Privacy Channel that starts with the statement "at Google, we make privacy a priority in everything we do."[10] Google also stated in another privacy video from 2010 that

---

[10] Google's Privacy Principles, http://www.youtube.com/watch?v=5fvL3mNt1g (January 26, 2010) (last visited October 25, 2010) (not available as of April 26, 2012).

CONSOLIDATED COMPLAINT                                                    10-cv-4809-EJD

"We don't sell user information to other companies."[11] In a 2011 video on its Privacy

Channel called "What is a search log?," Google explains that it keeps logs of user search

queries for a short period of time, but does not disclose that it shares those search logs with

any third parties.[12]

31.     In 2010, Google reiterated its commitment to user privacy to the Federal

Trade Commission. In a letter to the FTC, Google wrote that it "supports the passage of a

comprehensive federal privacy law that … build[s] consumer trust … enact[s] penalties to

deter bad behavior ... include[s] uniform data safeguarding standards, data breach notification

procedures, and stronger procedural protections relating to third party access to individuals'

information."[13] Google also wrote that it "acts every day to promote and expand free

expression online and increase global access to information. As new technology empowers

individuals with more robust free expression tools and greater access to information, we

believe that governments, companies, and individuals must work together to protect the right

to online free expression. Strong privacy protections must be crafted with attention to the

critical role privacy plays in free expression. The ability to access information anonymously

or pseudonymously online has enabled people around the world to view and create

controversial content without fear of censorship or retribution by repressive regimes or

disapproving neighbors … If all online behavior were traced to an authenticated identity, the

free expression afforded by anonymous web surfing would be jeopardized."[14]

---

[11] Google's Privacy Principles, http://googleblog.blogspot.com/2010/01/googles-privacyprinciples.html at 1:44 (January 27, 2010, 7:00 p.m.) (last visited October 23, 2010) (not available as of April 26, 2012).

[12] http://www.youtube.com/watch?v=PIdfBUm0CPo&list=UUsB_OLJA28Nc-47BihG2_Ww&index=6&feature=plcp (October 18, 2011) (last visited April 26, 2012).

[13] Google's April 14, 2010 letter to Donald S. Clark, http://www.scribd.com/doc/30196432/FTCRoundtable-Comments-Final (last visited October 24, 2010).

[14] *Id.*

32.     At all relevant times, Google has maintained a separate privacy policy for Web History (the "Web History Privacy Policy").

33.     Google defines "Web History" and "Personal Information" as follows:

WEB HISTORY

Personal Information

Web History records information about the web pages you visit and your activity on Google, including your search queries, the results you click on, and the date and time of your searches in order to improve your search experience and display your web activity. Over time, the service may also use additional information about your activity on Google or other information you provide us in order to deliver a more personalized experience.

34.     Google has promised that it will use Web History solely for the benefit of the user or with the user's consent.  Google promised to Plaintiffs and the Class at relevant times:

Web History uses the information from your web history or other information you provide us to improve your Google search experience, such as improving the quality of your search results and providing recommendations. In addition to enabling the Web History functionality, the information we collect when you use Web History may be shared among all of our services in order to provide you with a seamless experience and to improve the quality of our services. We will not disclose this information to other companies or individuals, except in the limited circumstances described in our main Google Privacy Policy, or with your consent.

35.     At relevant times Google's Terms of Service expressly provided that information entered by a user on Google.com, including Plaintiffs' and other Class members' search terms, remain the property of the user: "Google acknowledges and agrees that it obtains no right, title or interest from you (or your licensors) under these Terms in or to any Content that you submit, post, transmit or display on, or through, the Services"[15] Currently,

---

[15] http://www.google.com/accounts/TOS (as of November 19, 2010).

Google's Terms of Service expressly state: "Some of our Services allow you to submit content. You retain ownership of any intellectual property rights that you hold in that content. In short, what belongs to you stays yours."[16] "Content" is broadly defined and includes and is clearly meant to include written text and search queries used on Google.com.

36.     Google's conduct has breached the above-described privacy promises. Contrary to these terms, Google has provided individual search queries, non-aggregated search queries, search queries and results containing personal information, Web History including "search queries" or search terms and "results," and Referrer Headers, to third-parties and advertisers, including via Google Analytics, and not for the benefit of the user experience (i.e., not "to provide you with a seamless experience and to improve the quality of our services" as Google's terms have promised). Rather, Google's conduct was designed to enhance Google's profit and position by peddling user Web History and search queries to third-party website owners via Google Analytics reports, in order to market and expand its Google AdWords advertising services for Google's financial gain.

37.     In addition, because Web History and search queries or results constitute and/or contain "personal information," Google's provision of such information through Google Analytics breaches its Privacy Policy. Google agreed to share personal information only in the following limited circumstances, none of which applies here: (1) with user consent – opt-in consent is required; (2) to Google "subsidiaries, affiliated companies or other trusted businesses or persons for the purpose of processing personal information on [Google's] behalf"; and (3) as reasonably necessary to follow applicable law and the like.

38.     Additionally, though Google compiles Web History by default, Google has represented that users can "choose to stop storing [their] web activity in Web History either temporarily or permanently" and delete or turn off their Web History:

---

[16] http://www.google.com/accounts/TOS (last viewed on March 29, 2013).

> [D]eleting web history from your Google Account will erase all items from your web history and stop your web history from being recorded in the future.  You can also remove individual items without deleting all of your web history.[17]

39.     Such terms convey that when Web History is deleted, Google no longer holds onto it or uses it, but rather, "erases," "deletes" and "removes" it from its records.

40.     Upon information and belief, in violation of these promises, Google continues to store in its files, and transmit to third-parties via Referrer Headers or Google Analytics, Web Histories even after a user has deleted or turned it off.

### C.     Google Admits Search Queries Contain Sensitive, Personal Data

41.     In 2006, the Department of Justice sought to compel Google to produce thousands of users' individual search queries.[18] As set forth in the Government's subpoena, it sought only "anonymized" data, namely, the text of the search string entered by Google users, and not "any additional information that may be associated with such a text string that would identify the person who entered the text string into the search engine, or the computer from which the text string was entered."[19]

42.     To its credit, Google fought the government's request. In a declaration submitted to the court describing the kind of personal information that can end up in the company's search query logs, Matt Cutts, a Senior Staff Engineer who specializes in search optimization issues at Google, stated as follows:[20]

- Google does not publicly disclose the searches [sic] queries entered into its

---

[17] *E.g.*, http://www.google.com/support/accounts/bin/answer.py?hl=en&answer=54067.  *See also* http://www.google.com/intl/en/privacypolicy.html; http://www.google.com/history/privacyfaq.html?hl=en ("[i]f you remove items [from your Web History], they will be removed from the service….").

[18] *Gonzales v. Google*, 234 F.R.D. 674 (N.D. Cal. 2006) (No. 5:06-mc-80006-JW).

[19] *Id*. at 682.

[20] Declaration of Matt Cutts at 9, *Gonzales v. Google*, 234 F.R.D. 674 (N.D. Cal. 2006) (No. 5:06-mc-80006-JW).

search engine. If users believe that the text of their search queries could become public knowledge, they may be less likely to use the search engine for fear of disclosure of their sensitive or private searches for information or websites.

- There are ways in which a search query alone may reveal personally identifying information. For example, many internet users have experienced the mistake of trying to copy-and-paste text into the search query box, only to find that they have pasted something that they did not intended. Because Google allows very long queries, it is possible that a user may paste a fragment of an email or a document that would tie the query to a specific person. Users could also enter information such as a credit card, a social security number, an unlisted phone number or some other information that can only be tied to one person. Some people search for their credit card or social security number deliberately in order to check for identity theft or to see if any of their personal information is findable on the Web.

43.    Similarly, in its Opposition to the Government's Motion to Compel the disclosure of Google users' search queries, the company argued that:

- Google users trust that when they enter a search query into a Google search box, not only will they receive back the most relevant results, but that Google will keep private whatever information users communicate absent a compelling reason.[21]

- The privacy and anonymity of the service are major factors in the attraction of users – that is, users trust Google to do right by their personal information and to provide them with the best search results. If users believe that the text of their search queries into Google's search engine may become public knowledge, it only logically follows that they will be less likely to use the service.[22]

- This is no minor fear because search query content can disclose identities and personally identifiable information such as user-initiated searches for their own social security or credit card numbers, or their mistakenly pasted but

---

[21] Google's Opposition to the Government's Motion to Compel at 1, supra, n.12.

[22] *Id*. at 18.

revealing text."[23]

44.     In its order[24] denying the Government's request to discover Google users' search queries, the Court shared Google's concern that disclosing search queries would raise serious privacy issues:

> The Government contends that there are no privacy issues raised by its request for the text of search queries because the mere text of the queries would not yield identifiable information. Although the Government has only requested the text strings entered … basic identifiable information may be found in the text strings when users search for personal information such as their social security numbers or credit card numbers through Google in order to determine whether such information is available on the Internet. The Court is also aware of so-called 'vanity searches,' where a user queries his or her own name perhaps with other information. Google's capacity to handle long complex search strings may prompt users to engage in such searches on Google. Thus, while a user's search query reading '[username] stanford glee club' may not raise serious privacy concerns, a user's search for '[user name] third trimester abortion san jose,' may raise certain privacy issues as of yet unaddressed by the parties' papers. This concern, combined with the prevalence of Internet searches for sexually explicit material — generally not information that anyone wishes to reveal publicly — gives this Court pause as to whether the search queries themselves may constitute potentially sensitive information.

45.     Google's awareness of the privacy concerns surrounding search queries was also demonstrated in response to a massive disclosure of user search queries by AOL. In August 2006, AOL released an "anonymized" dataset of 20 million search queries conducted by 658,000 AOL users over a three-month period.[25] That data included search queries

___

[23] *Id.*

[24] *Gonzales*, 234 F.R.D. at 687.

[25] Complaint at ¶ 16, *Doe 1 v. AOL LLC*, 2010 WL 2524494 (N.D. Cal. June 23, 2010) (No. C-06-5866-SBA).

revealing names, addresses, local landmarks, medical ailments, credit card numbers and social security numbers.[26]

46.     In an article about the incident, the New York Times wrote that the AOL dataset "underscored how much people unintentionally reveal about themselves when they use search engines," and referred to search queries about "depression and medical leave," "fear that spouse contemplates cheating," "child porno," and "how to kill oneself by natural gas."[27]

47.     Even more surprising, however, was that the New York Times journalists were able to reidentify individual "anonymized" AOL search users due to the vanity searches they had conducted, and then link other, non-vanity search queries in the dataset to those individuals through the crosssession identifiers (cookies) included in the dataset.[28] One AOL user who was reidentified said she was shocked to learn that AOL had published her search queries: "My goodness, it's my whole personal life. I had no idea somebody was looking over my shoulder."[29]

48.     An AOL spokesman, Andrew Weinstein, apologized on behalf of AOL and said he wasn't surprised that the New York Times was able to connect the dots and reidentify "anonymous" users in the dataset: "We acknowledged that there was information that could potentially lead to people being identified…"[30]

49.     Soon after the release of the search query data by AOL, Google CEO Eric Schmidt spoke about the AOL privacy breach. He called AOL's release of user search data

---

[26] *Id*. at ¶ 18.

[27] Michael Barbaro and Tom Zeller Jr., *A Face is Exposed for AOL Searcher No. 4417749*, N.Y. Times, August 9, 2006, available at http://www.nytimes.com/2006/08/09/technology/09aol.html.

[28] *Id*.

[29] *Id*.

[30] *Id*.

"a terrible thing" and reassured Google users that their search queries were safe and private:

> Well, [this sort of privacy breach is] obviously a terrible thing. And the data as released was obviously not anonymized enough, and maybe it wasn't such a good idea to release it in the first place. Speaking for Google, we exist by virtue of the trust of our end users. So if we were to make a mistake to release private information that could be used against somebody, especially if it could be used against them in a way that could really hurt them in a physical way or something like that, it would be a terrible thing. We have lots and lots of systems in the company to prevent that.
>
> It's funny that we talk about the company being more transparent. But there are many things inside our company that are important that we don't share with everyone, starting with everyone's queries and all the information that that implies. I've always worried that the query stream was a fertile ground for governments to randomly snoop on people [for example]. We had a case where we were only a secondary party, where the government gave us a subpoena, which was in our view, over-broad. And this over-broad subpoena we fought in federal court – one of the great things about the American system is that you can actually have a judge make an impartial decision. And the judge ruled largely in our favor. So that's an example of how strongly we take this point.[31]

**D.     A Brief Primer on "Referrer Headers"**

50.     Software engineers are generally familiar with the risk of Referrer Header "leakage" of information companies intended to keep confidential and/or are obliged to keep confidential.

51.     The HTTP Referrer function is a standard web browser function, provided by standard web browsers since the HTTP 1.0 specification in May 1996.[32] When an internet user visits a web page using their computer or mobile device, every major web browser (e.g.,

---

[31] Conversation with Eric Schmidt hosted by Danny Sullivan, http://www.google.com/press/podium/ses2006.html (last visited April 26, 2012).

[32] http://www.w3.org/Protocols/rfc1945/rfc1945

Internet Explorer, Firefox, Chrome, Safari) by default reports the last page that the user viewed before clicking on a link and visiting the current page — that is, the page that "referred" them to the current page. This information is transmitted in the HTTP Referrer Header.

52.     The current version of the publicly-available HTTP specification, RFC 2616,[33] provides for HTTP Referrer Headers in its provision 14.36.[34] It is well known that if a site places confidential information, such as a username, in a URL, then the site risks releasing this information whenever a user clicks a link to leave the site. Indeed, the HTTP specification specifically flags this risk; in section 15.1.3, the HTTP specification advises developers of substantially the same problem: "Authors of services which use the HTTP protocol SHOULD NOT use GET based forms for the submission of sensitive data, because this will cause this data to be encoded in the REQUESTURI."[35]

53.     While the HTTP Referrer function is a standard web browser function, Google ultimately determines whether to send referrer header information to third parties and exercises control over the content of the URL that is referred by this function to the owner of the destination web page.

54.     Google's use and provision of Referrer Headers for third-party advertising (and without filtering or deleting user information) appears to go well beyond the intended use of this function pursuant to the internet community Hypertext Transfer Protocol. *See* internet community Hypertext Transfer Protocol--HTTP /1.1, http://tools.ietf.org/html/rfc2616.

55.     The Protocol indicates that Referrer information is for the server's benefit to provide service: in the words of the  Hypertext Transfer Protocol for internet functions, "The

---

[33] http://www.w3.org/Protocols/rfc2616/rfc2616.html

[34] http://www.w3.org/Protocols/rfc2616/rfc2616-sec14.html#sec14.36

[35] http://www.w3.org/Protocols/rfc2616/rfc2616-sec15.html#sec15.1.3

Referrer request-header allows a server to generate lists of back-links to resources for interest, logging, optimized caching, etc. It also allows obsolete or mistyped links to be traced for maintenance." *Id.* at 14.36.  Referrer headers have also been used to provide browsing security.  According to the industry Protocol, contrary to Google's practice, "Because the source of a link might be private information or might reveal an otherwise private information source, it is strongly recommended that the user be able to select whether or not the Referrer field is sent."  *Id.* at 15.1.3.

### E.     Google Transmits Individual User Search Queries to Third Parties

56.     Since the service's launch, and continuing to this day, Google's search engine has included its users' search terms in the URL of the search results page. Thus, for example, a search for "abortion clinics in Indianapolis" would return a page with a URL similar to http://www.google.com/search?q=abortion+clinics+in+Indianapolis.

57.     Because the search terms are included in the search results URL, when a Google user clicks on a link from Google's search results page, the owner of the website that the user clicks on will receive from Google the user's search terms in the Referrer Header.

58.     Several web analytics services, including SEOs, include and use functionality to automatically parse the search query information from web server logs, or to otherwise collect the search query from the referrer header transmitted by each visitor's web browser. Google's own analytics products provide webmasters with this information at an aggregate level (e.g., revealing how many visitors were drawn by particular search terms).

59.     By transmitting user search queries to third parties, Google is also violating its Web History-specific privacy promises as described above.

### F.     Google's Transmission of User Search Queries is Intentional

60.     Because Google's financial success depends on, among other things, the symbiotic relationship it shares with SEOs and the ability for third parties to engage in web analytics, Google has placed a high priority on revealing individual user search queries to third parties. Notwithstanding its repeated representations to the contrary in its Privacy

Policy and to privacy regulators, Google continues to this day to transmit user search queries.

61.     Neither Google's search technology nor the nature of the Internet compels Google to divulge user search queries. Google could easily cease transmission of user search queries to third parties, but chooses not to.

62.     On September 6, 2010, a former FTC employee, Christopher Soghoian, filed a complaint with the FTC accusing Google of not adequately protecting the privacy of consumers' search queries. Much of the following information comes from Mr. Soghoian's complaint.[36]

63.     Starting approximately in November 2008, Google began to test a new method of delivering search results that uses advanced AJAX (Asynchronous JavaScript and XML) technologies.[37] AJAX is one of the key pillars of the Web 2.0 experience.[38] This pilot was initially deployed in the Netherlands,[39] but in subsequent months, was observed by users in other countries.

64.     One of the side effects of the AJAX search page is that the URL of the search results page includes the search query terms after a # symbol in the URL. Thus, on an AJAX enabled search page, the URL listed at the top of the page will be similar to:

http://www.google.com/#hl=en&source=hp&q=drug+addiction

65.     The addition of the # symbol had a significantly positive, albeit unintentional

---

[36] *In the Matter of Google, Inc.*, FTC Complaint, available at http://online.wsj.com/public/resources/documents/FTCcomplaint100710.pdf.
[37] Jesse James Garrett, *Ajax: A New Approach to Web Applications* (February 18, 2005), http://www.adaptivepath.com/ideas/essays/archives/000385.php ("Ajax isn't a technology. It's really several technologies, each flourishing in its own right, coming together in powerful new ways").
[38] Tim O'Reilly, *What Is Web 2.0 Design Patterns and Business Models for the Next Generation of Software* (September 30, 2005), http://oreilly.com/web2/archive/what-is-web-2-20.html ("AJAX is also a key component of Web 2.0 applications such as Flickr, now part of Yahoo!, 37signals' applications basecamp and backpack, as well as other Google applications such as Gmail and Orkut.")
[39] Ulco, "Google Search in AJAX?!" (November 19, 2008), http://www.ulco.nl/gibberish/googlesearch-in-ajax.

CONSOLIDATED COMPLAINT                                                           10-cv-4809-EJD

impact upon Google user privacy. This is because web browsers do not pass on any information after the # symbol in the referrer header. Thus, using the previous example of a search for the query "drug addiction," if a user clicked on the first result, the owner of that web site would only receive "http://www.google.com/" in the referrer header, rather than the search terms that follow the # symbol.

66.     This change was immediately noticed by the webmaster and SEO community, who complained to Google:

- "I'm seeing hundreds of these empty google referrers today and wondered what was going on."[40]

- "This means organic searches from Google will now show up as just http://www.google.com/, with no search parameters. In other words, no analytics app can track these searches anymore. I started noticing lots of hits from just 'http://www.google.com/' recently in our own search logs. I thought maybe it was just a bug with Clicky. But then one of our users contacted me about this article, and my jaw about broke from hitting the floor so hard."[41]

- "What actually breaks if Google makes this switchover, and is in fact broken during any testing they are doing, is much more widespread. Every single analytics package that currently exists, at least as far as being able to track what keywords were searched on to find your site in Google, would no longer function correctly."[42]

---

[40] Posting of sorabji.com to Clicky.blog, http://getclicky.com/blog/150/googles-new-ajax-poweredsearch-results-breaks-search-keyword-tracking-for-everyone (February 03 2009, 1:05 p.m.).

[41] Clicky.blog, http://getclicky.com/blog/150/googles-new-ajax-powered-search-results-breakssearch-keyword-tracking-for-everyone (February 03, 2009, 9:50 a.m.).

[42] Posting of Michael VanDeMar to Smackdown!, What Will *Really* Break If Google Switches To AJAX…?, http://smackdown.blogsblogsblogs.com/2009/02/02/what-will-really-break-if-googleswitches-to-ajax/ (February 2, 2009, 11:26 a.m.).

67.     Responding to complaints from the webmaster community, Google quickly issued a public statement:

> Currently AJAX results are just a test on Google. At this time only a small percentage of users will see this experiment. It is not our intention to disrupt referrer tracking, and we are continuing to iterate on this project and are actively working towards a solution. As we continue experiments, we hope that this test may ultimately provide an easier solution for our customers and a faster experience for our users.[43]

68.     Google soon ended the test of the AJAX search results page, a fact confirmed by Google Senior Engineer Matt Cutts, who specializes in search optimization issues at Google:

> [T]he team didn't think about the referrer aspect. So they stopped [the test]. They've paused it until they can find out how to keep the referrers.[44]

69.     In March 2009, Google again began to test technology that unintentionally caused the users' search terms to be stripped from the referrer header transmitted to web sites. The following is an example of the format of the new URL that was being tested in March 2009:

> http://www.google.com/url?q=http://www.webmd.com&ei=in66Sc njBtKgtwfn0LTiDw&sa=X&oi=smap&resnum=1&ct=result&cd= 1&usg=AFQjCNF9RdVC6vXBFOYvdia1s_ZE_BMu8g

70.     Michael VanDeMar, a prominent member of the SEO community noticed that

---

[43] Posting of Matt McGee to Search Engine Land, Google AJAX Search Results = Death To Search Term Tracking?, http://searchengineland.com/google-ajax-search-results-death-to-search-termtracking-16431 (February 3, 2009, 5:41 p.m.) (emphasis supplied).
[44] Posting of Lisa Barone to Outspoken Media, Keynote Address – Matt Cutts, Google, http://outspokenmedia.com/internet-marketing-conferences/pubcon-keynote-matt-cutts/ (March 12, 2009).

he was again seeing AJAX based search results in addition to redirected URLs for every link in the search results page:

> Occasionally you will see these Google redirects in the normal [search engine results pages] as well, although usually not. The thing is, I was seeing them on every search I performed. It struck me as odd, until I suddenly realized that every search was being done via AJAX.[45]

71.     Google's Matt Cutts soon responded to VanDeMar by leaving a comment on his blog:

> Hi Michael, I checked with some folks at Google about this. The redirection through a url redirector was separate from any AJAX-enhanced search results; we do that url redirection for some experiments, but it's not related to the JavaScript-enhanced [AJAX] search results.
>
> **The solution to the referrer problem will be coming online in the future. It uses a JavaScript-driven redirect that enables us to pass the redirect URL as the referrer. This URL will contain a 'q' param that matches the user's query.**[46]

72.     On April 14, 2009, Google announced that it would be deploying the URL redirection tool for all links in the search results. The company described the details in a blog post to the webmaster community:

> Starting this week, you may start seeing a new referring URL format for visitors coming from Google search result pages. Up to now, the usual referrer for clicks on search results for the term "flowers", for example, would be something like this:

---

[45] Posting of Michael VanDeMar to Smackdown!, Google Re-initiates Testing of AJAX SERP's With Faulty Proposed Fix, http://smackdown.blogsblogsblogs.com/2009/03/13/google-re-initiatetesting-of-ajax-serps-with-faulty-proposed-fix/ (March 13, 2009, 11:14 a.m.).
[46] Posting of Matt Cutts to Smackdown!, supra, n.39, http://smackdown.blogsblogsblogs.com/2009/03/13/google-re-initiates-testing-of-ajax-serps-withfaulty-proposed-fix/ (March 17, 2009, 10:10 a.m.) (emphasis added).

http://www.google.com/search?hl=en&q=flowers&btnG=Google+Search

Now you will start seeing some referrer strings that look like this:

http://www.google.com/url?sa=t&source=web&ct=res&cd=7&url=http%3A%2F%2F**www.example.com**%2Fmypage.htm&ei=0SjdSa-1N5O8M_qW8dQN&rct=j&q=**flowers**&usg=AFQjCNHJXSUh7Vw7oubPaO3tZOzz-F-u_w&sig2=X8uCFh6IoPtnwmvGMULQfw

….

The new referrer URLs will initially only occur in a small percentage of searches. You should expect to see old and new forms of the URLs as this change gradually rolls out.[47]

73.     The redirection tool that Michael VanDeMar described in March 2009 did not include the search terms in its URL (and thus, these terms were not subsequently transmitted to webmasters via the browser's referrer header). However, one month later when Google announced that it would be using the redirection tool for all links, the redirection script was changed to include the search terms in the redirection URL (via a new "q" parameter), thus guaranteeing that webmasters would not lose access to user search query data.

74.     The new redirection tool also leaks data to web site administrators that had never before been available to anyone but Google: The item number of the search result that was clicked non (e.g., the 3rd link or 5th link from the search results page).[48] The leakage of this additional information was confirmed by Matt Cutts, which he described as a benefit to web site administrators:

I think if you do experiments, you'll be able to confirm your

---

[47] Posting of Brett Crosby to Google Analytics Blog, An upcoming change to Google.com search referrals; Google Analytics unaffected, http://analytics.blogspot.com/2009/04/upcoming-change-togooglecom-search.html (April 14, 2009, 2:50 p.m.).
[48] Posting of Patrick Altoft to Blogstorm, Google Ads Ranking Data to Referrer String, http://www.blogstorm.co.uk/google-adds-ranking-data-to-referrer-string/ (April 15, 2009).

CONSOLIDATED COMPLAINT                                                   10-cv-4809-EJD

speculation … **I think this is awesome for webmasters--even more information than you could glean from the previous referrer string.**[49]

75.    A May 2009 video featuring Matt Cutts, posted to the official GoogleWebmasterHelp YouTube channel, describes the change in the search query information leaked via the referrer header:

> [T]here is a change on the horizon and it's only a very small percentage of users right now, but I think that it probably will grow and it will grow over time where Google's referrer, that is whenever you do a Google search and you click on a result, you go to another website and your browser passes along a value called a referrer. That referrer string will change a little bit.
>
> It used to be google.com/search, for example.
>
> Now, it will be google.com/url.
>
> **And for a short time we didn't have what the query was which got a lot of people frustrated**, but the google.com/search, **the new Google referrer string will have the query embedded in it**.
>
> And there's a really interesting tidbit that not everybody knows, which is--it also has embedded in that referrer string a pretty good idea of where on the page the click happened.
>
> So, for example, if you were result number one, there's a parameter in there that indicates the click came from result number one. If you were number four, it will indicate the click came from, result number four. So, now, you don't necessarily need to go scraping Google to find out what your rankings were for these queries. You can find out, "Oh, yeah. I was number one for this query whenever someone clicked on it and came to my website."
>
> So that can save you a ton of work, you don't need to worry nearly

---

[49] Posting of Matt Cutts to Blogstorm, Google Ads Ranking Data to Referrer String, http://www.blogstorm.co.uk/google-adds-ranking-data-to-referrer-string/#IDComment77457344 (April 15, 2009, 7:28 p.m.) (emphasis added).

as much, you don't have to scrape Google, you don't have to think about ranking reports. Now, we don't promise that these will, you know, be a feature that we guarantee that we'll always have on Google forever but definitely take advantage of it for now.

….

[F]or the most part, this gives you a very accurate idea of where on the page you were, so you get all kinds of extra information that you can use in your analytics and to compute your ROIs without having to do a lot of extra work. So, if you can, it's a good idea to look at that referrer string and start to take advantage of that information."[50]

76.   In or around July 2010, Google again began stripping the search terms from the Referrer Headers transmitted by a small percentage of browsers. On July 13, 2010, individuals in the SEO community noticed the change made by Google. One commentator in a web forum wrote that:

More and more visits from Google in my server log files are without exact referrer information, and have only 'http://www.google.com', 'http://www.google.com.au', etc. which doesn't allow to find out keyword and SERP [search engine results] page from which this visit was made.[51]

77.   On July 13 2010, Matt Cutts posted a message to the same SEO forum:

Hey everybody, I asked folks who would know about this. It turns out there was an issue a couple weeks ago where some code got refactored, and the refactoring affected referrers for links opened in a new tab or window. Right now the team is **expecting to have a fix out in the next week** or so. Hope that helps.[52]

---

[50] Matt Cutts, Can you talk about the change in Google's referrer string?, GoogleWebMasterHelp Channel (May 6, 2009), http://www.youtube.com/watch?v=4XoD4XyahVw (last viewed October 24, 2010).

[51] Posting of at2000 to Webmaster World, More and more referrals from Google are without exact referrer string, http://www.webmasterworld.com/google/4168949.htm (July 13, 2010, 4:01 a.m.).

[52] Posting of Matt Cutts to Webmaster World, supra, n.45 (July 13, 2010, 9:46 p.m.) (emphasis added).

78.     On or about May 21, 2010, Google introduced an encrypted search service at https://www.google.com.[53] By using the encrypted search service, Google would no longer pass along search queries via Referrer Headers to unencrypted search links. On or about June 25, 2010, Google moved the encrypted search service to https://encrypted.google.com.

79.     Later, on or about October 18, 2011, Google announced a change in policy for how it handled search queries embedded in Referrer Headers.[54] According to its new policy, Google would proactively scrub out any and all search queries from all searches performed by users who were logged in to any Google service, such as Google Docs, before sending the Referrer Headers to the sites in the results on which users would click. Thus, when logged-in users would click on a search result link (whether the results link is encrypted or unencrypted), Google would no longer pass on the search queries used to find those results.

80.     For users not logged in, Google would still transmit search queries via Referrer Headers to the results sites on which users would click, unless those users entered the search at https://encrypted.google.com.

81.     Moreover, the new policy only applies to organic sites. For clicks on paid links or advertisements, Google would still pass on the search queries.

82.     If nothing else, Google's new policy regarding search queries demonstrates two things: 1) Google is fully capable of determining independently whether to transmit search queries to third parties—transmitting search queries embedded within Referrer Headers is not just how the Internet works; and, 2) Google is now effectively selling search queries to paying advertisers. Stated differently, part of what paying advertisers pay for when they buy AdWords are the search queries users enter.

### G.     The Science of Reidentification

---

[53] http://googleblog.blogspot.com/2010/05/search-more-securely-with-encrypted.html (last visited April 26, 2012).

[54] http://googleblog.blogspot.com/2011/10/making-search-more-secure.html (last visited April 26, 2012).

CONSOLIDATED COMPLAINT                                                    10-cv-4809-EJD

83.    "Reidentification" is a relatively new area of study in the computer science field. Paul Ohm, a professor of law and telecommunications at the University of Colorado Law School, is a leading scholar on how reidentification impacts internet privacy. Much of the following information comes from Professor Ohm's article entitled "Broken Promises of Privacy: Responding to the Surprising Failure of Anonymizaton" published in the UCLA Law Review in August of 2010.[55]

84.    In a nutshell, reidentification creates and amplifies privacy harms by connecting the dots of "anonymous" data and tracing it back to a specific individual. Professor Ohm describes it as follows:

> The reverse of anonymization is reidentification or deanonymization. A person, known in the scientific literature as an adversary, reidentifies anonymous data by linking anonymized records to outside information, hoping to discover the true identity of the data subjects.
> . . .
> Reidentification combines datasets that were meant to be kept apart, and in doing so, gains power through accretion. Every successful reidentification, even one that reveals seemingly nonsensitive data like movie ratings, abets future reidentification. Accretive reidentification makes all of our secrets fundamentally easier to discover and reveal.[56]

85.    Reidentification techniques, like those used in the AOL debacle, can be used as links in chains of inference connecting individuals to harmful facts. Reidentification works by discovery pockets of surprising uniqueness in aggregated data sets. Just as human fingerprints can uniquely identify a single person and link that person with "anonymous" information—a print left at a crime scene—so too do data subjects generate "data fingerprints"—combinations of values of data shared by nobody else. What has surprised

---

[55] 57 UCLA L. REV. 1701 (2010).

[56] *Id.* at *7-8.

1   researchers is that data fingerprints can be found in pools of non-PII data, such as the

2   uniqueness of a person's search queries in the AOL debacle.[57]

3       86.   Once a person finds a unique data fingerprint, he can link that data to outside

4   information, sometimes called auxiliary information. "Anonymous" search query information

5   would protect privacy, if only the adversary knew nothing else about people in the world. In

6   reality, however, the world is awash in data about people, with new databases created, bought

7   and sold every day. "Adversaries" (as defined above) combine anonymized data with outside

8   information to pry out obscured identities.[58]

9       87.   And the amount of information contained in new databases has grown

10  exponentially. What's more, the type of available data is increasingly personal and specific.

11  Take, for example, the phenomenon of Facebook's growth. The data created by Facebook

12  users is highly personal, and includes actual names, religious, sexual and political

13  preferences, identification of friends, pictures, messages intended to be shared with friends,

14  and more. With the exploding popularity of social network sites like Facebook, and personal

15  blogs, the information available to adversaries is not only highly-specific to individuals, it is

16  often user-created, increasing accuracy and veracity of available data. Never before in human

17  history has it been so easy to peer into the private diaries of so many people. Some

18  researchers call this the "age of self-revelation."[59]

19      88.   Reidentification is characterized by accretion, or the growing together of

20  separate parts into a single whole. As Professor Ohm explains:

21          The accretion problem is this: once an adversary has linked two
22          anonymized databases together, he can add the newly linked data
            to his collection of outside information and use it to help unlock
23          other anonymized databases. Success breeds further success . . .

24  _____

25  [57] *Id*. at *17.

26  [58] *Id*.

27  [59] *Id*. at *17-18.

28

*once any piece of data has been linked to a person's real identity,
any association between this data and a virtual identify breaks
the anonymity of the latter. This is why we should worry even
about reidentification events that seem to expose only non-
sensitive information, because they increase the linkability of
data, and thereby expose people to potential future harm.*[60]

89.     The accretive reidentification problem is exacerbated by the growing
prevalence of internet "data brokers." The buying and selling of consumer data is a
multibillion-dollar, unregulated business that's growing larger by the day.[61] Data is
increasingly bought, sold and resold by data brokers, which amplifies the accretion problem.
Advancements in computer science, data storage and processing power, and data accretion by
data brokers make it much more likely that an adversary could link at least one fact to any
individual and blackmail, discriminate against, harass, or steal the identity of that person.

90.     On October 25, 2010, the Wall Street Journal reported that a highly-
sophisticated data broker, RapLeaf Inc. is accomplishing accretive reidentification of
"anonymous" data with astonishing success.[62] According to the report, RapLeaf has been
gathering data, including user names and email addresses, from numerous sources across the
internet. Using accretive reidentification techniques, RapLeaf is able to cross-index
"anonymous" data with email addresses and thereby associate real names with Web-
browsing habits and highly-personal information scraped from social network sites such as
Facebook. By 2009, RapLeaf had indexed more than 600 million unique email addresses, and
was adding more at a rate of 35 million per month.

91.     Data gathered and sold by data brokers like RapLeaf can be very specific.
RapLeaf deanonymizes and connects to real names a wide variety of data types, including

---

[60] *Id*. at *29 (emphasis added).
[61] Rick Whiting, *Data Brokers Draw Increased Scrutiny* (July 10, 2006),
http://www.informationweek.com/news/global-cio/showArticle.jhtml?articleID=190301136.
[62] Emily Steele, *A Web Pioneer Profiles Users by Name* (October 25, 2010), available at
http://online.wsj.com/article/SB10001424052702304410504575560243259416072.html.

data regarding demographics, interests, politics, lifestyle, finances, donations, social networks, site memberships, purchases, and shopping habits. RapLeaf's segments recently included a person's household income range, age range, political leaning, and gender and age of children in the household, as well as interests in topics including religion, the Bible, gambling, tobacco, adult entertainment and "get rich quick" offers. In all, RapLeaf segmented people into more than 400 categories. This aggregated and deeply personal information is then sold to or used by tracking companies or advertisers to rack users across the Internet.

**H.      Google's Systematic Disclosure of Billions of User Search Queries Each Day Presents an Imminent Threat of Concrete and Particularized Privacy Harm**

92.    One type of anonymization practice is called "release-and-forget," in which the data administrator will release records, and then forgets, meaning she makes no attempt to track what happens to the records after release.[63] To protect the privacy of the users in the released data, prior to releasing the data, the administrator will single out identifying information and either strip that information from the database, or modify it to make it more general and less specific to any individual.[64] Many of the recent advances in the science of reidentification target release-and-forget anonymization in particular.[65]

93.    Google's transmission of search queries is a type of piecemeal "release-and-forget" anonymization.[66] Google transmits a single user search query each time a Google user clicks on a link in Google's search results page. Over the course of just one day, on information and belief, Google transmits millions of search queries to third parties. Google

---

[63] Ohm, supra, n.47 at *9-10.

[64] *Id*. at *11-12.

[65] *Id*. at *10.

[66] *Id*. at *9.

will likely argue that search query information alone contains no personally-identifiable information. Such an argument is practically equivalent to the data administrator who "anonymizes" data before releasing it to the outside world. But, as repeatedly demonstrated, easy reidentification of "anonymous" highlights the flaws in this thinking.

94.     Google itself has taken the position that even seemingly benign, "anonymous" information presents serious privacy concerns. For example, in Gonzales v. Google, supra, n.12, even though the Government was requesting search queries stripped of any "identifying information" (such as the user's IP address), Google argued that releasing such data would nonetheless risk disclosure of user identities.

95.     In fact, when a Google user clicks on a link in Google's search results page, the user's search query is not the only information revealed. For the vast majority of Google users, the user's IP address is concurrently transmitted along with the search query. An IP address is similar to a phone number in that it identifies the exact computer being used by the user to search and navigate the internet.

96.     In response to an inquiry from Congressman Joe Barton about privacy issues surrounding Google's acquisition of DoubleClick, Google admitted that "information that can be combined with readily available information to identify a specific individual is also generally considered personal information."[67] But Google has repeatedly downplayed the existence of "readily available information" helpful for tying IP addresses to places and individuals. Professor Ohm highlights Google's untenable position as follows:

> For example, websites like Google never store IP addresses devoid of context; instead, they store them connected to identity or behavior. Google probably knows from its log files, for example, that an IP address was used to access a particular email or calendar account, edit a particular word processing document, or send

---

[67] Letter from Alan Davidson, Google's Senior Policy Counsel and Head of U.S. Public Policy, to Congressman Joe Barton at 12-13 (December 21, 2007), available at http://searchengineland.com/pdfs/071222-barton.pdf.

particular search queries to its search engine. By analyzing the connections woven throughout this mass of information, Google can draw some very accurate conclusions about the person linked to any particular IP address.

Other parties can often link IP addresses to identity as well. Cable and telephone companies maintain databases that associate IP addresses directly to names, addresses, and credit card numbers. That Google does not store these data associations on its own servers is hardly the point. Otherwise, national ID numbers in the hands of private parties would not be "personal data" because only the government can authoritatively map these numbers to identities.[68]

97.     Similarly, an independent European advisory body on data protection and privacy found that "The correlation of customer behaviour across different personalised services of a search engine provider … can also be accomplished by other means, based on cookies or other distinguishing characteristics, such as individual IP addresses."[69]

98.     Congressman Barton's inquiry in connection with the DoubleClick acquisition also focused on cookies and privacy. Cookies are small data files that store user preferences and other information, and allow websites to recognize the user or computer visiting their site. In its response to Congressman Barton, Google wrote that "online ad-serving technology can be used by advertisers to serve and manage ads across the web … the ad server sets a cookie on the user's computer browser when the user views an ad served through the ad server. That cookie may be read in the future when the ad server serves other ads to the same browser."[70] An ad serving company with any substantial market share would thus be able to readily link the search queries that Google provides to the IP addresses or cookies of internet users visiting the websites they serve.

---

[68] Ohm, supra, n.47 at *41.
[69] Article 29 Data Protection Working Party at 21 (January 2008), available at http://ec.europa.eu/justice/policies/privacy/docs/wpdocs/2008/wp148_en.pdf.
[70] Letter from Davidson to Barton, supra, n.58 at 15.

1    **I.     Google Accounts**

2        99.     In addition to search, Google operates many services that require users to

3    register for Google Accounts. Google Accounts grant access to services such as Gmail,

4    Google Docs, and Google+, among others.

5                          **FACTS RELATING TO PLAINTIFFS**

6    **A.     Paloma Gaos**

7        100.    Plaintiff Paloma Gaos has a Google Account and has at all material times

8    been a user of Google's search engine services, including the period prior to November 2008

9    when Google first began to test advanced AJAX technologies that temporarily eliminated

10   user search queries from referrer headers coming from Google search results pages, and for

11   all periods thereafter when Google was disseminating search queries to third party websites.

12       101.    During all time periods in which Google was transmitting user search queries

13   to third parties, Plaintiff Gaos conducted numerous searches, including "vanity searches" for

14   her actual name and the names of her family members, and clicked on links on her Google

15   search results pages.

16       102.    As a result, Google transmitted Plaintiff Gaos's full search queries to third

17   parties by sending the URLs containing her search queries to third party websites that

18   appeared in Plaintiff Gaos's Google search results page and which Plaintiff Gaos clicked on a

19   link.

20       103.    In other words, when Plaintiff Gaos clicked on each link on her Google search

21   results pages, the owner of the destination website that Plaintiff clicked on received from

22   Google Plaintiff Gaos's search terms through the Referral Header function.

23       104.    As a result, Plaintiff Gaos has suffered actual harm in the form of Google's

24   unauthorized and unlawful dissemination of Plaintiff Gaos's search queries, which

25   sometimes contained sensitive personal information, to third parties.

26   **B.     Anthony Italiano**

27

28

---

CONSOLIDATED COMPLAINT

34

105.    Plaintiff Anthony Italiano has at all material times been a user of Google's search engine services, including the period prior to November 2008 when Google first began to test advanced AJAX technologies that temporarily eliminated user search queries from referrer headers coming from Google search results pages, and for all periods thereafter when Google was disseminating search queries to third party websites.

106.    Plaintiff Italiano has also had a Google Account since at least January 2008.

107.    During all time periods in which Google was transmitting user search queries to third parties, including the time period from July 2010 to August 2011, Plaintiff Italiano conducted numerous searches on Google's unencrypted search service, including:

        a.   His name + his home address;

        b.   His name + bankruptcy;

        c.   His name + foreclosure proceedings;

        d.   His name + short sale proceedings;

        e.   His name + Facebook; and,

        f.   His name + the name of his then soon-to-be ex-wife + forensic accounting.

108.    These searches and the timeframe during which he conducted them are particularly memorable to Plaintiff Italiano because it was during this time that he was going through formal divorce proceedings. Moreover, many of his searches related directly or indirectly to his divorce proceedings—exactly the sort of personal, confidential searches that he did not want disclosed to third parties without his knowledge or consent, and exactly the sort of personal, confidential searches Google described to the federal government in the *Gonzales* matter.

109.    As a result, Google transmitted Plaintiff Italiano's full search queries to third parties by sending the URLs containing his search queries to third party websites that appeared in Plaintiff Italiano's Google search results page and which Plaintiff Italiano clicked on a link.

110.    In other words, when Plaintiff Italiano clicked on each link on his Google search results pages, the owner of the destination website that Plaintiff clicked on received from Google Plaintiff Italiano's search terms through the Referral Header function.

111.    As a result, Plaintiff Italiano has suffered actual harm in the form of Google's unauthorized and unlawful dissemination of Plaintiff Italiano's search queries, which sometimes contained sensitive personal information, to third parties.

**C.    Gabriel Priyev**

112.    Plaintiff Gabriel Priyev has at all material times been a user of Google's search engine services, including the period prior to November 2008 when Google first began to test advanced AJAX technologies that temporarily eliminated user search queries from referrer headers coming from Google search results pages, and for all periods thereafter when Google was disseminating search queries to third party websites.

113.    Plaintiff Priyev began using Google search in the fall of 2005, while living in California. Plaintiff Priyev's Web History, kept by Google, reinforces this fact, stretching all the way back to September 2006. Plaintiff Priyev has continued to search using Google in both California, from the Fall of 2005 through the Spring of 2008, and then in Illinois from the Spring of 2008 until the present.

114.    Priyev has also had a Google Account at all relevant times.

115.    During all time periods in which Google was transmitting user search queries to third parties, Plaintiff Priyev conducted numerous searches, including searches for financial and health information, and clicked on links on his Google search results pages.

116.    As a result, Google transmitted Plaintiff Priyev's full search queries to third parties by sending the URLs containing his search queries to third party websites that appeared in Plaintiff Priyev's Google search results page and which Plaintiff Priyev clicked on a link.

117.    In other words, when Plaintiff Priyev clicked on each link on his Google search results pages, the owner of the destination website that Plaintiff clicked on received from Google Plaintiff Priyev's search terms through the Referral Header function.

118.    As a result, Plaintiff Priyev has suffered actual harm in the form of Google's unauthorized and unlawful dissemination of Plaintiff Priyev's search queries, which sometimes contained sensitive personal information, to third parties.

## CLASS ALLEGATIONS

119.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring these claims on behalf of themselves as individuals and all other similarly situated persons in the following class:

> *All persons in the United States who submitted a search query to Google at any time between October 25, 2006 and the date of notice to the class of certification* (the "Class"). Excluded from the Class are Google, its officers and directors, legal representatives, successors or assigns, any entity in which Google has or had a controlling interest, any judge before whom this case is assigned and the judge's immediate family.

120.    The Class is composed of numerous people, whose joinder in this action would be impracticable. The disposition of their claims through this class action will benefit Class members, the parties and the courts. Upon information and belief, Google's search engine has been used by hundreds of millions of users during the relevant time period.

121.    There is a well-defined community of interest in questions of law and fact affecting the Class. These questions of law and fact predominate over individual questions affecting individual Class members, including, but not limited to, the following:

    a.    whether and to what extent Google has disclosed its users' search queries to
          third parties, and whether the disclosure is ongoing;

    b.    whether Google continues to use or store information that is part of Web
          History after users choose to delete, remove or to no longer store with Google

---

CONSOLIDATED COMPLAINT

10-cv-4809-EJD

1    such information;

2    c.   whether Google's conduct described herein violates Google's Terms of

3         Service, Privacy Policy, Web History policy and representations to Plaintiffs

4         and the Class;

5    d.   whether Google's conduct described herein violates the Electronic

6         Communications Privacy Act, 18 U.S.C. § 2702 et seq.;

7    e.   whether Google's conduct described herein constitutes a breach of contract or

8         implied contract;

9    f.   whether Google's conduct breached its duty of good faith and fair dealing;

10   g.   whether Google is unjustly enriched as a result of its conduct described

11        herein; and

12   h.   whether Plaintiffs and members of the Class are entitled to injunctive and

13        other equitable relief.

14       122.    Google has engaged, and continues to engage, in a common course of conduct

15   giving rise to the legal rights sought to be enforced by Plaintiffs and the Class. Similar or

16   identical statutory and common law violations, business practices and injuries are involved.

17   Individual questions, if any, pale by comparison to the numerous common questions that

18   dominate.

19       123.    The injuries, actual and imminent, sustained by Plaintiffs and the Class flow,

20   in each instance, from a common nucleus of operative facts. In each case, Google caused or

21   permitted unauthorized communications of private and personally-identifying information to

22   be delivered to third parties without adequate or any notice, consent or opportunity to opt out.

23       124.    Given the similar nature of the Class members' claims and the absence of

24   material differences in the statutes and common laws upon which the Class members' claims

25   are based, a nationwide class action will be easily managed by the Court and the parties.

26       125.    Because of the relatively small size of the individual Class members' claims,

27   no Class user could afford to seek legal redress on an individual basis.

28

CONSOLIDATED COMPLAINT                              38                              10-cv-4809-EJD

126.    Plaintiffs' claims are typical of those of the Class as all members of the Class are similarly affected by Google's uniform and actionable conduct as alleged herein.

127.    Google has acted and failed to act on grounds generally applicable to Plaintiffs and members of the Class, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class.

128.    Plaintiffs will fairly and adequately protect the interests of the Class, and have retained counsel competent and experienced in class action litigation. Plaintiffs have no interests antagonistic to, or in conflict with, the Class that Plaintiffs seek to represent.

129.    Plaintiffs reserve the right to revise the above class definition as appropriate or based on facts learned in discovery.

## COUNT I
### Violation of the SCA, 18 U.S.C. § 2702
### (on behalf of all Plaintiffs individually and the Class)

130.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

131.    The Electronic Communications Privacy Act (the "ECPA") broadly defines an "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in party by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce…" 18 U.S.C. § 2510(12).

132.    The ECPA also broadly defines the contents of a communication. Pursuant to the ECPA, "contents" of a communication, when used with respect to any wire, oral, or electronic communications, include any information concerning the substance, purport, or meaning of that communication. 18 U.S.C. § 2510(8). "Contents," when used with respect to any wire or oral communication, includes any information concerning the identity of the parties to such communication or the existence, substance, purport, or meaning of that communication. The definition thus includes all aspects of the communication itself. No aspect, including the identity of the parties, the substance of the communication between

them, or the fact of the communication itself, is excluded. The privacy of the communication to be protected is intended to be comprehensive.

133.    Pursuant to the ECPA, "electronic storage" means any "temporary storage of a wire or electronic communication incidental to the electronic transmission thereof." 18 U.S.C. § 2510(17)(A).

134.    Pursuant to the ECPA, Google operates an "electronic communications service" as defined in 18 U.S.C. § 2510(15). Pursuant to the Stored Communications Act of 1986 (the "SCA"), Google also provides a "remote computing service" to the public. 18 U.S.C. § 2711(2).

135.    In relevant part, 18 U.S.C. § 2702(a) of the ECPA provides as follows:

(a) **Prohibitions**.— Except as provided in subsection (b) or (c)—
(1) a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service; and
(2) a person or entity providing remote computing service to the public shall not knowingly divulge to any person or entity the contents of any communication which is carried or maintained on that service—
(A) on behalf of, and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer of such service;
(B) solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing; and
(3) a provider of remote computing service or electronic communication service to the public shall not knowingly divulge a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications covered by paragraph (1) or (2)) to any governmental entity.

136.    As alleged herein, by disclosing the private search queries and Web History information of Plaintiffs and members of the Class without authorization, Google has knowingly divulged the contents of communications of Plaintiffs and members of the Class while those communications were in electronic storage on its service, in violation of 18

1    U.S.C. § 2702(a)(1).

2        137.   As alleged herein, by disclosing the private search queries and Web History

3    information of Plaintiffs and members of the Class without authorization, Google has

4    knowingly divulged the contents of communications of Plaintiffs and members of the Class

5    carried or maintained on its systems, in violation of 18 U.S.C. § 2702(a)(2).

6        138.   Google intentionally disclosed its users' communications to third parties to

7    enhance its profitability and revenue. The disclosures were not necessary for the operation of

8    Google's systems or to protect Google's rights or property.

9        139.   As a result of Google's unauthorized and unlawful disclosure of Plaintiffs'

10   and the Class members' private search queries and Web History information, Plaintiffs and

11   members of the Class have suffered damages from Google's violations of 18 U.S.C. § 2702

12   in an amount to be determined at trial.

13       140.   Plaintiffs and Class members are "person[s] aggrieved by [a] violation of [the

14   SCA] in which the conduct constituting the violation is engaged in with a knowing or

15   intentional state or mind…" within the meaning of 18 U.S.C. § 2707(a).

16       141.   Plaintiff and members of the Class therefore seek remedy as provided for by

17   18 U.S.C. § 2707(b) and (c), including such preliminary and other equitable or declaratory

18   relief as may be appropriate, damages consistent with subsection (c) of that section to be

19   proven at trial, punitive damages to be proven at trial, and attorneys' fees and other litigation

20   costs reasonably incurred.

### COUNT II
### Breach of Contract
### (on behalf of all Plaintiffs individually and the Class)

23       142.   Plaintiffs incorporate by reference the foregoing allegations.

24       143.   The provisions of Google's Terms of Service, which expressly incorporate its

25   Privacy Policy, and Web History Privacy Policy constitute a valid and enforceable contract

26   between Plaintiffs and the Class on the one hand, and Google on the other.

27

28

---

144.    Under the Terms of Service, Web History Privacy Policy and Privacy Policy, Plaintiffs and the Class agreed to use Defendant's services and transmit sensitive personally-identifiable information to Google in exchange for Google's promise that it would not share that personal information with third parties without users' authorization.

145.    Google materially breached the terms of its Terms of Service, Web History Privacy Policy and Privacy Policy through its unlawful conduct alleged herein, including the disclosure of Plaintiffs and the Class's private search queries and Web History information to third parties, as more fully set forth above.

146.    Google's conduct also violates principles of equity and justice, which prohibit Google from retaining the above-described benefits.

147.    As a result of Google's misconduct and breaches of Google's Terms of Service, Web History Privacy Policy and Privacy Policy described herein, Plaintiffs and the Class suffered injury. Plaintiffs, on behalf of themselves and the Class, seek damages and/or restitution from Google in an amount to be determined at trial.

## COUNT III
### Breach of Covenant of Good Faith and Fair Dealing
### (on behalf of all Plaintiffs individually and the Class)

148.    Plaintiffs incorporate by reference the foregoing allegations.

149.    At all times, Google owed Plaintiffs and the Class a duty of good faith and fair dealing.

150.    Google delivered search services, and maintained Web History, pursuant to contract, whereby Plaintiffs and other Class members' Web History, Personal Information, search queries, and Referrer Headers were to be stored and used only according to Google's published terms, which promise that their information is private, and is their property, as set forth more fully above.

151.    Google abused its discretion as described above for its own benefit, and to the detriment of the property rights and expectations of Plaintiffs and the Class.  Google's

conduct breached its duty of good faith and fair dealing to Plaintiffs and the Class and damaged Plaintiffs and the Class.

152.    Google was unjustly enriched by its aforementioned conduct and Plaintiffs and the Class are entitled to restitution.  Google should account for revenues and profits it improperly collected from its transmission of Referrer Headers and Web History information, including from increased Google AdWords business, and should have a constructive trust imposed with respect to such monies until further order of the Court.

## COUNT IV
### Breach of Contract Implied in Law
### (on behalf of all Plaintiffs individually and the Class)

153.    Plaintiffs incorporate by reference the foregoing allegations.

154.    Google has knowingly, voluntarily and willfully received and retained benefits by sharing Plaintiffs' and other Class members' Web History, Personal Information and search queries or results via Referrer Headers and/or Google Analytics, as set forth above, under circumstances that would render it unjust to allow Google to retain such benefits.

155.    The benefits received by Google from sharing Plaintiffs and other Class members' Web History, Personal Information and search queries via Referrer Headers and/or Google Analytics were related to the obligation and duty of Google to use such information only as outlined in the Google's Web History Privacy Policy which does not include dissemination to third parties and in Google's other above-described terms of use, and/or as prescribed by applicable law.

156.    Google has increased its revenues and profits by peddling Plaintiffs' and the Class members' Personal Information, Web History, Referral Headers, or search terms or

results without notice or their consent.

157.     Google's above-described conduct violates principles of equity and justice, which prohibits Google from retaining these above-described benefits and constitutes a breach of contract implied in law.

158.     As a result, Plaintiffs and other Class members are entitled to disgorgement and restitution of Google's revenues, profits and/or monies received by Google due to Google's use of Plaintiffs' and other Class members' property i.e., their search terms and results.

## COUNT V
### Unjust Enrichment (In the Alternative)
### (on behalf of all Plaintiffs individually and the Class)

159.     Plaintiffs incorporate by reference the foregoing allegations.

160.     Plaintiffs and members of the Class have conferred a benefit upon Google. Google has received and retained valuable information belonging to Plaintiffs and members of the Class, and as a result of sharing its users' search queries with third parties without their consent, Google has improved the quality of its search engine and enjoyed increased revenues from advertisers.

161.     Google appreciates or has knowledge of said benefit.

162.     Under principles of equity and good conscience, Google should not be permitted to retain the benefits that it unjustly received as a result of its actions.

163.     Plaintiffs, on their own behalf and on behalf of the Class, seek the imposition of a constructive trust on and restitution of the proceeds of Google received as a result of its conduct described herein, as well as attorney's fees and costs pursuant to Cal. Civ. Proc. Code § 1021.5.

## COUNT VI
### Declaratory Judgment and Corresponding Injunctive Relief
### 28 U.S.C. §§ 2201, 2202
### (on behalf of all Plaintiffs individually and the Class)

164.     Plaintiffs incorporate by reference the foregoing allegations.

165.     Google has violated applicable law as more fully set forth above.

166.     Plaintiffs and the Class are entitled to a declaration of their rights in connection with what Google can and cannot do with their Web History and search queries.

167.     Plaintiffs and the Class and Google have adverse legal interests, and there is a substantial controversy between Plaintiffs and the Class, and Google, to warrant the issuance of a declaratory judgment as to whether Google violated applicable law by its above-described practice of sharing Plaintiffs' and other Class members' Referrer Headers, and whether Google is entitled to share the Web Histories of Plaintiffs and the Class with third-parties for its commercial gain, in violation of its preexisting contract and terms of use.

168.     Absent injunctive relief, Google is likely to continue its above-described practices, as Google is endowed with all of the discretion to do as it wishes with Plaintiffs' and the Class members' information.

169.     As a result of Google's above-described conduct in violation of applicable law, Plaintiffs and the Class are entitled to corresponding injunctive relief, and an order establishing a constructive trust, for the benefit of Plaintiffs and the Class, consisting of monies received by Google from its unlawful sharing of Plaintiffs' and the Class's search queries with third-party persons and entities.

170.     Google's new Terms of Use do not directly address preexisting Web History, changes to Web History, or the issues described above leaving Plaintiffs and the Class without any indication of what Google intends to do with the Web Histories belonging to Plaintiffs and the Class creating a need for injunctive relief holding Google to the terms of previous contract with and terms of use for Plaintiffs and the Class described in detail above.

171.    As a result of Google's above-described conduct in violation of applicable law, Plaintiffs and the Class are also entitled to an order requiring Google not to use or store preexisting Web History for purposes of profiting by transmitting their information to third-parties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray that the Court provide the following relief:

A.    Certify this case as a class action on behalf of the Class, as defined above, appoint Plaintiffs Gaos, Italiano, and Priyev as representatives of the Class, and appoint their counsel as counsel for the Class, pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Declare that Google's actions, as described herein, violate the Stored Communications Act (18 U.S.C. § 2702 et seq.), constitute Breach of Express and Implied Contracts, and unjust enrichment;

C.    Award injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and the Class, including, *inter alia*, an order declaring the rights of the parties as stated above and prohibiting Google from engaging in the wrongful and unlawful acts described herein;

D.    Award damages, including statutory damages where applicable, to Plaintiffs and the Class, in an amount to be determined at trial;

E.    Award all economic, monetary, actual, consequential, and compensatory damages caused by Google's conduct, and if its conduct is proved willful, awarding Plaintiffs and the Class exemplary damages;

F.    Award restitution against Google for all money to which Plaintiffs and the Class are entitled in equity;

G.    Establish a constructive trust, until further order of the Court, consisting of monies Google improperly collected or received from its above-described illicit conduct;

H.    Order Google to disgorge revenues and profits wrongfully obtained;

1  I.   Award Plaintiffs and the Class their reasonable expenses and attorneys' fees;

2  J.   Award Plaintiffs and the Class interest, to the extent allowable; and,

3  K.   Award such other and further relief as equity and justice may require.

4             **JURY TRIAL**

5   Plaintiffs demand a trial by jury for all issues so triable.

6

7  Dated:  April 26, 2013        Respectfully submitted,

8

9                KASSRA P. NASSIRI (215405)
                knassiri@nassiri-jung.com
                NASSIRI & JUNG LLP

10               47 Kearny St, Suite 700
                San Francisco, California 94108

11               Telephone: (415) 762-3100
                Facsimile: (415) 534-3200

12

13               MICHAEL J. ASCHENBRENER (277114)
                mja@aschenbrenerlaw.com

14               ASCHENBRENER LAW, P.C.
                795 Folsom Street, First Floor

15               San Francisco, California 94107
                Telephone: (415) 813-6245

16               Facsimile: (415) 813-6246

17               ILAN CHOROWSKY
                ilan@progressivelaw.com

18               ALEX STEPICK
                alex@progressivelaw.com

19               PROGRESSIVE LAW LLC
                1 N LaSalle Blvd, Suite 2255

20               Chicago, IL 60602
                Telephone: (312) 787-2717

21               Facsimile: (888) 574-9038

22

23               *Attorneys for Plaintiffs and the Putative Class*

24

25

26

27

28

---

CONSOLIDATED COMPLAINT      47        10-cv-4809-EJD

1

**FILER'S ATTESTATION**

2          Pursuant to Civil L.R. 5-1 (i), the undersigned attests that concurrence in the filing of

3    this document has been obtained from each of the other signatories.

4

5

6    Dated: April 26, 2013                          NASSIRI & JUNG LLP

7

8                                                   By: /s/ Kassra P. Nassiri
                                                    Kassra P. Nassiri
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28