# epic.org

FILED

2013 SEP -3 P 5:07

August 28, 2013

Clerk of the United States District Court for the Northern District of California
San Jose Courthouse, Courtroom 4 - 5th Floor
280 South 1st Street
San Jose, CA 95113

1718 Connecticut Ave NW
Suite 200
Washington DC 20009
USA
+1 202 483 1140 [tel]
+1 202 483 1248 [fax]
www.epic.org

Attention: The Honorable Edward J. Davila

Re: *In re Google Referrer Header Privacy Litigation*, No. 10-4809

Dear Judge Davila:

Regarding *In re Google Referrer Header Privacy Litigation*, we write to thank the Court for the extensive hearing undertaken on August 23, 2013 to assess the fairness of the settlement. We appreciate that the Court has requested that a revised proposed order be submitted before further action is taken. To protect the interests of Class members, it is vitally important that the Court carefully review the proposed settlement, particularly in light of the key settlement terms and the guiding law of the Ninth Circuit.

We write now to call your attention to new information about the case and also the order of Judge Seeborg in the related Facebook settlement filed this week. We ask that this letter and the earlier letter from the Consumer Privacy Groups be added to the case docket.

**The Hearing Makes Clear that Order Must Be Revised**

At the hearing on Friday, there were several exchanges with class counsel that lend further support to the objections raised by Consumer Privacy Groups in our recent letter to you.[1] We write to you now to explain how this new information makes clear the need to reject the proposed preliminary settlement.

First, counsel did not deny that the settlement would produce no monetary benefit to Class members and no change in substantial business practices by Google. The company will continue to disclose user search queries to third parties in violation of privacy law and user expectations. The proposed remedy – notifying the

---

[1] *See* Transcript of Oral Argument, *In re Google Referrer Header Privacy Litigation*, No. 10-4809 (N.D. Cal. filed Oct. 25, 2010).

| In re Google Referrer Header Privacy Litigation, No. 10-4809 | 1 | August 28, 2013 |

Class of the ongoing practice – adds insult to injury. Such a notice simply tells users of Google Search that they have less privacy than they would have otherwise expected. Such a remedy also opens the door to widespread class action abuse with attorneys receiving hefty fees and class members left with notices of the ongoing consumer harm that provided the basis for the lawsuit. The Ninth Circuit has routinely rejected such outcomes.[2]

Second, your important questions concerning the selection of the *cy pres* recipients are critical to understanding that the groups proposed are simply not aligned with the interests of class members. Here are three brief examples that demonstrate why consumer privacy organizations (and not the *alma maters* of class counsel) are the appropriate recipient of *cy pres* funds in a case concerning consumer privacy.

(1) Consumer Privacy Groups Forced Google to Comply with California Privacy Law Regarding Notice Placement; Proposed *Cy Pres* Recipients Did Not[3]

Consumer Privacy Groups have already indicated to the Court that they do not favor notice as an effective means to protect privacy. Privacy notices are difficult to comprehend, are subject to frequent change, are easily manipulated, and, because of significant market concentration, leave little real choice for consumers. Experts in consumer behavior have rightly concluded that such notices operate more as disclaimers or waivers than to offer any actual rights to users.[4]

Nonetheless, Consumer Privacy Groups believe that where such privacy policies exist it is critical that companies comply with requirements to make them readily accessible. It is therefore significant for this proceeding that in 2008 many of the same Consumer Privacy Groups that are objecting to this settlement wrote to Eric Schmidt to urge the Google CEO to make the Google Privacy Policy accessible from its homepage as required by the California Online Privacy Protection Act.[5] As the groups explained:

---

[2] *See, e.g., Dennis v. Kellogg Co.*, 697 F.3d 858, 866 (9th Cir. 2012); *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011).

[3] The Consumer Privacy Groups have already acknowledged that World Privacy Forum, one of the proposed *cy pres* recipients, has frequently defended consumer privacy interests and is aligned with the interests of Class members. For this reason, we do not dispute the designation of World Privacy Forum.

[4] *See, e.g.,* Helen Nissenbaum, *A Contextual Approach to Privacy Online*, 140(4) DAEDALUS 32, 36 (2011) *available at* http://www.amacad.org/publications/daedalus/11_fall_nissenbaum.pdf; Aleecia M. McDonald & Lorrie Faith Cranor, *The Cost of Reading Privacy Policies*, 4 I/S J. L. & POL'Y FOR INFO. SOC'Y 543, 544, 564 (2008).

[5] Letter from Consumer Privacy Groups to Eric Schmidt, CEO, Google, Inc. (June 3, 2008), http://epic.org/privacy/ftc/google/Google_Letter060308.pdf.

We are writing to you on behalf of California consumers and Internet users around the world to urge Google to include a direct link to its privacy policy on its homepage.

California law requires the operator of a commercial web site to "conspicuously post its privacy policy on its Web site." The straightforward reading of that law is that Google must place the word "privacy" on the Google.com web page linked to its privacy policy. Moreover, just about every major company that operates a web site places a link to its privacy policy on its homepage.

While we do not believe that a privacy policy is a guarantee of privacy protection, it does represent a commitment by a commercial web site to inform users about the company's privacy practices.[6]

Eventually Google relented and posted a link to the privacy policy on the homepage of its website as required by law.[7] Consumer privacy organizations, clearly aligned with the interests of Google users concerned about privacy, had succeeded in forcing the company to comply with its obligations under California law.[8]

The signatories to that letter include the ACLU of Northern California, the Center for Digital Democracy, the Center for Financial Privacy and Human Rights, Consumer Action, the Consumer Federation of America, the Electronic Frontier Foundation, the Electronic Privacy Information Center, the Identity Theft Action Council of Nebraska, Knowledge Ecology International, Privacy Lives, Privacy Rights Clearinghouse, Privacy Times, U.S. Bill of Rights Foundation, and the World Privacy Forum.

With the exception of the World Privacy Forum, none of the organizations proposed by class counsel in the *cy pres* settlement presently before this Court asked Dr. Schmidt to make the Google privacy policy more readily accessible to the public as required by California law.

---

[6] *Id.*
[7] Roy Merk, Google Relents on Privacy Policy Link, eWeek, July 7, 2007 ("It took a month, but Google finally relented to pressure from privacy groups to add a link on its homepage to the company's privacy policy. Google had resisted the addition of a privacy link, saying it did not want to clutter its homepage."), available at http://www.eweek.com/c/a/Security/Google-Relents-on-Privacy-Policy-Link/
[8] Saul Hansell, *Google Changes Home Page, Adding Link to Privacy Policy*, NY TIMES (BITS BLOG) (July 4, 2008), http://bits.blogs.nytimes.com/2008/07/04/google-changes-home-page-adding-link-to-privacy-policy/

### (2) Consumer Privacy Groups Obtained a Substantial Privacy Settlement from the Federal Trade Commission Concerning Google's Business Practices; Proposed *Cy Pres* Recipients Did Not.

Consumer Privacy Groups have objected to this settlement because it provides no meaningful benefit to class members. By way of contrast, many of these same groups obtained a substantial victory for Google users when the related matter of Google's use of user data obtained for its email services was wrongfully used for its social network service "Buzz."

As the Federal Trade Commission explained in a press release announcing the 2011 settlement concerning Google Buzz:

> Google Inc. has agreed to settle Federal Trade Commission charges that it used deceptive tactics and violated its own privacy promises to consumers when it launched its social network, Google Buzz, in 2010. The agency alleges the practices violate the FTC Act. The proposed settlement bars the company from future privacy misrepresentations, requires it to implement a comprehensive privacy program, and calls for regular, independent privacy audits for the next 20 years. This is the first time an FTC settlement order has required a company to implement a comprehensive privacy program to protect the privacy of consumers' information. In addition, this is the first time the FTC has alleged violations of the substantive privacy requirements of the U.S.-EU Safe Harbor Framework, which provides a method for U.S. companies to transfer personal data lawfully from the European Union to the United States.[9]

The FTC further stated:

> The proposed settlement bars Google from misrepresenting the privacy or confidentiality of individuals' information or misrepresenting compliance with the U.S.-EU Safe Harbor or other privacy, security, or compliance programs. *The settlement requires the company to obtain users' consent before sharing their information with third parties if Google changes its products or services in a way that results in information sharing that is contrary to any privacy promises made when the user's information was collected.* The settlement further requires Google to establish and maintain a comprehensive privacy program, and it requires that for the next 20 years, the

---

[9] Press Release, Federal Trade Commission, *FTC Charges Deceptive Privacy Practices in Google's Rollout of Its Buzz Social Network* (Mar. 30, 2011), http://www.ftc.gov/opa/2011/03/google.shtm. The Final Order and other related materials are available at http://www.ftc.gov/os/caselist/1023136/index.shtm.

| In re Google Referrer Header Privacy Litigation, No. 10-4809 | 4 | August 28, 2013 |
|---|---|---|


company have audits conducted by independent third parties every two years to assess its privacy and data protection practices.[10]

The FTC Google Buzz settlement is significant for two reasons related to the matter now before this Court. First, that outcome resulted directly from the efforts of the consumer privacy organizations who brought the matter to the attention of the Federal Trade Commission.[11] None of the *cy pres* recipients proposed in the present case played any role in the effort to establish the comprehensive privacy program for Google that the FTC mandated.

Second, the 2011 FTC Order made clear that the company could not share information with third parties if such sharing was contrary to privacy promises when the data was collected. "The Order also prohibits Google from deception by implication in addition to explicit statements, meaning that Google must do more than simply refrain from making false statements regarding referrer headers— Google must also adequately explain its business practices related to referrer headers." Thus, it remains unclear what benefit, if any, the proposed settlement provides to class members that is not already set out in the FTC Order

### (3) Consumer Privacy Groups Properly Opposed Google's Unified Privacy Notice of March 2012 Proposed *Cy Pres* Recipients Did Not

The problem of changes in the Google privacy policy to announce new business practices was brought into sharp relief when Google moved on January 28, 2012 to "unify" its privacy notices. The practical consequence was a downward harmonization that reduced the privacy standards for Google services to the lowest common denominator and allowed the company to transfer user data from one service to another without obtaining users' consent. (Ratifying Google's practice of disclosing search queries to third parties in the matter before this Court would have a similar downward impact on privacy rights of Google users).

In 2010 when Google set forth a similar proposal, consumer privacy organizations wrote to Dr. Schmidt to express concern. They said:

> The effect of these changes will be to diminish privacy protections for users of Google services. With this new policy, Google is now treating user data as part of an integrated platform. Previously, users could selectively reveal information to Google for the use of a particular service, such as email, document management, or mapping. Now, users will no longer be able to do so, and information previously

---

[10] *Id.* (emphasis added).
[11] *Id.* ("Google's data practices in connection with its launch of Google Buzz were the subject of a complaint filed with the FTC by the Electronic Privacy Information Center shortly after the service was launched.").

provided for only one service can be transferred between Google services without user consent.

We urge the withdrawal of these proposed changes to Google's privacy policy and a greater commitment by your company to the privacy of users of Google's services.[12]

The signatories of that letter included: the Electronic Privacy Information Center, the American Library Association, the Bill of Rights Defense Committee, the Center for Digital Democracy, the Center for Media and Democracy, the Consumer Federation of America, the Consumer Watchdog, the Doctor Patient Medical Association, the Liberty Coalition, Patient Privacy Rights, Privacy Journal, Privacy Rights Clearinghouse, the U.S. Bill of Rights Foundation, and World Privacy Forum. Again, with the exception of WPF, none of the *cy pres* recipients proposed in the current matter seemed much concerned at the time about the interests of class members.

But it was not just consumer privacy organization that expressed concern about Google's efforts to consolidate its privacy policy so that it could use users' data in a way inconsistent with their expectations. When Google proposed similar changes in 2012, consumer privacy organizations once again expressed strong opposition. But so too did Members of Congress, 37 state Attorneys Generals, and privacy experts around the world.[13] Google's change in business practices was the subject of substantial hearings and ongoing investigations that continue to this day.[14]

Significantly, with the exception of WPF, none of the proposed *cy pres* recipients played any role in opposing a change in Google's business practices that directly impacted the privacy interests of Google users, which is both the legal basis

---

[12] Letter from Consumer Privacy Groups to Eric Schmidt, CEO, Google, Inc., (Oct. 1, 2010), http://www.privacylives.com/wp-content/uploads/2010/10/Coalition-letter-to-Eric-Schmidt-Oct.-1-2010.pdf.

[13] *See* Letter from Edward J. Markey et al., to Jon Leibowitz, Chairman, Federal Trade Commission (Feb. 17, 2012), https://epic.org/privacy/ftc/google/Congress-Ltr-FTC-Google-2-17-12.pdf; Letter from NAAG to Larry Page, CEO, Google, Inc. (Feb. 22, 2012), https://epic.org/privacy/google/20120222-Google-Privacy-Policy-Final.pdf; Karen Evans and Jeff Gould, *Google's New Privacy Policy Is Unacceptable and Jeopardizes Government Information in the Cloud*, SAFEGOV (Jan. 25, 2012), http://safegov.org/2012/1/25/google%E2%80%99s-new-privacy-policy-is-unacceptable-and-jeopardizes-government-information-in-the-cloud.

[14] Press Release, CNIL, CNIL orders Google to comply with the French Data Protection Act, within three months (Jun. 20, 2013), http://www.cnil.fr/english/news-and-events/news/article/cnil-orders-google-to-comply-with-the-french-data-protection-act-within-three-months/.

for this class action and the interests of class members put forward by class example.

### The Court Should Select Cy Pres Recipients Aligned with the Interests of Class Members

Each example illustrates that consumer privacy organizations routinely, and without regard to pending *cy pres* awards, defend the interests of class members. And none of the examples involve any actual litigation by any of the consumer privacy organizations, a claim occasionally presented to block the award of fees to effective consumer organizations that are actually aligned with the interests of class members. Moreover, the work of consumer privacy organization before the Federal Trade Commission in 2011 actually produced safeguards for Google users that will be undermined by the proposed settlement.

The *cy pres* recipients proposed by class counsel are distinguished institutions and worthy of support. But they do not work to protect consumer privacy, they are not aligned with the interests of Class members, and they are therefore not appropriate recipients of *cy pres* allocations in this matter. In other similar matters, your colleagues have set up an objective process to determine appropriate means for the allocation of settlement funds. That would be appropriate in this matter.

### The Order of Judge Seeborg Underscores (1) Problem with Illusory Cy Pres Awards and (2) the Need to Provide Benefit to Class Members

This week Judge Seeborg approved the proposed settlement in the Facebook Sponsored Stories matter.[15] While there are still significant problems with the settlement, it has improved as a result of the Judge Seeborg's review.

At the outset in *Fraley*, class counsel proposed that no compensation would go directly to class members on whose behalf the case was brought. Class counsel

---

[15] *See* Order Granting Motion for Final Approval of Settlement Agreement, *Fraley v. Facebook*, No. 11-1726 (N.D. Cal. filed Apr. 8, 2011). There are still two key problems with the Order in *Fraley*. First, the court allocated only $100,000 of the $20,000,000 settlement fund to the class members, even after finding that the Class members who sought funds would have been entitled to $5,000,0000 in statutory damages. Second, the Court approved a *cy pres* allocation that purposefully excluded all but one of the consumer privacy organizations that had previously opposed Facebook's practices and obtained relief for the Class members. *See* FTC, "Facebook Settles FTC Charges That It Deceived Consumers By Failing To Keep Privacy Promises, (Nov. 29, 2011) ("Facebook's privacy practices were the subject of complaints filed with the FTC by the Electronic Privacy Information Center and a coalition of consumer groups. "), available at http://www.ftc.gov/opa/2011/11/privacysettlement.shtm.

also proposed to give the settlement funds to several organizations that vouched for the deal and stood to gain from the deal, but none directly involved with consumer protection or aligned with the interests of class members.

Judge Seeborg rejected that proposal and required counsel to revise the settlement such that class members would be compensated directly. And regarding the allocation of *cy pres* funds, Judge Seeborg noted that this it was "difficult to say that providing funds to these recipients is precisely aligned with the 'purpose' of the lawsuit." He concluded that the proposed *cy pres* organizations addressed issues "closely related to the matters raised in the complaint" but did not find their purposes aligned with the interests of class members, which would be a necessary showing to sustain the determination.[16]

## Conclusion

It is ultimately for the Court to decide whether the proposed *Google Referrer* settlement is fair to the Class members. Consumer Privacy Groups believe that in every meaningful respect, the settlement fails to protect the interest of the Class and would actually be detrimental to the interests of Class members. The recent order of Judge Seeborg lends further support to the argument that the order must be modified to provide some direct benefit to class members and if a *cy pres* fund is created, it should be allocated to organizations aligned with the interests of class members.

We believe that an objective standard for *cy pres* allocation, similar to the ones adopted by the Court in the *Google Buzz* matter and the *In re Netflix* settlement, is more likely to produce to an outcome that is fair and would protect the interests of Class members.

Based on the recent statements of Class Counsel and the Order in the *Fraley* matter, we again respectfully urge the Court to reject the proposed preliminary settlement agreement

Respectfully,

/s/ Marc Rotenberg
Marc Rotenberg, Executive Director
Electronic Privacy Information Center
(EPIC)

/s/ Jeff Chester
Jeff Chester, Executive Director
Center for Digital Democracy (CDD)

---

[16] *See Nachshin v. AOL. LLC* 663 F.3d 1034, 1039 (9th Cir. 2011).

/s/ John Simpson
John Simpson, Privacy Project Director
Consumer Watchdog

/s/ Deborah Peel
Deborah Peel, Founder and Chair
Patient Privacy Rights

/s/ Beth Givens
Beth Givens, Director
Privacy Rights Clearinghouse

cc:
Michael James Aschenbrener
Aschenbrener Law P.C.
795 Folsom Street
First Floor
San Francisco, CA 94107

Ilan Chorowsky
Progressive Law Group LLC
One North LaSalle
Suite 2255
Chicago, IL 60602

Kassra Powell Nassiri
Nassiri & Jung LLP
47 Kearny Street
Suite 700
San Francisco, CA 94108