KASSRA P. NASSIRI (215405)
(knassiri@nassiri-jung.com)
CHARLES H. JUNG (217909)
(cjung@nassiri-jung.com)
NASSIRI & JUNG LLP
47 Kearny Street, Suite 700
San Francisco, California 94108
Telephone: (415) 762-3100

MICHAEL J. ASCHENBRENER (277114)
(mja@aschenbrenerlaw.com)
ASCHENBRENER LAW, P.C.
795 Folsom Street, First Floor
San Francisco, CA 94107
Telephone: (415) 813-6245

ILAN CHOROWSKY (*Admitted Pro Hac Vice*)
(ilan@progressivelaw.com)
PROGRESSIVE LAW GROUP, LLC
1 N LaSalle Street, Suite 2255
Chicago, IL 60602
Telephone: (312) 787-2717
*Attorneys for Plaintiffs and the Putative Class*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| PALOMA GAOS, ANTHONY ITALIANO, and GABRIEL PRIYEV individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE INC., a Delaware corporation,<br><br>Defendant. | Case No. 5:10-CV-4809-EJD<br><br>CLASS ACTION<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Date: August 29, 2014<br>Time: 9:00 a.m.<br>Place: Courtroom 4, 5th Floor<br>Judge: Hon. Edward J. Davila |

1

<u>**NOTICE OF MOTION**</u>

2   NOTICE IS HEREBY GIVEN that the Plaintiffs will move the Court, pursuant to Federal

3 Rule of Civil Procedure 23(e), to grant final approval of the proposed class action settlement

4 entered into by the Parties on August 29, 2014 at 9:00 a.m., or at such other time as set by the

5 Court, at 280 South 1st Street, Courtroom 4, 5th Floor in San Jose, California, before the

6 Honorable Judge Davila.

7   Plaintiffs seek an order granting final approval of the proposed class action Settlement.

8 The Motion is based on this Notice of Motion, the Brief in Support of the Motion attached hereto

9 and the authorities cited therein, oral argument of counsel, and any other matter raised or

10 submitted at the hearing, and all of the documents in the record.

11

12   Dated: July 25, 2014

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ..........................................................................................................1

II.  FACTUAL BACKGROUND ......................................................................................2

   A.   Litigation History .................................................................................................2

   B.   Key Settlement Terms .........................................................................................3

      1.   *Class Definition* ..........................................................................................3

      2.   *Settlement Fund Payments* .......................................................................3

      3.   *Prospective Relief* ......................................................................................4

      4.   *Cy Pres* .......................................................................................................4

      5.   *Other Relief* ...............................................................................................6

III. ARGUMENT ...............................................................................................................7

   A.   The Settlement Between the Parties Should Be Approved. .............................7

      1.   *The standard for judicial approval favors class action settlements.* ...........7

      2.   *The Ninth Circuit factors to assess whether a settlement is fundamentally fair, adequate, and reasonable favor settlement for the Parties.* .........................9

         a.   *The strength of Plaintiffs' case favors settlement.*....................................... 10

         b.   *The risk, expense, complexity, and likely duration of further litigation favors settlement.*.................................................................................................... 11

         c.   *The risk of maintaining class action status throughout the trial favors final approval of the Settlement.*............................................................................ 12

         d.   *The amount offered in the Settlement is the best means of providing a benefit to the Class.* ................................................................................................. 13

         e.   *Class Counsel have engaged in extensive motion practice and extensively negotiated the terms of the Settlement.*......................................................... 16

         f.   *Class Counsel have abundant experience and their opinion favoring settlement should be affirmed by this Court.*................................................ 17

         g.   *No government official has objected to the Settlement after receiving notice.* ...................................................................................................................... 18

         h.   *The reaction of the Class members to the Settlement favors final approval.* ...................................................................................................................... 18

         i.   *Given the absence of any signs of collusion, the Settlement is appropriate for final approval.* ................................................................................................ 19

   B.   The Class Notice Comports with Due Process and Rule 23. .........................21

IV.  CONCLUSION...........................................................................................................23

1

## **TABLE OF AUTHORITIES**

2

**CASES**

3

*Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431 (E.D. Cal. 2013) ................................ 16

4

*Bellows v. NCO Fin. Sys., Inc.*, 2008 WL 4155361 (S.D. Cal. Sept. 5, 2008) .............................. 15

5

*Boyd v. Bechtel Corp.*, 485 F. Supp. 610 (N.D. Cal. 1979) ............................................................. 17

6

*Byrd v. Civil Serv. Comm'n*, 459 U.S. 1217 (1983) ......................................................................... 8

7

*Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848 (N.D. Cal. 2010) ................................. 19

8

*Churchill Village, LLC v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) ...................................... 7, 8, 9

9

*Class Plaintiffs v. City of Seattle,* 955 F.2d 1268 (9th Cir. 1992) .................................................. 8

10

*Dennings v. Clearwire Corp.*, 2013 WL 185797 (W.D. Wash. May 3, 2013), *aff'd* (Sept. 9, 2013)

11

........................................................................................................................................................ 15

12

*Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010) ....................................................... 9

13

*Four in One Co., Inc. v. S.K. Foods, L.P.*, 2014 WL 28808 (E.D. Cal. Jan. 2, 2014) ................... 21

14

*Garner v. State Farm Mut. Auto Ins. Co.*, 2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) .......... 8, 9

15

*Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982) .................................................................... 12

16

*Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975) ............................................................................... 16

17

*Greko v. Diesel U.S.A., Inc.*, 2013 WL 1789602 (N.D. Cal. Apr. 26, 2013) ................................ 11

18

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) .................................................. 8, 19, 21

19

*In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*, 109 F.3d 602 (9th

20

    Cir. 1997) ...................................................................................................................... 21

21

*In re Google Buzz Privacy Litig.*, 2011 WL 7460099 (N.D. Cal. June 2, 2011) .......................... 14

22

*In re HP Laser Printer Litig.*, 2011 WL 3861703 (C.D. Cal. Aug. 31, 2011) .............................. 12

23

*In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000) ............................................. 9, 16

24

*In re Netflix Privacy Litig.*, 2013 WL 1120801 (March 18, 2013) ......................................... 13, 14

25

*In re OmniVision Tech, Inc.*, 559 F. Supp. 2d 1036 (N.D. Cal. 2008) .............................. 8, 16, 17

26

*In re Pacific Enters. Sec. Litig.*, 47 F.3d 373 (9th Cir. 1995) ....................................................... 17

27

*In re Zynga Privacy Litig.*, 750 F.3d 1098 (9th Cir. 2014) ..................................................... 11, 12

28

---

*LaGarde v. Support.com, Inc.*, 2013 WL 1994703 (N.D. Cal. May 13, 2013)........................ 15, 18

*Laguna v. Coverall N. Am., Inc.*, 2014 WL 2465049 (9th Cir. June 3, 2014) ................................ 19

*Lane v. Facebook, Inc.*, 696 F.3d 811 (9th Cir. 2012) ...................................................... 12, 13, 14

*Molski v. Gleichi,* 318 F.3d 937 (9th Cir. 2003) ................................................................ 9

*Mora v. Harley-Davidson Credit Corp.*, 2014 WL 29743 (E.D. Cal. Jan. 3, 2014)...................... 11

*Nachshin v. AOL, LLC*, 663 F.3d 1034 (9th Cir. 2011) ................................................... 13, 14

*Nat'l Rural Telecomms. Coop. v. DirecTV, Inc.,* 221 F.R.D. 523 (C.D. Cal. 2004)............. 7, 16, 18

*Officers for Justice v. Civil Srv. Comm'n*, 688 F.2d 615 (9th Cir. 1982) .................................. 8, 19

*Pierce v. Rosetta Stone, Ltd.*, 2013 WL 5402120 (N.D. Cal. Sept. 26, 2013) ................................ 8

*Powers v. Eichen*, 229 F.3d 1249 (9th Cir. 2000)............................................................... 20

*Rodriguez v. West Publg. Corp.*, 563 F.3d 948 (9th Cir. 2009) ..................................... 9, 10, 12, 16

*Thieriot v. Celtic Ins. Co.*, 2011 WL 1522385 (N.D. Cal. April 21, 2011) .................................. 11

*Tijero v. Aaron Bros., Inc.*, 2013 WL 6700102 (N.D. Cal. Dec. 19, 2013) ................................. 16

*Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943 (9th Cir. 1976)............................................... 8

*Vasquez v. Coast Valley Roofing, Inc.*, 670 F. Supp. 2d 1114 (E.D. Cal. 2009) ........................... 23

*Vincent v. Reser*, 2013 WL 621865 (N.D. Cal. Feb. 19, 2013)........................................... 21

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002) .............................................. 20

*Wal-Mart Stores, Inc. v. Visa USA, Inc.*, 396 F.3d 96 (2d Cir. 2005)........................................ 8

**RULES**

Fed. R. Civ. P. 23(c)(2)(B)................................................................................. 21

Federal Rule of Civil Procedure 23(e) .................................................................. 8

# I.      INTRODUCTION

The proposed Settlement is a successful outcome for the Class and for advocates of Internet user privacy. In exchange for dismissal of the Class's claims, the Settlement requires Defendant Google, Inc. ("Google"), the Internet's most visited website, to make permanent changes to the way it discloses its practices, as well as a non-reversionary payment of $8.5 million.

Under the terms of the Settlement, Google will be obligated to inform users as to when and under what circumstances the content of users' search queries and web histories are disclosed to third parties. These disclosures represent a critical and long overdue transition to informed consent between Google and its users. Notably, Google has never agreed to make these crucial disclosures in the absence of litigation.

The Settlement also contains a monetary component in the form of an $8.5 million Common Fund, out of which money will be distributed to six proposed *Cy Pres* Recipients. The Recipients have crafted concrete proposals, with diverse reach, dedicated to privacy-focused education, advocacy, and technology aimed at preventing the use of private information without appropriate disclosure. (Settlement Agreement, Dkt. 52-3, ¶ 3.2.)

Plaintiffs now bring this Settlement Agreement before the Court in an effort to fully and finally resolve this matter. In response to the instant consolidated class action, after numerous motions to dismiss (Dkts. 19, 29, and 44), discovery, and negotiations before a neutral mediator, the Parties have arrived at a Settlement Agreement that is fair, adequate, and reasonable. Notably, to date there has not been a single objection to the Settlement, and only twelve Class Members (out of more than a class that likely exceeds 100 million) have chosen to opt out of the Settlement. Because Class Counsel have, through the Class Administrator, dutifully implemented the Court-approved Notice Plan and because the terms of the Settlement are favorable to the Class under each of the *Churchill* factors (*infra*), Plaintiffs respectfully request that this Court enter final approval on this Settlement.

## II.     FACTUAL BACKGROUND

### A.     Litigation History

Plaintiffs assert in their complaint the following causes of action: (1) violations of the Stored Communications Act ("SCA"), 18 U.S.C. § 2701; (2) breach of contract; (3) breach of the covenant of good faith and fair dealing; (4) breach of implied contract; (5) unjust enrichment; and (6) declaratory and injunction relief.

Google moved to dismiss all claims under Rule 12(b)(1). (Dkt. 19.) The Honorable James Ware dismissed Plaintiff Gaos's Complaint with leave to amend. (Dkt. 24.) The case was then reassigned and Defendant's second motion to dismiss was granted with leave to amend. (Dkts. 25, 38.) Plaintiff Gaos then filed a Second Amended Complaint, adding Plaintiff Italiano as an additional class representative, and which Defendant again moved to dismiss. (Dkts. 39, 44.) Meanwhile, Plaintiff Priyev filed an action on February 29, 2012 in the Northern District of Illinois. That case was transferred to this district and ultimately consolidated with Plaintiff Gaos and Plaintiff Italiano's complaint for the purpose of settlement proceedings. (Dkt. 51.)

From the beginning and while actively litigating, the Parties attempted to resolve the matter without further litigation, but did not find success until mediation with Randall Wulff. (Dkt. 52 at 2.) Also, throughout the litigation, Plaintiffs propounded written discovery upon Google, including requests for admission and deposition notices. (Declaration of Michael Aschenbrener ("Asch. Decl."), attached hereto as Exhibit 1, ¶ 5.)

During this time, Plaintiff Priyev filed a case, alleging claims inclusive of the conduct at issue in *Gaos*, in the Northern District of Illinois in February 2012. *Priyev v. Google, Inc.*, No. 12-cv-1467 (N.D. Ill.). Priyev's allegations and causes of action related to Google's sharing of search queries via referrer headers and, among other things, Google's resulting breach of its own express contract terms related to Google's Web History service. (Dkt. 53 at 3.) On August 28, 2012, the Court in the Northern District of Illinois transferred the *Priyev* matter to the Northern District of California. (*Id*.) On December 8, 2013 Priyev's case file was electronically transferred to the Northern District of California. (*Id*.) On January 8, 2013, the *Priyev* action was officially transferred to the Northern District of California's docket. (*Id*.)

In an effort to advance the putative class's interest most efficiently and effectively, counsel for Plaintiffs Gaos and Italiano and for Plaintiff Priyev decided to work cooperatively to again attempt to resolve the matter. (Dkt. 53 at 3.) On January 28, 2013, in Oakland, California, the Parties mediated the case before Randall Wulff, an experienced and well-respected mediator of class action disputes. (Asch. Decl., ¶ 11); (Declaration of Kassra Nassiri ("Nassiri Decl."), attached hereto as Exhibit 2, ¶ 8); (Declaration of Ilan Chorowsky ("Chor. Decl.") attached hereto as Exhibit 3, ¶ 15). Based upon his review of the facts and applicable law, Mr. Wulff proposed a settlement amount in the form of a "mediator's proposal," which the Parties accepted and used to form the material terms of the Settlement. (Asch. Decl., ¶ 12); (Nassiri Decl., ¶ 8). On March 16, 2013, the Parties executed the Settlement Agreement. (*See generally*, "Settlement Agreement," Dkt. 52-3.)

### B.    Key Settlement Terms

After an arms-length negotiation before a mediator, the Parties have come to terms, as memorialized in the Settlement Agreement currently before this Court for final approval. The key terms of the Settlement are briefly summarized here as follows:

#### 1.    Class Definition

The Settlement Agreement provides for a single Settlement Class, which this Court certified in its Preliminary Approval Order (Dkt. 63) for purposes of Settlement, and defined as follows:

> All persons in the United States who submitted a search query to Google at any time between October 25, 2006 and the date of notice to the class of certification. Excluded from the Class are Google, its officers and directors, legal representatives, successors or assigns, any entity in which Google has or had a controlling interest, any judge before whom this case is assigned and the judge's immediate family.

Dkt. 63 at 2.

#### 2.    Settlement Fund Payments

Google has agreed to pay a total amount of eight million five hundred thousand dollars ($8.5 million USD) in cash into a Settlement Fund—none of which will revert to Google under any circumstances—to be used for the payment of Settlement Administration Expenses, *cy pres*

1  distributions to the proposed *Cy Pres* Recipients, any Fee Award or costs awarded to Class

2  Counsel, and any incentive awards awarded to the Class Representatives and named Plaintiffs in

3  the Related Actions. (Dkt. 52-3, ¶ 3.2.)

4          **3.**     ***Prospective Relief***

5       A major component of the Settlement is Google's agreement, for the first time, to disclose

6  to users the ways in which Google actually treats queries entered into Google.com, so that users

7  can make informed choices about whether and how to use Google search. (Asch. Decl., ¶ 18);

8  (Nassiri Decl., ¶ 11). Pursuant to the Settlement, Google has implemented significant changes to

9  the disclosures on its website, to alert users that they can prevent transmission or sale of their

10  search queries by using Google's encrypted search option ("SSL Search") or by choosing another

11  search engine. Moreover, Google's obligation to disclose its treatment of search queries is

12  permanent under the Settlement Agreement.

13          **4.**     ***Cy Pres***

14       After payment of Settlement Administration Expenses, the Fee Award and the collective

15  Incentive Award, the balance of the Settlement Fund shall be distributed to the *Cy Pres* Recipients

16  selected by the parties and approved by the Court. Class Counsel have proposed the following

17  entities as *Cy Pres* Recipients:

18       • **Carnegie Mellon University (21%):** Carnegie Mellon's CyLab is one of the

19          largest academic security and privacy research centers in the world, with over 50

20          faculty and 100 graduate students working on all facets of computer and

21          information security and privacy issues. Carnegie Mellon intends to use its

22          distribution to fund a comprehensive effort to improve user privacy online, by: (1)

23          furthering researchers' understanding of user privacy behaviors and online threats

24          to users' privacy; (2) improving user-facing interfaces and technologies to increase

25          users' understanding and control of their privacy; and (3) developing computational

26          mechanisms to help ensure that systems and organizations adhere to privacy

27          regulations or policies.

28       • **World Privacy Forum (17%):** World Privacy Forum (WPF) is the only privacy-

focused public interest research group in the United States. As a public interest research and consumer education group, WPF focuses exclusively on consumer privacy in general, and digital privacy in particular. WPF intends to use its distribution to fund two interrelated projects: (1) a research project into third-party data flows to uncover consumer harms stemming from search queries typed into online search boxes; and (2) a national consumer education project focused on bringing online privacy education to all consumers, with a particular focus on vulnerable consumers who often miss online privacy educational campaigns due to financial, linguistic, educational, medical, or other barriers.

- **Chicago-Kent College of Law Center for Information, Society, and Policy (16%):** The Center for Information, Society and Policy at IIT Chicago-Kent College of Law ("CISP") is an academic research project dedicated to analyzing the role that privacy plays in the law and in society, to helping people assess their online privacy risks, and to helping policymakers develop policies to respond to those risks. CISP intends to use its distribution to fund PRIVACY PREPAREDNESS, which will combine academic research, public education, and outreach to safeguard individuals' online privacy and to help users implement privacy protections when they interact with the Internet.

- **Stanford Law School Center for Internet and Society (16%):** Stanford Law School's Center for Internet and Society ("CIS") is a non-profit organization that works to improve technology law and policy through ongoing interdisciplinary study, analysis, research and discussion. CIS intends to use its distribution to fund four projects designed to improve users' ability to make informed online privacy decisions: (1) original research to advance best practices for mobile phone privacy; (2) controlled trials to improve existing Privacy Enhancing Technologies ("PETs") and develop new ones; (3) analysis of proposed privacy legislation; and (4) an educational speaker and public outreach series to educate, inform, and train users about online privacy risks and available tools to mitigate those risks.

- **Berkman Center for Internet & Society at Harvard University (15%):** The Berkman Center is a university-wide, interdisciplinary program founded to explore cyberspace, share in its study, and help pioneer its development. The Berkman Center intends to use its distribution to develop concrete proposals for safeguarding Internet privacy more effectively via legal and policy reform, company action, technological innovation, targeted education and user outreach. This initiative will generate specific recommendations targeted at lawmakers and relevant companies, as well as materials, resources, and tools that enable users to make informed choices about their data—and better control it—when searching the Internet.

- **AARP Foundation (15%):** The AARP Foundation is the charitable arm of AARP, the leading national expert on people aged 50 and over, with access to data and research regarding each socioeconomic segment of the population. The AARP Foundation intends to use its distribution to develop a national initiative to educate and inform 1,000,000 individuals over a three-year period on how to protect their online privacy and proactively avoid the harmful impact of Internet fraud and identity theft.

Class Counsel have made public, via the Settlement Website, the proposals and suggested allocation of funds to each proposed *Cy Pres* Recipient. If this Court approves the Settlement, the notice on the Settlement Website indicates the percentage of the $8.5 million dollars (minus attorneys' fees and costs, any potential incentive awards, and administration costs) that each *Cy Pres* Recipient will receive.[1]

### 5.   *Other Relief*

The Settlement Fund is also designed to cover: (1) all notice and administration costs (Dkt. 52-3, ¶ 5.3.); (2) incentive awards for each Class Representative, up to $5,000 each, subject to Court approval (*Id*. at ¶¶ 10.1-10.2.); and (3) attorneys' fees and costs. Class Counsel, as detailed

---

[1] Notification listed at: http://www.googlesearchsettlement.com/hc/en-us/articles/202372170-Proposed-Cy-Pres-Recipients-and-Allocations.

in their Motion for Approval of Fees, Costs, and Incentive Awards filed herewith, seek $2,125,000 in fees, $21,643.16 in costs, and $15,000 in incentive awards ($5,000 for each of the Class Representatives).

The Fee Award will be paid from the Settlement Fund, and it is not a condition of this Settlement that any particular amount of attorneys' fees, costs, or expenses be approved by the Court, or that such fees, costs, or expenses be approved at all. *Id*. Plaintiffs have not negotiated and do not intend to negotiate a "clear sailing" provision for Plaintiffs' attorneys' fees and costs request.

## III.   ARGUMENT

The Settlement Agreement, reached by the Parties after arms'-length negotiations, provides immediate relief to the Class in the form of permanent, prospective relief designed to inform Google search users about their rights to privacy and Google's use of search query information. The *cy pres* distributions the Parties propose go even further, funding a variety of initiatives to educate users and advance the state of technology, law, and policy in the direction of protecting online privacy rights. Because the methods of notice to all Class Members and the content of the Agreement itself are appropriate, Plaintiffs request that this Court enter final approval of the Settlement.

### A.   The Settlement Between the Parties Should Be Approved.

The Settlement Agreement, mutually agreed upon by the Parties, is ripe for final approval. Plaintiffs request that this Court grant final approval to the Settlement because the law favors the voluntary settlement of disputes. Moreover, the Settlement is a fair and reasonable outcome based upon the *Churchill* factors, outlined below. *Churchill Village, LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004).

#### 1.   The standard for judicial approval favors class action settlements.

The law strongly favors parties voluntarily resolving their disputes. "Unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *Nat'l Rural Telecomms. Coop. v. DirecTV, Inc.,* 221 F.R.D. 523, 526 (C.D. Cal. 2004). Settlements avoid the time, cost, and inconvenience of complex litigation. *See*

1  *Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1276 (9th Cir. 1992); *Officers for Justice v. Civil*

2  *Srv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982); *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943,

3  950 (9th Cir. 1976).

4       This is "particularly true in class action suits which are now an ever increasing burden to

5  so many federal courts." *Van Bronkhorst*, 529 F.2d at 950. Settling such complex cases relieves a

6  heavy burden on otherwise strained judicial resources and serves the interests of justice more

7  efficiently. *See e.g. Byrd v. Civil Serv. Comm'n.*, 459 U.S. 1217 (1983); *Churchill Village,* 361

8  F.3d at 576.  Moreover, there is a presumption that a class settlement produced from adversarial

9  negotiation by capable counsel is fair. *See e.g. Wal-Mart Stores, Inc. v. Visa USA, Inc.*, 396 F.3d

10  96, 116 (2d Cir. 2005) (a "presumption of fairness, adequacy, and reasonableness may attach to a

11  class settlement reached in arm's-length negotiations between experienced, capable counsel after

12  meaningful discovery") (quoting *Manual for Complex Litigation (Third)* § 30.42).

13       Under Federal Rule of Civil Procedure 23(e), the court must approve any settlement,

14  voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class. The court

15  may only approve a settlement "after a hearing and on finding that [the settlement] is fair,

16  reasonable, and adequate." *Id.*; *see In re OmniVision Tech, Inc.*, 559 F. Supp. 2d 1036, 1040 (N.D.

17  Cal. 2008). A settlement is fair, reasonable, and adequate where, as here, "the interests of the class

18  are better served by the settlement than by further litigation." *v. State Farm Mut. Auto Ins. Co.*,

19  2010 WL 1687832 at *8 (N.D. Cal. Apr. 22, 2010) (quoting *Manual for Complex Litig. (4th)* §

20  21.61 (2004)).

21       While "the decision to approve or reject a settlement [under Rule 23(e)] is committed to

22  the sound discretion of the trial [j]udge[,]" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th

23  Cir. 1988), the Court should nonetheless limit its inquiry to a determination "that the agreement is

24  not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that

25  the settlement taken as a whole, is fair, reasonable, and adequate to all concerned." *Officers for*

26  *Justice*, 688 F.2d at 625. *See also Pierce v. Rosetta Stone, Ltd.*, 2013 WL 5402120 at *5 (N.D.

27  Cal. Sept. 26, 2013). In exercising such discretion, courts give "proper deference to the private

28  consensual decision of the parties[,]" and avoid substituting their own judgment of what is fair for

1   what the parties have deemed fair during arms-length negotiations. *Garner*, 2010 WL 1687832, at

2   *8 (citing *Rodriguez v. West Publg. Corp.*, 563 F.3d 948, 965 (9th Cir. 2009).

3       Here, the Settlement Agreement is fair, adequate, and reasonable. Not only was the

4   Settlement Agreement the product of adversarial negotiation (as detailed in the litigation history

5   above), it was achieved through arms-length negotiation with an experienced mediator and the

6   terms were largely adapted from the mediator's proposal by capable Class Counsel with extensive

7   experience in consumer class action cases. (Asch. Decl., ¶ 41); (Nassiri Decl., ¶¶ 4, 7-9). Upon

8   agreeing to the terms of this Settlement Agreement, Plaintiffs filed an unopposed motion for

9   preliminary approval on July 19, 2013. (Dkt. 52 at 24.) This Court granted preliminary approval

10  on March 26, 2014. (Dkt. 63 at 14.) Plaintiffs' unopposed motion for final approval further

11  evidences that the Parties have mutually agreed that settlement, rather than continued litigation, is

12  in their best interests. Because courts within this Circuit favor class action settlements (*see e.g.*

13  *Van Bronkhorst*, 529 F.2d at 950), and because there was extensive, arms-length negotiations

14  between the Parties and vigorous litigation prior to settlement discussions, this Court need not

15  harbor any concerns about collusion. As such, Plaintiffs request that this Court grant final

16  approval to the Settlement Agreement.

17       ***2.    The Ninth Circuit factors to assess whether a settlement is fundamentally***

18                ***fair, adequate, and reasonable favor settlement for the Parties.***

19       To assess whether a class action settlement is fair, adequate, and reasonable, courts in the

20  Ninth Circuit generally consider the following non-exhaustive list of factors:

21       "(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely
         duration of further litigation; (3) the risk of maintaining class action status
22       throughout the trial; (4) the amount offered in the settlement; (5) the extent of
         discovery completed and the stage of the proceedings; (6) the experience and view
23       of counsel; (7) the presence of a governmental participant; and (8) the reaction of
         the class members to the proposed settlement."

24  *Churchill Village* 361 F.3d at 575 (9th Cir. 2004); *see also Rodriguez*, 563 F.3d at 963 (quoting

25  *Molski v. Gleichi,* 318 F.3d 937, 953 (9th Cir. 2003), *overruled on other grounds by Dukes v. Wal-*

26  *Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010)); *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454,

27  458 (9th Cir. 2000).

28

---

FINAL APPROVAL BRIEF                             9                              5:10-CV-4809-EJD

Applying these factors to the proposed Settlement Agreement, each factor favors final approval.

*a.        The strength of Plaintiffs' case favors settlement.*

The first step in assessing the fairness of a class action settlement is to examine the strength of the plaintiff's case. The Court's analysis of this first factor is not rigid or beholden to any "particular formula by which the outcome must be tested," nor is the Court meant to "reach any ultimate conclusions of the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Garner*, 2010 WL 1687832 at *9 (quoting *Rodriguez*, 563 F.3d at 965). "Rather, the Court's assessment of the likelihood of success is 'nothing more than an 'amalgam of delicate balancing, gross approximations and rough justice.'" *Garner*, 2010 WL 1687832 at *9 (citing *Officers for Justice*, 688 F.2d at 625). Given the subjective components inherent in handicapping any potential range of recovery, "the Court may presume that through negotiation, the Parties, counsel, and mediator arrived at a reasonable range of settlement by considering Plaintiff[s'] likelihood of recovery." *Id.* (citing *Rodriguez*, 563 F.3d at 965).

While Plaintiffs are confident in the strength of their claims and their ability to ultimately prevail at trial, Plaintiffs are also cognizant that litigation is inherently risky. (Asch. Decl., ¶ 23); (Nassiri Decl., ¶ 13-14); (Chor. Decl., ¶ 13). That is even more so where Defendant may raise credible substantive and/or procedural defenses to the Class's claims, including express defenses under the SCA. These potential defenses make this Settlement all the more reasonable. (Asch. Decl., ¶ 24) (Nassiri Decl., ¶ 15); (Chor. Decl., ¶ 14). *Cf. Rodriguez* 563 F.3d at 964 (9th Cir. 2009) (defendants' substantive and procedural defense to the class's claims favored final approval of class settlement agreement).

Proceeding to trial would carry significant risks, including the danger that a jury might not properly grasp the technical concepts implicated by Plaintiffs' claims, or that key expert testimony might be excluded. (*See* Asch. Decl., ¶ 23); (Nassiri Decl., ¶ 14). Moreover, at the time Plaintiffs filed this action, some of Plaintiffs' allegations and legal theories were matters of first impression

within the Ninth Circuit. Since then, the Ninth Circuit held in *In re Zynga Privacy Litig.*, 750 F.3d 1098 (9th Cir. 2014), that the plaintiffs' claims under the SCA against defendants for using plaintiffs' personal information were not actionable. The *In re Zynga* SCA allegations are substantially similar to the SCA allegations proffered by Plaintiffs here, and thus put the viability of some of Plaintiffs' claims at risk.

Even a verdict in Plaintiffs' favor would bring additional challenges. Calculation of actual damages suffered by Class Members would be inordinately difficult, while a full award of statutory damages might reach into the trillions of dollars, a sum that would far exceed the value of Google. Google would then be inclined to seek *remittitur*, on constitutional due process grounds, again multiplying the risk to the Class.

Viewed against this backdrop, Plaintiffs' counsel justifiably accepted the Settlement, which offers an immediate and certain award for the Class.

> b.    *The risk, expense, complexity, and likely duration of further litigation favors settlement.*

When a party continues to deny liability, there is an inherent risk in continuing litigation. In *Thieriot v. Celtic Ins. Co.*, 2011 WL 1522385 at *5 (N.D. Cal. April 21, 2011), the district court approved a settlement agreement in which the defendant specifically denied liability, noting that such denial of liability posed a risk to continued litigation. *See also Mora v. Harley-Davidson Credit Corp.*, 2014 WL 29743 at *4 (E.D. Cal. Jan. 3, 2014) (granting final approval to settlement agreement where defendant denied any liability). Further, the court acknowledged that "even with a strong case, litigation entails expense." *See Greko v. Diesel U.S.A., Inc.*, 2013 WL 1789602 at *4 (N.D. Cal. Apr. 26, 2013).

Similarly here, the terms of the Proposed Settlement include Defendant's absolute denial of any liability. (Dkt. 52-3 at 2.) Defendant has also vigorously litigated this case, filing three separate Motions to Dismiss in response to Plaintiffs' original complaints and subsequent amended complaints. (Dkts. 19, 29, and 44.) Defendant's absolute denial of liability, paired with its concerted efforts to dismiss this case, favor granting final approval to the proposed Settlement Agreement. Otherwise, the Class is certain to face significant procedural hurdles, including

anticipated motions for summary judgment, class certification, and possible appeals. *Rodriguez*, 563 F.3d at 966.

The degree of complex issues or facts facing the parties also favors settlement. *See e.g. Lane v. Facebook, Inc.,* 696 F.3d 811, 820 (9th Cir. 2012). Here, Plaintiffs allege Google violated both the SCA, as well as state law claims. (Dkt. 50.) At the time Plaintiffs filed this action, the allegations were matters of first impression within the Ninth Circuit. Since then, the Ninth Circuit held in *In re Zynga Privacy Litig.*, 750 F.3d at 1098, that the plaintiffs' claims under the SCA against Facebook for using plaintiffs' personal information were not actionable. The *In re Zynga* SCA allegations are substantially similar to the allegations proffered by Plaintiffs here, adding to the risk of continued litigation. Moreover, the use of referrer headers is a highly technical, complex area of the law. This complexity, in conjunction with the now challenged viability of some of Plaintiffs' claims, counsels in favor of a certain and immediate settlement.

c.      *The risk of maintaining class action status throughout the trial favors final approval of the Settlement.*

This factor favors final approval where a Court grants preliminary approval to a class certification for settlement purposes, and no developments occur between preliminary approval and final approval that warrant reexamining the certification. *See In re HP Laser Printer Litig.*, 2011 WL 3861703, at *2 (C.D. Cal. Aug. 31, 2011) (finding that where the court previously granted plaintiffs' request to certify class for purposes of settlement, and where nothing changed since granting preliminary approval, final approval was appropriate.) Moreover, a district court has the ability to decertify a class at any time. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("Even after a certification order is entered, the judge remains free to modify it in light of subsequent developments in the litigation.").

Here, the Court approved class certification for purposes of settlement only. (Dkt. 63 at 7.) As in *In re HP Laser Printer Litig.*, there have not been any substantive changes to this Class's satisfaction of the numerosity, commonality, typicality, or adequacy of representation elements pursuant to Fed. R. Civ. P. 23. As such, the Court need not reexamine its certification of this Class for settlement purposes.

Although Plaintiffs and Class Counsel believe they would be successful in obtaining certification of an adversarial class absent the Settlement, Google has made it clear that it would vigorously oppose class certification. (Asch. Decl., ¶ 23); (Nassiri Decl. ¶ 16). As discussed in Section I-B-2, *supra*, Defendant has forcefully litigated this matter, filing three separate Motions to Dismiss in an effort to terminate Plaintiffs' case. (*See generally*, Dkts., 19, 29, and 44.) Plaintiffs have no doubt that Defendant will continue to litigate this case vigorously, should this Court decline to grant final approval to the Settlement Agreement. The amount offered in the Settlement is the best means of providing a benefit to the Class.

> d.      *The amount offered in the Settlement is the best means of providing a benefit to the Class.*

This Settlement contemplates both monetary relief ($8.5 million distributed via a Common Fund as *cy pres* awards) and prospective relief (via Google's Agreed-Upon Disclosures). (Dkt. 52-3, ¶¶ 3.1-3.2.) In combination, the terms of this Settlement provide the best means of conveying a benefit to the Class that directly addresses the substance of Plaintiffs' complaint: protecting consumers' privacy online and informing consumers of their rights.

> i.      *The Settlement's $8.5 million* cy pres *distribution is an appropriate use of the Settlement Fund due to the sheer size and negligible individual payout to the Class.*

A *cy pres* class action settlement is appropriate where "the proof of individual claims would be burdensome or distribution of damages costly." *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011); *In re Netflix Privacy Litig.*, 2013 WL 1120801 at *7 (Mar. 18, 2013); *Lane*, 696 F.3d at 825. Here, because the amount of potential Class Members likely exceeds one hundred million individuals, requiring proofs of claim from this many people would impose a significant burden to distribute, review, and then verify. (Dkt. 63 at 10–11.) As this Court noted in its preliminary approval order, "the cost of sending out what would likely be a very small payment to millions of class members would exceed the total monetary benefit obtained by the class." (*Id.* at 11.) Just as in *Netflix*, 2013 WL 1120801 at *7 (with a class of over 62 million members), the sheer class size makes individual distributions impracticable. This use of the Settlement funds for

*cy pres* awards is appropriate and favors final approval.

The size of the *cy pres* recovery obtained by Class Counsel ($8.5 million) also strongly supports final approval. (Dkt. 52-3, ¶ 3.2.) The substantial monetary value of the *cy pres* donations compare favorably to settlement in other Internet consumer privacy class action settlements. *See, e.g. In re Google Buzz Privacy Litig.*, 2011 WL 7460099, at *3-4 (N.D. Cal. June 2, 2011) (unauthorized disclosure of email contact lists; $8.5 million settlement fund with *cy pres* payments); *Lane*, 696 F.3d at 818 (unauthorized disclosure of personal information; *cy pres* distribution of $9.5 million); and in *In re Netflix Privacy Litig.*, 2013 WL 1120801 at *6 (March 18, 2013) (unauthorized storage of personal information; *cy pres* distribution of $9 million).

Finally, there is an appropriate nexus between the interests of the class and the *cy pres* recipients. A district court's review of class-action settlement damages in the form of *cy pres* awards is not substantively different from that of any other class-action settlement; however, the court should not find the settlement fair, adequate, and reasonable unless the *cy pres* remedy "'account[s] for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members.'" *Lane,* 696 F.3d at 819 (quoting *Nachshin*, 663 F.3d at 1036). In *Lane*, the Ninth Circuit approved a *cy pres* donation to a newly created entity with a mission to "fund and sponsor programs designed to educate users . . . regarding critical issues relating to the protection of identity and personal information." 696 F.3d at 822.

Here, the recipients of the *cy pres* donations are organizations with track records that have identified specific uses for the distributed funds, ensuring that each *cy pres* distribution accounts for the natures of Plaintiffs' lawsuit (protecting consumer privacy), the objectives of the underlying statutes (protecting consumer privacy), and the interest of the Class (having their privacy protected). As this Court noted in its Preliminary Approval Order, the proposed *Cy Pres* Recipients meet certain qualifying criteria[2] tailored to the claims in this case and the proposed

---

[2] Plaintiffs' Counsel used the following criteria to select appropriate *cy pres* recipients: (1) organizations that were independent and free from conflict; (2) organizations with exemplary service records that would promote public awareness and education, and/or support research, development, and initiatives related to protecting privacy on the Internet, with an emphasis on consumer-facing efforts; (3) organizations reaching and targeting internet users of all

1    recipients have submitted detailed proposals aimed at resolving issues tailored to the subject of

2    Plaintiffs' claims and the goals of the litigation – protecting Internet privacy. (Dkt. 63 at 11.)

3    Given this careful selection of *Cy Pres* Recipients, the sheer size of the class, and the amount

4    proposed in the Settlement, this factor favors final approval.

5                            *ii.      Google's disclosures are appropriate prospective relief for*

6                                      *the Class.*

7            Noneconomic, prospective relief is appropriate where it provides a remedy to the

8    violations alleged in a class action. *See Dennings v. Clearwire Corp.*, 2013 WL 185797 (W.D.

9    Wash. May 3, 2013), *aff'd* (Sept. 9, 2013) (granting final approval where settlement provided non-

10   monetary, programmatic relief to class members regarding defendant's deceptive advertising);

11   *Bellows v. NCO Fin. Sys., Inc.*, 2008 WL 4155361, at *9 (S.D. Cal. Sept. 5, 2008) (holding that

12   injunction requiring defendant to implement company-wide training program to prevent collectors

13   from making unwanted calls was appropriate settlement relief); *LaGarde v. Support.com, Inc.*,

14   2013 WL 1994703 (N.D. Cal. May 13, 2013) (granting final approval to settlement with terms

15   proscribing noneconomic relief directing the defendant to create documentation for its product that

16   more clearly and concisely described terms) .

17           In addition to the *cy pres* award, this Settlement also contemplates non-monetary,

18   permanent prospective relief. Specifically, Defendant agrees to make certain "Agreed-Upon

19   Disclosures" concerning search queries. Defendant will post these disclosures on Google's

20   "FAQs" webpage, "Key Terms" webpage, and "Privacy FAQ for Google Web History" webpage.

21   (Dkt. 52-3, ¶ 3.1.)  These disclosures alert Google users to the ways in which their personal

22   information or Google search web history could be used or compromised via referrer headers.[3]

23   _____

24   demographics across the country; (4) organizations willing to provide detailed proposals to the
     court and the class; and (5) organizations capable of using the funds to educate the class about
25   risks attendant with disclosing personal information to internet service providers; or to inform
     policy makers about the challenges associates with internet privacy and possible solutions; or to
26   develop tools allowing consumers to understand and control the flow of their personal information
     to third parties; or to develop tools to prevent third parties from exploiting consumer data. (Asch.
27   Decl., ¶ 21).
     [3] For example, on Google's Privacy FAQ webpage, www.google.com/policies/privacy/faq,
28   Defendant discloses that "[w]hen you click on a search result in Google Search, your web browser

1   This permanent prospective relief, paired with the *cy pres* distributions, weighs favorably as a

2   factor toward granting final approval of this Settlement.

3                   e.      *Class Counsel have engaged in extensive motion practice and*

4                           *extensively negotiated the terms of the Settlement.*

5           The fifth *Churchill* factor requires the Court to consider both the extent of the discovery

6   conducted to date and the stage of the litigation as indicators of class counsel's familiarity with the

7   case and ability to make informed decisions. *OmniVision*, 559 F. Supp. 2d at 1042 (citing *In re*

8   *Mego Fin. Corp.*, 213 F.3d at 459). A compromise based on an understanding of the legal and

9   factual issues with a genuine arm's-length negotiation is "presumed fair." *Nat'l Rural Telecomms.*

10  *Corp*, 221 F.R.D. at 528.

11          Final approval is appropriate here because Class Counsel have engaged in extensive

12  motion practice and document exchange. Plaintiffs have fully briefed, argued, and opposed three

13  motions to dismiss. (Dkts. 19, 29, and 44.) Furthermore, this Settlement is the of product arms-

14  length, serious, and extensive discussion amongst the Parties. *Cf. In re Mego Fin. Corp. Sec.*

15  *Litig.*, 213 F.3d at 459; *Rodriguez*, 563 F.3d at 963; *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir.

16  1975); *Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 445 (E.D. Cal. 2013). *See also*

17  *Tijero v. Aaron Bros., Inc.*, 2013 WL 6700102, at *7 (N.D. Cal. Dec. 19, 2013) (where settlement

18  reached after parties participated in private mediation, settlement was appropriate for final

19  approval).

20          The Parties met on multiple occasions, face-to-face, to discuss and negotiate the terms of

21  this Settlement. (Asch. Decl., ¶ 14); (Nassiri Decl., ¶ 9). Counsel for the Parties first met in person

22

---

23  also may send the Internet address, or URL, of the search results page to the destination webpage
    as the HTTP Referrer. The URL of the each results page may sometimes contain the search query
24  you entered. If you are using SSL Search (Google's encrypted search functionality), under most
    circumstances, your search terms will not be sent as part of the URL in the HTTP Referrer. There
25  are some exceptions to this behavior, such as if you are using some less popular browsers. More
    information can be found here [hyperlinking to
26  https://support.google.com/websearch/answer/173733?hl=en]. Search queries or information
    contained in the HTTP Referrer may be available via Google Analytics or an application
27  programming interface (API). In addition, advertisers may receive information relating to the
    exact keywords that triggered an ad click."

28

---

FINAL APPROVAL BRIEF                                                      5:10-CV-4809-EJD

1   in January 2011 in San Francisco to discuss possible resolution. (Asch. Decl., ¶ 7); (Nassiri Decl.,

2   ¶ 6). Although the initial meeting was unsuccessful, Counsel for the parties met again in San

3   Francisco in February 2011 but were unable to come to an agreement. (Asch. Decl., ¶ 8); (Nassiri

4   Decl., ¶ 6). Counsel for the Parties met a third time in June 2012, this time for an all-day

5   negotiating session, but once again were unsuccessful in coming to terms despite extensive post-

6   meeting discussions throughout the summer of 2012. (Asch. Decl., ¶ 9); (Nassiri Decl., ¶ 6).

7   Finally, on January 28, 2013, in Oakland, California, the Parties mediated before Randall Wulff,

8   an experienced and well-respected mediator of class action disputes. (Asch. Decl., ¶ 11); (Nassiri

9   Decl., ¶ 8); (Chor. Decl., ¶ 15). The arms-length negotiation went all day and long into the night.

10  The Parties accepted Mr. Wulff's proposed settlement amount in the form of a "mediator's

11  proposal" and used the proposal for creating the framework of a settlement in principle. (Asch

12  Decl., ¶ 12); (Nassiri Decl., ¶ 8). Later that week, the parties began negotiating a settlement

13  agreement over the span of two months. (Asch. Decl., ¶¶ 15-16); (Nassiri Decl., ¶ 9). The

14  negotiation involved exchanging numerous drafts between the parties and related documents.

15  Finally, on March 16, 2013 the Parties executed the Settlement Agreement that is now before this

16  Court for final approval. (Asch. Decl., ¶ 17); (Nassiri Decl., ¶ 10).

17          Settlement discussions were taken seriously by all Parties, and this Agreement is the result

18  of months of arms-length negotiation. Therefore, this factor favors final approval.

19                      f.      *Class Counsel have abundant experience and their opinion favoring*

20                              *settlement should be affirmed by this Court.*

21          Where the attorneys have such experience, "[t]he recommendations of plaintiff's counsel

22  should be given a presumption of reasonableness." *OmniVision*, 559 F. Supp. 2d at 1043 (quoting

23  *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979)). Reliance on such

24  recommendations is premised on the fact that "parties represented by competent counsel are better

25  positioned than courts to produce a settlement that fairly reflects each party's expected outcome in

26  litigation." *Rodriguez*, 563 F.3d at 967 (quoting *In re Pacific Enters. Sec. Litig.*, 47 F.3d 373, 378

27  (9th Cir. 1995)). *See also Garner*, 2010 WL 1687832 at *14 (considering views of plaintiff's and

28  defendant's counsel that the settlement was fair); *OmniVision*, 559 F. Supp. 2d at 1043.

---

FINAL APPROVAL BRIEF                                                            5:10-CV-4809-EJD

1      Class Counsel have regularly engaged in major complex litigation and have extensive

2   experience in consumer class action lawsuits that are similar in size, scope, and complexity to the

3   present case. (*See* Firm Resume of Aschenbrener Law, P.C. (attached to Asch. Decl. as Exhibit 1-

4   1)); Nassiri & Jung LLP (attached Nassiri Decl. as Exhibit 2-1); and Progressive Law Group LLC

5   (attached as Exhibit 3-1). In light of these credentials and the experience of Class Counsel, this

6   Court should award final approval to the settlement.

7              g.      *No government official has objected to the Settlement after receiving*

8                      *notice.*

9      "Although CAFA does not create an affirmative duty for either the state or federal officials

10  to take any action in response to a class action settlement, CAFA presumes that, once put on

11  notice, state or federal officials will raise any concerns that they may have during the normal

12  course of the class action settlement procedures." *LaGarde,* 2013 WL 1283325 at *7 (N.D. Cal.

13  March 26, 2013).

14     Here, the Parties directed the Class Administrator to comply with CAFA's notice

15  requirement and the Class Administrator provided the appropriate notice on August 8, 2013.

16  (Class Administrator Declaration ("Class Admin. Decl."), attached hereto as Exhibit 4, ¶ 48.) A

17  copy of the CAFA notice substantially similar to the notice sent is attached to the Declaration of

18  the Class Administrator as Exhibit 4-6. To date, no state or federal officials have raised any

19  objection to the Settlement. (Class Admin. Decl., ¶ 63.) Therefore, this factor favors final approval

20  of the Settlement.

21             h.      *The reaction of the Class members to the Settlement favors final*

22                     *approval.*

23     Courts in the Ninth Circuit consider the number of class members who object to a

24  proposed settlement when determining whether to grant final approval to a settlement agreement.

25  *Mandujano v. Basic Vegetable Prods. Inc.*, 541 F.2d 832, 837 (9th Cir. 1976). Where the vast

26  majority of class members have not objected to the terms of a proposed settlement, this factor

27  weighs in favor of the court granting final approval. *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at

28  526 (holding that "in the absence of a large number of objections to a proposed class action

1  settlement, settlement actions are favorable to the class members.").

2  To date, although the period for filing objections has not yet passed, the Class

3  Administrator has not received any objections to the Settlement. (Class Admin. Decl., ¶ 60.) This

4  strongly indicates a favorable class reaction, especially in a class of more than 100,000,000

5  individuals. (Dkt. 63 at 12.) *See Chun-Hoon v. McKee Foods Corp*., 716 F. Supp. 2d 848, 852

6  (N.D. Cal. 2010) (approving settlement where no objections raised to settlement).

7  Where exclusions and opt-outs are low, there is also a presumption of a favorable class

8  reaction. *Id.* at 850 (granting final approval where sixteen out of 329 class members excluded

9  themselves from the settlement).

10  Here, the exclusion period has passed, and the total number of exclusions pales in

11  comparison to the number of Class Members who have opted to remain within the class. The Class

12  Administrator received only twelve exclusion forms by the opt-out deadline of June 24, 2014.

13  (Class Admin. Decl., ¶ 64.) This minimal number of exclusions—representing approximately

14  0.000012% of the Class—paired with absolutely no objections, demonstrates a favorable class

15  reaction.

16  i.  *Given the absence of any signs of collusion, the Settlement is*

17  *appropriate for final approval.*

18  Because collusion is not always evident on the face of a settlement, the Court may be

19  required to look to these signs for evidence that counsel have pursued their own interests at the

20  cost of the interests of the class. *Officers for Justice,* 688 F.2d at 625. The Ninth Circuit has

21  instructed courts to carefully scrutinize cases that are settled without adversarial certification for

22  possible collusion. *Hanlon*, 150 F.3d at 1026. In particular, courts are to be aware of certain signs

23  that warrant heightened scrutiny of the negotiation process, including: (1) where class counsel

24  receives a disproportionate distribution of the settlement or when the class receives no monetary

25  distribution; (2) where unawarded attorneys' fees revert to defendants rather than the settlement

26  fund for the class; and (3) where there is a "clear sailing" fee arrangement. *Laguna v. Coverall N.*

27  *Am., Inc.*, 2014 WL 2465049 at *5 (9th Cir. June 3, 2014).

28  Here, the Class was certified for purposes of settlement only, and therefore was not the

1    product of adversarial certification. (Dkt. 63 at 7.) Nonetheless, even when examined under

2    heightened scrutiny, this Settlement is wholly free of collusion. First, the terms of the Settlement

3    do not raise the concern that counsel is receiving a disproportionate distribution of the settlement.

4    Here, Class Counsel seek the Ninth Circuit's "benchmark" twenty-five percent (25%) fee award of

5    the $8.5 million common fund earmarked for *cy pres* distributions. *See Powers v. Eichen*, 229

6    F.3d 1249, 1256 (9th Cir. 2000) ("We have . . . established twenty-five percent of the recovery as

7    a 'benchmark' for attorneys' fees calculations under the percentage-of-recovery approach").

8    Further, although it is true that the Settlement does not involve a direct cash distribution to Class

9    members, such a distribution would produce only *de minimis* cash payments, which would be

10   reduced even further after applying administrative and distribution costs. (Dkt. 63 at 11.) Instead,

11   the terms of the Settlement ensure that each Class member enjoys an actual indirect benefit

12   through the sizeable *cy pres* distributions. (Dkt. 52-3, ¶ 3.2.)

13         Second, this Settlement does not provide for payment of attorneys' fees separate and apart

14   from funds paid to the Class. (Dkt. 52-3, ¶ 10.1). Rather, Class Counsel seek a percentage of the

15   common fund from which *cy pres* distributions will be made – and any funds not awarded in fees

16   will simply be distributed to the approved *cy pres* recipients rather than reverting to Google. (Dkt.

17   52-3, ¶ 10.1); *compare In re HP Laser Printer Litigation*, 2011 WL 3861703 at *4 (It is a sign of

18   collusion "when the parties arrange for fees to revert to the defendant instead of to the class fund

19   or a *cy pres* fund.").

20         Third, this Settlement does not contain a "clear sailing" provision.[4] (*See generally*, Dkt.

21   52-3.) The absence of a "clear sailing" provision supports a finding of non-collusion. In fact, the

22   Settlement is not contingent on the Court awarding a specific fee to Class Counsel. Rather, the

23   Parties have agreed to an overall Settlement Fund and have left the division of that fund as

24   between the Class and Counsel to the district court, as is usual in common fund cases. (Dkt. 52-3,

25   ¶ 10.1); *see Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002); *In re Coordinated*

26

27   _____

     [4] A "clear sailing" provision refers to a settlement term in which a defendant agrees not to
     challenge class counsels' fee request up to an agreed amount.

28

1   *Pretrial Proceedings in Petroleum Products Antitrust Litig.*, 109 F.3d 602, 607 (9th Cir. 1997).

2        Finally, although not dispositive, the presence of a mediator supports a finding of non-

3   collusion. *Vincent v. Reser*, 2013 WL 621865 at *4 (N.D. Cal. Feb. 19, 2013). As described *supra*,

4   the complete process resulting in the Settlement was done at arms-length, by well-represented

5   parties, and under the supervision of a neutral mediator. (Asch. Decl., ¶ 11); (Nassiri Decl., ¶¶ 7-

6   8); (Chor. Decl., ¶ 15). In fact, the terms of the Settlement were based upon the mediator's

7   proposal that mediator Randall Wulff suggested to the parties. (Asch Decl., ¶ 12); (Nassiri Decl.,

8   ¶ 8).

9        Accordingly, the non-collusive nature of this Settlement, reached after a series of arms-

10  length negotiations and a contested mediation, should dispel any concern of the signs of collusion

11  that appear in some class actions but are completely absent here.

12       **B.      The Class Notice Comports with Due Process and Rule 23.**

13       In order for a court to grant final approval of a class action settlement, the class must be

14  provided with notice of the settlement that complies both with the requirements of due process and

15  Federal Rule of Civil Procedure ("Rule") 23(e)(1). Class notice satisfies these requirements where

16  the notice states in plain, easily understood language "the nature of the action; the definition of the

17  class certified; the claims, issues or defense; that a class member may enter an appearance through

18  an attorney if the member so desires; that the court will exclude from the class any member who

19  requests exclusion; the time and manner for requesting exclusion; and the binding effect of a class

20  judgment on members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B). *See also Four in One

21  Co., Inc. v. S.K. Foods, L.P.*, 2014 WL 28808 at *12-13 (E.D. Cal. Jan. 2, 2014); *Hanlon*, 150

22  F.3d at 1024.

23       Here, notice requirements have been appropriately satisfied. The Class Administrator was

24  allocated $1.0 million to implement the Notice Plan (Dkt. 63 at 8), and this Court approved the

25  Plan. (*Id*.) Moreover, given that the size and nature of the Class (which likely exceeds one hundred

26  million (100,000,000) (Dkt. 63 at 12)) makes it nearly impossible to determine exactly who may

27

28

FINAL APPROVAL BRIEF                                                      5:10-CV-4809-EJD

qualify as a Class Member, the Notice Plan that was proposed, approved, and implemented, was appropriate.[5] (Class Admin. Decl., ¶ 24.) The Class Administrator used four media channels: (1) Internet-based notice using paid banner ads targeted at potential class members (in English and in Spanish on Spanish-language websites); (2) notice via "earned media" or, in other words, through articles in the press; (3) a website dedicated solely to the settlement (in English and Spanish versions); and (4) a toll-free telephone number through which Class Members can obtain additional information and request a class notice. (Class Admin. Decl., ¶ 29.) This plan was based upon substantial research to determine how to best target potential Class Members. (Class Admin. Decl., ¶¶ 20-28.)

As a result of the Notice Plan, 90,238 unique visitors visited the Settlement Website from April 25, 2013 to July 24, 2014. (Class Admin. Decl., ¶ 59.) Class Counsel and the Class Administrator responded to 179 inquiries posted on the Settlement Website or sent via email. (Class Admin. Decl., ¶ 67.) Furthermore, per Rule 23, the notice language used simple, plain language regarding the nature of the lawsuit and the operative complaint, the terms of the Settlement, and how a Class Member could participate in, object to, or be excluded from the Settlement. (Class Admin. Decl., ¶ 62.) Notice also provided the dates and deadlines for responding to the Notice and informed Class Members that the Settlement would be binding. (Class Admin. Decl., ¶ 43.) A copy of the notice posted on the Settlement Website is attached to the Declaration of the Class Administrator as Exhibit 4-4.

Notice on the Settlement Website was also supplemented with paid banner advertising and earned media. There were 221,668,171 views of these ads by an estimated 95,014,649 individuals. (Class Admin. Decl., ¶ 65.) Copies of these banner ads are attached to the Declaration of the Class Administrator as Exhibit 4-5.

Lastly, sixty-three individuals used the toll-free number to contact the Class Administrator regarding the Settlement and its terms. (Class Admin. Decl., ¶ 68.)

---

[5] Indeed, based open a comprehensive study of Internet users and their preferred search engines, the Class Administrator determined that approximately 72.6% of the U.S. Internet population had visited Google.com within a six-month period. (Class Admin. Decl., ¶ 25.)

1   The notice terms fall in line with other, similar, class action notice plans. *See e.g. Vasquez*

2   *v. Coast Valley Roofing, Inc.*, 670 F. Supp. 2d 1114 (E.D. Cal. 2009) (finding proposed settlement

3   notice appropriate where it generally described the nature of the litigation, the essential terms of

4   the Settlement, how to make a claim, object to or comment on or elect not to participate in the

5   settlement, and where notice was additionally provided via newspaper publication). Because

6   notice to the Class complied with the Preliminary Approval Order (Dkt. 63), Rule 23, and Due

7   Process, it comprised the best practicable notice under the circumstances.

8   **IV.     CONCLUSION**

9   For the foregoing reasons, Plaintiffs, on behalf of the Class, respectfully request that this

10  Court grant Plaintiffs' Motion for Final Approval of the Class Action Settlement Agreement, and

11  award such and further relief as the Court deems equitable and just.

12

13  Dated: July 25, 2014                    ASCHENBRENER LAW, P.C.

14                                          /s/ Michael J. Aschenbrener
                                            Michael J. Aschenbrener
15

16                                          ATTORNEYS FOR PLAINTIFFS
                                            AND THE CLASS
17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2          The undersigned certifies that, on July 25, 2014, he caused this document to be

3   electronically filed with the Clerk of Court using the CM/ECF system, which will send

4   notification of filing to counsel of record for each party.

5

6   Dated: July 25, 2014                          ASCHENBRENER LAW, P.C.

7

8                                                 By: /s/ Michael J. Aschenbrener
                                                  Michael J. Aschenbrener
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28