# Exhibit 4

## Class Administrator Declaration

1  KASSRA P. NASSIRI (215405)
   knassiri@nassiri-jung.com
2  NASSIRI & JUNG LLP
   47 Kearny Street, Suite 700
3  San Francisco, California 94108
   Telephone: (415) 762-3100
4  Facsimile: (415) 534-3200

5
   MICHAEL J. ASCHENBRENER (SBN 277114)
6  mja@aschenbrenerlaw.com
   ASCHENBRENER LAW, P.C.
7  795 Folsom Street, First Floor
   San Francisco, CA 94107
8  Telephone: (415) 813-6245
   Facsimile: (415) 813-6246
9

10 Attorneys for Plaintiffs and the Putative Class

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13                   SAN JOSE DIVISION

14

15 In re GOOGLE REFERRER HEADER          Case No. 5:10-cv-04809-EJD
   PRIVACY LITIGATION
16                                        **DECLARATION OF RICHARD W.**
                                          **SIMMONS REGARDING**
17 _____        **CLASS NOTICE**

18
   This Document Relates To: All Actions  Date: August 29, 2014
19                                         Time: 9:00 a.m.
                                           Place: Courtroom 4, 5th Floor
20                                         Judge: Hon. Edward J. Davila

21

22

23

24

25

26

27

28

STATE OF MINNESOTA       )

                         ) SS

COUNTY OF HENNEPIN       )


I, Richard W. Simmons, declare as follows:

    1.  I am the President of Analytics Consulting LLC ("Analytics")[1], a firm in Chanhasssen, Minnesota, that provides consulting services relating to the design and administration of class action and mass tort litigation settlements and notice programs.

    2.  I am responsible for designing the Notice Plan for the proposed settlement in this matter and for overseeing Analytics' execution of the Notice Plan. I am over 21 years of age, and I have personal knowledge of the facts herein and, if called as a witness, could and would testify competently thereto.

    3.  This declaration is based on my personal knowledge, information provided by Analytics personnel, and information provided by Analytics' media partners.

    4.  This declaration describes:

        a.  The methodology used to create the Notice Plan;

        b.  The Notice Plan;

        c.  The digital media (Internet) Notice;

        d.  The Notice design;

        e.  The calculation and verification of reach and frequency;

        f.  Earned media;

        g.  The toll-free helpline; and,

        h.  The Settlement website.

## QUALIFICATIONS

    5.  Since 1974, Analytics has consulted regarding the administration of class action settlements involving, antitrust, consumer fraud, employment, insurance, product liability, discrimination, and securities litigation. For nearly four decades, Analytics has pioneered developments

---

[1] In October 2013, Analytics Consulting LLC acquired Analytics Incorporated (d/b/a BMC Group Class Action Services ("BMC Group")).  I was formerly the President/Managing Director of BMC Group.  References to Analytics herein include the prior legal entities.

1    in landmark consumer, mass tort/personal injury, and securities litigation settlements. Analytics experts

2    led the development of analysis in antitrust litigation (*In re Corrugated Container Antitrust Litigation*,

3    MDL 310) and helped develop statistical models that are still used today to determine the existence and

4    impact of discrimination (*Rajender v. University of Minnesota*, No. 4-73-435 (D.Minn)).

5        6.   I joined Analytics in 1990, and have twenty-four years of experience in designing and

6    implementing class action settlements and notice campaigns. The settlements I have managed range in

7    size from fewer than 100 class members to more than 40 million, including some of the largest and most

8    complex notice and claims administration programs in history.

9        7.   I have been accepted as an expert and testified in state and federal courts as to the design and

10   implementation of notice programs, claims processes, and the impact attorney communications has had

11   on claims rates.  As has always been my practice, I personally performed or oversaw Analytics'

12   consulting services in each of the cases indicated on my CV, which is attached hereto as Exhibit 1.

13       8.   I have also presented to panels of judges and lawyers on issues regarding class notice, claims

14   processing, and disbursement.  In 2011, I was a panelist at the Federal Judicial Center's

15   workshop/meeting regarding class action notice and settlement administration.  In 2014, I was

16   interviewed by the Consumer Financial Protection Bureau regarding notice and claims administration in

17   class action litigation as part of their study on arbitration and consumer class litigation waivers.  I have

18   co-authored and presented CLE programs and whitepapers regarding class notice and class action claims

19   administration.  My speaking engagements regarding notice include: *Class Action Administration: Data*

20   *and Technology*, presented by Richard Simmons, Harris Martin Target Data Breach Conference in San

21   Diego (2014); *Developments in Legal Notice*, accredited CLE Program, presented by Richard Simmons

22   and Christian Clapp at Shook Hardy & Bacon, LLP in Kansas City (2013), presented by Richard

23   Simmons and Christian Clapp at Halunen & Associates in Minneapolis (2013), and presented by

24   Richard Simmons and Christian Clapp at Susman Godfrey in Dallas (2014) and, *Class Actions 101: Best*

25   *Practices and Potential Pitfalls in Providing Class Notice*, CLE Program, presented by Brian

26   Christensen, Gina Intrepido, and Richard Simmons, to the Kansas Bar Association (March 2009).

27       9.   I have been recognized by courts for my opinion as to which method of notification is

28   appropriate for a given case and whether a certain method of notice represents the best notice practicable

2

under the circumstances. Our judicial recognition includes notice programs targeting consumers. For example:

    a.  *Judge Thomas N. O'Neill, Jr., In Re: CertainTeed Fiber Cement Siding Litigation* (March 20, 2014), MDL Docket No. 2270 (E.D. PA): *"Settlement class members were provided with notice of the settlement in the manner and form set forth in the settlement agreement... Notice was also provided to pertinent state and federal officials... The notice plan was reasonably calculated to give actual notice to settlement class members of their right to receive benefits from the settlement or to be excluded from the settlement or object to the settlement. The notice plan met the requirements of Rule 23 and due process."*

    b.  *Judge Robert G. Gettleman, In Re Aftermarket Filters Antitrust Litigation (October 25, 2012),* MDL Docket No. 1957 (N.D. IL): *"Due and adequate notice of the Settlement was provided to the Class... The manner of giving notice provided in this case fully satisfies the requirements of Federal Rule of Civil Procedure 23 and due process, constitutes the best notice practicable under the circumstances, and constituted due and sufficient notice to all persons entitled thereto. A full and fair opportunity was provided to the members of the Class to be heard regarding the Settlements."*

    c.  *Judge Marco Roldan, Mary Plubell v. Merck & Co* (March 15, 2013), 04CV235817-01 (Jackson County, MO): *"Under the circumstances, the notice this Settlement provided to Class Members in accordance with the Notice Order was the best notice practicable the proceedings and matters set forth therein, including the proposed Settlement, to all Persons entitled to such notice, and said notice fully satisfied the requirements due process and Missouri law."*

    d.  *Judge James P. Kleinberg, Janet Skold, et al. v. Intel Corporation, et al.* (March 14, 2013) 05-CV-039231 (County of Santa Clara, CA): *"The Court finds that Plaintiff's proposed Notice plan has a reasonable chance of reaching a substantial percentage of class members."*

DECLARATION OF RICHARD W. SIMMONS
CASE NO. 5:10-CV-4809-EJD

e.  Judge J. Phil Gilbert, *Greenville IL, et al. v. Syngenta Crop Protection, Inc. et al.*
    *(October 23, 2012), 10-00188 (S.D. IL): "The Notice provided to the Class fully*
    *complied with Rule 23, was the best notice practicable, satisfied all constitutional*
    *due process requirements, and provides the Court with jurisdiction over the Class*
    *Members."*

10. My clients include corporations, law firms (both plaintiff and defense), the Department of Justice, the Securities and Exchange Commission, and the Federal Trade Commission, which since 1998 has retained Analytics (with me specifically as the designated "Contractor's Representative") to administer and provide expert advice regarding notice and claims processing in their settlements/distribution funds.  I have consulted with the Federal Trade Commission regarding the design of media campaigns to provide notice to individuals whose identities and mailing addresses are unknown regarding the existence of a claims fund.

11. In addition to my class action consulting work, I have taught a college course in antitrust economics, have been a guest lecturer at the University of Minnesota Law School on issues of statistical and economic analysis, was a charter member of the American Academy of Economic and Financial Experts, and am a former referee for the Journal of Legal Economics (reviewing and critiquing peer reviewed articles on the application of economic and statistical analysis to legal issues).

12. In forming my opinions, I draw from my in-depth class action case experience, as well as my educational and related work experiences. I graduated from St. Olaf College with a B.A. in Economics, have pursued extensive graduate level statistics and consumer economics work at the University of Minnesota, and received formal media planning training from New York University.

## METHODOLOGY

13.     Working with Analytics' media partner, Mediasmith, Analytics designed a Notice Plan that primarily utilizes digital (Internet) based advertisements to reach members of the proposed Settlement Class ("Class Member" or "Class). In developing this Notice Plan, we took into account the nature of the class, the demographics of class members, and shifts in consumer consumption patterns from print to digital media. This Notice Plan relies upon the same contemporary advertising methodologies that are relied upon by companies and advertising agencies world wide to target

audiences and deliver advertising messages, including demographic profiling, audience targeting, and advertisement delivery to provide targeted notice of the proposed settlement to Class Members.

14.    The standard method to measure the effectiveness of a media campaign is to calculate its "reach and frequency." These are calculated using established practices and statistical models developed for the marketing and advertising industries. **Reach** is the estimated percentage of an audience (Class Members) that will be exposed one or more times to a message (the Class Notice) during a given period of time. **Frequency** is the estimated average number of times an audience is exposed to a vehicle carrying the message within a given period of time.

15.    The digital Notice program, and the measurement of the effectiveness of that program, is based on data provided by comScore. comScore is a global Internet information provider on which companies and advertising agencies rely for data regarding consumer behavior and Internet usage. comScore maintains a proprietary database capturing more than 1.5 trillion transactions monthly, equal to almost 40% of the monthly page views of the entire Internet. Leading advertising and media firms rely on comScore data to design online media campaigns and to measure and verify the effectiveness of those campaigns.

## CLASS MEMBERS AND SEARCH ENGINE USAGE

16.    The Settlement Class includes "[a]ll persons in the United States who submitted a search query to Google at any time between October 25, 2006 and the date of the notice to the class of certification."   By definition, all of the interaction between Google and class members occurred on-line.

17.    Since the beginning of the class period, search engine use has been the most popular online activity. 54% of search engine users indicate that they use a search engine at least once a day. [2]

18.    To conduct a search, users formulate a search query using keywords and phrases reflecting the information sought by the user. The search engine then matches the search query with websites matching the query and provides a search engine results page identifying relevant websites to the user.

19.    Google Search (or Google Web Search) is the most used search engine on the Internet, with a market share ranging from 70% to 80% of all Internet users[3]. According to Quantcast[4], Google is

---

[2] Pew Internet, Search Engine Use 2012, pp. 5-6.

DECLARATION OF RICHARD W. SIMMONS
CASE NO. 5:10-CV-4809-EJD

the highest ranked (visited) website in the United States, and averages more than 23 daily page views per visitor. This is confirmed by a second source, Alexa[5], that indicates that the average Google.com visitor has 23.56 daily page views and spends an average of 18.75 minutes on Google.com.

20.     An account (or registration) is not required to conduct a search using Google.com. Thus, the names and addresses for Class Members are not readily available, and providing notice directly to Class Members by mail is not a feasible option. In instances where Google also provides email service to Class Members, because individuals have multiple email addresses, it is not currently possible to determine the reach of notice, if any, provided by email addresses should they be available.

## NOTICE PLAN

21. The objective of the Notice Plan is to provide notice of the proposed Settlement to Class Members in a manner that satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure. To meet that objective, we designed the Notice Plan to satisfy the notice guidelines established by the *Federal Judicial Center's Manual for Complex Litigation,* 4th Edition (2004) and the Federal Judicial Center's *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* (2010).

*Target Audience*

22. As noted above, the Settlement Class includes "[a]ll persons in the United States who submitted a search query to Google at any time between October 25, 2006 and the date of the notice to the class of certification."

23. To develop a profile of potential class members, my staff and I relied upon data made available by the Pew Research Center Internet & American Life Project (www.pewinternet.org) as well as nationally syndicated media research bureaus such as comScore[6].

---

[3]  See http://marketshare.hitslink.com/search-engine-market-share.aspx?qprid=5&qpcustomb=0 (last visited July 15, 2013).
[4]  Quantcast is a digital advertising company specialized in audience measurement and real-time advertising. As the pioneer of direct audience measurement in 2006, Quantcast has today the most in-depth understanding of digital audiences across the web.
[5]  See http://www.alexa.com/siteinfo/google.com#keywords (last visited July 23, 2014).
[6]  **comScore** is a global Internet information provider on which companies and advertising agencies rely for data regarding consumer behavior and Internet usage. comScore maintains a proprietary database capturing more than 1.5 trillion transactions monthly, equal to almost 40% of the monthly page views of the entire Internet. Leading advertising and media firms rely on comScore data to design online media campaigns and to measure and verify the effectiveness of those campaigns.

DECLARATION OF RICHARD W. SIMMONS
CASE NO. 5:10-CV-4809-EJD

24. The Pew Internet and American Life Project provides a comprehensive view of Internet Users and their usage of Search Engines (See Exhibit 2). In summary:

    a.  80% of all American Adult Males are online and 90% have used search engines;

    b.  82% of all American Adult Females are online and 92% have used search engines; and

    c.  Internet usage increases with education, with only 51% of adults with no high school diploma utilizing the Internet (of which 78% utilized a search engine), while 95% of adults with at least a college degree utilize the Internet (of which 95% have used a search engine.

25. In order to directly target Class Members for the purpose of notice/digital media planning, comScore data was studied among individuals aged 18 or older in the United States who have visited Google.com within the last six months.  This group represents 129,979,000 individuals, or 72.6% of the US Internet population.

26. Accordingly, while there is some targeting that can be done to target individuals who conducted searches using Google, the primary goal in this matter is to effectuate the wide spread distribution of information regarding the settlement.

*Selection of Media*

27. In the past few years, American consumers have significantly shifted their consumption of media from print-based consumption to online consumption. In response to this consumer shift in consumption, advertisers have moved advertising spending from print-based advertising spending to online-based spending:



DECLARATION OF RICHARD W. SIMMONS
CASE NO. 5:10-CV-4809-EJD

28. In the year 2000, advertisers spent a collective $72.68 billion on magazine and newspaper advertising. In 2005, this number increased to $74.14 billion. It has since been on a significant and steady decline, totaling $36.0 billion in 2011. During the same period, online spending is projected to significantly surpass print media advertising. The effect of this is shown, for example, by the discontinuance by Newsweek Magazine of its print edition.

29. Consequently, because: (a) the class consists of individuals who are online; (b) the lack of available information regarding Class Members (physical or email addresses); (c) the ability to communicate the same message via banner advertisements as you would with either the outside of an envelope or the subject line of an email; and (d) the ability to control the volume of and target digital advertisement, published notice via Internet banner advertising represents the best notice practicable in this matter.

*Notice Plan*

30. The Notice Plan was designed to reach a substantial percentage of Class Members with multiple opportunities to be exposed to the Notice via four media channels:

   a. Internet-based notice using paid banner ads targeted to potential class members;

   b. Notice via earned media – nationwide press release via PR Newswire's US1 distribution to more than 7,000 traditional media outlets (print, TV, and radio) and 5,700 online outlets;

   c. A dedicated case website through which Class Members can obtain more detailed information about the Settlements and access case documents; and,

   d. A toll-free telephone helpline by which Class Members can obtain additional information about the Settlements and request a Notice.

31. In providing guidance on meeting the standards of Rule 23, the Judicial Conference has set presumptive acceptable reach benchmarks at 70% to 95%[7]. In order to reach 70%+ of Class Members, Analytics used a web-based notice campaign utilizing banner-style notices that link directly to the to the Settlement website.

---

[7] Federal Judicial Center, *Judges' Class Action Notice Claims Process Checklist and Plain Language Guide* (2010).

8

32.     Digital notice was provided though the use of targeted Internet advertising. Banner advertisements were placed on a wide range of websites targeted to meet the demographics of the Class, enabling maximum exposure opportunities to reach the Target Audience.

33.     The banner notices appeared in standard Internet (IAB) formats, and included Leaderboard (728 x 90) and Medium Rectangle (300 x 250) size alternatives. These advertisements appeared on a subset group of websites known as the "comScore 2000," which represents the top 2,000 highest trafficked websites on the Internet. The banner notices ran on a website when the website's demographics matched our target audience. Spanish language banner ads were displayed on Spanish language websites.

34.     To further target the appropriate demographic, we placed targeting filters on the Internet advertising based upon the comScore demographic profile of class members. Once this was completed the next step was choosing which websites and in which ad locations to display the Notice. In part, this choice was based upon the relative cost and effectiveness of the individual websites. Cost and effectiveness is evaluated by previous notice campaigns, comparative data, and overall knowledge of the digital space. All advertisements purchased were priced on a "cost-per-thousand impressions" ("CPM") basis and varied based on available inventory and real time market pricing.

35.     In this case, we reached potential Class Members on popular, highly trafficked websites and focused on banner advertisements that were "above the fold" – i.e., on the top half of the webpage that the user first sees when going to a site. Sample websites include: NYTimes.com, Huffingtonpost.com, Yahoo.com, Weather.com, LAtimes.com, LinkedIn.com, Facebook.com.

36.     All banner advertisements were linked directly to the Case Website. This provided the ability to transfer Class Members directly from a summary message regarding the settlement to a comprehensive online resource providing detailed information regarding the Settlement. Specifically, users who "clicked" on our banner advertisements were routed directly to the website, where they found information regarding the case in greater detail. This combination of reaching our audience and connecting them to greater detail via the Settlement website provided us with a comprehensive approach to inform Class Members of the Settlement.

37.     The Notice Plan outlined in Exhibit 3 was designed to reach 70.8% of class members with a frequency of 2.2 times each[8] through 202 million targeted digital impressions. Coverage and exposure was further increased by the earned media campaign, the website, and the toll-free helpline. Moreover, this Notice Plan could be rapidly altered to meet a higher percentage of the class by increasing digital impressions, if necessary.

38.     While the primary goal was to reach as many Internet users as possible, the plan also targeted a subset of Internet users that are "security conscious." This target audience, defined using comScore data and definitions, included individuals who: a) use Google Search, and (b) have high on-line security consciousness or are highly worries about online financial transaction security, and (c) are influential and frequently advise others on Internet content/services. This supplemental plan was designed to increase the reach among these individuals to 91.8% and the frequency to 3.1 times each through an additional 12.8 million targeted digital impressions.

39.     Combined, the notice plan was designed to reach 73.1% of likely Class Members, and provide these individuals with, on average, 2.2 exposure opportunities to the Notice.

40.     The number of times that a Class Member saw a notice was limited (so we do not have instances where some class members are inundated and others receive no opportunities to see the Notice). This method of controlling exposure is called "frequency capping." A frequency cap limits the number of times a given ad is served to a unique user. In this program, we used a frequency cap of 2.0, meaning we only showed our ads to unique web browsers two times.

41.     Frequency capping was based on the use of "cookies." A cookie, or browser cookie, is a piece of data sent from a website and stored on user's computer. As used here, cookies were designed to remember when an individual is shown an advertisement. Using this method, we can effectively cap the number of times a unique web browser is shown a notice banner.

42.     The measurement of the delivery of the Internet-based Notice was accurate because browser-based "cookies" enabled precise tracking of where and to which particular Internet Protocol

---

[8] One advantage of digital media over traditional print media is that the scope, reach, and frequency of the campaign can be adjusted to meet Court requirements, including alternate target audiences or changing class definitions.

("IP") addresses – unique identifiers assigned to each computer browsing the Internet – the Notice was delivered and displayed.

## NOTICE DESIGN

43.     Rule 23(c)(2) of the Federal Rules of Civil Procedure requires that class action notices be written in "plain, easily understood language." The Notices – a concise "Summary Notice" and more comprehensive "Long Form Notice" – were designed to be noticed, read and understood by potential Class Members. Both the Summary Notice and the Long Form Notice, which were available to those who called the toll-free helpline or visited the website, contained substantial, easy-to-understand descriptions containing all key information about the Settlements and Class Members' rights and options. The Long Form Notice was also made available in Spanish. A copy of the Long Form Notice is attached as Exhibit 4. Copies of the Banner Advertisements, substantially similar to the ads that were published, are attached as Exhibit 5.

## EARNED MEDIA

44.     The Notice Plan also included earned media to supplement the paid media portion of the plan. "Earned media" refers to promotional efforts outside of direct, paid media placement. The earned media efforts provide additional awareness of the Settlement to Class Members, though the effect is not measurable as is it with the paid media portion of the Notice campaign.

## WEBSITE

45.     The Notice Plan proposed supporting the digital advertisements with a neutral Website that provided Class Members the opportunity to obtain additional information and documents about the litigation.  The website address was to have been cited in all notice materials and be registered with search engines to make it easier to locate the website when searching for various related keyword combinations.

## PHONE SUPPORT

46.     Notice Plan proposed supporting the notice campaign with a toll free number to allow Class Members to call and listen to answers to frequently asked questions and request to have a Detailed Notice mailed to them. The toll free number was prominently displayed in all notice documents.  The toll free number was proposed to be accessible 24-hours a day, 7-days a week.

**MAIL SUPPORT**

47.     Finally, a post office box was also established to allow Class Members the opportunity to request additional information or ask questions by mail.

## NOTICE PLAN IMPLEMENTATION AND RESULTS

### *CAFA Notification*

*48.*     I complied with all CAFA requirements, and I sent appropriate notice on August 8, 2013. A copy of the CAFA notice substantially similar to the notice sent is attached here as Exhibit 6.

### *Reach And Frequency of Notice Campaign*

49.     On April 25, Analytics began the digital media campaign that was proposed in this Settlement.   These notices were displayed nationwide, and appeared 24 hours a day, seven days a week. This notice campaign ended on May 25, 2014, but because the website is still accessible through search engines, ongoing notice is provided to class members who currently average more than 100 visits per week.  The results of this notice campaign are summarized in Exhibit 7.

50.     The core Notice Plan was designed to reach 70.8% of class members with a frequency of 2.2 times each through 202 million targeted digital impressions.  As implemented, Analytics delivered 205,433,888 advertisements, thus slightly exceeding the initial planned impressions by 2%.  The additional advertisements slightly added frequency, resulting in a reach and frequency as planned.

51.     The supplemental Notice Plan targeting security conscious class members was designed to increase the reach among these individuals to 91.8% and the frequency to 3.4 times each through an additional 12.8 million targeted digital impressions.  As implemented, Analytics delivered 16,234,283 advertisements, thus exceeding expectations by 8%. The additional advertisements added frequency, resulting in a reach of 91.8% of class members with a frequency of 3.7 times each.

52.     Using standard advertising media industry methodologies, we arrive at a net percentage reach of 71.4%% of likely Class Members who viewed the display advertisements an average of 2.3 times each.  Reach was further enhanced by the press release and case website.

### *Average Frequency of Exposure*

53.     The Notice Plan provide Class members with the opportunity to view and understand the Notice and their rights, including their right to exclude themselves from the litigation an average of 2.3 times each.

*Earned Media*

54.     Concurrent with the launch of the print and online Notices, Analytics released a national press release via PR Newswire. The press release was distributed by PR Newswire to 5,815 newspapers, television stations, radio stations and magazines. In addition, PR Newswire sent the press release to approximately 5,400 websites and online databases, including all major search engines.

*Case Website*

55.     Prior to the launch of the notice campaigns, Analytics launched a Settlement website at www.googlesearchsettlement.com. The website address was cited in all notice materials and was registered with search engines to make it easier to locate the website when searching for various related keyword combinations. The website provided Class Members the opportunity to obtain additional information and documents about the litigation. The website established and maintained by Analytics has been accessible 24-hours a day, 7-days a week.

56.     Analytics worked with counsel to develop the content for the Settlement website. The website was published in both English and Spanish and provided Class Members with general information about the Settlements, answers to frequently asked questions, important date and deadline information, a summary of Settlement benefits, a means by which to review and print copies of certain Settlement documents including the Long Form Notice in both English and Spanish and a link to contact the Settlement Administrator via email.

57.     A copy of the home page from the website as it exists on July 25, 2014 is attached as Exhibit 8.  Prominent links were provided for individuals to as questions (a red box labeled "CLICK HERE TO ASK A QUESTION"), to view answers to questions regarding the settlement (a blue box labeled "CLICK HERE TO VIEW A LIST OF FAQs"), and, to view case documents ("a green box labeled "CLICK HERE TO VIEW CASE DOCUMENTS").

58.     On May 23, 2014, the Settlement website was updated to include the Cy Pres distribution proposals.   This update included prominent placement of a link for visitors to view the proposed Cy

13

Pres recipients and allocations (a purple box labeled "CLICK HERE TO VIEW PROPOSED CY PRES RECIPIENTS AND ALLOCATIONS") , and the Frequently Asked Questions page was modified to include this information and emphasize its availability by making it the first listing.

59.     I relied upon "Google Analytics" to provide information and reporting regarding visitors to the Settlement website[9].  Website traffic is summarized in Exhibit 9:

      a.   Between April 25, 2014 and May 25, 2014, there were 84,028 unique visits to the Settlement Website.  The "average" visitor viewed 1.43 pages.  Through July 24, 2014, there have been a total of 90,238 unique visits to the website.

      b.   Visitors to the website were dispersed across the entire United States, with California have the most visitors.

      c.   Visitors who viewed only the main page (80.6%) were able to read a summary of the litigation, their rights and options, as well as deadlines in this matter.  The other  19.3% of  visitors viewed more than one page.

      d.   The most popular page on the Settlement website (aside from the home page), was the Frequently Asked Questions page.  The top two questions viewed were "What does this settlement provide?" and "What is this case about?".

*Phone Support*

60.     Analytics established a toll free number was established to allow Class Members to call and listen to answers to frequently asked questions and request to have a Detailed Notice mailed to them. The toll free number was prominently displayed in all notice documents.  The toll free number established and maintained by Analytics has been accessible 24-hours a day, 7-days a week.

*Mail Support*

61.     A post office box was also established to allow Class Members the opportunity to request additional information or ask questions by mail.

---

[9] Information from Google Analytics is used for trend purposes only.  Many factors, including users enabling functions in browsers to disable tracking (e.g., blocking "cookies" and javasscript) result in traffic not being reported.  This, along with the same individual clicking an advertisement more than once, are reasons for differences between display advertisement "clicks" and website visits.

## SUMMARY OF NOTICE PLAN RESULTS

62.     The notice language used via all media channels used simple, plain language regarding the nature of the lawsuit, the operative complaint, the terms of the Settlement, and how a Class member could participate in, object to, or be excluded from the Settlement.

63.     To date, no state or federal officials have raised any objection to the Settlement.

64.     Twelve individuals have excluded themselves from the Settlement.

65.     The banner ads were viewed 221,668,171 times by an estimated 95,014,649 individuals.

66.     Of these views, the banner advertisement was "clicked" 198,018 times..

67.     Our firm and Class Counsel collectively responded to 179 inquiries posted by members on the Settlement Website or sent via email.

68.     Sixty-three (63) Class Members used the toll-free number to contact the Class Administrator regarding the Settlement.

69.     As of July 23, 2014, zero Class Members have raised objections to the Settlement.

70.     Since the Class is estimated to consist of more than 100,000,000 members, cash payments would be *de minimis*, if at all.

71.     Individual payments would also be unduly burdensome to execute and distribute.

## CONCLUSION

72.     In class action notice planning, execution, and analysis, we are guided by due process considerations, local rules and statutes, and case law pertaining to notice.  Sound code of conduct and communications planning practices also mandate that the notice program be designed to reach the greatest practicable number of potential class members and, in a situation such as this, that the notice or notice program itself should not limit the ability of class members to exercise their rights in any way. All of these requirements were met in this case.

73.     I believe the Notice Program provided the best notice practicable under the circumstances of this case.


          /s/_Richard W. Simmons_____

          Richard W. Simmons

# Exhibit 4-1

## Richard Simmons CV

# RICHARD W. SIMMONS

**EDUCATION**

St. Olaf College
Northfield, Minnesota, 1986-1990
Bachelor of Arts in Economics with Concentration in Quantitative Methods

University of Minnesota
St. Paul, Minnesota, 1994-2000
*A.B.D: Completion of all graduate study and preliminary exams.  Dissertation suspended due to management of class action and mass tort consulting practice*

        Fields:     Microeconomics
                       Econometrics
                       Consumption and Household Economics
                       Industrial Organization: Prices and Markets
                       Natural Resource and Energy Economics

New York University
New York City, New York, 2012
Media Planning, Buying, and Analysis

*Other Training*

        GfK MRI: *Media Planning - MRI Methodology 101*

**PROFESSIONAL EXPERIENCE**

President
Analytics
18675 Lake Drive East
Chanhassen, MN  55331

Date:   October 2013 to Present (President)
           May 2008 to October 2013 (Managing Director, Analytics/BMC Group)
           January 2002 to May 2008 (President)
           May 1997 to December 2002 (Vice President)
           May 1996 to May 1997 (Principal)
           June 1990 to May 1996 (Associate)

Instructor, Department of Economics
Industrial Organization/Antitrust Economics
St. Olaf College, Northfield, MN
Date:   June 1998 to December 1998

**ARTICLES AND MONOGRAPHS**

Richard W. Simmons and Richard C. Hoyt, "Economic Damage Analysis in Rule 10b-5 Securities Litigation" ***Journal of Legal Economics***, March 1993.

Richard W. Simmons and Richard C. Hoyt, "Calibration of Damage Models in Rule 10b-5 Securities Litigation" May 1995 Working Paper.

Richard W. Simmons, "Optimal Regulation of Polluting Oligopolists," February 1998 Working Paper.

Richard W. Simmons, "Is Your Claims Administrator Out of Control? What You Need to Know to About Protecting Class Member Data, Your Firm, And Your Reputation." August 2011 Monograph

**CONTINUING LEGAL EDUCATION PRESENTATIONS**

> Developments in Class Action Notice and Claims Administration, 2010 – 2013
> Data Privacy and Class Action/Mass Tort Settlements, 2011

**PROFESSIONAL AFFILIATIONS**

> Panelist, Federal Judicial Center Workshop on Class Action Settlements, 2011
> Panelist, Frances McGovern/Duke University, Distribution of Securities Litigation Settlements -- Improving the Process", 2005
> Charter Member, American Academy of Economic and Financial Experts
> Former Referee, Journal of Legal Economics



**Partial List of Legal Notification and Settlement Administration Experience**

| | |
|---|---|
| ***Antitrust*** | *All Star Carts and Vehicles, Inc., et al. v. BFI Canada Income Fund, et al.*<br>08-CV-1816  (E.D. NY |
| | *In Re: Aftermarket Filters Antitrust Litigation*<br>No. 1:08-cv-4883, MDL No. 1957 (N.D. Ill.) |
| | *In Re: Aluminum Phosphide Antitrust Litigation*<br>Case No. 93-cv-2452 (D. Kan.) |
| | *In Re: Beef Antitrust Litigation*<br>MDL No. 248 (N.D. Tex.) |
| | *In Re: Bromine Antitrust Litigation*<br>MDL No. 1310 (S.D. Ind.) |
| | *In Re: Industrial Silicon Antitrust Litigation*<br>Case No. 95-cv-2104 (W.D. Pa.) |
| | *In Re: Workers Compensation Insurance Antitrust Litigation*<br>Case No.  4:85-cv-1166 (D. Minn.) |
| | *Red Eagle Resources Corporation, Inc., et al. v. Baker Hughes Inc., et al.*<br>Case No. 91-cv-627 (S.D. Tex.) |
| | *Rob'n I, Inc., et al. v. Uniform Code Counsel, Inc.*<br>Case No. 03-cv-203796-1 (Spokane County, Wash.) |
| | *Sarah F. Hall d/b/a Travel  Specialist, et al. v. United Airlines, Inc., et al.*<br>Case No. 7:00-cv-123-BR(1) (E.D. S.C.) |
| ***Business*** | *American Golf Schools, LLC, et al. v. EFS National Bank, et al.*<br>Case No. 00-cv-005208 (D. Tenn.) |
| | *AVR, Inc. and Amidon Graphics v. Churchill Truck Lines*<br>Case No.  4:96-cv-401 (D. Minn.) |
| | *Do Right's Plant Growers, et al. v. RSM EquiCo, Inc., et al.*<br>Case No. 06-CC-00137 (Orange County, Cal.) |
| | *F.T.C. v. Ameritel Payphone Distributors*<br>Case No. 00-cv-514 (S.D. Fla.) |
| | *F.T.C. v. Datacom Marketing, Inc.*<br>Case No. 06-cv-2574 (N.D. Ill.) |
| | *F.T.C. v. Davison & Associates, Inc.*<br>Case No. 97-cv-01278 (W.D. Pa.) |
| | *F.T.C. v. Fidelity ATM, Inc.*<br>Case No. 06-cv-81101 (S.D. Fla.) |



**Partial List of Legal Notification and Settlement Administration Experience**

| | |
|---|---|
| ***Business*** | *F.T.C. v. Financial Resources Unlimited, Inc.*<br>Case No. 03-cv-8864 (N.D. Ill.) |
| | *F.T.C. v. First American Payment Processing Inc.*<br>Case No. 04-cv-0074 (D. Ariz.) |
| | *F.T.C. v. Group C Marketing, Inc.*<br>Case No. 06-cv-6019 (C.D. Cal.) |
| | *F.T.C. v. Jordan Ashley, Inc.*<br>Case No. 09-cv-23507 (S.D. Fla.) |
| | *F.T.C. v. Medical Billers Network, Inc.*<br>Case No. 05-cv-2014 (S.D. N.Y.) |
| | *F.T.C. v. Minuteman Press Int'l*<br>Case No. 93-cv-2496 (E.D. N.Y.) |
| | *F.T.C. v. Netfran Development Corp*<br>Case No. 05-cv-22223 (S.D. Fla.) |
| | *F.T.C. v. USA Beverages, Inc*<br>Case No. 05-cv-61682 (S.D. Fla.) |
| | *Garcia, et al. v. Allergan, Inc.*<br>11-CV-9811 (C.D. CA) |
| | *Law Offices of Henry E. Gare, P.A., et al. v. Healthport Technologies, LL*<br>No. 16-2011-CA-010202 (Duval County, FL) |
| | *Physicians of Winter Haven LLC v. STERIS Corp.*<br>Case No. 1:10-cv-00264 (N.D. Ohio) |
| | *Sue Ramirez et al. v. Smart Professional Photocopy Corporation*<br>No. 01-L-385 (Peoria County, IL) |
| | *Todd Tompkins, Doug Daug and Timothy Nelson v. BASF Corporation, e*<br>Case No. 96-cv-59 (D. N.D.) |
| | *United States of America v. $1,802,651.56 in Funds Seized from E-Bulli*<br>Case No. 09-cv-01731 (C.D. Cal.) |
| | *Waxler Transportation Company, Inc. v. Trinity Marine Products, Inc., e*<br>Case No. 08-cv-01363 (E.D. La.) |
| ***Civil Rights*** | *Bentley v. Sheriff of Essex County*<br>Case No. 11-01907 (Essex County, MA) |
| | *Cazenave, et al. v. Sheriff Charles C. Foti, Jr., et al.*<br>Case No. 00-cv-1246 (E.D. La.) |



**Partial List of Legal Notification and Settlement Administration Experience**

| | |
|---|---|
| *Civil Rights* | *Garcia, et al v. Metro Gang Strike Force, et al.*<br>Case No. 09-cv-01996  (D. Minn.) |
| | *Gregory Garvey, Sr., et al. v. Frederick B. MacDonald & Forbes Byron*<br>3:07-cv-30049 (S.D. Mass.) |
| | *McCain, et al. v. Bloomberg, et al.*<br>Case No. 41023/83 (New York) |
| | *Nancy Zamarron, et al. v. City of Siloam Springs, et al.*<br>Case No. 08-cv-5166 (W.D. Ark.) |
| | *Nathan Tyler, et al. v. Suffolk County, et al.*<br>Case No. 1:06-cv-11354 (S.D. Mass.) |
| | *Nilsen v. York County*<br>Case No. 02-cv-212 (D. Me.) |
| | *Richard S. Souza et al. v. Sheriff Thomas M. Hodgson*<br>2002-0870 BRCV (Superior Ct., Mass.) |
| | *Travis Brecher, et al. v. St. Croix County, Wisconsin, et al.*<br>Case No. 02-cv-0450-C (W.D. Wisc.) |
| *Consumer* | *Andrew J. Hudak, et al. v. United Companies Lending Corporation*<br>Case No.  334659 (Cuyahoga County, Ohio) |
| | *Angela Doss, et al. v. Glenn Daniels Corporation*<br>Case No. 02-cv-0787 (E.D. Ill.) |
| | *Angell v. Skechers Canada*<br>8562-12 (Montreal, Quebec) |
| | *Anthony Talalai, et al. v. Cooper Tire & Rubber Company*<br>Case No. L-008830-00-MT (Middlesex County, NJ) |
| | *Arnett v. Bank of America, N.A.*<br>No. 3:11-CV-01372-SI (D. OR) |
| | *Ballard, et al. v. A A Check Cashiers, Inc., et al.*<br>Case No. 01-cv-351 (Washingotn County, Ark.) |
| | *Belinda Peterson, et al. v. H & R Block Tax Services, Inc.*<br>Case No. 95-CH-2389 (Cook County, Ill.) |
| | *Boland v. Consolidated Multiple Listing Service, Inc.*<br>Case No. 3:19-cv-01335-SB (D. SC) |
| | *Carideo et al. v. Dell, Inc.*<br>Case No. 06-cv-1772 (W.D. Wash.) |



**Partial List of Legal Notification and Settlement Administration Experience**

| | |
|---|---|
| **Consumer** | *Carnegie v. Household International, Inc.*<br>No. 98-C-2178 (N.D. Ill.) |
| | *Clair Loewy v. Live Nation Worldwide Inc.*<br>Case No. 11-cv-04872 (N.D. Ill.) |
| | *Clements, et al. v. JPMorgan Chase Bank, N.A., et al.*<br>No. 3:12-cv-02179-JCS (N.D. CA) |
| | *Covey, et al. v. American Safety Council, Inc.*<br>2010-CA-009781-0 (Orange County, FL) |
| | *Cummins, et al. v. H&R Block, et al.*<br>Case No. 03-C-134 (Kanawha County, W.V.) |
| | *David and Laurie Seeger, et al. v. Global Fitness Holdings, LLC*<br>No. 09-CI-3094, (Boone Circuit Court, Boone County, Ky.) |
| | *Don C. Lundell, et al. v. Dell, Inc.*<br>Case No. 05-cv-03970 (N.D. Cal.) |
| | *Duffy v. Security Pacific Autmotive Financial Services Corp., et al.*<br>Case No. 3:93-cv-00729 (S.D. Cal.) |
| | *Edward Hawley, et al. v. American Pioneer Title Insurance Company*<br>No. CA CE 03-016234 (Broward County, Fla.) |
| | *Evans, et al. v. Linden Research, Inc., et al.*<br>Case No. 4:11-cv-1078-DMR (N.D. CA) |
| | *F.T.C. and The People of the State of New York v. UrbanQ*<br>Case No. 03-cv-33147 (E.D. N.Y.) |
| | *F.T.C. v. 1st Beneficial Credit Services LLC*<br>Case No. 02-cv-1591 (N.D. Ohio) |
| | *F.T.C. v. 9094-5114 Quebec, Inc.*<br>Case No. 03-cv-7486 (N.D. Ill.) |
| | *F.T.C. v. Ace Group, Inc.*<br>Case No. 08-cv-61686 (S.D. Fla.) |
| | *F.T.C. v. Affordable Media LLC*<br>Case No. 98-cv-669 (D. Nev.) |
| | *F.T.C. v. AmeraPress, Inc.*<br>Case No. 98-cv-0143 (N.D. Tex.) |
| | *F.T.C. v. American Bartending Institute, Inc., et al.*<br>Case No. 05-cv-5261 (C.D. Cal.) |



**Partial List of Legal Notification and Settlement Administration Experience**

| | |
|---|---|
| ***Consumer*** | *F.T.C. v. American International Travel Services Inc.*<br>Case No. 99-cv-6943 (S.D. Fla.) |
| | *F.T.C. v. Bigsmart.com, L.L.C., et al.*<br>Case No. 01-cv-466 (D. Ariz.) |
| | *F.T.C. v. Call Center Express Corp.*<br>Case No. 04-cv-22289 (S.D. Fla.) |
| | *F.T.C. v. Capital Acquistions and Management Corp.*<br>Case No. 04-cv-50147 (N.D. Ill.) |
| | *F.T.C. v. Capital City Mortgage Corp.*<br>Case No. 98-cv-00237 (D. D.C.) |
| | *F.T.C. v. Certified Merchant Services, Ltd., et al.*<br>Case No. 4:02-cv-44 (E.D. Tex.) |
| | *F.T.C. v. Check Inforcement*<br>Case No. 03-cv-2115 (D. N.J.) |
| | *F.T.C. v. Chierico et al.*<br>Case No. 96-cv-1754 (S.D. Fla.) |
| | *F.T.C. v. Clickformail.com, Inc.*<br>Case No. 03-cv-3033 (N.D. Ill.) |
| | *F.T.C. v. Consumer Credit Services*<br>Case No. 96-cv-1990 (S.D. N.Y.) |
| | *F.T.C. v. Consumer Direct Enterprises, LLC.*<br>Case No. 07-cv-479 (D. Nev.) |
| | *F.T.C. v. Debt Management Foundation Services, Inc.*<br>Case No. 04-cv-1674 (M.D. Fla.) |
| | *F.T.C. v. Digital Enterprises, Inc.*<br>Case No. 06-cv-4923 (C.D. Cal.) |
| | *F.T.C. v. Dillon Sherif*<br>Case No. 02-cv-00294 (W.D. Wash.) |
| | *F.T.C. v. Discovery Rental, Inc., et al.*<br>Case No: 6:00-cv-1057  (M.D. of Fla.) |
| | *F.T.C. v. EdebitPay, LLC.*<br>Case No. 07-cv-4880 (C.D. Cal.) |
| | *F.T.C. v. Electronic Financial Group, Inc.*<br>Case No. 03-cv-211 (W.D. Tex.) |



**Partial List of Legal Notification and Settlement Administration Experience**

| | |
|---|---|
| **Consumer** | *F.T.C. v. Eureka Solutions*<br>Case No. 97-cv-1280 (W.D. Pa.) |
| | *F.T.C. v. Federal Data Services, Inc., et al.*<br>Case No. 00-cv-6462 (S.D. Fla.) |
| | *F.T.C. v. Financial Advisors & Associates, Inc.*<br>Case No. 08-cv-00907 (M.D. Fla.) |
| | *F.T.C. v. First Alliance Mortgage Co.*<br>Case No. 00-cv-964 (C.D. Cal.) |
| | *F.T.C. v. First Capital Consumer Membership Services Inc., et al.*<br>Case No. 1:00-cv-00905 (W.D. N.Y.) |
| | *F.T.C. v. First Capital Consumers Group, et al.*<br>Case No. 02-cv-7456 (N.D. Ill.) |
| | *F.T.C. v. Franklin Credit Services, Inc.*<br>Case No. 98-cv-7375 (S.D. Fla.) |
| | *F.T.C. v. Global Web Solutions, Inc., d/b/a USA Immigration Services, et*<br>Case No. 03-cv-023031 (D. D.C.) |
| | *F.T.C. v. Granite Mortgage, LLC*<br>Case No. 99-cv-289 (E.D. Ky.) |
| | *F.T.C. v. ICR Services, Inc.*<br>Case No. 03-cv-5532 (N.D. Ill.) |
| | *F.T.C. v. iMall, Inc. et al.*<br>Case No. 99-cv-03650 (C.D. Cal.) |
| | *F.T.C. v. Ira Smolev, et al.*<br>Case No.  01-cv-8922 (S.D. Fla.) |
| | *F.T.C. v. Jeffrey L. Landers*<br>Case No. 00-cv-1582 (N.D. Ga.) |
| | *F.T.C. v. Jewelway International, Inc.*<br>Case No. 97-cv-383  (D. Ariz.) |
| | *F.T.C. v. Komaco International, Inc., et al.*<br>Case No. 02-cv-04566 (C.D. Cal.) |
| | *F.T.C. v. LAP Financial Services, Inc.*<br>Case No. 3:99-cv-496 (W.D. Ky.) |
| | *F.T.C. v. Marketing & Vending, Inc. Concepts, L.L.C., et al.*<br>Case No. 00-cv-1131 (S.D. N.Y.) |



**Partial List of Legal Notification and Settlement Administration Experience**

| | |
|---|---|
| ***Consumer*** | *F.T.C. v. Mercantile Mortgage*<br>Case No. 02-cv-5078 (N.D. Ill.) |
| | *F.T.C. v. Meridian Capital Management*<br>Case No. 96-cv-63  (D. Nev.) |
| | *F.T.C. v. NAGG Secured Investments*<br>Case No. 00-cv-02080 (W.D. Wash.) |
| | *F.T.C. v. National Consumer Counsil, Inc., et al.*<br>Case No. 04-cv-0474 (C.D. Cal.) |
| | *F.T.C. v. National Credit Management Group*<br>Case No. 98-cv-936 (D. N.J.) |
| | *F.T.C. v. National Supply & Data Distribution Services*<br>Case No.  99-cv-128-28 (C.D. Cal.) |
| | *F.T.C. v. Nationwide Information Services, Inc.*<br>Case No. 00-cv-06505 (C.D. Cal.) |
| | *F.T.C. v. NBTY, Inc.*<br>No. 05-4793 (E.D. NY) |
| | *F.T.C. v. Pace Corporation*<br>Case No. 94-cv-3625 (N.D. Ill.) |
| | *F.T.C. v. Paradise Palms Vacation Club*<br>Case No. 81-1160D (W.D. Wash.) |
| | *F.T.C. v. Patrick Cella, et al.*<br>Case No. 03-cv-3202 (C.D. Cal.) |
| | *F.T.C. v. Platinum Universal, LLC*<br>Case No. 03-cv-61987 (S. D. Fla.) |
| | *F.T.C. v. Raymond Urso*<br>Case No. 97-cv-2680 (S.D. Fla.) |
| | *F.T.C. v. Robert S. Dolgin*<br>Case No. 97-cv-0833 (N.D. Cal.) |
| | *F.T.C. v. Southern Maintenance Supplies*<br>Case No.  99-cv-0975 (N.D. Ill.) |
| | *F.T.C. v. Star Publishing Group, Inc.*<br>Case No. 00-cv-023D (D. Wy.) |
| | *F.T.C. v. Stuffingforcash.com Corp.*<br>Case No. 02-cv-5022 (N.D. Ill.) |



**Partial List of Legal Notification and Settlement Administration Experience**

| *Consumer* | *F.T.C. v. Target Vending Systems, L.L.C., et al.*<br>Case No. 00-cv-0955 (S.D. N.Y.) |
|---|---|
| | *F.T.C. v. The College Advantage, Inc.*<br>Case No. 03-cv-179 (E.D. Tex.) |
| | *F.T.C. v. The Crescent Publishing Group, Inc., et al.*<br>Case No. 00-cv-6315(S.D. N.Y.) |
| | *F.T.C. v. The Tungsten Group, Inc.*<br>Case No. 01-cv-773 (E.D. Va.) |
| | *F.T.C. v. Think Achievement Corp.*<br>Case No. 2:98-cv-12 (N.D. Ind.) |
| | *F.T.C. v. Think All Publishing*<br>Case No. 07-cv-11 (E.D. Tex.) |
| | *F.T.C. v. Trustsoft, Inc.*<br>Case No. 05-cv-1905 (S.D. Tex.) |
| | *F.T.C. v. Unicyber Gilboard, Inc.*<br>Case No. 04-cv-1569 (C.D. Cal.) |
| | *F.T.C. v. US Grant Resources, LLC.*<br>Case No. 04-cv-0596 (E.D. La.) |
| | *F.T.C. v. Verity International, Ltd., et al.*<br>Case No. 00-cv-7422-LAK (S.D. N.Y.) |
| | *F.T.C. v. Wellquest International, Inc.*<br>Case No. 2:03-cv-05002 (C.D. Cal.) |
| | *F.T.C. v. Wolf Group*<br>Case No. 94-cv-8119 (S.D. Fla.) |
| | *Fernando N. Lopez and Mallory Lopez, et al. v. City Of Weston*<br>Case No. 99-8958  CACE 07 (FL 17th Jud Dist) |
| | *Fiori, et al. v. Dell Inc., et al.*<br>Case No. 09-cv-01518 (N.D. Cal.) |
| | *FMS, Inc. v. Dell, Inc. et al.,*<br>Case No. 03-2-23781-7SEA (King County, Wash.) |
| | *Galatis, et al. v. Psak, Graziano Piasecki & Whitelaw, et. al.*<br>No.  L-005900-04 (Middlesex County, NJ) |
| | *Garcia v. Allergan*<br>11-cv-9811 (C.D. Cal.) |



**Partial List of Legal Notification and Settlement Administration Experience**

| | |
|---|---|
| *Consumer* | *Grabowski v. Skechers U.S.A., Inc.* <br> No. 3:12-cv-00204 (W.D. Ky.) |
| | *Greg Benney, et al. v. Sprint International Communications Corp. et al.* <br> Case No. 02-cv-1422 (Wyandotte County, KS) |
| | *Griffin v. Dell Canada Inc* <br> Case No. 07-cv-325223D2 (Ontario, Superio Court of Justice) |
| | *Harris, et al. v. Roto-Rooter Services Company* <br> Case No. 00-L-525 (Madison County, IL) |
| | *Harrison, et al. v. Pacific Bay Properties* <br> No. BC285320 (Los Angeles County, CA) |
| | *Henderson, et al . V. Volvo Cars of North America, LLC, et al.* <br> 09-04146 (D. NJ) |
| | *In Re: Bancomer Transfer Services Mexico Money Transfer Litigation* <br> BC238061, BC239611(Los Angeles County, CA) |
| | *In Re: Certainteed Fiber Cement Siding Litigation* <br> MDL 2270 (E.D. PA) |
| | *In Re: H&R Block Express IRA Marketing Litigation* <br> Case No. 06-md-01786 (W.D. Mo.) |
| | *In Re: High Carbon Concrete Litigation* <br> Case No. 97-cv-20657 (D. Minn.) |
| | *In Re: High Sulfur Content Gasoline Products Liability Litigation* <br> MDL No. 1632 (E.D. La.) |
| | *In Re: Ria Telecommunications and Afex Mexico Money Transfer Litigat* <br> Case No. 99-cv-0759 (San Louis Obispo, Cal.) |
| | *In Re: Salmonella Litigation* <br> Case No. 94-cv-016304 (D. Minn.) |
| | *Janet Figueroa, et al. v. Fidelity National Title   Insurance Company* <br> Case No. 04-cv-0898 (Miami Dade County, Fla.) |
| | *Jerome H. Schlink v. Edina Realty Title* <br> Case No. 02-cv-18380 (D. Minn.) |
| | *Joel E. Zawikowski, et al. v. Beneficial National Bank, et al.* <br> Case No. 98-cv-2178 (N.D. Ill.) |
| | *John Babb, et al. v. Wilsonart International, Inc.* <br> Case No. CT-001818-04 (Memphis, Tenn.) |



**Partial List of Legal Notification and Settlement Administration Experience**

| | |
|---|---|
| ***Consumer*** | *Kenneth Toner, et al. v. Cadet Manufacturing Company*<br>Case No. 98-2-10876-2SEA (King County, Wash.) |
| | *Kiefer, et al. v. Ceridian Corporation, et al.*<br>Case No. 3:95-cv-818 (D. Minn.) |
| | *Kobylanski et al. v. Motorola Mobility, Inc. et al.*<br>No. 13-CV-1181 (W.D. PA) |
| | *Long et al v. Americredit Financial Services, Inc.*<br>0:2011-02752 (Hennepin County, MN) |
| | *Louis Thula, et al. v. Lawyers Title Insurance Corporation*<br>Case No. 0405324-11 (Broward County, Fla.) |
| | *Lynn Henderson, et al. v. Volvo Cars of North America, LLC, et al.*<br>No. 2:09-cv-04146-CCC-JAD (D. N.J.) |
| | *Lynnette Lijewski, et al. v. Regional Transit Board, et al.*<br>Case No. 4:93-cv-1108 (D. Minn.) |
| | *Mark Laughman, et al. v. Wells Fargo Leasing Corp. et al.*<br>Case No. 96-cv-0925 (N.D. Ill.) |
| | *Mark Parisot et al v. US Title Guaranty Company*<br>Case No. 0822-cc-09381 (St. Louis Circuit Court, Mo.) |
| | *Mark R. Lund v. Universal Title Company*<br>Case No. 05-cv-00411 (D. Minn.) |
| | *Melissa Castille Dodge, et al. v. Phillips College of New Orleans, Inc., et*<br>Case No. 95-cv-2302 (E.D. La.) |
| | *Michael Drogin, et al. v. General Electric Capital Auto Financial Services*<br>Case No. 95-cv-112141 (S.D. N.Y.) |
| | *Michael Sutton v. DCH Auto Group, et al.*<br>(Essex County, NJ) |
| | *Michael T. Pierce et al. v. General Electric Capital Auto Lease*<br>CV 93-0529101 S |
| | *Mitchem, et al v. Illinois Collection Service, Inc.*<br>Case No. 09-cv-7274 (N.D. Ill.) |
| | *Northcoast Financial Services v. Marcia Webster*<br>2004 CVF 18651 (Cuyahoga County, OH) |
| | *Oubre v. Louisiana Citizens Fair Plan*<br>No. 625-567 (Jefferson Parish, LA) |



**Partial List of Legal Notification and Settlement Administration Experience**

| | |
|---|---|
| **Consumer** | *Patricia Faircloth, et a. v. Certified Finance, Inc., et al.*<br>Case No. 99-cv-3097 (E.D. La.) |
| | *Pistilli v. Life Time Fitness, Inc.*<br>Case No. 07-cv-2300 (D. Minn.) |
| | *Rawlis Leslie, et al. v. The St. Joe Paper Company*<br>Case No. 03-368CA (Gulf County, Fla.) |
| | *Regayla Loveless, et al. v. National Cash, Inc, et al.*<br>Case No. 2001-cv-892-2 (Benton County, Ark.) |
| | *Ricci, et al., v. Ameriquest Mortgage Co.*<br>Case No. 27-cv-05-2546 (D. Minn.) |
| | *Ronnie Haese, et al. v. H&R Block, et al.*<br>Case No. 96-cv-423 (Kleberg County, Tex.) |
| | *Sandra Arnt, et al. v. Bank of America, N.A.*<br>No. 27-cv-12-12279 (Hennepin County, MN) |
| | *Sara Khaliki, et al. v. Helzberg Diamond Shops, Inc.*<br>4:11-cv-00010 (W.D. Mo.) |
| | *Shepherd, et al. v. Volvo Finance North America, Inc., et al.*<br>Case No. 1:93-cv-971 (D. Ga.) |
| | *Skusenas v. Linebarger, Goggan, Blair & Sampson, LLC.*<br>Case No. 1:10-cv-8119 (N.D. Ill.) |
| | *Smith v. NRT Settlement Services of Missouri, LLC*<br>Case No. 06-cv-004039 (St. Louis County, MO) |
| | *Terrell Ervin v. Nokia Inc. et al.*<br>Case No. 01-L-150 (St. Clair County, Ill.) |
| | *Theresa Boschee v. Burnet Title, Inc.*<br>Case No. 03-cv-016986 (D. Minn.) |
| | *Thomas Losgar, et al. v. Freehold Chevrolet, Inc., et al.*<br>Case No. L-3145-02 (Monmouth County, NJ) |
| | *Tom Lundberg, et al. v. Sprint Corporation, et al.*<br>Case No. 02-cv-4551 (Wyandotte County, Kan.) |
| | *Truc-way, Inc., et al. v. General Electric Credit Auto Leasing*<br>Case No. 92-CH-08962 (Cook County, Ill.) |
| | *Trudy Latman, et al. vs. Costa Cruise Lines, N.V., et al*<br>Case No. 96-cv-8076 (Dade County, Fla.) |



**Partial List of Legal Notification and Settlement Administration Experience**

| | |
|---|---|
| *Consumer* | *U.S. v. $1,802,651.56 in Funds Seized from e-Bullion, et al. ("Goldinger"*<br>No. CV 09-1731 (C.D. Cal.) |
| | *U.S. v. $1,802,651.56 in Funds Seized from e-Bullion, et al. ("Kum Vent*<br>No. CV 09-1731 (C.D. Cal.) |
| | *U.S. v. David Merrick*<br>6:10-cr-109-Orl-35DAB |
| | *U.S. v. Sixty-Four 68.5 lbs (Approx.) Silver Bars, et al.*<br>(E.D. FL) |
| | *United States of America v. Alfredo Susi, et al.*<br>3:07-cr-119 (W.D. NY) |
| | *United States of America v. Elite Designs, Inc.*<br>Case No. 05-cv-058 (D. R.I.) |
| | *Vicente Arriaga, et al. v. Columbia Mortgage & Funding Corp, et al.*<br>Case No. 01-cv-2509 (N.D. Ill.) |
| | *William R. Richardson, et al., v. Credit Depot Corporation of Ohio, et al.*<br>Case No. 315343 (Cuyahoga County, Ohio) |
| *Employment* | *Adam P. Kelly, et al v. Bank of America, N.A., et al.*<br>No. 10-CV-5332 (E.D. IL) |
| | *Alequin, et al. v. Darden Restaurants, Inc. et al.*<br>Case No.: 12-61742-CIV (S.D. FL) |
| | *Alice Williams, et a. v. H&R Block Enterprises*<br>RG 08366506, (County of Alameda, CA) |
| | *Alma Anguiano v. First United Bank and Trust Co.*<br>Case No. CIV-12-1096 (D. OK) |
| | *Andrew R. Rondomanski, et al. v. Midwest Division, Inc.*<br>No. 11-cv-00887 (W.D. MO) |
| | *Balandran, et al. v. Labor Ready, et al.*<br>BC 278551 (Losa Angeles County, Cal.) |
| | *Ballard, et al., v. Fogo de Chao, LLC*<br>Case No. 09-cv-7621 (D. Minn.) |
| | *Beasley, et al. v. GC Services LP*<br>Case No. 09-cv-01748 (E.D. Mo.) |
| | *Berry v. Farmers Bank & Trust, N.A.*<br>Case No. 13-02020 |



**Partial List of Legal Notification and Settlement Administration Experience**

| | |
|---|---|
| *Employment* | *Berte v. WIS Holdings Corporation*<br>07-cv-1932 (S.D. CA) |
| | *Bishop et al. v. AT&T Corp.*<br>Case No. 08-cv-00468 (W.D. Pa.) |
| | *Bobbie Jarrett v. GGNSC Holdings, LLC*<br>Case No.: 12-CV-4105-BP (W.D. MO) |
| | *Chandler Glover and Dean Albrecht, et al., v. John E. Potter*<br>EEOC No. 320-A2-8011X; Agency No. CC-801-0015-99 |
| | *Claudine Wilfong, et al. v. Rent-A-Center, Inc.*<br>Case No. 00-cv-680 (S.D. Ill.) |
| | *Creed, et al. v. Benco Dental Supply Co.*<br>3:12-CV-1571 (E.D. PA) |
| | *Doe, et al. v. Cin-Lan, Inc, et al.*<br>Case No. 4:08-cv-12719 (E.D. Mich.) |
| | *DuBeau et al v. Sterling Savings Bank et al.*<br>No. 12-cv-1602 (D. OR) |
| | *DuBeau, et al. v. Sterling Savings Bank, et al.*<br>1:12-cv-01602-CL  (D. OR) |
| | *Equal Employment Opportunity Commission (EEOC) v. Star Tribune Co*<br>Case No. 08-cv-5297(D. Minn.) |
| | *Equal Employment Opportunity Commission v Faribault Foods, Inc.*<br>Case No. 07-cv-3976  (D. Minn.) |
| | *Fisher, et al. v. Michigan Bell Telephone Company*<br>Case No. 09-cv-10802 (E.D. Mich.) |
| | *Frank, Peasley, Waters, and Wilhelm, v Gold'n Plump Poultry, Inc.*<br>Case No. 04-cv-1018 (D. Minn.) |
| | *Geelan, et al. v. The Mark Travel Coporation*<br>Case No. 03-cv-6322 (D. Minn.) |
| | *Gipson, et al. v. Southwestern Bell Telephone Company*<br>Case No. 08-cv-2017 (D. Kan.) |
| | *Gregory Hernandez v. The Children's Place*<br>No. CGC 04-4300989 (San Francisco, CA) |
| | *Helen Bernstein, et al. v. M.G. Waldbaum*<br>Case No. 08-cv-0363 (D. Minn.) |



**Partial List of Legal Notification and Settlement Administration Experience**

| | |
|---|---|
| **Employment** | *Holt v. Living Social*<br>1:2012cv00745 (D. DC) |
| | *Jimmy West v. PSS World Medical, Inc.*<br>Case No. 4:13-cv-00574 (E.D. Mo) |
| | *John Alba, et al. v. Papa John's USA, Inc.*<br>Case No. 05-cv-7487 (W.D. Cal.) |
| | *Johnson, et al v. General Mills, Inc.*<br>Case No. 10-cv-1104 (W.D. Mo.) |
| | *Kelly Marie Camp, et al. v. The Progressive Corporation, et al.*<br>Case No. 01-cv-2680 (E.D. La.) |
| | *Kelly, et al v. Bank of America, N.A. et al.*<br>No. 10-5332 (ND IL) |
| | *Lang, et al v DirecTV, Inc., et al.*<br>No. 10-1085 (E.D. La) |
| | *Lynn Lietz, et al. v. Illinois Bell Telephone Company, et al.*<br>No. 1:11-cv-0108 (N.D. Ill.) |
| | *Michelle Jackson, et al. v. Jamba Juice Company*<br>Case No. 8:02-cv-00381 (C.D. Cal.) |
| | *Pamela Adams, et al., v. MedPlans Partners, Inc*<br>Case No. 3:07-cv-259  (W.D. Ky.) |
| | *Phillip Busler, et al. v. Enersys Energy Products Inc., et al.*<br>Case No. 09-cv-0159 (W.D. Mo.) |
| | *Rocher, et al. v. Sav-on Drugs, et al.*<br>Case No. BC 227551 (Los Angeles County, Cal.) |
| | *Russell, et al. v. Illinois Bell Telephone Company*<br>Case No. 08-cv-1871 (N.D. Ill.) |
| | *Sequoia Moss-Clark, et al. v. New Way Services, Inc., et al.*<br>Case No. C12-1391 (Contra Costa County, CA) |
| | *Smallwood, et al. v. Illinois Bell Telephone Company,*<br>Case No. 09-cv-4072 (N.D. Ill.) |
| | *Smith v. Family Video*<br>No. 11-cv-01773 (N.D. Ill.) |
| | *Smith v. Pizza Hut, Inc.*<br>No. 09--cv-01632-CMA-BNB (D. Colo.) |



**Partial List of Legal Notification and Settlement Administration Experience**

| | |
|---|---|
| *Employment* | *Teeter v. NCR Corporation*<br>Case No. 08-cv-00297 (C.D. Cal.) |
| | *Thomas Cramer et al. v. Bank of America, N.A. et al.*<br>Case No. 12-08681 (N.D. IL) |
| | *Thomas Dege, et al., v. Hutchinson Technology, Inc.*<br>Case No. 06-cv-3754 (D. Minn.) |
| | *Wilkinson, et al. v. NCR Corporation*<br>Case No. 1:08-cv-5578  (N.D. Ill.) |
| | *William Perrin, et al. v. Papa John's International*<br>No. 4:09-CV-01335 (E.D. Mo.) |
| | *Williams, et al. v. Dollar Financial Group, et al.*<br>Case No. RG03099375 (Alameda County, Cal.) |
| | *Williams, et al. v. H&R Block Enterprises, Inc.*<br>No. RG 08366506 (Alameda County, CA) |
| | *Wittemann, et al. v. Wisconsin Bell, Inc.*<br>Case No. 09-cv-440 (W.D. Wisc.) |
| | *Wlotkowski, et al. v. Michigan Bell*<br>Case No. 09-cv-11898 (E.D. Mich.) |
| *Environmental* | *Bernice Samples, et al. v. Conoco, Inc., et al.*<br>Case No. 01-0631-CA-01 (Escambia Country, Fla.) |
| | *Billieson, et al. v. City of New Orleans, et al.*<br>No. 94-19231 (Orleans Parish, LA) |
| | *City of Greenville, et al., v. Syngenta Crop Protection, Inc., and Syngent*<br>No. 3:10-cv-00188-JPG-PMF (S. D. Ill.) |
| | *In Re: Duluth Superior Chemical Spill Litigation*<br>Case No. 92-cv-503 (W.D. Wis.) |
| | *McGruder, et al. v. DPC Enterprises*<br>No. CV2003-022677 (Maricopa County, AZ) |
| | *Mehl v. Canadian Pacific Railway, Limited*<br>Case No. 02-cv-009 (D. N.D.) |
| | *Michelle Marshall, et al. v. Air Liquide -- Big Three, Inc. et al.*<br>No. 2005-08706 (Orleans Parish, LA) |
| | *Perrine, et al. v. E.I. Dupont De Nemours and Company, et al.*<br>01-0631-CA-01 (Harrison C., WV) |



**Partial List of Legal Notification and Settlement Administration Experience**

| | |
|---|---|
| **ERISA** | *In Re: Broadwing Inc ERISA Litigation*<br>Case No. 02-cv-00857 (S.D. Ohio) |
| | *In Re: Xcel Energy, Inc. ERISA Litigation*<br>Case No. 03-cv-2218 (D. Minn.) |
| | *Pat Beesley, et al v. International Paper Co. et al.*<br>Case No. 06-703-DRH (S.D. IL) |
| | *Quince Rankin v. Charles C. Conway (Kmart ERISA Litigation)*<br>Case No. 02-cv-71045 (E.D. Mich.) |
| **FACTA** | *Albright v. Metrolink*<br>No. 4:11-CV-01691AGF (E.D. MO) |
| | *Ebert, et al. v. Warner's Stellian*<br>No. 11-cv-02325 JRT/ SER (D. Minn) |
| | *Fouks, et al. v. Red Wing Hotel Corporation*<br>Case No. 12-cv-02160 (D. MN) |
| | *Jones v. Dickinson*<br>No. 11 CV 02472 (D. MO) |
| | *Linda Todd, et al. v. Medieval Times*<br>Case No. 1:10-cv-00120 (D. N.J.) |
| | *Masters v. Lowe's Home Centers, Inc.*<br>Case No. 3:09-cv--255 (S.D. Ill.) |
| | *Seppanen et al. v. Krist Oil Company*<br>Case No. 2:09-cv-195 (W.D. Mich.) |
| | *Waldman v. Hess Corporation*<br>Case No. 07-cv-2221 (D. N.J.) |
| **Insurance** | *Ann Castello v. Allianz Life Insurance Company*<br>Case No. 03-cv-20405  (D. Minn.) |
| | *Boyd Demmer, et al. v. Illinois Farmers Insurance Company*<br>Case No. MC 00-017872 (Hennepin County, Minn.) |
| | *Chultem v. Ticor Title Insur. Co., et al.*<br>Case No. 2006-CH-09488 (Circuit Court of Cook County, Ill.) |
| | *Colella v. Chicago Title Insur. Co., et al.*<br>Case No. 2006-CH-09489 (Circuit Court of Cook County, Ill.) |
| | *Deborah Hillgamyer, et al. v. Reliastar Life Insurance Company, et al.*<br>No. 11-cv-729 (W.D. WI) |



**Partial List of Legal Notification and Settlement Administration Experience**

| | |
|---|---|
| *Insurance* | *Doan v. State Farm*<br>108CV129264 (Santa Clara Co, CA) |
| | *Dorothea Pavlov v. Continental Casualty Company*<br>Case No. 07-cv-2580 (N.D. Ohio) |
| | *Frank Rose, et al. v. United Equitable Insurance Company, et al.*<br>Case No. 00-cv-02248 (Cass County, ND) |
| | *Froeber v. Liberty Mutual Fire Insurance Company*<br>Case No. 00C15234 (Marion County, OR) |
| | *Garrison, et al., v. Auto-Owners Insurance Company*<br>Case No. 02-cv-324076 (Cole County, Mo.) |
| | *Harold Hanson, et al. v. Acceleration Life Insurance Company, et al.*<br>Case No. 3:97-cv-152 (D. N.D.) |
| | *Hofstetter, et al. v. Chase Home Finance, LLC., et al.*<br>Case No. 10-cv-1313 (N.D. Cal.) |
| | *In Re: Lutheran Brotherhood Variable Insurance Products Co. Sales Pra*<br>Case No. 99-md-1309 (D. Minn.) |
| | *Irene Milkman, et al. v. American Travellers Life Insurance Company, et*<br>No. 03775 (Philadelphia Court of Common Pleas, Pa.) |
| | *Jacobs v. State Farm General Insurance Company*<br>No. CJ-96-406 (Sequoyah County, Okla.) |
| | *James M.  Wallace, III, et al. v. American Agrisurance, Inc., et al.*<br>Case No. 99-cv-669 (E.D. Ark.) |
| | *James Ralston, et al. v. Chrysler Credit Corporation, et al.*<br>Case No. 90-cv-3433 (Lucas County, Ohio) |
| | *Michael T. McNellis, et al. v. Pioneer Life Insurance Company, et al.*<br>CV 990759 (County of San Luis Obispo, Cal.) |
| | *Morris v. Liberty Mutual Fire Insurance Company*<br>CJ-03-714 (Pottawatomie County, OK) |
| | *Paul Curtis, et al v. Northern Life Insurance Company*<br>Case No. 01-2-18578 (King County, Wash.) |
| | *Ralph Shaffer v. Continental Casualty Company and CNA Financial Corp*<br>Case No. 06-cv-2253 (C.D. Cal.) |
| | *Raymond Arent, et al. v. State Farm Mutual Insurance Company*<br>Case No. 00-mc-16521 (D. Minn.) |



**Partial List of Legal Notification and Settlement Administration Experience**

| | |
|---|---|
| ***Insurance*** | *Roy Whitworth, et al. v. Nationwide Mutual Insurance Company, et al.*<br>Case No. 00CVH-08-6980 (Franklin County, Ohio) |
| | *Sonia Gonzalez, et al. v. Rooms to Go, Inc., et al.*<br>Case No. 97-cv-3146 (S.D. Fla.) |
| | *Tow Distributing, Inc., et al. v. BCBSM, Inc., d/b/a Blue Cross and Blue S*<br>Case No. 02-cv-9317 (D. Minn.) |
| ***Legal Notice*** | *Cazenave, et al. v. Sheriff Charles C. Foti, Jr., et al.*<br>Case No. 00-cv-1246 (E.D. La.) |
| | *City of Greenville, et al., v. Syngenta Crop Protection, Inc., and Syngent*<br>No. 3:10-cv-00188-JPG-PMF (S. D. Ill.) |
| | *Evans, et al. v. Linden Research, Inc., et al.*<br>Case No. 4:11-cv-1078-DMR (N.D. CA) |
| | *F.T.C. v. NBTY, Inc.*<br>No. 05-4793 (E.D. NY) |
| | *In Re: Aftermarket Filters Antitrust Litigation*<br>No. 1:08-cv-4883, MDL No. 1957 (N.D. Ill.) |
| | *In Re: Certainteed Fiber Cement Siding Litigation*<br>MDL 2270 (E.D. PA) |
| | *In Re: Google Referrer Header Privacy Litigation*<br>No. 10-04809 (N.D. CA) |
| | *In Re: Salmonella Litigation*<br>Case No. 94-cv-016304 (D. Minn.) |
| | *Kobylanski et al. v. Motorola Mobility, Inc. et al.*<br>No. 13-CV-1181 (W.D. PA) |
| | *Mary Plubell, et al. v. Merck and Co., Inc.*<br>Case No. 04-cv-235817 (Jackson County, MO) |
| | *McGruder, et al. v. DPC Enterprises*<br>No. CV2003-022677 (Maricopa County, AZ) |
| | *Mehl v. Canadian Pacific Railway, Limited*<br>Case No. 02-cv-009 (D. N.D.) |
| | *Michelle Marshall, et al. v. Air Liquide -- Big Three, Inc. et al.*<br>No. 2005-08706 (Orleans Parish, LA) |
| | *Skold, et al. v Intel Corporation, et al.*<br>Case No. 1-05-cv-039231 (County of Santa Clara, CA) |



**Partial List of Legal Notification and Settlement Administration Experience**

| | |
|---|---|
| *Medical/Drug* | *F.T.C. v. CHK Trading Corp.*<br>Case No. 04-cv-8686 (S.D. N.Y.) |
| | *F.T.C. v. Christopher Enterprises, Inc.*<br>Case No. 2:01-cv-0505 (D. Utah) |
| | *F.T.C. v. Conversion Marketing, Inc.*<br>Case No. 04-cv-1264 (C.D. Cal.) |
| | *F.T.C. v. Enforma Natural Products, Inc.*<br>Case No. 00-cv-04376 (C.D. Cal.) |
| | *F.T.C. v. Goen Technologies*<br>FTC File No. 042 3127 |
| | *F.T.C. v. Great American Products*<br>Case No. 05-cv-00170 (N.D. Fla.) |
| | *F.T.C. v. Kevin Trudeau, et al.*<br>Case No. 03-cv-3904 (N.D. Ill.) |
| | *F.T.C. v. Latin Hut, Inc.*<br>Case No. 04-cv-0830 (S.D. Cal.) |
| | *F.T.C. v. QT, Inc.*<br>Case No. 03-cv-3578 (N.D. Ill.) |
| | *F.T.C. v. Seasilver USA, Inc.*<br>Case No. 03-cv-0676 (D. Nev.) |
| | *F.T.C. v. Smart Inventions, Inc.*<br>Case No. 04-cv-4431 (C.D. Cal.) |
| | *F.T.C. v. Sunny Health Nutrition Technology & Products, Inc.*<br>Case No. 06-cv-2193 (M.D. Fla.) |
| | *F.T.C. v. United Fitness of America, LLC*<br>Case No. 02-cv-0648 (D. Nev.) |
| | *In Re: Guidant Corp Implantable Defibrillators Products Liability Litigati*<br>Case No. 05-cv-1708 (D. Minn.) |
| | *Karen Wright, et al. v. Milan Jeckle*<br>Case No. 98-2-07410-2 (Spokane County, Wash.) |
| | *Mary Plubell, et al. v. Merck and Co., Inc.*<br>Case No. 04-cv-235817 (Jackson County, MO) |
| *Privacy/Data Breach* | *Anderson, et al. v. United Retail Group, Inc., et al.*<br>Case No. 37-cv-89685 (San Diego County, Cal.) |



**Partial List of Legal Notification and Settlement Administration Experience**

| | |
|---|---|
| *Privacy/Data Breach* | *F.T.C. v. CEO Group, Inc.*<br>Case No. 06-cv-60602 (S.D. Fla.) |
| | *F.T.C. v. Choicepoint*<br>Case No. 06-cv-0198 (N.D. Ga.) |
| | *In Re: U.S. Bank National Association Litigation*<br>Case No. 99-cv-891 (D. Minn.) |
| | *Michael Stoner, et al. v. CBA Information Services*<br>Case No. 04-cv-519 (E.D. Pa.) |
| | *St. Clair, et al. v MRB, et al.*<br>Casse No. 12-cv-1572 (D. MN) |
| | *Sterling et al. v. Strategic Forecasting, Inc. et al.*<br>No. 2:12-cv-00297-DRH-ARL (E.D. N.Y.) |
| *Securities* | *Alan Freberg, et al. v. Merrill Corporation, et al.*<br>Case No. 99-cv-010063  (D. Minn.) |
| | *Anderson v. Investors Diversified Services*<br>Case No. 4:79-cv-266 (D. Minn.) |
| | *Charter Township Of Clinton v. OSI Restaurants*<br>Case No. 06-CA-010348 (Hillsborough County, Fla.) |
| | *Christopher Carmona, et al. v. Henry I. Bryant, et al. (Albertson's Securi*<br>Case No. 06-cv-01251 (Ada County, Idaho) |
| | *Daryl L. Cooper, et al. v. Miller Johnson Steichen Kinnard, Inc.*<br>Case No. 02-cv-1236 (D. Minn.) |
| | *Dutton v. Harris Stratex Networks, Inc. et al*<br>08-cv-00755-LPS (D. DE) |
| | *Edith Gottlieb v. Xcel Energy, Inc., et al.*<br>Case No. 02-cv-2931 (D. Minn.) |
| | *Family Medicine Specialsts, et al. v. Abatix Corp., et al.*<br>Case No. 3:04-cv-872B (N.D. Tex.) |
| | *Fisk, et al. v. H&R Block Inc., et al.*<br>1216-CV20418 (Jackson County. MO) |
| | *Friedman, et al. v. Penson Worldwide, Inc.*<br>11-cv-02098 (N.D. TX) |
| | *In Re: American Adjustable Rate Term Trust Securities Litigation*<br>Case No. 4:95-cv-666 and 4:95-cv-667 (D. Minn.) |



**Partial List of Legal Notification and Settlement Administration Experience**

| | |
|---|---|
| ***Securities*** | *In Re: Ancor Communications, Inc Securities Litigation*<br>Case No. 97-cv-1696 (D. Minn.) |
| | *In Re: Asia Pulp & Paper Securities Litigation*<br>Case No. 01-cv-7351 (S.D. N.Y.) |
| | *In Re: Bayer AG Secuirites*<br>Case No. 03-cv-1546 (S.D. N.Y.) |
| | *In Re: Bio-One Securities Litigation*<br>Case No. 05-cv-1859 (M.D. Fla.) |
| | *In Re: Bioplasty Securities Litigation*<br>Case No. 4:91-cv-689 (D. Minn.) |
| | *In Re: Citi-Equity Group, Inc. Securities Litigation*<br>Case No. 94-cv-012194 (D. Minn.) |
| | *In Re: Citi-Equity Group, Inc., Limited Partnerships Securities Litigation*<br>MDL No. 1082 (C.D. Cal.) |
| | *In Re: Control Data Corporation Securities Litigation*<br>Case No. 3:85-cv-1341 (D. Minn.) |
| | *In Re: Cray Research Securities Litigation*<br>Case No. 3:89-cv-508 (D. Minn.) |
| | *In Re: Cybex International Securities Litigation*<br>No. 653794/2012 (County of New York, NY) |
| | *In Re: E.W. Blanch Holdings, Inc. Securities Litigation*<br>Case No. 01-cv-258 (D. Minn.) |
| | *In Re: Encore Computer Corporation Shareholder Litigation*<br>Case No. 16044 (New Castle County, Del.) |
| | *In Re: EVCI Career Colleges Holding Corp Securities Litigation*<br>Case No. 05-cv-10240 (S.D. N.Y.) |
| | *In Re: Flight Transportation*<br>MDL No. 517 (D. Minn.) |
| | *In Re: Frontier Oil Corporation*<br>Case No. 2011-11451 (Harris County, Tex.) |
| | *In Re: Hennepin County 1986 Recycling Bond Litigation*<br>Cas No. 92-cv-22272 (D. Minn.) |
| | *In Re: McCleodUSA Incorporated Securities Litigation*<br>Case No. 02-cv-0001 (N.D. Iowa) |



**Partial List of Legal Notification and Settlement Administration Experience**

| **Securities** | |
|---|---|
| | *In Re: McKesson HBOC, Inc. Securities Litigation*<br>Case No. 99-cv-20743 (N.D. Cal.) |
| | *In Re: Merrill Lynch & Co., Inc. Securities Derivative and ERISA Litigatio*<br>07-cv-9633 (S.D. NY) |
| | *In Re: Merrill Lynch Research Reports Securities Litigation*<br>Case No. 02-md-1484 (S.D. N.Y.) |
| | *In Re: Micro Component Technology, Inc. Securities Litigation*<br>Case No. 4:94-cv-346 (D. Minn.) |
| | *In Re: National City Corp. Securities, Derivative and Erisa Litig.*<br>MDL No. 2003 (N.D. Ohio) |
| | *In Re: New Century*<br>No. 07-CV-0931 (C.D. Cal.) |
| | *In Re: Novastar Financial, Inc. Securities Litigation*<br>Case No. 04-cv-0330 (W.D. Mo.) |
| | *In Re: OCA, Inc. Securities and Derivative Litigation*<br>Case No. 05-cv-2165 (E.D. La.) |
| | *In Re: Raytheon Company Securities Litigation*<br>Case No. 99-cv-12142 (D. Mass.) |
| | *In Re: Reliance Group Holdings, Inc. Securities Litigation*<br>Case No. 00-cv-4653 (S.D. N.Y.) |
| | *In Re: Retek Inc Securities Litigation*<br>Case No. 02-cv-4209 (D. Minn.) |
| | *In Re: Salomon Analyst Metromedia Litigation*<br>Case No. 02-cv-7966 (S.D. N.Y.) |
| | *In Re: Scimed Life Systems, Inc. Shareholders Litigation*<br>Case No. 94-mc-17640 (D. Minn.) |
| | *In Re: Sourcecorp Securities Litigation*<br>Case No. 04-cv-02351 (N.D. Tex.) |
| | *In Re: SS&C Technologies, Inc. Shareholders Litigation*<br>Case No. 05-cv-1525 (D. Del.) |
| | *In Re: Taxable Municipal Bond Securities Litigation*<br>MDL 863 (E.D. La.) |
| | *In Re: Tellium Inc Securities Litigation*<br>Case No. 02-cv-5878  (D. N.J.) |



**Partial List of Legal Notification and Settlement Administration Experience**

| | |
|---|---|
| **Securities** | *In Re: The Sportsman's Guide, Inc. Litigation*<br>Case No. 06-cv-7903  (D. Minn.) |
| | *In Re: Tonka Corporation Securities Litigation*<br>Case No.  4:90-cv-002 (D. Minn.) |
| | *In Re: Tonka II Securities Litigation*<br>Case No. 3:90-cv-318 (D. Minn.) |
| | *In Re: Tricord Systems, Inc. Securities Litigation*<br>Case No. 3:94-cv-746 (D. Minn.) |
| | *In Re: VistaCare, Inc. Securities Litigation*<br>Case No. 04-cv-1661 (D. Ariz.) |
| | *In Re: Williams Securities Litigation*<br>Case No. 02-cv-72(N.D. Okla.) |
| | *In Re: Xcel Energy, Inc. Securities Litigation*<br>Case No. 02-cv-2677 (D. Minn.) |
| | *In Re: Xcelera.Com Securities Litigation*<br>Case No. 00-cv-11649 (D. Mass.) |
| | *In Re: Xybernaut Corp. Securities MDL Litigation*<br>Case No. 05-mdl-1705 (E.D. Va.) |
| | *Ivy Shipp, et al. v. Nationsbank Corp.*<br>19,002 (TX 12th Jud Dist) |
| | *Karl E. Brogen and Paul R. Havig, et al. v. Carl Pohlad, et al.*<br>Case No. 3:93-cv-714 (D. Minn.) |
| | *Lewis H. Biben, et al. v. Harold E. Card, et al.*<br>Case No. 84-cv-0884 (W.D. Mo.) |
| | *Lori Miller, et al. v. Titan Value Equities Group Inc., et al.*<br>Case No. 94-mc-106432 (D. Minn.) |
| | *Makor Issues & Rights, Ltd., et al. v. Tellabs, Inc., et al.*<br>02-C-4356 (N.D. IL) |
| | *Montoya, et al. v. Mamma.com, Inc., et al.*<br>Case No. 1:05-cv-02313 (S.D. N.Y.) |
| | *Resendes, et al.; Maher, et al.; Hawkins, et al.; Schooley, et al. v. Thorp,*<br>Case No. 84-cv-03457, 84-cv-11251, 85-cv-6074, 86-cv-1916L (D. Minn.) |
| | *Richard Donal Rink, et al. v. College Retirement Equities Fund*<br>No. 07-CI-10761, (Jefferson County, KY) |



**Partial List of Legal Notification and Settlement Administration Experience**

| | |
|---|---|
| ***Securities*** | *Robert Trimble, et al. v. Holmes Harbor Sewer District, et al.* <br> Case No. 01-2-00751-8 (Island County, Wash.) |
| | *SEC v Al-Raya Investment Company, et. al.* <br> No. 109-CV-6533 |
| | *Superior Partners, et al. v. Rajesh K. Soin, et al.* <br> Case No. 08-cv-0872 (Montgomery County, Ohio) |
| | *Svenningsen, et al. v. Piper Jaffray & Hopwood, et al.* <br> Case No. 3:85-cv-921 (D. Minn.) |
| | *Three Bridges Investment Group, et al. v. Honeywell, et al.* <br> Case No. 88-cv-22302 (D. Minn.) |
| | *United States of America v. Zev Saltsman* <br> Case No. 04-cv-641 (E.D. N.Y.) |
| | *William Steiner, et al. v. Honeywell, Inc. et al.* <br> Case No. 4:88-cv-1102 (D. Minn.) |
| ***Test Score*** | *David Andino, et al. v. The Psychological Corporation, et al.* <br> Case No. A457725 (Clark County, Nev.) |
| | *Frankie Kurvers, et al. v. National Computer Systems* <br> No. MC00-11010 (Hennepin County, Minn) |

# Exhibit 4-2

## Pew Internet and American Life Project

 

MARCH 9, 2012

# Search Engine Use 2012

*Even though online Americans are more satisfied than ever with the performance of search engines, strong majorities have negative views of personalized search results and targeted ads*

**Kristen Purcell**
*Associate Director for Research, Pew Internet Project*

**Joanna Brenner**
*Web Coordinator, Pew Internet Project*

**Lee Rainie**
*Director, Pew Internet Project*

Pew Research Center's Internet & American Life Project
1615 L St., NW – Suite 700
Washington, D.C. 20036
Phone: 202-419-4500

http://pewinternet.org/Reports/2012/Search-Engine-Use-2012.aspx

# Summary of findings

Search engines remain popular—and users are more satisfied than ever with the quality of search results—but many are anxious about the collection of personal information by search engines and other websites.

## Most search users disapprove of personal information being collected for search results or for targeted advertising

The Pew Internet & American Life survey in February 2012 included several questions probing how respondents feel about search engines and other websites collecting information about them and using it to either shape their search results or target advertising to them.  Clear majorities of internet and search users disapprove of these practices in all the contexts we probed.

Specifically, the survey posed the following choices to search engine users:

| | |
|---|---|
| **65% say…** | It's a BAD thing if a search engine collected information about your searches and then used it to rank your future search results, because it may limit the information you get online and what search results you see |
| **29% say…** | It's a GOOD thing if a search engine collected information about your searches and then used it to rank your future search results, because it gives you results that are more relevant to you |
| **73% say they would…** | NOT BE OKAY with a search engine keeping track of your searches and using that information to personalize your future search results because you feel it is an invasion of privacy |
| **23% say they would…** | Be OKAY with a search engine keeping track of your searches and using that information to personalize your future search results, even if it means they are gathering information about you |

All internet users were posed the following choice regarding targeted advertising:

| | |
|---|---|
| **68% say…** | I'm NOT OKAY with targeted advertising because I don't like having my online behavior tracked and analyzed |
| **28% say…** | I'm OKAY with targeted advertising because it means I see advertisements and get information about things I'm really interested in |

2

## Overall views of search engine performance are very positive

For more than a decade, Pew Internet data has consistently shown that search engine use is one of the most popular online activities, rivaled only by email as an internet pursuit. In January 2002, 52% of *all Americans* used search engines. In February 2012 that figure grew to 73% of *all Americans.* On any given day in early 2012, more than half of adults using the internet use a search engine (59%). That is double the 30% of internet users who were using search engines on a typical day in 2004. And people's frequency of using search engines has jumped dramatically.

Moreover, users report generally good outcomes and relatively high confidence in the capabilities of search engines:

- 91% of search engine users say they always or most of the time find the information they are seeking when they use search engines
- 73% of search engine users say that most or all the information they find as they use search engines is accurate and trustworthy
- 66% of search engine users say search engines are a fair and unbiased source of information
- 55% of search engine users say that, in their experience, the quality of search results is getting better over time, while just 4% say it has gotten worse
- 52% of search engine users say search engine results have gotten more relevant and useful over time, while just 7% report that results have gotten less relevant

These findings are a backdrop for the ongoing policy debates about privacy, collection of personal information online, and the enthusiasm for targeted search and targeted advertising among companies. They also arise as Google implements a new privacy policy in which information about users' online behavior when they are signed into Google's programs can be collected and combined into a cohesive user profile. This includes material from Google's search engine, the Google+ social networking site, YouTube video-sharing site, and Gmail.

## Most internet users say they do not know how to limit the information that is collected about them by a website

Just 38% of internet users say they are generally aware of ways they themselves can limit how much information about them is collected by a website.  Among this group, one common strategy people use to limit personal data collection is to delete their web history: 81% of those who know ways to manage the capture of their data do this. Some 75% of this group uses the privacy settings of websites to control what's captured about them. And 65% change their browser settings to limit the information that is collected.[1]

---

[1] There are a range of other strategies that users can employ, including the deletion of cookies and the use of anonymizing software and proxies that were not part of this survey.

## Overall, search users are confident in their abilities

Most search users say they are confident in their own search abilities, and find what they are looking for most of the time.  More than half of search users (56%) say they are *very* confident in their search abilities, while only 6% say they are not too or not all confident.  And the vast majority of search users report being able to find what they are looking for always (29%) or most of the time (62%).

## Positive search experiences are more common than negative experiences

Asked about different experiences they have had using search engines, more users report positive experiences than negative. They said in their use of search engines they had:

- learned something new or important that really helped them or increased their knowledge (86% of search users have had this experience)
- found a really obscure fact or piece of information they thought they would not be able to find (50%)
- gotten conflicting information in search results and not been able to figure out what is correct (41%)
- gotten so much information in a set of results that you feel overwhelmed (38%)
- found that critical information is missing from search results (34%)

## Google continues to be the most popular search engine, by a wide margin

Google continues to dominate the list of most used search engines.  Asked which search engine they use most often, 83% of search users say Google.  The next most cited search engine is Yahoo, mentioned by just 6% of search users.  When we last asked this question in 2004, the gap between Google and Yahoo was much narrower, with 47% of search users saying Google was their engine of choice and 26% citing Yahoo.

## About the survey

These are the findings from a survey conducted from January 20-February 19, 2012 among 2,253 adults age 18 and over, including 901 cell phone interviews. Interviews were conducted in English and Spanish. The margin of error for the full sample is plus or minus 2 percentage points.

# Main findings

## Search engine use over time

A February 2012 Pew Internet survey finds that 91% of online adults use search engines to find information on the web, up from 84% in June 2004, the last time we did an extended battery of survey questions about people's search engine use. On any given day online, 59% of those using the Internet use search engines. In 2004 that figure stood at just 30% of internet users.

As early as 2002, more than eight in ten online adults were using search engines, and as we noted in an August 2011 report[2], search is only rivaled by email both in the overall percent of internet users who engage in the activity and the percent of internet users doing it on a given day. The table below shows how search compares over time with some other popular online activities.

### Over time, search has remained one of the most popular internet activities

*% of internet users who do each activity*



**Source:** The Pew Research Center's Internet & American Life Project tracking surveys, 2002-2012. Social network site use not tracked prior to February, 2005. For more activity trends, go to pewinternet.org. "Get news online" and "buy a product online" have not yet been asked in 2012 surveys.

---

[2] See "Search and Email Still Top the List of Most Popular Online Activities," available at http://www.pewinternet.org/Reports/2011/Search-and-email.aspx

Search is most popular among young adult internet users, those who have been to college, and those with the highest household incomes.  These same groups—the young, college-educated, and affluent—are also most likely to report using a search engine "yesterday."  And while white and black online adults are more likely than Hispanics to report using search overall, white online adults stand out from all others as more likely to use search on a given day.

## Who uses search?

*% of online adults in each group who use search engines*

| | % of each group who ever use search engines | % of each group who used a search engine yesterday |
|---|---|---|
| All online adults | 91% | 59% |
| **Gender** | | |
| Male | 90 | 59 |
| Female | 92 | 60 |
| **Race/Ethnicity** | | |
| White | 93* | 63* |
| African American | 89* | 44 |
| Hispanic | 79 | 44 |
| **Age** | | |
| 18-29 | 96 | 66* |
| 30-49 | 91 | 65* |
| 50-64 | 92 | 52* |
| 65+ | 80 | 38 |
| **Education** | | |
| Some high school | 78 | 34 |
| High school | 88* | 45* |
| Some college | 94* | 65* |
| College graduate | 95* | 74* |
| **Household income** | | |
| < $30,000 | 84 | 45 |
| $30,000 - $49,999 | 93* | 54* |
| $50,000 - $74,999 | 97* | 66* |
| $75,000+ | 95* | 76* |

**\*** Denotes statistically significant difference with other rows in that category
**Source:** The Pew Research Center's Internet & American Life Project Winter 2012 Tracking Survey, January 20-February 19, 2012. N=2,253 adults age 18 and older, including 901 cell phone interviews. Interviews conducted in English and Spanish. The margin of error is plus or minus 3 percentage points for internet users.

Asked how often they use a search engine to find information online, just over half of all search engine users (54%) say they do this at least once a day, a significant increase over 2004.

## Search users are turning to search engines more frequently

*% of adult search users who use a search engine to find information….*



**Source:** The Pew Research Center's Internet & American Life Project Winter 2012 Tracking Survey, January 20-February 19, 2012. N=2,253 adults, age 18 and older, including 901 cell phone interviews. Interviews conducted in English and Spanish. An asterisk (*) indicates a significant difference across years at the .95 confidence level.

Frequency of search engine use varies by age, education and income, with adults under age 50 and those with more education and higher household incomes using search more frequently than others.

## Daily searching is most common among younger, more educated and more affluent search engine users

*Frequency of search engine use among each group of search users….*



**Source:** The Pew Research Center's Internet & American Life Project Winter 2012 Tracking Survey, January 20-February 19, 2012. N=2,253 adults, age 18 and older, including 901 cell phone interviews. Interviews conducted in English and Spanish.

## Google is far and away the most popular search engine

Among search engine users, Google dominance continues and it is far and away the search engine they report using most often.  Fully 83% of searchers use Google more often than any other search engine. Yahoo is a very distant second at just 6%.  In 2004, the gap between these two search leaders was much narrower.  At that time, 47% said that Google was the search engine they used most often while 26% named Yahoo.

### Google is far and away the search engine of choice, preferred by 83% of search users

*% of search users who answered the question: Which search engine do you use MOST OFTEN?*



**2004**                    **2012**

**Source:** The Pew Research Center's Internet & American Life Project Winter 2012 Tracking Survey, January 20-February 19, 2012. N=2,253 adults, age 18 and older, including 901 cell phone interviews. Interviews conducted in English and Spanish.

9

## Quality of information

Fairly large majorities of search engine users express confidence in these tools and the results they generate. Not only does a majority believe that search engines are fair and unbiased, they also believe that most results are accurate and trustworthy. And most say that the quality and relevance of search results has been improving over time or has not changed, while very few see the quality and relevance of results declining.

### Bias and accuracy

There continues to be widespread faith in search results, and perceptions of fairness and bias have not changed at all over the past eight years. Roughly two-thirds of searchers (66%) say search engines are a fair and unbiased source of information. In 2004, 68% of search users said that search engines were a fair and unbiased source of information.

Asked how much of the information they get in search results is accurate or trustworthy, 28% say all or almost all and another 45% say most.

### Most adult search engine users have faith in the fairness and accuracy of their results

*In general, do you think Internet search engines are a fair and unbiased source of information, or do you think search engines are NOT a fair and unbiased source?*



*In general, how much of the information you find using search engines do you think is accurate or trustworthy?*



**Source:** The Pew Research Center's Internet & American Life Project Winter 2012 Tracking Survey, January 20-February 19, 2012. N=2,253 adults, age 18 and older, including 901 cell phone interviews. Interviews conducted in English and Spanish.

10                                                                 pewinternet.org

Younger search engine users have more faith in the results they get.  72% of 18-29 year-olds say that search engines are a fair and unbiased source, compared with 65% of 30-49 year-olds, 67% of 50-64 year-olds, and just 54% of search users age 65 and older.

Where accuracy and trustworthiness are concerned, women are slightly more likely than men (76% v. 69%) to feel that all or most of the results they get are accurate and trustworthy.  Search users living in the highest income households are also slightly more likely than others to believe that all or most of their results can be trusted.

## Relevance and quality over time

Half of adult search users (52%) say search results have gotten *more relevant and useful* over time, while just 7% see them as getting less relevant or useful.  The remaining 40% see no change over time. A similar question about changes in the *quality* of information over time yields similar results.  Just over half of adult search users (55%) say that in their experience the quality of search results has gotten better over time, while 4% say the quality has gotten worse.

### Most adult search engine users say the relevance and quality of results are improving over time

*Overall, in your experience, are search engine results getting MORE relevant and useful over time, LESS relevant and useful, or have you not seen any real difference over time?*



*Overall, in your experience, is the QUALITY of the information you get using search engines getting BETTER over time, WORSE over time, or have you not seen any real difference over time?*



**Source:** The Pew Research Center's Internet & American Life Project Winter 2012 Tracking Survey, January 20-February 19, 2012. N=2,253 adults, age 18 and older, including 901 cell phone interviews. Interviews conducted in English and Spanish.

Adult search users under age 50 are slightly more likely than older search users to feel the quality of search results is improving over time.  Older adult search users, in contrast, are more likely to see no difference in quality.  There are no notable demographic differences where perceptions of relevance are concerned.

## Search users under age 50 are slightly more likely to say the quality of results is improving over time

*Overall, in your experience, is the QUALITY of the information you get using search engines getting BETTER over time, WORSE over time, or have you not seen any real difference?*



**Source:** The Pew Research Center's Internet & American Life Project Winter 2012 Tracking Survey, January 20-February 19, 2012. N=2,253 adults, age 18 and older, including 901 cell phone interviews. Interviews conducted in English and Spanish. An asterisk (*) indicates a significant difference across age groups at the 95% confidence level.

## Searchers' experiences and perceptions of their own abilities

Search engine users not only have confidence in the information they get using these tools, they also have confidence in their own search abilities and report finding what they are looking for most or all of the time.

In 2012, just over half of search users (56%) say they are *very confident* in their search abilities, which is a small but significant increase over 2004 when 48% felt this confident.  Another 37% of search users today describe themselves as *somewhat* confident, with fewer than one in ten saying they are *not too* or *not at all* confident in their ability to use search engines to find information online.

12                                                                    pewinternet.org

## Search users are only slightly more confident in their search abilities than they were in 2004

*How CONFIDENT do you feel about your own searching abilities when using a search engine to find information online?*



**Source:** The Pew Research Center's Internet & American Life Project Winter 2012 Tracking Survey, January 20-February 19, 2012. N=2,253 adults, age 18 and older, including 901 cell phone interviews. Interviews conducted in English and Spanish. An asterisk (*) indicates a significant difference across years at the 95% confidence level.

Search users under age 50 are more likely to say they are *very* confident in their search abilities when compared with those age 50 and older (64% v. 40%), as are search users who have some college education when compared with those who do not (64% v. 45%).  And while 68% of adults living in households with incomes of $75,000 or greater say they are *very* confident in their ability to find information online using search engines, the same is true of only about half of adults in all other income ranges.

In addition to expressing more confidence, search users in 2012 are also slightly more likely than they were in 2004 to say that they *always* find the information they are looking for.  While 29% of search engine users today say this is the case, just 17% reported the same in 2004.  Still, in both 2012 and 2004, the majority of search users say they find what they are looking for *most* of the time, but not always.

While there are few notable demographic effects in terms of one's perception of their ability to find what they are looking for, the one group that stands out in this regard is adults living in the lowest income households.  This group is more likely than any other to say they *always* find what they are looking for, with 37% reporting this.

13

## Search users in 2012 are more likely to report always finding the information they are searching for

*When you use a search engine to look for information online, how often do you actually FIND the information you're looking for?*



**Source:** The Pew Research Center's Internet & American Life Project Winter 2012 Tracking Survey, January 20-February 19, 2012. N=2,253 adults, age 18 and older, including 901 cell phone interviews. Interviews conducted in English and Spanish. An asterisk (*) indicates a significant difference across years at the 95% confidence level.

## More search users report more positive experiences than negative experiences

Given the largely positive view of the quality of information search engines yield, and their own search abilities, it is not surprising that many search users report positive experiences using these tools.  More than eight in ten searchers say they have learned something new or important using a search engine that really helped them or increased their knowledge.  And half say they were able to find a really obscure fact or piece of information using a search engine.

Yet despite these positive occurrences, many respondents also report having experienced the downside of search.  Four in ten searchers say they have gotten conflicting or contradictory search results and could not figure out what information was correct.  About four in ten also say they have gotten so much information in a set of search results that they felt overwhelmed.  About one in three have had the experience of discovering that really critical or important information was missing from search results they got.

14

## More adult search users report positive experiences than negative experiences

*% of adult search engine users who have experienced each of the following…*



**Source:** The Pew Research Center's Internet & American Life Project Winter 2012 Tracking Survey, January 20-February 19, 2012. N=2,253 adults, age 18 and older, including 901 cell phone interviews. Interviews conducted in English and Spanish. The margin of error is plus or minus 3 percentage points for total adult search users.

The experiences search engine users report vary slightly by education level, sex, and age.  For example, college educated search engine users are more likely than those with less education to report having all five of the experiences asked about in the survey.  And men are more likely than women to report finding obscure facts via search engines, getting conflicting information, and discovering that critical information is missing from their results.

## College educated search users are more likely to report having both positive and negative experiences

*% of each group who have experienced each of the following…*



Have been to college [n=1,090]   Have not been to college [n=515]

**Source:** The Pew Research Center's Internet & American Life Project Winter 2012 Tracking Survey, January 20-February 19, 2012. N=2,253 adults, age 18 and older, including 901 cell phone interviews. Interviews conducted in English and Spanish. An asterisk (*) indicates a significant difference at the 95% confidence level.

Among adult search users, one's experiences using search engines also vary by age.  Adults age 30-49, for example, are more likely than both their older and younger counterparts to report finding obscure information using search engines. Young adults, in contrast, are most likely to report getting conflicting or contradictory information in a set of results.  The oldest adults, those age 50 and older, are most likely to report feeling overwhelmed by the amount of information in search results and least likely to report finding that critical information was missing from their search results.

## Male search users are more likely to report missing or conflicting information, but also finding obscure information

*% of each group who have experienced each of the following…*



**Source:** The Pew Research Center's Internet & American Life Project Winter 2012 Tracking Survey, January 20-February 19, 2012. N=2,253 adults, age 18 and older, including 901 cell phone interviews. Interviews conducted in English and Spanish. An asterisk (*) indicates a significant difference at the 95% confidence level.

## Some search users' experiences vary by age

*% of each group who have experienced each of the following…*



**Source:** The Pew Research Center's Internet & American Life Project Winter 2012 Tracking Survey, January 20-February 19, 2012. N=2,253 adults, age 18 and older, including 901 cell phone interviews. Interviews conducted in English and Spanish. An asterisk (*) indicates a significant difference at the 95% confidence level.

## Most have negative views of search engines and other sites collecting information about them

The survey asked respondents their views of search engines and other websites collecting information about them and using it to either shape their search results or target advertising to them.  Overall, attitudes toward these practices are mixed, but the majority of internet and search users express disapproval.

This is especially relevant as Google implements a new privacy policy in which information about an individual's online behavior when they are signed in on any of Google's sites (including its search engine, Google+ social networking site, YouTube video-sharing site, and Gmail) can be collected and combined into a cohesive user profile.  As the firm put it in a blog post:

> "If you're signed in to Google, you expect our products to work really beautifully together. For example, if you're working on Google Docs and you want to share it with someone on Gmail, you want their email right there ready to use. Our privacy policies have always allowed us to combine information from different products with your account—effectively using your data to provide you with a better service. However, we've been restricted in our ability to combine your YouTube and Search histories with other information in your account. Our new Privacy Policy gets rid of those inconsistencies so we can make more of your information available to you when using Google."[3]

The company argues that the value of these user profiles is their ability to signal to marketers which products are likely to appeal to different individuals, thereby allowing them to target online advertising to those most likely to find it relevant and purchase products. Some privacy and consumer advocates argue that many consumers do not want to have personal information about them collected and that profiling process is often confusing to consumers, who don't know how they are being tracked and what profiling procedures determine what ads they see.

Our questions were designed to test these arguments. Two different questions probed searchers about whether they think it is okay for search engines to use information about them to rank their future search results.  In the first version of the question, two-thirds of searchers feel it is a bad thing if a search engine collected information about their searches and then used it to rank their future search results, because it may limit the information you get online and what search results you see.  Some 29% view the practice of tailoring search results favorably.

---

[3] See: http://googleblog.blogspot.com/2012/02/googles-new-privacy-policy.html

## Two-thirds of search users view personalized search results as a bad thing

*If a search engine kept track of what you search for, and then used that information to personalize your future search results, how would you feel about that?*

*based on search users [n=812]*



■ It's a BAD thing because it may limit the information you get online and what search results you see
■ It's a GOOD thing because it gives you results that are more relevant to you
■ Neither (VOL)
■ DK/Ref

**Source:** The Pew Research Center's Internet & American Life Project Winter 2012 Tracking Survey, January 20-February 19, 2012. N=2,253 adults, age 18 and older, including 901 cell phone interviews. Interviews conducted in English and Spanish.

Search users' views of search engines collecting information about them vary slightly by age, race/ethnicity, and income.  Younger search users (age 18-29) tend to view the practice more favorably, as do African-American/Hispanic adults when compared with white search users.  Search users in the lowest income category (household income less than $30,000 annually) are also more likely than higher income search users to say the practice of personalizing search results based on collected information about users is a good thing.

## Perceptions of personalized search results vary by age, race/ethnicity, and income

*If a search engine kept track of what you search for, and then used that information to personalize your future search results, how would you feel about that?*



**Source:** The Pew Research Center's Internet & American Life Project Winter 2012 Tracking Survey, January 20-February 19, 2012. N=2,253 adults, age 18 and older, including 901 cell phone interviews. Interviews conducted in English and Spanish.

A different version of the question asking about personalized search results yields even more negative views.  Almost three-quarters of searchers say they would NOT BE OKAY with a search engine keeping track of their searches and using that information to personalize their future search results because they see it as an invasion of privacy.  This view holds constant across most demographic groups, with the exception of those age 50 and older, who are especially likely to view the practice negatively.

## Three-quarters of search users say collecting user information to personalize search results is not okay

*If a search engine kept track of what you search for, and then used that information to personalize your future search results, how would you feel about that?*

*Based on search users [n=802]*



■ Would NOT be okay with it because you feel it is an invasion of your privacy
■ Would be OKAY with it, even if it means they are gathering information about you
■ Neither (VOL)
■ DK/Ref

**Source:** The Pew Research Center's Internet & American Life Project Winter 2012 Tracking Survey, January 20-February 19, 2012. N=2,253 adults, age 18 and older, including 901 cell phone interviews. Interviews conducted in English and Spanish.

## Targeted advertising: 59% of internet users have noticed it, but most don't like it

In addition to asking search users about personalized search results, all internet users were asked whether they had noticed ads being targeted to them online and more broadly, their opinion of targeted advertising.  A majority (59%) say they themselves have noticed targeted advertising online – specifically, they have noticed advertisements online that are directly related to things they had recently searched for or sites they had recently visited.

### Who experiences targeted advertising online?

*Have you, personally, ever noticed advertisements online that are directly related to things you have recently searched for or sites you have recently visited, or has this never happened to you?*

| | % of each group answering "yes" |
|---|---|
| **All online adults  [n=1,729]** | **59%** |
| **Gender** | |
| Male [n=804] | 62* |
| Female [n=925] | 56 |
| **Race/Ethnicity** | |
| White [n=1,229] | 62* |
| African American [n=172] | 51 |
| Hispanic [n=184] | 46 |
| **Age** | |
| 18-29 [n=316] | 62* |
| 30-49 [n=532] | 62* |
| 50-64 [n=521] | 56* |
| 65+ [n=320] | 47 |
| **Education** | |
| Some high school [n=108] | 38 |
| High school [n=465] | 44 |
| Some college [n=447] | 64* |
| College graduate [n=698] | 73* |
| **Household income** | |
| <$30,000 [n=390] | 48 |
| $30,000-$49,999 [n=290] | 57 |
| $50,000-$74,999 [n=250] | 67* |
| $75,000+ [n=523] | 69* |

**Source:** The Pew Research Center's Internet & American Life Project Winter 2012 Tracking Survey, January 20-February 19, 2012. N=2,253 adults, age 18 and older, including 901 cell phone interviews. Interviews conducted in English and Spanish. The margin of error is plus or minus 3 percentage points for total internet users. An asterisk (*) indicates a significant difference across groups at the .95 confidence level.

The demographic groups most likely to report noticing targeted advertising online are men, white internet users, those under age 65, those who have been to college, and those living in higher income households.  Three-quarters (73%) of college graduates have noticed online ads related to things they recently searched for or sites they recently visited, significantly higher than online adults with lower educational attainment.  Likewise, online adults living in households with annual incomes of $75,000 or greater are also especially likely to notice such ads, with 69% reporting having this experience.

Internet users were then asked how they feel about the practice of online targeted advertising.  Roughly two-thirds of internet users (68%) have an unfavorable view of the practice, saying they are not okay with targeted advertising because they do not like having their online behavior tracked and analyzed.  Some 28% said they are okay with targeted advertising because it means they see advertisements and get information about things they are really interested in.

---

### Two-thirds of internet users view online targeted advertising negatively

*Which of the following statements comes closest to how you, personally, feel about TARGETED ADVERTISING being used online – even if neither is exactly right?*

*Asked of adult internet users [n=1,729]*



■ I'm NOT okay with it because I don't like having my online behavior tracked and analyzed
■ I'm OKAY with it because it means I see ads and get information about things I'm really interested in
■ Neither (VOL)
■ DK/Ref

**Source:** The Pew Research Center's Internet & American Life Project Winter 2012 Tracking Survey, January 20-February 19, 2012. N=2,253 adults, age 18 and older, including 901 cell phone interviews. Interviews conducted in English and Spanish. The margin of error is plus or minus 3 percentage points for internet users.

---

While a majority of every demographic group says they are not okay with online targeted advertising, younger internet users and those in the lowest income households are more likely than others to view the practice favorably.   Yet, even among those groups, almost six in ten say they are not okay with targeted ads because they do not like having their online behavior tracked and analyzed.

## Views of targeted advertising vary by age and income

*Which of the following statements comes closest to how you, personally, feel about TARGETED ADVERTISING being used online – even if neither is exactly right?*

*Asked of adult internet users [n=1,729]*



Source: The Pew Research Center's Internet & American Life Project Winter 2012 Tracking Survey, January 20-February 19, 2012. N=2,253 adults, age 18 and older, including 901 cell phone interviews. Interviews conducted in English and Spanish.

## Most internet users say they do not know how to limit the information that is collected about them by a website

Just 38% of internet users say they are generally aware of ways they themselves can limit how much information about them is collected by a website.  Among this group, one common strategy people use to limit personal data collection is to delete their web history: 81% of those who know ways to manage the capture of their data do this. Some 75% of this group uses the privacy settings of websites to control what's captured about them. And 65% change their browser settings to limit the information that is collected.[4]

### Just 38% of online adults say they are aware of ways to limit how much personal information websites can collect about them

*The percent of those who are aware of ways to limit information who have done each of the following…*



**Source:** The Pew Research Center's Internet & American Life Project Winter 2012 Tracking Survey, January 20-February 19, 2012. N=2,253 adults, age 18 and older, including 901 cell phone interviews. Interviews conducted in English and Spanish.

Online men are significantly more likely than women to report knowing ways to limit how much personal information websites can collect about them, as are white online adults when compared with African-Americans and Hispanics.  Moreover, online adults who have been to college and those under age 50 are more likely than other online adults to report knowing how to do this.

---

[4] There are a range of other strategies that users can employ, including the deletion of cookies and the use of anonymizing software and proxies that were not part of this survey.

## Who knows how to limit websites' access to their personal information online?

*Are you aware of any ways internet users like yourself can limit how much personal information websites collect about you, or are you not aware of any ways to do this?*

| | % of each group answering "yes" |
|---|---|
| **All online adults  [n=1,729]** | **38%** |
| **Gender** | |
| Male [n=804] | 42* |
| Female [n=925] | 35 |
| **Race/Ethnicity** | |
| White [n=1,229] | 41* |
| African American [n=172] | 34 |
| Hispanic [n=184] | 27 |
| **Age** | |
| 18-29 [n=316] | 41* |
| 30-49 [n=532] | 42* |
| 50-64 [n=521] | 34* |
| 65+ [n=320] | 27 |
| **Education** | |
| Some high school [n=108] | 28 |
| High school [n=465] | 31 |
| Some college [n=447] | 43* |
| College graduate [n=698] | 44* |
| **Household income** | |
| <$30,000 [n=390] | 34 |
| $30,000-$49,999 [n=290] | 41 |
| $50,000-$74,999 [n=250] | 32 |
| $75,000+ [n=523] | 44* |

**Source:** The Pew Research Center's Internet & American Life Project Winter 2012 Tracking Survey, January 20-February 19, 2012. N=2,253 adults, age 18 and older, including 901 cell phone interviews. Interviews conducted in English and Spanish. The margin of error is plus or minus 3 percentage points for total internet users. An asterisk (*) indicates a significant difference across groups at the .95 confidence level.

# Methodology

This report is based on the findings of a survey on Americans' use of the Internet. The results in this report are based on data from telephone interviews conducted by Princeton Survey Research Associates International from January 20 to February 19, 2012, among a sample of 2,253 adults, age 18 and older. Telephone interviews were conducted in English and Spanish by landline (1,352) and cell phone (901, including 440 without a landline phone). For results based on the total sample, one can say with 95% confidence that the error attributable to sampling is plus or minus 2.3 percentage points.  For results based Internet users (n=1,729), the margin of sampling error is plus or minus 2.7 percentage points.  In addition to sampling error, question wording and practical difficulties in conducting telephone surveys may introduce some error or bias into the findings of opinion polls.

A combination of landline and cellular random digit dial (RDD) samples was used to represent all adults in the continental United States who have access to either a landline or cellular telephone. Both samples were provided by Survey Sampling International, LLC (SSI) according to PSRAI specifications.  Numbers for the landline sample were selected with probabilities in proportion to their share of listed telephone households from active blocks (area code + exchange + two-digit block number) that contained three or more residential directory listings. The cellular sample was not list-assisted, but was drawn through a systematic sampling from dedicated wireless 100-blocks and shared service 100-blocks with no directory-listed landline numbers.

New sample was released daily and was kept in the field for at least five days. The sample was released in replicates, which are representative subsamples of the larger population. This ensures that complete call procedures were followed for the entire sample.  At least 7 attempts were made to complete an interview at a sampled telephone number. The calls were staggered over times of day and days of the week to maximize the chances of making contact with a potential respondent. Each number received at least one daytime call in an attempt to find someone available. For the landline sample, interviewers asked to speak with the youngest adult male or female currently at home based on a random rotation. If no male/female was available, interviewers asked to speak with the youngest adult of the other gender. For the cellular sample, interviews were conducted with the person who answered the phone. Interviewers verified that the person was an adult and in a safe place before administering the survey. Cellular sample respondents were offered a post-paid cash incentive for their participation. All interviews completed on any given day were considered to be the final sample for that day.

Weighting is generally used in survey analysis to compensate for sample designs and patterns of non-response that might bias results. A two-stage weighting procedure was used to weight this dual-frame sample. The first-stage corrected for different probabilities of selection associated with the number of adults in each household and each respondent's telephone usage patterns.[5] This weighting also adjusts for the overlapping landline and cell sample frames and the relative sizes of each frame and each sample.

---

[5] i.e., whether respondents have only a landline telephone, only a cell phone, or both kinds of telephone.

The second stage of weighting balances sample demographics to population parameters. The sample is balanced to match national population parameters for sex, age, education, race, Hispanic origin, region (U.S. Census definitions), population density, and telephone usage. The Hispanic origin was split out based on nativity; U.S born and non-U.S. born. The White, non-Hispanic subgroup is also balanced on age, education and region. The basic weighting parameters came from a special analysis of the Census Bureau's 2011 Annual Social and Economic Supplement (ASEC) that included all households in the United States. The population density parameter was derived from Census 2000 data. The cell phone usage parameter came from an analysis of the July-December 2010 National Health Interview Survey.[6] Following is the full disposition of all sampled telephone numbers:

**Sample Disposition**

| Landline | Cell | |
|---|---|---|
| 33,732 | 22,499 | Total Numbers Dialed |
| | | |
| 1,396 | 274 | Non-residential |
| 1,483 | 47 | Computer/Fax |
| 8 | ---- | Cell phone |
| 14,936 | 8,237 | Other not working |
| 3,094 | 467 | Additional projected not working |
| 12,815 | 13,474 | Working numbers |
| 38.0% | 59.9% | Working Rate |
| | | |
| 1,031 | 156 | No Answer / Busy |
| 4,290 | 5,288 | Voice Mail |
| 40 | 16 | Other Non-Contact |
| 7,454 | 8,014 | Contacted numbers |
| 58.2% | 59.5% | Contact Rate |
| | | |
| 513 | 1,256 | Callback |
| 5,491 | 5,273 | Refusal |
| 1,450 | 1,485 | Cooperating numbers |
| 19.5% | 18.5% | Cooperation Rate |
| | | |
| 67 | 41 | Language Barrier |
| ---- | 524 | Child's cell phone |
| 1,383 | 920 | Eligible numbers |
| 95.4% | 62.0% | Eligibility Rate |
| | | |
| 31 | 19 | Break-off |
| 1,352 | 901 | Completes |
| 97.8% | 97.9% | Completion Rate |
| | | |
| 11.1% | 10.8% | Response Rate |

---

[6] Blumberg SJ, Luke JV. Wireless substitution: Early release of estimates from the National Health Interview Survey, July-December, 2010. National Center for Health Statistics. June 2011.

The disposition reports all of the sampled telephone numbers ever dialed from the original telephone number samples. The response rate estimates the fraction of all eligible respondents in the sample that were ultimately interviewed. At PSRAI it is calculated by taking the product of three component rates:

- Contact rate – the proportion of working numbers where a request for interview was made
- Cooperation rate – the proportion of contacted numbers where a consent for interview was at least initially obtained, versus those refused
- Completion rate – the proportion of initially cooperating and eligible interviews that were completed

Thus the response rate for the landline sample was 11 percent. The response rate for the cellular sample was 11 percent.

29

# Survey questions

## Winter Tracking Survey 2012
Data for January 20–February 19, 2012

Final Topline          02/22/2012

Princeton Survey Research Associates International for
the Pew Research Center's Internet & American Life Project

Sample: n=2,253 national adults, age 18 and older, including 901 cell phone interviews
Interviewing dates: 01.20.2012 – 02.19.2012

Margin of error is plus or minus 2 percentage points for results based on Total [n=2,253]
Margin of error is plus or minus 3 percentage points for results based on internet users [n=1,729]
Margin of error is plus or minus 3 percentage points for results based on cell phone owners [n=1,961]

Margin of error is plus or minus 3 percentage points for results based on SNS users [n=1,047]
Margin of error is plus or minus 3 percentage points for results based on SNS or Twitter users [n=1,062]

Margin of error is plus or minus 3 percentage points for results based on Total who use search engines [n=1,614]
Margin of error is plus or minus 4 percentage points for results based on Form A who use search engines [n=812]
Margin of error is plus or minus 4 percentage points for results based on Form B who use search engines [n=802]

**INTUSE** Do you use the internet, at least occasionally?

**EMLOCC** Do you send or receive email, at least occasionally?[7]

|  | USES INTERNET | DOES NOT USE INTERNET |
|---|---|---|
| Current | 80 | 20 |
| December 2011 | 82 | 18 |
| August 2011 | 78 | 22 |
| May 2011 | 78 | 22 |
| January 2011[i] | 79 | 21 |
| December 2010[ii] | 77 | 23 |
| November 2010[iii] | 74 | 26 |
| September 2010 | 74 | 26 |
| May 2010 | 79 | 21 |
| January 2010[iv] | 75 | 25 |
| December 2009[v] | 74 | 26 |
| September 2009 | 77 | 23 |
| April 2009 | 79 | 21 |
| December 2008 | 74 | 26 |
| November 2008[vi] | 74 | 26 |
| August 2008[vii] | 75 | 25 |
| July 2008[viii] | 77 | 23 |
| May 2008[ix] | 73 | 27 |

---

[7] Prior to January 2005, question wording was "Do you ever go online to access the Internet or World Wide Web or to send and receive email?"

| | USES INTERNET | DOES NOT USE INTERNET |
|---|---|---|
| April 2008[x] | 73 | 27 |
| January 2008[xi] | 70 | 30 |
| December 2007[xii] | 75 | 25 |
| September 2007[xiii] | 73 | 27 |
| February 2007[xiv] | 71 | 29 |
| December 2006[xv] | 70 | 30 |
| November 2006[xvi] | 68 | 32 |
| August 2006[xvii] | 70 | 30 |
| April 2006[xviii] | 73 | 27 |
| February 2006[xix] | 73 | 27 |
| December 2005[xx] | 66 | 34 |
| September 2005[xxi] | 72 | 28 |
| June 2005[xxii] | 68 | 32 |
| February 2005[xxiii] | 67 | 33 |
| January 2005[xxiv] | 66 | 34 |

**INTUSE/EMLOCC continued...**

**INTUSE/EMLOCC continued...**

| | USES INTERNET | DOES NOT USE INTERNET |
|---|---|---|
| Nov 23-30, 2004[xxv] | 59 | 41 |
| November 2004[xxvi] | 61 | 39 |
| June 2004[xxvii] | 63 | 37 |
| February 2004[xxviii] | 63 | 37 |
| November 2003[xxix] | 64 | 36 |
| August 2003[xxx] | 63 | 37 |
| June 2003[xxxi] | 62 | 38 |
| May 2003[xxxii] | 63 | 37 |
| March 3-11, 2003[xxxiii] | 62 | 38 |
| February 2003[xxxiv] | 64 | 36 |
| December 2002[xxxv] | 57 | 43 |
| November 2002[xxxvi] | 61 | 39 |
| October 2002[xxxvii] | 59 | 41 |
| September 2002[xxxviii] | 61 | 39 |
| July 2002[xxxix] | 59 | 41 |
| March/May 2002[xl] | 58 | 42 |
| January 2002[xli] | 61 | 39 |
| December 2001[xlii] | 58 | 42 |
| November 2001[xliii] | 58 | 42 |
| October 2001[xliv] | 56 | 44 |
| September 2001[xlv] | 55 | 45 |
| August 2001[xlvi] | 59 | 41 |
| February 2001[xlvii] | 53 | 47 |
| December 2000[xlviii] | 59 | 41 |
| November 2000[xlix] | 53 | 47 |
| October 2000[l] | 52 | 48 |
| September 2000[li] | 50 | 50 |
| August 2000[lii] | 49 | 51 |
| June 2000[liii] | 47 | 53 |
| May 2000[liv] | 48 | 52 |

pewinternet.org

pewinternet.org

**YEST1NW**      Did you happen to use the internet YESTERDAY?[8]

Based on all internet users [N=1,729]

| | YES, USED INTERNET YESTERDAY | NO, DID NOT USE INTERNET YESTERDAY | DON'T KNOW[9] | REFUSED |
|---|---|---|---|---|
| Current | 82 | 18 | * | 0 |
| August 2011 | 76 | 23 | * | 0 |
| May 2011 | 77 | 22 | * | 0 |
| November 2010 | 76 | 24 | * | * |
| September 2010 | 76 | 24 | * | 0 |
| May 2010 | 78 | 22 | * | 0 |
| January 2010 | 72 | 27 | * | 0 |
| December 2009 | 71 | 28 | 1 | * |
| September 2009 | 73 | 27 | * | * |
| April 2009 | 73 | 26 | 1 | * |
| December 2008 | 72 | 28 | * | -- |
| November 2008 | 72 | 27 | * | -- |
| August 2008 | 72 | 27 | 1 | -- |
| July 2008 | 71 | 28 | 1 | -- |
| May 2008 | 70 | 30 | 1 | -- |
| April 2008 | 72 | 28 | * | -- |
| December 2007 | 72 | 27 | * | -- |
| September 2007 | 68 | 32 | * | -- |
| February 2007 | 69 | 31 | * | -- |
| December 2006 | 65 | 34 | * | -- |
| November 2006 | 64 | 36 | * | -- |
| August 2006 | 66 | 34 | * | -- |
| April 2006 | 66 | 33 | * | -- |
| December 2005 | 63 | 36 | * | -- |
| September 2005 | 65 | 34 | * | -- |
| February 2005 | 60 | 40 | * | -- |
| January 2005 | 58 | 42 | * | -- |
| November 2004 | 61 | 39 | * | -- |
| June 2004 | 53 | 46 | 1 | -- |
| February 2004 | 55 | 44 | * | -- |
| November 2003 | 54 | 45 | * | -- |
| July 2003 | 52 | 47 | 1 | -- |
| June 2003 | 55 | 44 | * | -- |
| May 2003 | 58 | 42 | * | -- |
| March 3-11, 2003 | 60 | 40 | 0 | -- |
| February 2003 | 60 | 40 | * | -- |

**YEST1NW continued...**

---

[8] Prior to January 2005, question wording was "Did you happen to go online or check your email **yesterday**?"
[9] For this question and many others throughout the topline, results for "Don't know" often reflect combined "Don't know" and "Refused" percentages.  DK and REF are reported separately where available.

**YEST1NW continued...**

| | YES, USED INTERNET YESTERDAY | NO, DID NOT USE INTERNET YESTERDAY | DON'T KNOW | REFUSED |
|---|---|---|---|---|
| December 2002 | 56 | 44 | * | -- |
| November 2002 | 57 | 43 | * | -- |
| October 2002 | 57 | 43 | 0 | -- |
| September 2002 | 58 | 42 | * | -- |
| July 2002 | 53 | 47 | * | -- |
| March/May 2002 | 57 | 43 | * | -- |
| January 2002[10] | 59 | 41 | * | -- |
| Dec. 17-23, 2001 | 58 | 42 | * | -- |
| Nov. 19-Dec. 16 2001 | 60 | 40 | * | -- |
| Oct. 19-Nov. 18 2001 | 61 | 39 | * | -- |
| Oct. 8-18 2001 | 51 | 49 | 1 | -- |
| October 2-7 2001 | 56 | 43 | 1 | -- |
| Sept 20-Oct 1 2001 | 57 | 42 | 1 | -- |
| Sept 12-19 2001 | 51 | 49 | * | -- |
| August 2001 | 56 | 44 | * | -- |
| February 2001[11] | 59 | 41 | * | -- |
| Fall 2000[lv] | 56 | 44 | * | -- |
| August 2000 | 50 | 50 | * | -- |
| June 2000 | 52 | 48 | * | -- |
| May 2000 | 55 | 45 | 0 | -- |
| March 2000[lvi] | 60 | 40 | * | -- |

**WEB1** Next... Please tell me if you ever use the internet to do any of the following things. Do you ever use the internet to...[INSERT; RANDOMIZE]? / Did you happen to do this yesterday, or not?[12]

Based on all internet users [N=1,729]

| | TOTAL HAVE EVER DONE THIS | ---------- DID YESTERDAY | HAVE NOT DONE THIS | DON'T KNOW | REFUSED |
|---|---|---|---|---|---|
| **Use an online search engine to help you find information on the Web** | | | | | |
| Current | 91 | 59 | 8 | 1 | 0 |
| May 2011 | 92 | 59 | 8 | * | 0 |
| May 2010 | 87 | 49 | 12 | * | * |
| April 2009[13] | 88 | 50 | 12 | * | 0 |
| May 2008 | 89 | 49 | 10 | * | -- |
| December 2006 | 91 | 41 | 9 | 1 | -- |
| August 2006 | 88 | 42 | 11 | * | -- |
| Dec 2005 | 91 | 38 | 9 | 1 | -- |

---

[10] Internet user defined as Q5=1 and Q6=1 from Aug. 2001 until Jan 2002.
[11] Internet user for Feb. 2001 defined as Q5=1 and (Q6=1 or Q6A=1-7).
[12] Prior to January 2005, question wording was "Please tell me if you ever do any of the following when you go online. Do you ever...?/Did you happen to do this yesterday, or not?" Unless otherwise noted, trends are based on all internet users for that survey.
[13] In April 2009, item was asked only of Form B internet users [N=879].

|  |  |  |  |  |
|---|---|---|---|---|
| September 2005 | 90 | 41 | 9 | * | -- |
| June 2004 | 84 | 30 | 16 | * | -- |
| June 2003 | 89 | 31 | 10 | 1 | -- |
| Jan 2002 | 85 | 29 | 14 | 1 | -- |

**Q32** Next, I have a few questions about how you use online search engines... First, how often do you use search engines to find information online? Several times a day, about once a day, 3-5 days a week, 1-2 days a week, once every few weeks, or less often?

Based on those who use search engines

| % | CURRENT |  | JUNE 2004[14] |
|---|---|---|---|
| % | 37 | Several times a day | 23 |
|  | 17 | About once a day | 12 |
|  | 16 | 3 to 5 days a week | 18 |
|  | 15 | 1 to 2 days a week | 18 |
|  | 7 | Once every few weeks | 15 |
|  | 8 | Less often | 14 |
|  | 1 | Never (VOL.) | n/a |
|  | * | Don't know | * |
|  | * | Refused | -- |
|  | [n=1,614] |  | [n=1,165] |

**Q33** Which search engine do you use MOST OFTEN? [PRECODED OPEN-END]

Based on those who use search engines

| % | CURRENT |  | JUNE 2004[15] |
|---|---|---|---|
| % | 83 | Google | 47 |
|  | 6 | Yahoo Search | 26 |
|  | 3 | Bing | n/a |
|  | * | AOL | 5 |
|  | * | Ask | 2 |
|  | * | Lycos | n/a |
|  | * | MyWebSearch | n/a |
|  | 0 | Dogpile | n/a |
|  | 0 | WebCrawler | n/a |
|  | 2 | Other (SPECIFY) | 12 |
|  | 1 | None/Don't use any regularly (VOL.) | 1 |
|  | 3 | Don't know | 7 |
|  | * | Refused | -- |
|  | [n=1,614] |  | [n=1,165] |

---

[14] In June 2004, question was asked of internet users who use search engines.
[15] In June 2004, question was asked of internet users who use search engines.

**Q34a**   In general, do you think Internet search engines are a fair and unbiased source of information, or do you think search engines are NOT a fair and unbiased source?

Based on Form A respondents who use search engines

| % | CURRENT | | JUNE 2004[16] |
|---|---|---|---|
| % | 66 | Yes, they are a fair and unbiased source of information | 68 |
| | 20 | No, they are NOT a fair and unbiased source of information | 19 |
| | 3 | Depends (VOL.) | 5 |
| | 9 | Don't know | 8 |
| | 1 | Refused | -- |
| | [n=812] | | [n=1,165] |

**Q34b**   In general, how much of the information you find using search engines do you think is accurate or trustworthy? Would you say... [READ 1-5]

Based on Form B respondents who use search engines [N=802]

| % | CURRENT | |
|---|---|---|
| % | 28 | All or almost all |
| | 45 | Most |
| | 22 | Some |
| | 2 | Very little |
| | 1 | None at all |
| | 1 | (DO NOT READ) Don't know |
| | * | (DO NOT READ) Refused |

**Q35a**   When you use a search engine to look for information online, how often do you actually FIND the information you're looking for? [READ 1-4]

Based on Form A respondents who use search engines

| % | CURRENT | | JUNE 2004[17] |
|---|---|---|---|
| % | 29 | Always | 17 |
| | 62 | Most of the time | 70 |
| | 7 | Only some of the time | 11 |
| | 2 | Hardly ever | 1 |
| | 1 | (DO NOT READ) Don't know | 1 |
| | 0 | (DO NOT READ) Refused | -- |
| | [n=812] | | [n=1,165] |

**Q35b**   How CONFIDENT do you feel about your own searching abilities when using a search engine to find information online? [READ 1-4]

Based on Form B respondents who use search engines

| CURRENT | JUNE 2004[18] |
|---|---|

---

[16] In June 2004, question was asked of internet users who use search engines.
[17] In June 2004, question was asked of internet users who use search engines.
[18] In June 2004, question was asked of internet users who use search engines.

pewinternet.org

| % | 56 | Very confident | 48 |
|---|---|---|---|
| | 37 | Somewhat confident | 44 |
| | 5 | Not too confident | 6 |
| | 1 | Not confident at all | 2 |
| | * | (DO NOT READ) Don't know | * |
| | * | (DO NOT READ) Refused | -- |
| | [n=802] | | [n=1,165] |

**Q36** Thinking about recent searches you have done online using a search engine... Have you ever... [INSERT ITEM; RANDOMIZE], or has this never happened?

Based on those who use search engines [N=1,614]

| | | YES, HAS HAPPENED | NO, HAS NOT HAPPENED | DON'T KNOW | REFUSED |
|---|---|---|---|---|---|
| a. | Discovered that really critical or important information was missing from the search results you got | 34 | 64 | 2 | * |
| b. | Learned something new or important using a search engine that really helped you or increased your knowledge | 86 | 13 | 1 | 0 |
| c. | Gotten so much information in a set of search results that you felt overwhelmed | 38 | 61 | * | * |
| d. | Gotten conflicting or contradictory search results and could not figure out what information was correct | 41 | 57 | 1 | * |
| e. | Found a really obscure fact or piece of information using a search engine that you didn't think you'd be able to find | 50 | 49 | 1 | * |

**Q37a** Overall, in your experience, are search engine results getting MORE relevant and useful over time, LESS relevant and useful, or have you not seen any real difference over time?

Based on Form A respondents who use search engines [N=812]

| | CURRENT | |
|---|---|---|
| % | 52 | MORE relevant and useful |
| | 7 | LESS relevant and useful |
| | 40 | No difference over time |
| | 1 | Don't know |
| | * | Refused |

**Q37b** Overall, in your experience, is the QUALITY of the information you get using search engines getting BETTER over time, WORSE over time, or have you not seen any real difference?

Based on Form B respondents who use search engines [N=802]

| | CURRENT | |
|---|---|---|
| % | 55 | Quality getting better |

37

|   |   |
|---|---|
| 4 | Quality getting worse |
| 39 | No difference in quality over time |
| 2 | Don't know |
| * | Refused |

**Q38a**  If a search engine kept track of what you search for, and then used that information to personalize your future search results, how would you feel about that? Would you say... [READ AND ROTATE 1-2]?

Based on Form A respondents who use search engines [N=812]

CURRENT

| % | 65 | It's a BAD thing if a search engine collected information about your searches and then used it to rank your future search results, because it may limit the information you get online and what search results you see (OR) |
|---|---|---|
|  | 29 | It's a GOOD thing if a search engine collected information about your searches and then used it to rank your future search results, because it gives you results that are more relevant to you (OR) |
|  | 2 | (DO NOT READ) Neither of these |
|  | 3 | (DO NOT READ) Don't know |
|  | 1 | (DO NOT READ) Refused |

**Q38b**  If a search engine kept track of what you search for, and then used that information to personalize your future search results, how would you feel about that? Would you...[READ AND ROTATE 1-2]?

Based on Form B respondents who use search engines [N=802]

CURRENT

| % | 73 | NOT BE OKAY with a search engine keeping track of your searches and using that information to personalize your future search results because you feel it is an invasion of privacy (OR) |
|---|---|---|
|  | 23 | Be OKAY with a search engine keeping track of your searches and using that information to personalize your future search results, even if it means they are gathering information about you (OR) |
|  | 1 | (DO NOT READ) Neither of these |
|  | 2 | (DO NOT READ) Don't know |
|  | 1 | (DO NOT READ) Refused |

38

pewinternet.org

**Q39**    As you may know, businesses sometimes use TARGETED ADVERTISING to reach online consumers. Targeted advertising uses information about a person's online behavior collected by websites and search engines to determine what advertisements that person will see online.

Have you, personally, ever noticed advertisements online that are directly related to things you have recently searched for or sites you have recently visited, or has this never happened to you?

Based on all internet users [N=1,729]

| | CURRENT | |
|---|---|---|
| % | 59 | Yes, I've noticed this |
| | 39 | No, this hasn't happened to me |
| | 2 | Don't know |
| | * | Refused |

**Q40**    Which of the following statements comes closest to how you, personally, feel about TARGETED ADVERTISING being used online – even if neither is exactly right? [READ AND ROTATE 1-2]

Based on all internet users [N=1,729]

| | CURRENT | |
|---|---|---|
| % | 68 | I'm NOT OKAY with targeted advertising because I don't like having my online behavior tracked and analyzed (OR) |
| | 28 | I'm OKAY with targeted advertising because it means I see advertisements and get information about things I'm really interested in (OR) |
| | 2 | (DO NOT READ) Neither of these |
| | 1 | (DO NOT READ) Don't know |
| | 1 | (DO NOT READ) Refused |

**Q41**    Are you aware of any ways internet users like yourself can limit how much personal information websites collect about you, or are you not aware of any ways to do this?

Based on all internet users [N=1,729]

| | CURRENT | |
|---|---|---|
| % | 38 | Yes, aware of ways to do this |
| | 60 | No, not aware of any ways to do this |
| | 1 | Don't know |
| | * | Refused |

**Q42**   Have you, personally, done any of the following to limit the information websites gather about you? (First,/Next,) How about…[INSERT ITEM; RANDOMIZE]? Have you done this, or not?

Based on those who are aware of ways to limit personal information collected by websites [N=633]

|  | YES, HAVE DONE THIS | NO, HAVE NOT DONE THIS | DON'T KNOW | REFUSED |
|---|---|---|---|---|
| a. Changed your browser settings | 65 | 33 | 2 | * |
| b. Deleted your web history | 81 | 18 | * | * |
| c. Used the privacy settings of websites | 75 | 24 | 1 | * |

---

[i] January 2011 trends based on the Pew Internet Project/Project for Excellence in Journalism/Knight Foundation "Local News survey," conducted January 12-25, 2011 [N=2,251, including 750 cell phone interviews].

[ii] December 2010 trends based on the Social Side of the Internet survey, conducted November 23–December 21, 2010 [N=2,303, including 748 cell phone interviews].

[iii] November 2010 trends based on the Post-Election Tracking Survey 2010, conducted November 3-24, 2010 [N=2,257, including 755 cell phone interviews].

[iv] January 2010 trends based on the Online News survey, conducted December 28, 2009 – January 19, 2010 [N=2,259, including 562 cell phone interviews].

[v] December 2009 trends based on the Fall Tracking "E-Government" survey, conducted November 30 – December 27, 2009 [N=2,258, including 565 cell phone interviews].

[vi] November 2008 trends based on the Post-Election 2008 Tracking survey, conducted November 20-December 4, 2008 [N=2,254].

[vii] August 2008 trends based on the August Tracking 2008 survey, conducted August 12-31, 2008 [N=2,251].

[viii] July 2008 trends based on the Personal Networks and Community survey, conducted July 9-August 10, 2008 [N=2,512, including 505 cell phone interviews]

[ix] May 2008 trends based on the Spring Tracking 2008 survey, conducted April 8-May 11, 2008 [N=2,251].

[x] April 2008 trends based on the Networked Workers survey, conducted March 27-April 14, 2008. Most questions were asked only of full- or part-time workers [N=1,000], but trend results shown here reflect the total sample [N=2,134].

[xi] January 2008 trends based on the Networked Families survey, conducted December 13, 2007-January 13, 2008 [N=2,252].

[xii] December 2007 trends based on the Annual Gadgets survey, conducted October 24-December 2, 2007 [N=2,054, including 500 cell phone interviews].

[xiii] September 2007 trends based on the Consumer Choice survey, conducted August 3-September 5, 2007 [N=2,400, oversample of 129 cell phone interviews].

[xiv] February 2007 trends based on daily tracking survey conducted February 15-March 7, 2007 [N=2,200].

[xv] December 2006 trends based on daily tracking survey, conducted November 30 - December 30, 2006 [N=2,373].

[xvi] November 2006 trends based on Post-Election tracking survey, conducted Nov. 8-Dec. 4, 2006 [N=2,562]. This includes an RDD sample [N=2,362] and a cell phone only sample [N=200]. Results reflect combined samples, where applicable.

[xvii] August 2006 trends based on daily tracking survey, conducted August 1-31, 2006 [N=2,928].

[xviii] April 2006 trends based on the Annual Gadgets survey, conducted Feb. 15-Apr. 6, 2006 [N=4,001].

[xix] February 2006 trends based on the Exploratorium Survey, conducted Jan. 9-Feb. 6, 2006 [N=2,000].

[xx] December 2005 trends based on daily tracking survey conducted Nov. 29-Dec. 31, 2005 [N=3,011].

[xxi] September 2005 trends based on daily tracking survey conducted Sept. 14-Oct.13, 2005 [N=2,251].

xxii June 2005 trends based on the Spyware Survey, conducted May 4-June 7, 2005 [N=2,001].

xxiii February 2005 trends based on daily tracking survey conducted Feb. 21-March 21, 2005 [N=2,201].

xxiv January 2005 trends based on daily tracking survey conducted Jan. 13-Feb.9, 2005 [N=2,201].

xxv November 23-30, 2004 trends based on the November 2004 Activity Tracking Survey, conducted November 23-30, 2004 [N=914].

xxvi November 2004 trends based on the November Post-Election Tracking Survey, conducted Nov 4-Nov 22, 2004 [N=2,200].

xxvii June 2004 trends based on daily tracking survey conducted May 14-June 17, 2004 [N=2,200].

xxviii February 2004 trends based on daily tracking survey conducted February 3-March 1, 2004 [N=2,204].

xxix November 2003 trends based on daily tracking survey conducted November 18-December 14, 2003 [N=2,013].

xxx August 2003 trends based on 'E-Government' survey conducted June 25-August 3, 2003 [N=2,925].

xxxi June 2003 trends based on 'Internet Spam' survey conducted June 10-24, 2003 [N=2,200].

xxxii May 2003 trends based on daily tracking survey conducted April 29-May 20, 2003 [N=1,632].

xxxiii March 3-11, 2003 trends based on daily tracking survey conducted March 3-11, 2003 [N=743].

xxxiv February 2003 trends based on daily tracking survey conducted February 12-March 2, 2003 [N=1,611].

xxxv December 2002 trends based on daily tracking survey conducted Nov. 25–Dec. 22, 2002 [N=2,038].

xxxvi November 2002 trends based on daily tracking survey conducted October 30-November 24, 2002 [N=2,745].

xxxvii October 2002 trends based on daily tracking survey conducted October 7-27, 2002 [N=1,677].

xxxviii September 2002 trends based on daily tracking survey conducted September 9-October 6, 2002 [N=2,092].

xxxix July 2002 trends based on 'Sept. 11th-The Impact Online' survey conducted June 26-July 26, 2002 [N=2,501].

xl March/May 2002 trends based on daily tracking surveys conducted March 1-31, 2002 and May 2-19, 2002.

xli January 2002 trends based on a daily tracking survey conducted January 3-31, 2002 [N=2,391].

xlii December 2001 trends represent a total tracking period of December 1-23, 2001 [N=3,214].  This tracking period based on daily tracking surveys conducted December 17-23, 2001 and November 19-December 16, 2001.

xliii November 2001 trends represent a total tracking period of November 1-30, 2001 [N=2,119]. This tracking period based on daily tracking surveys conducted October 19 – November 18, 2001 and November 19 – December 16, 2001.

xliv October 2001 trends represent a total tracking period of October 1-31, 2001 [N=1,924].  This tracking period based on daily tracking surveys conducted September 20 – October 1, 2001, October 2-7, 2001, October 8-18, 2001, and October 19 – November 18, 2001.

xlv September 2001 trends represent a total tracking period of September 1-30, 2001 [N=742].  This tracking period based on daily tracking surveys conducted August 13-September 10, 2001, September 12-19, 2001 and September 20 – October 1, 2001.

xlvi August 2001 trends represent a total tracking period of August 12-31, 2001 [N=1,505].  This tracking period based on a daily tracking survey conducted August 13-September 10, 2001.

xlvii February 2001 trends based on a daily tracking survey conducted February 1, 2001-March 1, 2001 [N=2,096].

xlviii December 2000 trends based on a daily tracking survey conducted December 2-22, 2000 [N=2,383].

xlix November 2000 trends based on a daily tracking survey conducted November 2, 2000 – December 1 [N=6,322].

l October 2000 trends based on a daily tracking survey conducted October 2 – November 1, 2000 [N=3,336].

li September 2000 trends based on a daily tracking survey conducted September 15 – October 1, 2000 [N=1,302].

lii August 2000 trends based on a daily tracking survey conducted July 24 – August 20, 2000 [N=2,109].

liii June 2000 trends based on a daily tracking survey conducted May 2 – June 30, 2000 [N=4,606].

liv May 2000 trends based on a daily tracking survey conducted April 1 – May 1, 2000 [N=2,503].

pewinternet.org

[lv] Fall 2000 figures based on a daily tracking survey conducted September 15 – December 22, 2000 [N=13,342].

[lvi] March 2000 figures based on a daily tracking survey conducted March 1 – March 31, 2000 [N=3,533].

# Exhibit 4-3

## Notice Plan

**bmcgroup**
Class Action Services

Confidential

Schedule 3

Internet Based Class Notice
Includes Emphasis on Security Conscious Google Users

| | |
|---|---|
| Size of Target Audience | 129,979,000 |

| | |
|---|---|
| Estimated Reach of Notice Plan | 71.5% |
| Estimated Frequency | 2.2 |

**Target Audience**
*Adults 18+ who had visited Google Search (72.6%) of US Internet Population.*

| Outlet | Unit Size | Total Impressions | Estimated Cost |
|---|---|---|---|
| MediaMath | Standard IAB Sizes: | 131,350,000 | |
| Facebook Exchange | Static jpeg - 100x72 | 71,000,000 | |
| | | | |
| *Total Digital Impressions* | | 202,350,000 | |

| | | |
|---|---|---|
| *Estimated Reach* | *70.8* | |
| *Estimated Frequency* | *2.2* | |
| *Target Rating Points* | *156* | $720,921 |

**Security Concious Audience**
*Adults 18+ who had visited Google Search (72.6%) of US Internet Population AND have high on-line security consciousness OR highly worries about online financial transaction security AND is influential AND frequently advises others on internet content/services*

| Outlet | Unit Size | Total Impressions | Estimated Cost |
|---|---|---|---|
| MediaMath | Standard IAB Sizes: | 7,040,000 | |
| AdExchanger.com | Leaderboard (728 x 90) | 1,928,100 | |
| Arstechnica.com | or Medium Rectangle | 1,005,000 | |
| Zdnet.com | (300 x 250) | 1,000,000 | |
| Ziff Davis | | 1,800,000 | |

| | | |
|---|---|---|
| *Estimated Reach* | *91.8* | |
| *Estimated Frequency* | *3.4* | |
| *Target Rating Points* | *314* | $134,617 |

| | |
|---|---|
| Total Estimated Cost | $855,539 |

# Exhibit 4-4

## Long Form Notice

# NOTICE OF CLASS ACTION AND PROPOSED SETTLEMENT

*A federal court authorized this notice.  This is not a solicitation from a lawyer.*

This Notice relates to a proposed Settlement of consolidated class action lawsuits (the "Lawsuit") filed against Google Inc. relating to the inclusion of Google search queries in referrer headers (also called "referrer headers") or during the provision of certain Google services.  **If you used Google Search at any time after October 26, 2006, you may be a "Class Member" in this Lawsuit.**

The Settlement would resolve the legal claims against Google.  Under the Settlement, Google will pay $8.5 million to fund organizations and particular initiatives focused on Internet privacy, as well as to cover lawyers' fees and costs and other expenses related to the Settlement.  Google will also revise its "FAQs", "Key Terms" and "About Google Web History" webpages to include conspicuous, clear and concise explanations of how and when search queries may be disclosed to third parties via referrer headers.

**This Notice explains important legal rights you may have. Your legal rights will be affected regardless of whether you do or do not act.**  The following rights and options—**and the deadlines to exercise them**—are explained in this Notice.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **DO NOTHING** | Accept the terms of this Settlement and thereby give up your rights to sue Google about the same legal claims as are made in this case. |
| **EXCLUDE YOURSELF** | This is the only option that allows you to bring your own, or be part of any other, lawsuit against Google about the legal claims resolved in this Settlement. The Deadline for Excluding Yourself is Tuesday, June 24, 2014. |
| **OBJECT** | Write to the Court about why you think the Settlement should not be approved. The Deadline for Objecting is Friday, August 8, 2014. |
| **GO TO A HEARING** | Ask to speak in Court about the fairness of the Settlement. |

The Court in charge of this Lawsuit has preliminarily approved the Settlement and will hold a hearing to make a final decision to approve it.  The relief provided to Class Members will be provided only if the Court gives final approval to the Settlement and, if there are any appeals, after the appeals are resolved in favor of the Settlement.

## WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION**

   1. Why did I get this Notice?
   2. What is this case about?
   3. Why is there a Settlement?
   4. Why is this a class action, and how do I know if I am part of the Settlement?

**THE SETTLEMENT BENEFITS**

   5. What does this Settlement provide?
   6. What am I giving up as part of the Settlement?
   7. Will the Class Representatives receive any compensation for their efforts in bringing this Lawsuit?

**EXCLUDING YOURSELF FROM THE SETTLEMENT**

   8. How do I exclude myself from the Settlement?
   9. If I do not exclude myself, can I sue later?
  10. What happens if I do nothing at all?

**THE LAWYERS REPRESENTING YOU**

  11. Do I have a lawyer in the case?
  12. How will the lawyers be paid?

**OBJECTING TO THE SETTLEMENT**

  13. How do I tell the Court that I do not like the Settlement?
  14. What is the difference between objecting and asking to be excluded?

**THE COURT'S FAIRNESS HEARING**

  15. When and where will the Court decide whether to approve the Settlement?
  16. Do I have to come to the hearing?
  17. May I speak at the hearing?

**GETTING MORE INFORMATION**

  18. How do I get more information about the Settlement?

## BASIC INFORMATION

### 1. Why did I get this Notice?

A Court authorized this Notice to inform people that may be Class Members about a proposed Settlement of this class action regarding the alleged inclusion of Google search queries in referrer headers or during the provision of certain Google services. This Notice explains the nature of the lawsuits and claims being settled, your legal rights, and the benefits to the Class.

Judge Edward Davila of the United States District Court for the Northern District of California is overseeing this class action. The case is known as *In re Google Referrer Header Privacy Litigation*. The people who sued are called the "Plaintiffs," and the company they sued, Google, Inc., is called the "Defendant."

### 2. What is this case about?

Google Search allows users to find certain information on the Internet by using words, numbers and phrases (the "search query") in the search box at www.google.com.

The Plaintiffs who filed this case allege that Google broke privacy promises to Google users by intentionally and systematically embedding individual search queries, and search query components of user Web Histories, in referrer headers sent to third parties without user consent or through its Analytics service.

"Referrer headers" are a standard Internet feature that web servers, web browsers, and other web-enabled tools use to communicate with each other. A referrer header is often generated when an Internet user requests a web page from a web server. The referrer header, under most circumstances, identifies the page containing the link the user clicked on to request the web page — that is, the page that "referred" the user to that web page. "Web History" is a Google service that stores a particular user's Google search query information.

The Plaintiffs presently bring claims against Google for (i) violations of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 et seq.; (ii) breach of contract, (iii) breach of contract implied in law, (iv) breach of the covenant of good faith and fair dealing; (v) unjust enrichment; and (vi) declaratory judgment and corresponding injunctive relief.

Google denies the accuracy of the Plaintiffs' allegations, denies that it broke any privacy promises, and denies that it violated any law or caused any harm as alleged in the Lawsuit.

To obtain more information about this case and Settlement, please see Section 18.

For more information about referrer headers and/or how Google handles your search queries visit Google's FAQ, Key Terms and About Google Web History webpages, currently available at https://www.google.com/intl/en/policies/privacy/ key-terms/, https://www.google.com/policies/privacy/faq and https://support.google.com/accounts/answer/54068?hl=en, respectively.

## 3. Why is there a Settlement?

The Court did not decide in favor of the Plaintiffs or Google. Instead, both sides agreed to settle this case. That way, they avoid the costs and risk of a trial, and the Class will receive relief when the Settlement is final, rather than years from now, if at all.

## 4. Why is this a class action, and how do I know if I am part of the Settlement?

In a class action, one or more people called "class representatives" (in this case, Paloma Gaos, Anthony Italiano and Gabriel Priyev) sue on behalf of people who have similar claims. All of these people who may have similar claims form a "Class" and are "Class Members." The Settlement resolves the issues for all Class Members, except those who exclude themselves from the Class, as explained in Section 8.

To know if you will be affected by this Settlement, you first have to determine if you are a Class Member. The Court decided that the Class includes all users of Google Search in the United States from October 26, 2006 through April 25, 2014. The Class also includes anyone who could bring any of the claims in the Lawsuit on behalf of these users of Google Search, such as representatives, heirs, administrators, and assigns. If you are not sure whether you are in the Class, or have any other questions about the Settlement, visit www.googlesearchsettlement.com, or write with questions to:

> Info@GoogleSearchSettlement.com
>
> or
>
> Google Referrer Header Privacy Litigation
> Settlement Administrator
> P.O. Box 2002
> Chanhassen, MN 55317-2002

## THE SETTLEMENT BENEFITS

## 5. What does this Settlement provide?

If the proposed Settlement is finally approved by the Court, and after any appeals are resolved, Google has agreed to:

- Pay a total of $8,500,000 into an interest-bearing account. This $8,500,000, plus interest, will constitute the "Settlement Amount." Because millions of persons are estimated to be part of the Class, a distribution of the Settlement Amount to the Class would not be feasible. **Therefore, no individual class member will receive money as a result of this Settlement.** The Settlement Amount, net of any attorney fees and costs, expenses in administering the settlement, and service awards to the Class Representatives (i.e., the Net Settlement Amount), will be distributed to organizations to advance the privacy interests of Internet users such as the Class Members. Subject to Court approval and agreement by the organizations to use the funds they receive from this settlement to promote public awareness and education, and/or to support research, development, and initiatives, related to protecting privacy on the Internet, the organizations that might receive payment under the Settlement are: World

Privacy Forum, Carnegie-Mellon, Chicago-Kent College of Law Center for Information, Society, and Policy, Berkman Center for Internet and Society at Harvard University, Stanford Center for Internet and Society, and AARP, Inc.

Please check www.googlesearchsettlement.com periodically for any updates regarding which potential recipients will be presented to the Court for final approval, how much each potential recipient will receive, and how each potential recipient proposes to use any funds it receives. **The final recipient list and percentage of the Net Settlement Amount to go to each recipient will be posted on the website not later than sixty days after the settlement's Effective Date**.

- Make lasting changes to Google's FAQs and Key Terms to more fully explain how search queries are handled and actually or potentially made available to third parties.

### 6. What am I giving up as part of the Settlement?

If the Settlement becomes final, Class Members will be releasing Google (and certain others related to Google, such as Google directors, officers and employees) from all of the settled claims.  This means that you will no longer be able to sue Google (or the other released parties) regarding any of the settled claims if you are a Class Member and do not timely and properly exclude yourself from the Class.

The settled claims are any known or unknown claims that any Class Member may at any time have up to March  26, 2014, arising out of the subject matter giving rise to the claims in the lawsuits that were consolidated into this Lawsuit.  For a summary of the subject matter in the lawsuits, see Section 2, Section 18, and the Consolidated Complaint. In addition, Class Members expressly waive and relinquish the provisions of California Civil Code § 1542 (and all other similar provisions of law) to the full extent that these provisions may be applicable to this release. California Civil Code § 1542 provides:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN TO HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

The full text of the Settlement Agreement, which includes all the provisions about settled claims and releases, is available at www.googlesearchsettlement.com.

### 7. Will the Class Representatives receive any compensation for their efforts in bringing this Lawsuit?

Paloma Gaos, Anthony Italiano, and Gabriel Priyev will request a service award of up to $5,000.00 each for their services as class representatives and their efforts in bringing the Lawsuit. The Court will make the final decision as to the amount, if any, to be paid to the Class Representatives.

## EXCLUDING YOURSELF FROM THE SETTLEMENT

### 8. How do I exclude myself from the Settlement?

Class Members who do not want to be part of the Settlement must complete a form requesting to be excluded.  The form and instructions for its submission are available at www.googlesearchsettlement.com, or from the Class Administrator (see Section 18 for contact information).  Requests for exclusion must be made on an individual basis and submitted no later than June 24, 2014.

### 9. If I do not exclude myself, can I sue later?

No, if you are a Class Member.  If you do not exclude yourself, you forever give up the right to sue Google for all of the claims that this Settlement resolves.

If you submit a valid and timely request to be excluded, you cannot object to the proposed Settlement.  However, if you ask to be excluded, you may sue or continue to sue Google about the same claims resolved by this Settlement in the future.  You will not be bound by anything that happens in this Lawsuit.

### 10. What happens if I do nothing at all?

If you are a Class Member and do nothing, and you do not exclude yourself, you will not be able to start or proceed with a lawsuit, or be part of any other lawsuit against Google and the other released parties about the settled claims in this case at any time.

## THE LAWYERS REPRESENTING YOU

### 11.  Do I have a lawyer in the case?

The Court has ordered that Kassra Nassiri of Nassiri & Jung LLP, Michael Aschenbrener of Aschenbrener Law, P.C., and Ilan Chorowsky of Progressive Law Group, LLC (together, "Class Counsel") will represent the interests of all Class Members.  Class Members will not be separately charged for these lawyers.  If you want to be represented by your own lawyer, you may hire one at your own expense.

### 12.  How will the lawyers be paid?

Class Counsel will request up to 25% or $2.125 million of the Settlement Fund for their attorneys' fees and up to $30,000 to cover their out-of-pocket costs.  To see a copy of Class Counsel's application for attorneys' fees and costs, which will be available prior to the Fairness Hearing, please visit www.googlesearchsettlement.com.  The Court will make the final decisions as to the amounts to be paid to Class Counsel, and may award less than the amounts requested by Class Counsel.

## OBJECTING TO THE SETTLEMENT

### 13.  How do I tell the Court that I do not like the Settlement?

You can object to the Settlement if you do not like any part of it.  You must give the reasons why you think the Court should not approve the Settlement.  To object, you must deliver to the Class Administrator, Class Counsel and Google's counsel, and file with the Court, a written statement of your objection(s).  The written statement must include (i) your full name, address, telephone number and signature; (ii) the name of the Lawsuit; (iii) the specific reasons why you object to the Settlement; (iv) copies of any evidence and legal authority you would like the Court to consider; (v) information demonstrating that you are a Class Member; and (vi) whether you or your attorney will appear at the fairness hearing (see Section 14).  You must send a copy of your objection by First-Class mail to the four different places listed below, postmarked no later than August 8, 2014.

| | |
|---|---|
| **COURT** | **CLASS COUNSEL** |
| U.S. District Court | Kassra Nassiri |
| Clerk's Office | Nassiri & Jung LLP |
| 280 S.  1st Street | 47 Kearny Street, Suite 700 |
| San Jose, CA 95113 | San Francisco, CA 94108 |
| **DEFENSE COUNSEL** | **CLASS ADMINISTRATOR** |
| Edward D. Johnson | Google Referrer Header Privacy Litigation |
| Mayer Brown LLP | Settlement Administrator |
| Two Palo Alto Square, Suite 300 | P.O. Box 2002 |
| 3000 El Camino Real | Chanhassen, MN 55317-2002 |
| Palo Alto, CA 94306-2112 | |

If you or your attorney intends to make an appearance at the Fairness Hearing and you have not so indicated in your objection, you must also deliver, according to the above procedures, no later than August 8, 2014, a Notice of Intention to Appear.  Any attorney hired by a Class Member to represent him or her and appear at the Fairness Hearing must also file a notice of appearance with the Court no later than August 8, 2014.

**If you fail to comply with these requirements, or fail to submit your objection before the deadline, you will be deemed to have waived all objections and will not be entitled to speak at the fairness hearing.**

### 14.  What is the difference between objecting and asking to be excluded?

Objecting is simply telling the Court that you don't like something about the Settlement.  You can object only if you stay in the Class.  Excluding yourself is telling the Court that you don't want to be part of the Class.  If you exclude yourself, you have no basis to object because the Settlement no longer affects you.

## THE COURT'S FAIRNESS HEARING

### 15.  When and where will the Court decide whether to approve the Settlement?

A Court has preliminarily approved the Settlement and will hold a hearing to determine whether to give final approval to the Settlement.  The purpose of the Fairness Hearing is for the Court to determine wither the Settlement should be approved

as fair, reasonable, adequate, and in the best interests of the Class to consider the award of attorneys' fees and expenses to Class Counsel and to consider the request for a service awards to the Class Representatives.

The Court will hold the Fairness Hearing on August 29, 2014, at United States District Court, Northern District of California, San Jose Division, 280 South 1st Street, San Jose California, 95113, Courtroom 4, 5th Floor, before the honorable Edward J Davila.  The hearing may be postponed to a different time or location without additional notice, so it is recommended that you periodically check www.googlesearchsettlement.com for updated information.

### 16.  Do I have to come to the hearing?

No, you are not required to come to the Fairness Hearing.  However, you are welcome to attend the hearing at your own expense.  If you send a written objection, you do not have to come to the hearing to talk about it.  As long as you submitted the written objection and it was received on time, the Court will consider it.  You also may pay your own lawyer to attend the Fairness Hearing, but that is not necessary.

### 17.  May I speak at the hearing?

As described in Section 13, you may speak at the Fairness Hearing only if (a) you have timely served and filed an objection, and (b) followed the procedures set forth in Section 13 for notifying the Court and the parties that you intend to speak at the Fairness Hearing.  You cannot speak at the hearing if you exclude yourself from the Settlement.

## GETTING MORE INFORMATION

### 18.  How do I get more information about the Settlement?

This Notice summarizes the proposed Settlement.

To see a copy of the actual Settlement Agreement, the complaints filed in this Lawsuit, the Court's Preliminary Approval Order, Class Counsel's application for attorneys' fees and costs, and other pertinent information, **and to check the status of the Settlement or if the Settlement has been approved by the Court,** please visit www.googlesearchsettlement.com.

You may also contact the Class Administrator at Info@GoogleSearchSettlement.com or:

> Google Referrer Header Privacy Litigation
> Settlement Administrator
> P.O. Box 2002
> Chanhassen, MN 55317-2002

To see papers filed with the Court and a history of this Lawsuit, you may visit the website for the Administrative Office of the U.S. Courts, PACER Service Center, located at http://pacer.psc.uscourts.gov/ and reference In re GOOGLE REFERRER HEADER PRIVACY LITIGATION, Case No. 5:10-cv-04809-EJD, and UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFONIA, SAN JOSE DIVISION.  Alternatively, to see Court papers and history in the lawsuits that were consolidated into this Lawsuit, reference the above case information, as well as *Priyev v. Google Inc*., Case No. 1:2012-cv-01467, Northern District of Illinois, and *Priyev v. Google Inc*., Case No. 5:2013-cv-00093, Northern District of California.  You may also visit or call the Clerk's office at the United States District Court for the Northern District of California, 280 South 1st Street, San Jose, California, 95113 .  The Clerk will tell you how to obtain the complete file for inspection and copying at your own expense.

You may also contact Class Counsel, Kassra Nassiri of Nassiri & Jung LLP as follows:

> Kassra Nassiri
> Nassiri & Jung LLP
> 47 Kearny Street, Suite 700
> San Francisco, CA 94108
> Telephone: 415-762-3100
> Facsimile: 415-534-3200

**PLEASE DO NOT ADDRESS ANY QUESTIONS ABOUT THE SETTLEMENT OR LITIGATION TO THE CLERK OF THE COURT OR THE JUDGE.**

# Exhibit 4-5

## Banner Advertisements

Digital Banner Advertisements





# Exhibit 4-6

## CAFA Notice

Notice Administrator for U.S. District Court

ATTORNEY GENERAL OF THE UNITED STATES
ERIC H HOLDER, JR
OFFICE OF THE ATTORNEY GENERAL
950 PENNSYLVANIA AVE, NW
WASHINGTON, DC 20530-0001


August 8, 2013

**CAFA Notification to Federal and State Officials**

As part of the Class Action Fairness Act, 28 U.S.C. § 1715(b), you are being sent this notification to inform you about a proposed class action settlement that may include residents of the United States.

- ❖ **Court:**  United States District Court for the Northern District of California.

- ❖ **Case Caption:**  *In re Google Referrer Header Privacy Litigation,* Case No. 5:10-CV-04809 EJD.

- ❖ **Named Defendant:**  Google Inc.

- ❖ **Documents Enclosed:**  The documents included on the enclosed CD are in Adobe Acrobat PDF format. If you do not have Acrobat Reader, it may be obtained free of charge at http://get.adobe.com/reader/otherversions/.

    - o  Complaint *Gaos v. Google Inc.*, N.D. Cal. Case No. 5-10-CV-04809 (filed 10/25/2010)
    - o  First Amended Complaint, *Gaos v. Google Inc.*, N.D. Cal. Case No. 5-10-CV-04809 (filed 5/2/2011)
    - o  Second Amended Complaint, *Gaos v. Google Inc.*, N.D. Cal. Case No. 5-10-CV-04809 (filed 5/1/2012)
    - o  Complaint *Priyev v. Google Inc.*, N.D. Cal. Case No. 5-13-00093 (formerly N.D. Ill. Case No. 12-CV-01467) (filed 2/29/2012)
    - o  Amended Complaint, *Priyev v. Google Inc.*, N.D. Cal. Case No. 5-13-00093 (formerly N.D. Ill. Case No. 12-CV-01467) (filed 8/3/2012)
    - o  Second Amended Complaint, *Priyev v. Google Inc.*, N.D. Cal. Case No. 5-13-00093 (filed 8/10/12)
    - o  Stipulation and Order for Consolidation of Class Actions (filed 4/30/2013)
    - o  Plaintiffs' Notice of Motion and Motion for Preliminary Approval of Class Action Settlement and Exhibits (filed 07/19/2013) including:
        - ▪  Ex. 1:  Aschenbrener Declaration in Support of Plaintiffs' motion for Preliminary Approve of Class Action Settlement
            - •  Ex. 1-A:  Aschenbrener Law Firm Resume
        - ▪  Ex. 2:  Chorowsky Declaration in Support of  Plaintiffs' Motion for Preliminary Approval of Class Action Settlement
            - •  Ex. 2-A:  Progressive Law Group, LLC Resume
        - ▪  Ex. 3:  Settlement Agreement and Release

- Ex. 4:  Declaration of Richard W. Simmons Regarding Class Notice
  - Ex. 4-A:  Richard W. Simmons Resume
  - Ex. 4-B:  Supporting Data Regarding Notice Plan
  - Ex. 4-C:  Notice Plan
  - Ex. 4-D:  Notice of Settlement
  - Ex. 4-E:  Sample Internet Banner Ads For Notice Dissemination
- Ex. 5:  Declaration of Kassra Nassiri in Support of Motion For Preliminary Approval of Settlement
  - Ex. 5-A:  Nassiri & Jung LLP Firm Resume
- Ex. 6:  Proposed Preliminary Approval Order

❖ **Reasonable Estimate:**  The Settlement Class includes "[a]ll persons in the United States who submitted a search query to Google at any time between October 25, 2006 and the date of the notice to the class of certification."  Because of the vast number of searches done on the Internet using Google, it is not feasible to determine the size of the class or the identity of the class members.  The settlement will be distributed to *Cy Pres* Recipients. Further details regarding relief can be found in the Settlement Agreement at Section 3.

❖ **Upcoming Judicial Hearings:**  The Court has scheduled a Preliminary Approval Hearing at the United States District Court for the Northern District of California United States Courthouse, San Jose Division, located at 280 South 1st Street, San Jose, CA 95113,  before the Honorable Edward J. Davila in Courtroom 4, 5th Floor on August 23, 2013 at 9:00 a.m.  The time and location of this hearing is subject to change.

❖ **Additional Information:**  A case website, www.googlesearchsettlement.com, will be established so that Class Members and other interested parties can obtain additional information about the settlement, including, as they become available, any additional materials required to be provided by 28 U.S.C. § 1715 (b).

# Exhibit 4-7

## Notice Campaign Results



ANALYTICS

## Summary of Digital Advertising Delivery

|  | Impressions Delivered | Clicks | Click Through Rate |
|---|---|---|---|
| **Notice Program - All Class Members** | | | |
| Data Enabled Purchasing (Mediamath) | 136,719,783 | 153,222 | 0.11% |
| Facebook.com | 68,714,105 | 20,598 | 0.03% |
| Total | 205,433,888 | 173,820 | 0.08% |
| Reach | 70.8% | | |
| Frequency | 2.2 | | |
| **"Security Concisous" Class Members** | | | |
| Data Enabled Purchasing (Mediamath) | 10,957,457 | 9,566 | 0.09% |
| ArsTechnica.com | 4,023,431 | 11,548 | 0.29% |
| Zdnet.com | 1,253,395 | 3,084 | 0.25% |
|  | 16,234,283 | 24,198 | 0.15% |
| Total | 221,668,171 | 198,018 | 0.09% |
| Reach | 91.8% | | |
| Frequency | 3.2 | | |

# Exhibit 4-8

## Website Home Page



In re Google Referrer Header Privacy Litigation
Case No. 5:10-cv-04809 EJD

---

### United States District Court for the Northern District of California

English (US) ▼

*In re Google Referrer Header Privacy Litigation,*
**Case No. 5:10-cv-04809 EJD**

## If you used Google Search at any time after October 26, 2006, you may be a "Class Member" in this Lawsuit.

This Website relates to a proposed Settlement of consolidated class action lawsuits (the "Lawsuit") filed against Google Inc. relating to the inclusion of Google search queries in referrer headers (also called "referer headers") or during the provision of certain Google services. If you used Google Search at any time after October 26, 2006, you may be a "Class Member" in this Lawsuit.

The Settlement would resolve the legal claims against Google. Under the Settlement, Google will pay $8.5 million to fund organizations and particular initiatives focused on Internet privacy, as well as to cover lawyers' fees and costs and other expenses related to the Settlement. Google will also revise its "FAQs," "Key Terms" and About Google Web History" webpages to include conspicuous, clear and concise explanations of how and when search queries may be disclosed to third parties via referrer headers.

 

**CLICK HERE TO ASK A QUESTION**   **CLICK HERE TO VIEW A LIST OF FAQs**   **CLICK HERE TO VIEW CASE DOCUMENTS**   **CLICK HERE TO VIEW PROPOSED CY PRES RECIPIENTS AND ALLOCATIONS**

### YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT

| | |
|---|---|
| **DO NOTHING** | Accept the terms of this Settlement and thereby give up your rights to sue Google about the same legal claims as are made in this case. |
| **EXCLUDE YOURSELF** | This is the only option that allows you to bring your own, or be part of any other, lawsuit against Google about the legal claims resolved in this Settlement. The Deadline for Excluding Yourself is Tuesday, June 24, 2014. Exclusion forms are available for download here. |
| **OBJECT** | Write to the Court about why you think the Settlement should not be approved. The Deadline for Objecting is Friday, August 8, 2014. Objection forms are available for download here. |
| **GO TO A HEARING** | Ask to speak in Court about the fairness of the Settlement. |

The Court in charge of this Lawsuit has preliminarily approved the Settlement and will hold a hearing to make a final decision on whether to approve it. The relief provided to Class Members will be provided only if the Court gives final approval to the Settlement and, if there are any appeals, after the appeals are resolved in favor of the Settlement. Visit this website to learn about the outcome or change in status of the Settlement. This website will remain active until at least 30 days after the date in which a Settlement is finally approved.

For more information on how to Object or how to Exclude yourself from the Class, please consult the Class Notice by clicking here.

**For more information about referrer headers and/or how Google handles your search queries, visit Google's FAQ, Key Terms and About Google Web History webpages, currently available at https://www.google.com/intl/en/policies/privacy/key-terms/, https://www.google.com/policies/privacy/faq, and https://support.google.com/accounts/answer/54068?hl=en respectively.**

**Questions: contact the Settlement Administrator by e-mail Info@GoogleSearchSettlement.com or call 1-855-332-3405**

Google Referrer Header Privacy Litigation                                                      7/25/14, 10:31 AM

FREQUENTLY ASKED QUESTIONS

★  Proposed Cy Pres Recipients and Allocations

What does this settlement provide?

What is this case about?

Why is this a class action?

Why is there a Settlement?

Should I get my own lawyer?

See all 13 articles

IMPORTANT DATES AND DEADLINES

Proposals for Settlement Funding: May 2014

Exclusion Deadline: June 24, 2014

Objection Deadline: August 8, 2014

Settlement Fairness Hearing: August 29, 2014

CASE DOCUMENTS

Class Notice

Settlement Agreement

Exclusion Form

Objection Form

Motion for Preliminary Approval

Complaints

See all 9 articles

CONTACT INFORMATION

About the Settlement Administrator

Attorneys for the Class / Class Counsel

🔍  Search

Have more questions? Submit a request

Privacy Policy and Terms of Use (c) 2014 Analytics Consulting LLC

# Exhibit 4-9

## Website Traffic Summary



7/25/14

Google Search Settlement
Summary Web Traffic
April 25, 2014 - May 25, 2014



Visits
**87,341**



Unique Visitors
**84,028**



Page Views
**125,199**



Average Pages/Visit
**1.43**

7/25/14



Google Search Settlement
Web Traffic by Geography
April 25, 2014 - May 25, 2014



| Region | Visits | % New Visits | New Visits | Pages / Visit |
|---|---|---|---|---|
| United States | 79,153 | 91.39% | 72,338 | 1.43 |

Top States

| State | Visits | % New Visits | New Visits | Pages / Visit |
|---|---|---|---|---|
| California | 12,422 | 90.84% | 11284 | 1.45 |
| New York | 6,454 | 91.12% | 5881 | 1.37 |
| Texas | 5,621 | 92.15% | 5180 | 1.43 |
| Florida | 5,073 | 91.60% | 4647 | 1.41 |
| Illinois | 2,795 | 90.91% | 2541 | 1.49 |
| New Jersey | 2,774 | 90.41% | 2508 | 1.37 |
| Pennsylvania | 2,752 | 92.37% | 2542 | 1.40 |
| Virginia | 2,729 | 92.63% | 2528 | 1.38 |
| Massachusetts | 2,566 | 92.91% | 2384 | 1.42 |
| Michigan | 2,101 | 90.86% | 1909 | 1.36 |

NOTE: Geogrpahic location could not be identified for all visitors.



7/25/14

Google Search Settlement
Website Engagement: Page Depth
April 25, 2014 - May 25, 2014

| Page Depth | Visits | Pageviews |
|---|---|---|
| 1 | 70,431 | 70,431 |
| 2 | 8,878 | 17,756 |
| 3 | 3,974 | 11,922 |
| 4 | 1,564 | 6,256 |
| 5 | 902 | 4,510 |
| 6 | 465 | 2,790 |
| 7 | 340 | 2,380 |
| 8 | 198 | 1,584 |
| 9 | 176 | 1,584 |
| 10 | 82 | 820 |
| 11 | 97 | 1,067 |
| 12 | 44 | 528 |
| 13 | 42 | 546 |
| 14 | 25 | 350 |
| 15 | 28 | 420 |
| 16 | 16 | 256 |
| 17 | 11 | 187 |
| 18 | 10 | 180 |
| 19 | 11 | 209 |
| 20+ | 47 | 1,423 |
| | 87,341 | 125,199 |

*Note:  Page Depth is the average number of page views a visitor reads*
*before ending their session.*



7/25/14

Google Search Settlement
Top Pages Viewed
April 25, 2014 - May 25, 2014

| Page | Pageviews | Unique Pageviews |
|------|-----------|------------------|
| Home Page | 96,182 | 86,156 |
| Frequently Asked Questions | 6,174 | 4,647 |
| FAQ: What does this settlement provide? | 5,324 | 5,162 |
| FAQ: What is this case about? | 4,517 | 4,389 |
| Case Documents | 2,371 | 2,032 |
| | | |
| Total: | 114,568 | 102,386 |