1    Joseph Darrell Palmer (SBN 125147)
     darrell.palmer@palmerlegalteam.com
2    Law Offices of Darrell Palmer PC
     2244 Faraday Avenue, Suite 121
3    Carlsbad, CA 92008
     Telephone: (858) 215-4064
4    Facsimile: (866) 583-8115

5    Attorneys for Objector Cameron Jan

6

7

8                        UNITED STATES DISTRICT COURT

9                        NORTHERN DISTRICT OF CALIFORNIA

10                            SAN JOSE DIVISION

11
     PALOMA GAOS, ANTHONY ITALIANO, and   )   Case No. 5:10-CV-4809-EJD
12   GABRIEL PRIYEV individually and on behalf of )
     all others similarly situated,       )   **CLASS ACTION**
13                                          )
                                            )   **OBJECTION OF CAMERON JAN TO**
14                   Plaintiffs,            )   **PROPOSED SETTLEMENT**
                                            )
15   v.                                     )
                                            )   Date: August 29, 2014
16   GOOGLE INC., a Delaware corporation,   )   Time: 9:00 a.m.
                                            )   Place: Courtroom 4, 5th Floor
17                                          )   Judge: Hon. Edward J. Davila
                     Defendant.            )
18                                          )

19

20

21

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

I.      INTRODUCTION …………………………………………………………   1

        A.  The Standard for Approving a Proposed Class Action Settlement ……………… 1

II.     ARGUMENT AND OBJECTIONS ……………………………………………   2

        A.  The Notice was Inadequate ………………………………………………  2

        B.  The Settlement does not Require Google to Change Its Business Practices …….  6

        C.  The Settlement Fund is Inadequate ……………………………………… 7

        D.  The *Cy Pres* is Improper ……………………………………………… 9

        E.  The Class Representatives and Class Counsel have not Adequately
            Represented the Interests of the Class and Should Not be Compensated ……….   13

III.    JOINDER IN OTHER OBJECTIONS …………………………………………   14

IV.     CONCLUSIONS …………………………………………………………   14

# TABLE OF AUTHORITIES

## CASES

*Dennis v. Kellogg Co.*
697 F.3d 858, 865 (9th Cir. 2012) ……………………………………………………… 10, 11

*Grant v. Bethlehem Steel Corp.*
823 F.2d 20, 23 (2d Cir. 1987) ……………………………………………………………… 1

*Fraley v. Facebook*
US District Court, Northern District of California, Case No. 11-cv-01726 ………………….   7

*In re Warner Communications Sec. Litig.*
798 F.2d 35, 37 (2d Cir.1986) ……………………………………………………………   2

*In re Wells Fargo Sec. Litig.*
991 F. Supp. 1193, 1197 (N.D. Cal. 1998) ……………………………………………   13

*Klier v. Elf Atochem N. Am., Inc.*
658 F.3d 468, 474 (5th Cir. 2011) ……………………………………………………   9

*Lane v. Facebook, Inc.*
696 F.3d 811, 819 (9th Cir. 2012) …………………………………………………… 2, 7

*Mirfashi v. Fleet Mortgage Corp.*
356 F.3d 781, 785 (7th Cir. 2004) ……………………………………………………   2

*Nachshin v. AOL, LLC*
663 F.3d 1034, 1038 (9th Cir.2011) …………………………………………………… 10

*Officers for Justice v. Civil Svc. Comm'n. of the City and Cnty. of San Francisco*
688 F.2d 615, 625 (9th Cir. 1982) ……………………………………………………   2

*Radcliffe v. Experian Info. Solutions*
715 F.3d 1157 (9th Cir. May 2, 2013) ………………………………………………… 11

*Silber v. Mahon*
957 F.2d 697, 701 (9th Cir. 1992) ……………………………………………………   2

*Six Mexican Workers v. Ariz. Citrus Growers*
904 F.2d 1301, 1308 (9th Cir.1990) …………………………………………………… 10

*Staton v. Boeing*
327 F.3d 938, 959 (9th Cir. 2012) ……………………………………………………   2

ii

1

**STATUTES**

2   18 U.S.C. § 2707(c)   ……………………………………………   5

3
    Federal Rules of Civil Procedure:
4       23(c)(2)(B)   ……………………………………………   2, 4
        23(e)(1)   ……………………………………………   2
5       23(e)(2)   ……………………………………………   1

6

7

**OTHER AUTHORITY**

8   ALI Principles §3.07(a) ……………………………………………   9

9

10  ALI Principles §3.07 cmt (b) ……………………………………………   11

11  *Cy pres* and the Optimal Class Action
    Jay Tidmarsh, 82 Geo. Wash. L. Rev. 1, 4 (2013) ……………………………   10
12

13  Doling out Other People's Money
    Adam Liptak, N.Y. TIMES, Nov. 26, 2007 ……………………………………   11
14

15  Reading the Privacy Policies You Encounter in a Year Would Take 7 Work Days
    Alexis Madrigal, THE ATLANTIC ……………………………………………   9
16

17  The FTC and the New Common Law of Privacy
    Daniel J. Solove and Woodrow Hartzog, 114 Colum. L. Rev. 583 (2014) …………………   12
18
    Two Views of the Class Action
19  Alexandra D. Lahav, 79 Fordham L. Rev. 1939, 1961-63 (2011) …………………………   13

20

21

22

23

24

25

26

27

28

iii

## I.   INTRODUCTION

Cameron Jan objects to the Settlement. Mr. Jan is a class member because he was a user of Google Search in the United States during the class period of October 26, 2006 through April 25, 2014.

Plaintiffs allege Google provided its users' private information, including individual search queries and search results containing personal information, to advertisers and other third parties, to enhance Google's market position, gain competitive advantage, and for financial gain.  According to the Complaint, Google sold its users' private information to third-party website owners via Google Analytics reports, for Google AdWords advertising services.  Although the lawsuit was filed in 2010, the case had not proceeded beyond the pleading stage when the Proposed Settlement was entered into. Before the Settlement, Google filed motions to dismiss the Complaint, the First Amended Complaint and the Second Amended Complaint – but never answered.  This Settlement does not right any of the wrongs alleged in the Complaint.  It does not stop Google from engaging in the conduct alleged in the various complaints and provides no compensation to Class Members.  Instead, the beneficiaries are Class Counsel and third party *cy pres* beneficiaries, who are not the "next best" recipients of the Settlement.

### A.  The Standard for Approving a Proposed Class Action Settlement

In reviewing a proposed settlement, the district court has a duty to ensure the settlement is "fair, reasonable, and adequate." Fed. R. Civ. Proc. 23(e)(2)  Appellate courts accord considerable deference to the district court's "knowledge of the litigants and of the strengths and weaknesses of their contentions". . . . and recognize that the district court "is in the best position to evaluate whether the settlement constitutes a reasonable compromise." *Grant v. Bethlehem Steel Corp*., 823 F.2d 20, 23 (2d Cir. 1987).  "Because class actions are rife with potential conflicts of interest between class counsel and Class Members, district judges presiding over such actions are expected to give careful scrutiny to the

1

terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *Mirfashi v. Fleet Mortgage Corp.* 356 F.3d 781, 785 (7th Cir. 2004).

The court must be protective of unnamed Class Members.  "In approving a proposed class action settlement, the district court has a fiduciary responsibility to ensure that 'the settlement is fair and not a product of collusion, and that the Class Members' interests were represented adequately.'" *Grant, citing In re Warner Communications Sec. Litig.*, 798 F.2d 35, 37 (2d Cir.1986).  *See also Silber v. Mahon*, 957 F.2d 697, 701 (9th Cir. 1992) ("Both the class representative and the courts have a duty to protect the interests of absent Class Members.")

Courts may refuse to approve a settlement if insufficient notice is provided to Class Members to protect their due process rights.  Fed. R. Civ. Proc. 23(e)(1) specifies that "direct notice" of a proposed settlement must be provided "in a reasonable manner to all Class Members who would be bound by the proposal."

The burden to demonstrate the fairness of a settlement falls upon its proponents.  *Staton v. Boeing*, 327 F.3d 938, 959 (9th Cir. 2012); *see also Officers for Justice v. Civil Svc. Comm'n. of the City and Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). When settlement occurs before formal class certification, settlement approval requires a higher standard of fairness to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the class. *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012).

## II.    ARGUMENT AND OBJECTIONS

### A.  The Notice was Inadequate

The requirements for providing notice to class members are in Fed. Rule Civ. Proc. 23(c)(2)(B). That rule requires the parties provide class members "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable

2

effort."   The parties argued individual notice was impractical.  The court agreed, and observed that "due to [the] popularity of Defendant's search engine and its rather ubiquitous position in American culture, this class potentially covers all internet users in the United States. That being the case, direct notice to class members by mail, e-mail or other electronic individualized means is impractical."  Dkt. 63, page 12.

Individual notice to a majority of the class is not only practical but also inexpensive.  Notice should have been sent to Gmail account holders.   Millions of Google users receive announcements from Google through their Gmail accounts, which according to Google is the number one email service worldwide.  See http://googleblog.blogspot.nl/2012/06/chrome-apps-google-io-your-web.html (noting Gmail surpassed Hotmail and became the world's leading email service in June of 2012, with 425 million users accessing their Gmail accounts at least once monthly).  A report from AYTM Market Research found that 60 percent of consumers use Gmail as their main email service.  The same study found that 74.3 percent of consumers use Google search as their primary option for finding information on the web.  AYTM study discussed at http://www.brafton.com/news/74-percent-of-consumers-use-google-search-60-own-gmail-accounts.

The Settlement Agreement states "The Notice Plan will ___not___ take the form of a bulk email message to Class Members." (emphasis added) This defies logic, unless the goal was to prevent widespread dissemination.

Even the indirect notice plan was flawed:

> The plan includes four media channels: (1) internet-based notice using paid banner ads targeted at potential class members (in English and in Spanish on Spanish-language websites); (2) notice via "earned media" or, in other words, through articles in the press; (3) a website decided solely to the settlement (in English and Spanish versions); and (4) a toll-free telephone number where class members can obtain additional information and request a class notice. There will also be a dedicated post office box for class members to correspond with the settlement administrator. Plaintiffs approximate this advertising campaign will

3

reach approximately 73.1% of likely class members. In light of the size of the class, the court finds that this plan meets the goals Rule 23(c)(2)(B). Dkt. 63, pages 12-13.

The use of paid banner internet advertising is suspicious.  There is a conflict allowing Google to place "paid advertisements" with their own subscribers and vendors.  The alternative, traditional print advertisements, would also reach class members (almost everyone who can read is a class member), but would not have the same conflicts of interest found in an online campaign.

Using "earned media", i.e. press articles, is similarly flawed.  Press releases are not a measurable device to provide actual notice.  The court should demand a tally of all related news stories; Google could compile this data.  Otherwise, public relations is not the "best notice practicable" notice.

The settlement did not require Google or the Settlement Administrator to ensure the website would appear upon certain search terms.  As of the objection deadline, a Google search for "Google Search Settlement", did not link to the settlement website.  This cannot be a mistake or oversight.  And the website remains active for only 30 days after the Final Settlement Date (Doc52-3, at 5.5)  Although in capital letters at section 5.5, the term does not appear among the defined terms; a deliberate obfuscation.

The Declaration of the Settlement Administrator Richard W. Simmons (Simmons Declaration, Dkt. 65-4) defies common sense. "In instances where Google also provides email service to Class Members, because individuals have multiple email addresses, it is not currently possible to determine the reach of notice, if any, provided by email addresses should they be available." (Doc 65-4, page 8, para. 20)  Simmons does not define "reach of notice" or explain failing to implement an inexpensive direct notice plan.  Measure advertising results is imprecise, but measuring how many notice emails were open and read is child's play for Google.

4

The results of the banner ad campaign are imprecise and misleading.  Simmons claims "The banner ads were viewed 221,668,171 times by an estimated 95,014,649 individuals."  (Doc 65-4, para. 65)  Internet users are bombarded with literally hundreds of advertisements.  Ad "views" mean nothing. "Of these views, the banner advertisement was "clicked" 198,018 times." Dkt. 65-4, para. 66.  Google can explain the "clicked" views (length of view session, further clicks within the clicked materials, inadvertent clicks, etc) but with less than one percent of the "views" leading to "clicks" the additional data is probably unimportant.  Simmons does not state the number of times the website was viewed or the number of times the Class Notice was viewed.  Based on "clicks" less than one in one thousand (or one tenth of one percent, i.e., 0.1%) of class members may have viewed the Notice.  Google must be ordered to email the Notice to hundreds of millions of potential class members.

The Notice results are very expensive.  Google could easily have run a pay per click at no expense, but instead funneled funds to its own clients.  The notice plan either failed miserably or was designed to do so.

Class Notice is inadequate because it fails to advise Class Members of the nature of the Claims. Class Members should have been advised that the case alleged violations of the Electronic Communications Privacy Act, which provides for minimum statutory damages of $1,000, with the possibility of additional punitive damages. 18 U.S.C. § 2707(c).  The few Class Members who reviewed the Class Notice should have been provided some information as to the potential value of the claims alleged.  This is material information for any Class Member attempting to determine whether to object or opt-out.

/ / /

/ / /

**B.  The Settlement does not Require Google to Change Its Business Practices**

Google had good reasons to prevent widespread dissemination of the Notice, Google is not required to change its practices.  The settlement is an $8M pass to break the law.  The court acknowledged concerns over the failure of the litigation change Google's business practices:

> At the same time, there are certain aspects of the settlement which could weigh against a finding of fairness. Most importantly, the court observes that Defendant's challenged practices will not change as a result of this settlement. Instead, Defendant will be obligated to make certain "agreed-upon disclosures," or changes to certain portions of its website, which better informs users how their search terms could be disclosed to third parties through a referrer header. This disclosure, as Plaintiffs indicate, will allow potential users of Defendant's search engine to know in advance how their search terms might be provided to third parties. This is not the best result when compared to the injunctive relief sought in the CCAC since such an order would have required Defendant to stop disclosing users' search terms for profit.  (Doc 63, at 8 – 9)

The changes to Google's notice procedures are meaningless.  It is widely acknowledged that internet users do not read privacy policies.  They are lengthy and filled with legal terminology aimed at shielding content providers from liability.  Reading and understanding privacy policies requires significant time and sophistication.[1]   The notices are a nuisance because they frequently appear when users are trying to access needed information.  And reading the notices achieves nothing because the terms are pre-determined by the companies, are not open for negotiation and can be changed.  The additional disclosures are an inadequate result.

There is no meaningful injunctive relief; Google gets a release for the bargain price of $8M.  The absence of meaningful injunctive relief distinguishes this case from other cases within this Circuit that resulted in companies changing their operating procedures.  In the Settlement at issue in *Lane v.*

---

[1] *See* Alexis Madrigal, Reading the Privacy Policies You Encounter in a Year Would Take 7 Work Days, THE ATLANTIC (Mar. 1, 2012), *available at*

*Facebook, Inc*., 696 F.3d 811, 817 (9th Cir. 2012), Facebook terminated its Beacon program, under which Facebook disclosed purchasing activity of Facebook users to Facebook friends, often with embarrassing results.  *Cf. Fraley v. Facebook*, Order Denying Motion for Preliminary Approval of Settlement, No. 11-01726 (N.D. Cal. filed Apr. 8, 2011) (refusing to approve a preliminary settlement agreement where the agreement insufficient benefit to the class, even though it allowed users to opt-out of the program at issue in the case).

## C.  The Settlement Fund is Inadequate

The Settlement is so grossly inadequate it is farcical.  The Settlement is inadequate in light of statutory damages, the court overlooked this issue with a footnote, "Plaintiffs point out that the full amount of statutory damages available through the CCAC is likely in the trillions of dollars considering the size of the class….This is an amount in excess of what Defendant could ever pay considering it is much more than its value as a company." (Doc 63, at 9)  Google could easily pay a billion or divert one percent of its advertising revenue for a year or two to fund privacy research.

Plaintiffs alleged unjust enrichment but neither the settlement agreement nor the notice provide any indication how much Google profited by selling user information.  That information is material to evaluating this Settlement.  The paltry nature of the Settlement Fund only really becomes apparent upon consideration of the financial resources of the defendant the money Google has earned from advertising revenue – revenue gained through internet users' private information.  As of February 10, 2014, shortly before the court granted preliminary approval of the Settlement, Google surpassed Exxon Mobil to

---

http://www.theatlantic.com/technology/archive/2012/03/reading-the-privacy-policiesyou-encounter-in-a-year-would-take-76-work-days/253851/ *and* Erik Sherman, Privacy Policies Are Great – For PhDs, (Sept. 4, 2008) available at http://www.cbsnews.com/news/privacy-policies-are-great-for-phds/.

7

become the second largest company in the S&P 500 Index.[2]  Google's market capitalization was built off its advertising revenue, "nearly 95% of Google's revenue is derived from its advertising programs, with total advertising revenues estimated at $28 billion in 2010, $36.5 billion in 2011, and $43.7 billion in 2012. Google has implemented various innovations in the online advertising market that helped make it one of the biggest advertising platforms in the world."  (Doc 50, at 12).

$8.5M is an infinitesimal fraction of one percent of Google's advertising revenue over the class period.  One percent of its advertising revenue for the class period would be $2.33 **billion** dollars.  This table summarizes information from Google's investor website at

ttps://investor.google.com/financial/tables.html

| Google, Inc. Advertising Revenue in *MILLIONS* | |
|---|---|
| 2007 | $16,413 |
| 2008 | $21,129 |
| 2009 | $22,889 |
| 2010 | $28,236 |
| 2011 | $36,531 |
| 2012 | $43,868 |
| 2013 | $50,547 |
| 1Q 2014 | $13,866 |

---

[2] See BNK Invest, February 10, 2014, "Google Now #2 Largest Company, Surpassing Exxon Mobil", available at http://www.nasdaq.com/article/google-now-2-largest-company-surpassing-exxon-mobil-cm325336#ixzz39hFKgmtI.

| Total | $233,479 |
|-------|----------|

The Settlement Fund is less the annual income of many Google executives during the class period as reported on the Summary Compensation Table, Google, Inc. 2014 Proxy Statement, available at http://www.sec.gov/Archives/edgar/data/1288776/000130817914000114/lgoogle2014_def14a.htm#x1_1gooa045.

"Because millions of persons are estimated to be part of the Class, a distribution of the Settlement Amount to the Class would not be feasible. Therefore, no individual class member will receive money as a result of this Settlement."  (Notice, sec 5)  Shameful.

**D.  The *Cy Pres* is Improper**

A fair settlement should yield a fund sufficient to compensate individual class members.  If *cy pres* beneficiaries receive the settlement consideration, a different selection process must be employed for the court to make factual findings regarding the indirect benefit the beneficiaries will bestow on the class.

The legal construct of *cy pres* (from the French "*cy pres* comme possible"—~~as~~ near as possible") has its origins in trust law as a vehicle to realize the intent of a settlor whose trust cannot be implemented according to its exact terms.  *Klier v. Elf Atochem N. Am., Inc*., 658 F.3d 468, 474 (5th Cir. 2011).  Imported to the class action context, it has become an increasingly popular albeit controversial method of distributing settlement funds to non-class third parties.

*Cy pres* distributions benefit third parties, and should only be a last resort.  ALI Principles §3.07(a).  *See also Klier*,  658 F.3d at 475 ("[The *cy pres* option arises only if it is not possible to put those funds to their very best use: benefitting the class members directly.").  "This form of *cy pres*

9

stands on the weakest ground because *cy pres* is no longer a last-resort solution for a problem of claims administration.  The concern for compensating victims is ignored (at least unless the indirect benefits of the *cy pres* award flow primarily to the victims)."  Jay Tidmarsh, *Cy pres* and the Optimal Class Action, 82 Geo. Wash. L. Rev. 1, 4 (2013).

The Ninth Circuit requires "a driving nexus between the plaintiff class and the *cy pres* beneficiaries."  *Dennis v. Kellogg Co.*, 697 F.3d 858, 865 (9th Cir. 2012)[3], *citing Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir.2011).  "A *cy pres* award must be "guided by (1) the objectives of the underlying statute(s) and (2) the interests of the silent class members."  *Id*., *citing Nachshin at 1039*, and must not benefit a group "too remote from the plaintiff class," *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1308 (9th Cir.1990).

The complaint focuses Google's misuse of internet users' private information, including violations of the Electronic Communications Privacy Act.  Only World Privacy Forum claims to focus on the same issues but its selection has other problems.  The other recipients are not focused on privacy issues and/or are not geographically diverse enough to fairly represent the interests of the class.

Recipients Chicago-Kent College of Law, Harvard University, and Stanford University just happen to be the alma maters of Class Counsel Kassra P. Nassiri, of Nassiri & Jung, LLP, received his J.D. from Harvard Law School, as did defense counsel Eric Butler Evans.  Nassiri's law partner, Charles Jung, received his J.D. from Stanford Law School; Nassiri also received an M.A. from Stanford.  Class Counsel Michael J. Aschenbrener received his J.D. from the Chicago-Kent College of Law, as did three out of four of the other attorneys employed at his firm (Amanda Brady, Anne Schmidlin and Adam

---

[3] Objector's counsel Darrell Palmer was lead appellate counsel in *Dennis*.

10

York; in addition patent agent and law clerk Robert Paladino is also a third year student at Chicago-Kent College of Law).

To avoid the appearance of impropriety, *cy pres* beneficiaries should not have a relationship with class counsel. *Dennis* cautioned "*Cy pres* distributions present a particular danger" that "incentives favoring pursuit of self-interest rather than the class's interests [may] in fact influence[d] the outcome of negotiations." *Dennis*, 858 F.3d at 867. This appearance of conflict of interest is troubling given the important role Class Counsel are provided as fiduciaries for the class. *See, e.g., Radcliffe v. Experian Info. Solutions*, 715 F.3d 1157 (9th Cir. May 2, 2013) ("The responsibility of class counsel to absent class members whose control over their attorneys is limited does not permit even the appearance of divided loyalties of counsel."). *See also* ALI Principles §3.07 cmt. (b) ("A *cy pres* remedy should not be ordered if the court or any party has any significant prior affiliation with the intended recipient that would raise substantial questions about whether the award was made on the merits.") The appearance of impropriety raised by attorneys funding their alma mater is damaging to the reputation of the legal system and class actions. *See* Adam Liptak, Doling out Other People's Money, N.Y. TIMES, Nov. 26, 2007 ("Lawyers and judges have grown used to controlling these pots of money, and they enjoy distributing them to favored charities, alma maters and the like.").

These law school institutes are not focused on privacy. The AARP is not focused on privacy concerns and does not meet Ninth Circuit standards.

World Privacy Forum is the only *cy pres* beneficiary designated with a track record and mission related to privacy on the internet but according its IRS 990 forms, until recently, the organization had only one employee, founder Pam Dixon, and WPF was only a part-time endeavor. WPF has produced reports, Ms. Dixon has testified before Congress on internet privacy issues and is gaining recognition but this is a small organization with a limited track record and few credentials beyond the production of

non-peer reviewed reports.  The organization has apparently benefited from receipt of *cy pres* awards in

previous class action litigation, which it acknowledges on its website.  See

http://www.worldprivacyforum.org/about-us/ ("Funding: The World Privacy Forum is funded by . . . *Cy*

*pres* privacy settlements . . . (among others).)  Ms. Dixon's work prior to founding the World Privacy

Forum related to online job searching and education, and included titles such as "Virtual College", "Be

Your Own Headhunter Online" and "Job Searching Online for Dummies."  World Privacy Forum is not

a national organization with an established reputation and is incapable of providing an indirect benefit to

hundreds of millions of class members.

       These *cy pres* beneficiaries are inadequate or improper in part because of who was excluded.

First, the geographic reach of these recipients is problematic.  Why only fund three law schools and one

university, including two universities in the Bay Area of California where this litigation is pending and

where Class Counsel and Defendant maintain their offices.  There are other research institutions to

consider: Professor Woodrow Herzog of the Cumberland School of Law at Samford University in

Alabama has done well respected research in internet privacy.  *See* Daniel J. Solove and Woodrow

Hartzog, "The FTC and the New Common Law of Privacy", 114 Colum. L. Rev. 583 (2014) Also

excluded from this Settlement were many prominent consumer organizations, with well-established

national reputations and policy goals and advocacy records better aligned with the interests of Class

members.  Chief among these organizations are the Electronic Privacy Information Center (EPIC),

Center for Digital Democracy (CDD), Consumer Watchdog, Patient Privacy Rights and the Privacy

Rights Clearinghouse.  Directors of each of these organizations were signatories to a letter to the court

filed September 16, 2013.  That letter, which requested that the court deny preliminary approval of the

Settlement, noted:

12

Of particular significance for this settlement, these same organizations have advocated for changes in business practices that safeguard Internet privacy rather than ratifying current business practices that place privacy at risk. Because it is specifically the privacy risks arising from Google's referrer heading practices that created the risk to Internet privacy and gave rise to this class action lawsuit, these organizations are far more appropriate recipients of *cy pres* funds as their missions, activities, and advocacy are closely aligned with the interests of Class members.  Dkt.  62.

The absence of these and others which have stood up to Google and other organizations in the past, suggest the interests of this Class will not be served by the hopelessly conflicted and inadequate *cy pres* beneficiaries chosen by Class Counsel.

Why not let the class choose the recipients?  For a discussion of class member polling see Alexandra D. Lahav, Two Views of the Class Action, 79 Fordham L. Rev. 1939, 1961-63 (2011) (recommending polling the class as a "modest proposal" to increase class members' voice).  *See also In re Wells Fargo Sec. Litig.,* 991 F. Supp. 1193, 1197 (N.D. Cal. 1998) (Walker, J.) ("The fact remains that this money belongs to class members, and it is they who should decide whether and to whom to donate it.").

### E. The Class Representatives and Class Counsel have not Adequately Represented the Interests of the Class and Should Not be Compensated.

The requested attorneys' fees have not been earned.  Given the manifest unfairness of this settlement to the class, the attorneys should not be compensated with a fee award.  Their fees, along with the benefits to the class, should go to the class.  It is appalling Class Counsel ask for a lodestar multiplier. They ask for thirty percent of the class benefit, they should not be paid a percent of the administrative fees. Google never even had to answer the Complaint.

Similarly, the Class Representatives should not be rewarded with cash when the class gets none. They have not insured adequate notice was provided to the Class, and they agreed to an unfair settlement.

13

**III.    JOINDER IN OTHER OBJECTIONS**

Jan joins in, adopts and incorporates by reference as though fully stated herein each objection by other class members which are not inconsistent with these objections.

**IV.    CONCLUSIONS**

For the foregoing reasons and all others to be presented at oral argument, these objectors request that the court sustain their objections and grant the following relief:

- Upon proper hearing, sustain these Objections.

- Deny approval of the Settlement and order the case to proceed.

- Upon proper hearing, enter such Orders as are necessary and just to alleviate the inherent unfairness, inadequacies and unreasonableness of the Settlement

LAW OFFICES OF DARRELL PALMER PC

Dated:   August 8, 2014          By: _____
                                 Joseph Darrell Palmer
                                 Attorney for Objector Cameron Jan

14

1

2

## **CERTIFICATE OF SERVICE**

3

        I hereby certify that on August 8, 2014, I mailed the foregoing document via US Postal Service,

4

postage prepaid, to the following:

5

**COURT**

6

U.S. District Court
Clerk's Office

7

280 S 1st Street
San Jose, CA 95113

8

9

**CLASS COUNSEL**
Kassra Nassiri

10

Nassiri & Jung LLP
47 Kearny Street, Suite 700

11

San Francisco, CA 94108

12

**DEFENSE COUNSEL**

13

Edward D. Johnson
Mayer Brown LLP

14

Two Palo Alto Square, Suite 300
3000 El Camino Real

15

Palo Alto, CA 94306-2112

16

**CLASS ADMINISTRATOR**

17

Google Referrer Header Privacy Litigation
Settlement Administrator

18

P.O. Box 2002
Chanhassen, MN 55317-2002

19

20

21

22

23

_____

24

Joseph Darrell Palmer

25

26

27

28

15