**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN RE GOOGLE REFERRER HEADER PRIVACY LITIGATION, | No. 15-15858 |
| ———————————— | D.C. No. 5:10-cv-04809-EJD |
| PALOMA GAOS; ANTHONY ITALIANO; GABRIEL PRIYEV, individually and on behalf of all others similarly situated, | |
| *Plaintiffs-Appellees*, | OPINION |
| v. | |
| MELISSA ANN HOLYOAK; THEODORE H. FRANK, | |
| *Objectors-Appellants*, | |
| v. | |
| GOOGLE, INC., a Delaware corporation, | |
| *Defendant-Appellee.* | |

Appeal from the United States District Court
for the Northern District of California
Edward J. Davila, District Judge, Presiding

2    In re Google Referrer Header Privacy Litig.

Argued and Submitted March 13, 2017
San Francisco, California

Filed August 22, 2017

Before:  J. Clifford Wallace, M. Margaret McKeown,
and Jay S. Bybee, Circuit Judges.

Opinion by Judge McKeown;
Partial Concurrence and Partial Dissent by Judge Wallace

SUMMARY[*]

### Stored Communications Act / Settlement

The panel affirmed the district court's order approving the *cy pres*-only settlement of a class action brought under the Stored Communications Act and state law by Google Search users, alleging that Google violated their privacy by disclosing their Internet search terms to owners of third-party websites.

The panel held that the district court did not abuse its discretion in approving the settlement, which provided that Google would pay a total of $8.5 million and provide information on its website disclosing how users' search terms are shared with third parties, in exchange for a release of the claims of the approximately 129 million people who used Google Search in the United States between October 25, 2006 and April 25, 2014.  Of the $8.5 million

_____

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

settlement fund, approximately $3.2 million was set aside for attorneys' fees, administration costs, and incentive payments to the named plaintiffs, and the remaining $5.3 million or so was allocated to six *cy pres* recipients.

The panel held that the *cy pres*-only settlement, reached prior to class certification, was appropriate because the settlement fund was non-distributable.  In addition, the fact that the settlement fund was non-distributable did not mean that a class action could not be the superior means of adjudicating the controversy under Fed. R. Civ. P. 23(b)(3).  The panel held that approval of the settlement was not an abuse of discretion due to claimed relationships between counsel or the parties and some of the *cy pres* recipients.  The panel held that a prior relationship or connection, without more, is not an absolute disqualifier.  Rather, a number of factors, such as the nature of the relationship, the timing and recency of the relationship, the significance of dealings between the recipient and the party or counsel, the circumstances of the selection process, and the merits of the recipient play into the analysis.  The panel also held that the district court did not abuse its discretion by approving the attorneys' fees and costs.

Concurring in part and dissenting in part, Judge Wallace agreed that a *cy pre*-only settlement was appropriate and that the district court did not abuse its discretion in calculating class counsel's fees.  Dissenting from Section II of the majority opinion, Judge Wallace wrote that the fact alone that 47% of the settlement was being donated to the alma maters of class counsel raised an issue which, in fairness, the district court should have pursued further.  Judge Wallace would vacate the district court's approval of the class settlement and remand with instructions to hold an evidentiary hearing, examine class counsel under oath, and

4    IN RE GOOGLE REFERRER HEADER PRIVACY LITIG.

determine whether class counsel's prior affiliation with the *cy pres* recipients played any role in their selection as beneficiaries.

---

## COUNSEL

Theodore H. Frank (argued), Melissa A. Holyoak, and Adam Ezra Schulman, Competitive Enterprise Institute, Center for Class Action Fairness, Washington, D.C., for Objectors-Appellants.

Kassra P. Nassiri (argued) and John J. Manier, Nassiri & Jung LLP, San Francisco, California, for Plaintiffs-Appellees.

Donald M. Falk (argued) and Edward D. Johnson, Mayer Brown LLP, Palo Alto, California; Daniel E. Jones, Mayer Brown LLP, Washington, D.C.; Randall W. Edwards, O'Melveny & Myers LLP, San Francisco, California; for Defendant-Appellee.

---

## OPINION

McKEOWN, Circuit Judge:

Google's free Internet search engine ("Google Search") processes more than one billion user-generated search requests every day. This case arises from class action claims that Google violated users' privacy by disclosing their Internet search terms to owners of third-party websites. We consider whether the district court abused its discretion in approving the $8.5 million *cy pres*–only settlement and conclude that it did not.

In re Google Referrer Header Privacy Litig.      5

## BACKGROUND

In these consolidated class actions, three Google Search users—Paloma Gaos, Anthony Italiano, and Gabriel Priyev (collectively "plaintiffs")—asserted claims for violation of the Stored Communications Act, 18 U.S.C. § 2701 *et seq.*; breach of contract; breach of the covenant of good faith and fair dealing; breach of implied contract; and unjust enrichment. The plaintiffs sought statutory and punitive damages and declaratory and injunctive relief for the alleged privacy violations.

The claimed privacy violations are the consequence of the browser architecture. Once users submit search terms to Google Search, it returns a list of relevant websites in a new webpage, the "search results page." Users can then visit any website listed in the search results page by clicking on the provided link.

When a user visits a website via Google Search, that website is allegedly privy to the search terms the user originally submitted to Google Search. This occurs because, for each search results page, Google Search generates a unique "Uniform Resource Locator" ("URL") that includes the user's search terms. In turn, every major desktop and mobile web browser (including Internet Explorer, Firefox, Chrome, and Safari) by default reports the URL of the last webpage that the user viewed before clicking on the link to the current page as part of "referrer header" information. *See In re Zynga Privacy Litig.*, 750 F.3d 1098, 1102 (9th Cir. 2014) (explaining how "referrer headers" operate).[1]

---

[1] For instance, if a user enters "2016 presidential election" into Google Search and clicks on a link to www.cnn.com/election on the

6    IN RE GOOGLE REFERRER HEADER PRIVACY LITIG.

The genesis of the plaintiffs' complaints is the application of the search protocol, coupled with Google's "Web History" service, which tracks and stores account holders' browsing activity on Google's servers. Following mediation, the parties reached a settlement, which they submitted to the district court for preliminary approval in July 2013. The settlement provided that Google would pay a total of $8.5 million and provide information on its website disclosing how users' search terms are shared with third parties, in exchange for a release of the claims of the approximately 129 million people who used Google Search in the United States between October 25, 2006 and April 25, 2014 (the date the class was given notice of the settlement).

Of the $8.5 million settlement fund, approximately $3.2 million was set aside for attorneys' fees, administration costs, and incentive payments to the named plaintiffs. The remaining $5.3 million or so was allocated to six *cy pres* recipients, each of which would receive anywhere from 15 to 21% of the money, provided that they agreed "to devote the funds to promote public awareness and education, and/or to support research, development, and initiatives, related to protecting privacy on the Internet." The six recipients were AARP, Inc.; the Berkman Center for Internet and Society at Harvard University; Carnegie Mellon University; the Illinois Institute of Technology Chicago-Kent College of Law Center for Information, Society and Policy; the Stanford Center for Internet and Society; and the World Privacy Forum. Each of the recipients submitted a detailed proposal for how the funds would be used to promote Internet privacy.

---

search results page, the "referrer header" would tell CNN that the user found her way there via "http://www.google.com/search?q=2016+presidential+election."

After a hearing, the district court certified the class for settlement purposes and preliminarily approved the settlement.  Notice was given to the class on April 25, 2014, via a website, toll-free telephone number, paid banner ads, and press articles.  Thirteen class members opted out of the settlement, and five class members, including Melissa Ann Holyoak and Theodore H. Frank (collectively "Objectors"), filed objections.

Following a final settlement approval hearing at which the district court heard from both the parties and Objectors, the district court granted final approval of the settlement on March 31, 2015.  With respect to the objections, the district court found that: (1) a *cy pres*–only settlement was appropriate because the settlement fund was non-distributable; (2) whether or not the settlement was *cy pres*–only had no bearing on whether Rule 23(b)(3)'s superiority requirement was met; (3) the *cy pres* recipients had a substantial nexus to the interests of the class members, and there was no evidence that the parties' preexisting relationships with the recipients factored into the selection process; and (4) the attorneys' fees were commensurate with the benefit to the class.  The district court awarded $2.125 million in fees to class counsel and $15,000 in incentive awards to the three named plaintiffs.  Objectors appealed.

## ANALYSIS

The settlement at issue involves a *cy pres*–only distribution of the $5.3 million or so that remains in the settlement fund after attorneys' fees, administration costs, and incentive awards for the named plaintiffs are accounted for.  *Cy pres*, which takes its name from the Norman French expression *cy pres comme possible* (or "as near as possible"), is an equitable doctrine that originated in trusts and estates law as a way to effectuate the testator's intent in making

8     In re Google Referrer Header Privacy Litig.

charitable gifts.  *Nachshin v. AOL, LLC*, 663 F.3d 1034,
1038 (9th Cir. 2011).  In the class action settlement context,
the *cy pres* doctrine permits a court to distribute unclaimed
or non-distributable portions of a class action settlement
fund to the "next best" class of beneficiaries for the indirect
benefit of the class.  *Id.*

Here, the *cy pres* recipients were six organizations that
have pledged to use the settlement funds to promote the
protection of Internet privacy.  We review for abuse of
discretion the district court's approval of the proposed class
action settlement.  *Id.*  In addition, because the settlement
took place before formal class certification, settlement
approval requires a "higher standard of fairness."  *Lane v.
Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (quoting
*Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir.
1998)), *cert. denied sub nom. Marek v. Lane*, 134 S. Ct. 8
(2013).  Recognizing that, at this early stage of litigation, the
district court cannot as effectively monitor for collusion and
other abuses, we scrutinize the proceedings to discern
whether the court sufficiently "account[ed] for the
possibility that class representatives and their counsel have
sacrificed the interests of absent class members for their own
benefit."  *Id.*

## I.  **Appropriateness of the *Cy Pres*–Only Settlement**

As an initial matter, we quickly dispose of the argument
that the district court erred by approving a *cy pres*–only
settlement.  Notably, Objectors do not contest the value of
the settlement nor do they plead monetary injury.  To be sure,
*cy pres*–only settlements are considered the exception, not
the rule.  *See Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468,
474 (5th Cir. 2011) (explaining that direct distributions to
class members are preferable because "[t]he settlement-fund
proceeds, having been generated by the value of the class

members' claims," are "the property of the class"); *accord* William B. Rubenstein, Newberg on Class Actions § 12:26 (5th ed. 2017). However, they are appropriate where the settlement fund is "non-distributable" because "the proof of individual claims would be burdensome or distribution of damages costly." *Lane*, 696 F.3d at 819 (quoting *Nachshin*, 663 F.3d at 1038). We have never imposed a categorical ban on a settlement that does not include direct payments to class members.

The district court's finding that the settlement fund was non-distributable accords with our precedent. In *Lane*, we deemed direct monetary payments "infeasible" where each class member's individual recovery would have been "*de minimis*" because the remaining settlement fund was approximately $6.5 million and there were over 3.6 million class members. *Id.* at 817–18, 820–21. The gap between the fund and a miniscule award is even more dramatic here. The remaining settlement fund was approximately $5.3 million, but there were an estimated 129 million class members, so each class member was entitled to a paltry 4 cents in recovery—a *de minimis* amount if ever there was one. The district court found that the cost of verifying and "sending out very small payments to millions of class members would exceed the total monetary benefit obtained by the class."

To begin, the district court found that the amount of the fund was appropriate given the shakiness of the plaintiffs' claims. Objectors do not contend that it would have been feasible to make a 4-cent distribution to every class member. Instead, they ask us to impose a mechanism that would permit a miniscule portion of the class to receive direct payments, eschewing a class settlement that benefits members through programs on privacy and data protection instituted by the *cy pres* recipients. Objectors suggest, for

example, that "it is possible to compensate an oversized class with a small settlement fund by random lottery distribution," or by offering "$5 to $10 per claimant" on the assumption that few class members will make claims.  Our review of the district court's settlement approval is not predicated simply on whether there may be "possible" alternatives; rather, we benchmark whether the district court discharged its obligation to assure that the settlement is "fair, adequate, and free from collusion."   *Lane*, 696 F.3d at 819 (quoting *Hanlon*, 150 F.3d at 1027).  If we took their objections at face value, Objectors would have us jettison the teachings of *Lane*.   Objectors would also have us ignore our prior endorsement of *cy pres* awards that go to uses consistent with the nature of the underlying action.  *Nachshin*, 663 F.3d at 1039–40.[2]

Likewise, we easily reject Objectors' argument that if the settlement fund *was* non-distributable, then a class action cannot be the superior means of adjudicating this controversy under Rule 23(b)(3).  "[T]he purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy."  *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (alteration in original) (quoting 7AA Charles Alan Wright et al., Federal Practice and Procedure § 1779 (3d ed. 2005)).  Not surprisingly, there

---

[2] It bears noting, of course, that district courts are not precluded from approving other distribution methods that might benefit the class more directly under certain circumstances.  However, the fact that there are other conceivable methods of distribution does not mean that the district court abused its discretion by declining to adopt them.  *See Kode v. Carlson*, 596 F.3d 608, 612 (9th Cir. 2010) (per curiam) (holding that "[t]he abuse of discretion standard requires us to uphold a district court determination that falls within a broad range of permissible conclusions").

is a relationship between the superiority requirement and the appropriateness of a *cy pres*–only settlement. The two concepts are not mutually exclusive, since "[w]here recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification." *Id.* The district court did not abuse its discretion in finding the superiority requirement was met because the litigation would otherwise be economically infeasible. This finding dovetails with the rationale for the *cy pres*–only settlement.[3]

## II. The *Cy Pres* Recipients

We now turn to the crux of this appeal: whether approval of the settlement was an abuse of discretion due to claimed relationships between counsel or the parties and some of the *cy pres* recipients. We have long recognized that the *cy pres* doctrine, when "unbridled by a driving nexus between the plaintiff class and the *cy pres* beneficiaries[,] poses many nascent dangers to the fairness of the distribution process," because the selection process may then "answer to the whims and self interests of the parties, their counsel, or the court." *Nachshin*, 663 F.3d at 1038–39; *see also Dennis v. Kellogg Co.*, 697 F.3d 858, 865 (9th Cir. 2012); *Six (6)*

---

[3] Objectors point to *In re Hotel Tel. Charges*, 500 F.2d 86, 91 (9th Cir. 1974), as an example of a case where we found the superiority requirement not met because "the principal, if not the only, beneficiaries to the class action are to be the attorneys for the plaintiffs and not the individual class members." But *In re Hotel* did not involve a *cy pres* distribution or even a settlement. *See id.* Instead, we held that a class action was not the superior means of resolving the controversy because the class members' antitrust claims involved a "great variety" of individualized determinations. *Id.* at 90–91; *see also Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1305–06 (9th Cir. 1990) (distinguishing *In re Hotel* on the basis that the case raised concerns regarding "individual proof of damages").

12    IN RE GOOGLE REFERRER HEADER PRIVACY LITIG.

*Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1308–39 (9th Cir. 1990).  Due to these dangers, we require *cy pres* awards to meet a "nexus" requirement by being tethered to the objectives of the underlying statute and the interests of the silent class members.  *Nachshin*, 663 F.3d at 1039.

Objectors suggest that the district court rubber-stamped the settlement, by "simply h[olding] that the Ninth Circuit and district courts have approved other all–*cy–pres* settlements and class members effectively had no right to complain about the parties' choice of compromise."  That characterization is unfair and untrue.  And oddly, despite this claim, Objectors do not dispute that the nexus requirement is satisfied here.

The district court found that the six *cy pres* recipients are "established organizations," that they were selected because they are "independent," have a nationwide reach and "a record of promoting privacy protection on the Internet," and "are capable of using the funds to educate the class about online privacy risks."  Although the district court expressed some disappointment that the recipients were the "usual suspects," it recognized that "failure to diversify the list of distributees is not a basis to reject the settlement . . . when the proposed recipients otherwise qualify under the applicable standard."  Accordingly, the district court appropriately found that the *cy pres* distribution addressed the objectives of the Stored Communications Act and furthered the interests of the class members.  Previous *cy pres* distributions rest on this same understanding of the nexus requirement.  *See, e.g.*, *Dennis*, 697 F.3d at 866–67 (no nexus between false advertising claims relating to the nutritional value of Frosted Mini-Wheats® and charities providing food for the indigent); *Lane*, 696 F.3d at 817, 820–

22 (nexus between Facebook privacy claims and charity giving grants promoting online privacy and security); *Nachshin*, 663 F.3d at 1039–41 (no nexus between breach of privacy, unjust enrichment, and breach of contract claims relating to AOL's provision of commercial e-mail services and the Legal Aid Foundation of Los Angeles, the Boys and Girls Clubs of Santa Monica and Los Angeles, and the Federal Judicial Center Foundation); *Six (6) Mexican Workers*, 904 F.2d at 1307–09 (no nexus between Farm Labor Contractor Registration Act claims and foundation operating human assistance projects in areas where plaintiffs resided).

Nonetheless, Objectors take issue with the choice of *cy pres* recipients because Google has in the past donated to at least some of the *cy pres* recipients, three of the *cy pres* recipients previously received Google settlement funds, and three of the *cy pres* recipients are organizations housed at class counsel's *alma maters*. *See In re Google Buzz Privacy Litig.*, No. C 10-00672 JW, 2011 WL 7460099, at *3 (N.D. Cal. Jun. 2, 2011). The Objectors point to a comment from the American Law Institute's ("ALI") Principles of the Law of Aggregate Litigation which suggests that "[a] *cy pres* remedy should not be ordered if the court or any party has any significant prior affiliation with the intended recipient that would raise substantial questions about whether the selection of the recipient was made on the merits." Principles of the Law of Aggregate Litig. § 3.07 cmt. b (Am. Law Inst. 2010) (emphasis added).[4]

The benchmark for "significant prior affiliation" is left undefined. *Id.* Of course it makes sense that the district

---

[4] This statement is found in a comment that is unsupported by any illustration, case law, or other authority. *Id.* § 3.07 cmt. b.

court should examine any claimed relationship between the *cy pres* recipient and the parties or their counsel. But a prior relationship or connection between the two, without more, is not an absolute disqualifier. Rather, a number of factors, such as the nature of the relationship, the timing and recency of the relationship, the significance of dealings between the recipient and the party or counsel, the circumstances of the selection process, and the merits of the recipient play into the analysis. The district court explicitly or implicitly addressed this range of considerations.

We do not need to explore the contours of the "significant prior affiliation" comment because in the context of this settlement, the claimed relationships do not "raise substantial questions about whether the selection of the recipient was made on the merits." *See id.* § 3.07 cmt. b.[5] As a starting premise, Google's role as a party in reviewing the *cy pres* recipients does not cast doubt on the settlement. In *Lane*, we approved a *cy pres*–only settlement in which the distributor of the settlement fund was a newly-created entity run by a three-member board of directors, one of whom was defendant Facebook's Director of Public Policy. 696 F.3d at 817. We rejected the claim that this structure created an "unacceptable conflict of interest," explaining that "[w]e do not require . . . that settling parties select a *cy pres* recipient that the court or class members would find ideal" since "such an intrusion into the private parties' negotiations would be improper and disruptive to the

---

[5] Other circuits have endorsed § 3.07's preference for direct distribution to class members over the use of *cy pres* awards where practicable. *See In re BankAmerica Corp. Sec. Litig.*, 775 F.3d 1060, 1064–65 (8th Cir. 2015); *Klier*, 658 F.3d at 475 n.16. And though we have not adopted § 3.07, we too have expressed a similar preference. *See Nachshin*, 663 F.3d at 1036. However, no circuit has yet adopted § 3.07 comment b's "significant prior affiliation" reference.

settlement process." *Id.* at 820–21.  Instead, we recognized that, as the "'offspring of compromise,'" settlement agreements "necessarily reflect the interests of both parties to the settlement." *Id.* at 821 (quoting *Hanlon*, 150 F.3d at 1027).  Thus, we concluded that Facebook's ability to have "its say" in the distribution of *cy pres* funds was "the unremarkable result of the parties' give-and-take negotiations" and acceptable so long as the nexus requirement was satisfied.  *Id.* at 821–22.

Given the burgeoning importance of Internet privacy, it is no surprise that Google has chosen to support the programs and research of recognized academic institutes and nonprofit organizations.  Google has donated to hundreds of third-party organizations whose work implicates technology and Internet policy issues, including university research centers, think tanks, advocacy groups, and trade organizations.[6]  These earlier donations do not undermine the selection process employed to vet the *cy pres* recipients in this litigation.  The district court conducted a "careful[] review" of the recipient's "detailed proposals" and found a "substantial nexus" between the recipients and the interests of the class members.  Notably, some of the recipient organizations have challenged Google's Internet privacy policies in the past.[7]   Most importantly, there was

---

[6] *See Transparency – U.S. Public Policy – Google*, Google.com, https://www.google.com/publicpolicy/transparency.html (last visited July 21, 2017) (listing third-party organizations Google has supported in the past).

[7] At least one of the recipients, World Privacy Forum, has publicly criticized Google's lack of transparency regarding its privacy policies. *See* Joseph Menn, *Privacy Advocates Target Google*, L.A. Times (June 4, 2008), http://articles.latimes.com/2008/jun/04/business/fi-google4. And a complaint filed by the World Privacy Forum and a Stanford Center

16    In re Google Referrer Header Privacy Litig.

transparency in this process, with the proposed recipients disclosing donations received from Google. Each recipient's *cy pres* proposal identified the scope of Google's previous contributions to that organization, and, unlike in *Lane*, explained how the *cy pres* funds were distinct from Google's general donations. *See Dennis*, 697 F.3d at 867–68 (casting doubt on the value of *cy pres* funds that a defendant "has already obligated itself to donate"). Citing *Lane*, the district court found that "[t]he chosen recipients and their respective proposals are sufficiently related so as to warrant approval; they do not have to be the recipients that objectors or the court consider ideal."

The objection that three of the *cy pres* recipients had previously received *cy pres* funds from Google does not impugn the settlement without something more, such as fraud or collusion. *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009). That "something more" is missing here. Indeed, the proposition that *cy pres* funds should not be awarded to previous recipients would be in some tension with our nexus requirements. As we have recognized, it is often beneficial for a *cy pres* recipient to have a "'substantial record of service,'" because such a

---

for Internet and Society study played a key role in the $17 million fine Google paid to the Federal Trade Commission for circumventing user's privacy choices in Apple's Safari Internet browser. *See* Kukil Bora, *FTC Appears Ready to Fine Google Millions Over Apple Safari Privacy Breach*, Int'l Bus. Times (May 5, 2012), http://www.ibtimes.com/ftc-appears-ready-fine-google-millions-over-apple-safari-privacy-breach-report-696537; Claire Cain Miller, *Google to Pay $17 Million to Settle Privacy Case*, N.Y. Times (Nov. 18, 2013), http://www.nytimes.com/2013/11/19/technology/google-to-pay-17-million-to-settle-privacy-case.html; Elinor Mills, *Privacy Brouhaha Reveals Google's Split Personality*, CNET (Feb. 17, 2012), http://www.cnet.com/news/privacy-brouhaha-reveals-googles-split-personality/. Both organizations are *cy pres* recipients here.

record inspires confidence that the recipient will use the funds to the benefit of class members. *See Dennis*, 697 F.3d at 865 (quoting *Six (6) Mexican Workers*, 904 F.2d at 1308); *Lane*, 696 F.3d at 822.  But in emerging areas such as Internet and data privacy, expertise in the subject matter may limit the universe of qualified organizations that can meet the strong nexus requirements we impose upon *cy pres* recipients.  Given that, over time, major players such as Google may be involved in more than one *cy pres* settlement, it is not an abuse of discretion for a court to bless a strong nexus between the *cy pres* recipient and the interests of the class over a desire to diversify the pick via novel beneficiaries that are less relevant or less qualified.  *See Nachshin*, 663 F.3d at 1040 (considering whether the *cy pres* distribution "provide[s] reasonable certainty that any member will be benefitted").

Finally, we reject the proposition that the link between the *cy pres* recipients and class counsel's *alma maters* raises a significant question about whether the recipients were selected on the merits.  There may be occasions where the nature of the alumni connections between the parties and the recipients could cast doubt on the propriety of the selection process.  But here, we have nothing more than a barebones allegation that class counsel graduated from schools that house the Internet research centers that will receive funds.

The claim that counsel's receipt of a degree from one of these schools taints the settlement can't be entertained with a straight face.  Each of these schools graduates thousands of students each year.  Objectors have never disputed that class counsel have no ongoing or recent relationships with their *alma maters* and have no affiliations with the specific research centers.  Nor did the district court simply accept this concession or put the burden on the Objectors.  The district

18    In re Google Referrer Header Privacy Litig.

court appropriately considered the substance of the objections and explained why those challenges did not undermine the overall fairness of the settlement.  *See In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 377 (9th Cir. 1995). The court affirmatively analyzed the issue and was cognizant of the claim of a potential conflict.  All class counsel swore that they have no affiliations with the specific research centers.  Class counsel repeated that attestation at the final settlement approval hearing and added that they sit on no boards for any of the proposed recipients.  As one class counsel put it, "I simply got my law degree [at Harvard], and that's simply the end of it."[8]   The recipients are well-recognized centers focusing on the Internet and data privacy, and the district court conducted a "careful[] review" of the recipients' "detailed proposals" and found a "substantial nexus" between the recipients and the interests of the class members.[9]   No one suggested that any of the centers acted

---

[8] The dissent's suggestion that what is needed is a hearing with sworn testimony seems superfluous in view of the extensive hearing held by the district court, the specific queries to counsel about the *cy pres* recipients, and the submission of sworn declarations.

[9] The dissent challenges the inclusion of the Chicago-Kent College of Law Center for Information, Society and Policy ("CISP") as a recipient, noting that the center was only inaugurated in 2012. *See* Chicago-Kent Mag., Summer 2012, at 8, *available at* https://issuu.com/chicagokentlaw/docs/chicago-kent-magazine-2012. This judicial second-guessing does not bear scrutiny, particularly in a field that is developing quickly and where the record reveals a different story.  CISP's *cy pres* proposal, which outlines a "privacy preparedness" project that would develop interactive materials to educate the public about ways to protect their Internet and data privacy, notes that the five faculty involved in the proposed project are respected leaders in the field of Internet and privacy law, that CISP has received other *cy pres* awards and grants, and that CISP has hosted five conferences on Internet and data privacy issues that have attracted hundreds of attendees and trained over a hundred journalists on data privacy.  In addition, CISP conducts

with any impropriety, and the Objectors provided no alternative suggestions for other law schools with more qualified centers or institutes.  The district court found "no indication that counsel's allegiance to a particular alma mater factored into the selection process," particularly since the identity of the recipients "was a negotiated term included in the Settlement Agreement and therefore not chosen solely by . . . alumni."  Thus, the district court gave a "sufficient[ly] reasoned" response to the objections as to the claimed preexisting relationships.  *In re Pac. Enters. Sec. Litig.*, 47 F.3d at 377.  We can hardly say that the alumni connections cloud the fairness of the settlement.

As an overarching matter, nothing in this record "raise[s] substantial questions about whether the selection of the recipient was made on the merits."  *See* Principles of the Law of Aggregate Litig. § 3.07 cmt. b.  We do not suggest, however, that a party's prior relationship with a *cy pres* recipient could not be a stumbling block to approval of a settlement.  *Cf. Marek*, 134 S. Ct. at 9 (mem.) (statement of Roberts, C.J., respecting the denial of certiorari) (recognizing that given the "fundamental concerns surrounding" *cy pres* awards and their increasing prevalence, the Court "may need to clarify the limits on the use of such remedies" in the future).  We hold merely that, under the circumstances here, the district court did not abuse its discretion in approving the *cy pres* recipients.

---

research in such areas as data aggregation, social networks and health information, and children and internet privacy; engages in policy advocacy, community outreach, and public education; and holds seminars on Internet and data privacy issues for law students.  *See Center for Information, Society and Policy*, Kentlaw.iit.edu, https://www.kentlaw.iit.edu/institutes-centers/center-for-information-society-and-policy (last visited July 24, 2017).

### III.   Attorneys' Fees

Turning to the issue of attorneys' fees, the district court did not abuse its discretion by approving $2.125 million in fees and $21,643.16 in costs.  As an initial matter, there is no support for Objectors' view that the settlement should have been valued at a lower amount for the purposes of calculating attorneys' fees simply because it was *cy pres*–only.  *See generally Lane*, 696 F.3d at 818 (acknowledging a 25% fee award that also involved a *cy pres*–only settlement).  Rather, the question is whether the amount of attorneys' fees was reasonable.  *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011).

In a settlement that produces a common fund for the benefit of the entire class, a court has discretion to employ either the "percentage-of-recovery" method or the "lodestar" method to calculate appropriate attorneys' fees, so long as its discretion is exercised so as to achieve a reasonable result.  *See id.* at 942.  Here, the district court found that the requested fees were appropriate under either metric.

Under the percentage-of-recovery method, the requested fee was equal to 25% of the settlement fund.  According to the district court, this percentage was commensurate with the risk posed by the action and the time and skill required to secure a successful result for the class, given that class counsel faced three motions to dismiss and participated in extensive settlement negotiations.  The district court also found that this percentage hewed closely to that awarded in similar Internet privacy actions.  *See, e.g.*, *In re Netflix Privacy Litig.*, No. 5:11-CV-00379 EJD, 2013 WL 1120801, at *9–10 (N.D. Cal. Mar. 18, 2013); *see also In re Bluetooth*, 654 F.3d at 942 (noting that 25% is our "benchmark" for a reasonable fee award).

Although not required to do so, the district court took an extra step, cross-checking this result by using the lodestar method. *See In re Bluetooth*, 654 F.3d at 941–44 (checking the district court's percentage-of-recovery fees calculation against the lodestar method, which is "calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation . . . by a reasonable hourly rate for the region and the experience of the lawyer"). The district court found that class counsel provided sufficient support for its lodestar calculation that fees totaled $2,126,517.25.

**AFFIRMED.**

WALLACE, Circuit Judge, concurring in part and dissenting in part:

I concur in Sections I and III of the majority opinion. I agree that a *cy pres*-only settlement was appropriate in this case and do not contend that the district court abused its discretion in calculating class counsel's fees.

I dissent, however, from Section II of the opinion, in which the majority blesses the district court's approval of the settlement, despite the preexisting relationships between class counsel and the *cy pres* recipients. To me, the fact alone that 47% of the settlement fund is being donated to the alma maters of class counsel raises an issue which, in fairness, the district court should have pursued further in a case such as this. The district court made no serious inquiry to alleviate that concern. Accordingly, I would vacate the district court's approval of the class settlement, and remand with instructions to hold an evidentiary hearing, examine class counsel under oath, and determine whether class counsel's

22    IN RE GOOGLE REFERRER HEADER PRIVACY LITIG.

prior affiliation with the *cy pres* recipients played *any* role in their selection as beneficiaries.

## I.

As the majority opinion outlines, plaintiffs in this case alleged that Google violated class members' privacy rights by disclosing personal information (such as search terms) to unauthorized third parties. Google's practice allegedly violated the federal Stored Communications Act, along with various state laws. After several rounds at the motion to dismiss stage, the parties agreed to a class-wide settlement (before formal class certification by the district court). The parties estimated the size of the class to be 129 million people.

The settlement contained the following key terms: (1) Google agreed to pay $8.5 million into a settlement fund; (2) Google would provide notice of the settlement on its website; (3) each class representative would receive $5,000, claims administration costs would be $1 million, and attorney's fees would be $2.125 million (25% of the settlement fund); and (4) the remainder of the settlement fund (about $5 million) would go to six *cy pres* recipients. The six *cy pres* recipients were to be Carnegie Mellon University (21% of the remainder), the World Privacy Forum (17%), Chicago-Kent College of Law Center for Information, Society and Policy (16%), the Stanford Center for Internet and Society (16%), the Berkman Center for Internet and Society at Harvard University (15%), and that the AARP Foundation (15%).

## II.

We review a district court's approval of a class action settlement for an abuse of discretion. *Rodriguez v. W. Publ'g*

*Corp.*, 563 F.3d 948, 963 (9th Cir. 2009). Here, however, the parties reached the settlement before the class certification stage. "Prior to formal class certification, there is an even greater potential for a breach of fiduciary duty owed the class during settlement. Accordingly, such agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required." *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).

As stated above, three of the *cy pres* distribution payments in our case are to Chicago-Kent College of Law (16%), Stanford (16%), and Harvard (15%). Attorneys for the class attended all three of these institutions. We, along with other courts and observers, have pointed out the unseemly occurrence of *cy pres* funds being doled out to interested parties' alma maters. *See, e.g., Nachshin v. AOL, LLC*, 663 F.3d 1034, 1039 (9th Cir. 2011); *Securities & Exchange Comm'n v. Bear, Stearns & Co., Inc.*, 626 F.Supp.2d 402, 414–16 (S.D.N.Y. 2009); Adam Liptak, *Doling out Other People's Money*, N.Y. Times, Nov. 26, 2007 ("Lawyers and judges have grown used to controlling these pots of money, and they enjoy distributing them to favored charities, alma maters and the like").

In response to this all-too-common development, the American Law Institute has set forth, in its Principles of the Law of Aggregate Litigation, that "[a] *cy pres* remedy should not be ordered if the court or any party has any significant prior affiliation with the intended recipient that would raise substantial questions about whether the selection of the recipient was made on the merits." American Law Institute (ALI), Principles of the Law of Aggregate Litigation § 3.07 comment b (2010) (emphasis added). Although the majority tells us correctly that no circuit has adopted the specific

"prior affiliation" language, circuits have endorsed § 3.07's guidance regarding scrutinizing *cy pres* disbursements. *See, e.g., In re BankAmerica Corp. Sec. Litig.*, 775 F.3d 1060, 1064–65 (8th Cir. 2015) (vacating a *cy pres* settlement because "class counsel and the district court entirely ignored this now-published ALI authority"); *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 172 (3d Cir. 2013) (quoting ALI § 3.07, comment a (2010)); *In re Lupron Marketing and Sales Practices Litig.*, 677 F.3d 21, 33 (1st Cir. 2012) (citing to ALI § 3.07 and asserting that "[c]ourts have generally agreed with the ALI Principles").

I conclude that our circuit should adopt the ALI's guidance as set forth in § 3.07. District courts should be required to scrutinize *cy pres* settlements when the proffered recipients of the funds have a "prior affiliation" with counsel, a party, or even the judge, especially when one of those players is a loyal alumni of a *cy pres* recipient. I do not mean to suggest that class counsel's alma mater can never be a *cy pres* beneficiary. Rather, I propose that the burden should be on class counsel to show through sworn testimony, in an on-the-record hearing, that the prior affiliation played *no role* in the negotiations, that other institutions were sincerely considered, and that the participant's alma mater is the proper *cy pres* recipient.

The majority responds to this line of argument by asserting that "here, we have nothing more than a barebones allegation that class counsel graduated from schools that house the Internet research centers that will receive funds." The majority then salutes the district court's conclusion that there is "no indication that counsel's allegiance to a particular alma mater factored into the selection process," and stresses that the *cy pres* recipients were a negotiated term, not chosen solely by alumni. In essence, the majority

IN RE GOOGLE REFERRER HEADER PRIVACY LITIG.    25

holds that despite the nascent dangers posed by apportioning *cy pres* funds to the distributing parties' alma maters, the burden is entirely on the objectors to show that the settlement might be tainted.

I disagree fundamentally with this analysis. Our precedent requires that district courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth*, 654 F.3d at 947. In our case, we have a *cy pres*-only settlement. That alone raises a yellow flag. Furthermore, we have a class settlement before formal class certification. That raises another yellow flag. Lastly, we have almost half of the settlement fund, several million dollars, being given to class counsel's alma maters. To me, that raises a red flag. I am especially dubious of the inclusion of the Center for Information, Society and Policy at Chicago-Kent Law School (a law school attended by class counsel), which center appears to have inaugurated only a year before the parties herein agreed to their settlement. Even with these red and yellow flags, under the majority's holding, the burden is still on the objectors to prove more, despite the objectors' lack of access to virtually any relevant evidence that would do so.

I would hold that the combination of a *cy pres*-only award, a pre-certification settlement, and the fact that almost half the *cy pres* fund is going to class counsel's alma maters, is sufficient to shift the burden to the proponents of the settlement to show, on a sworn record, that nothing in the acknowledged relationship was a factor in the ultimate choice. Here, the only sworn-to items in the record on this issue are boiler plate, one-line declarations from class counsel stating "I have no affiliation" with the subject

26    IN RE GOOGLE REFERRER HEADER PRIVACY LITIG.

institutions. While the majority asserts that the district court conducted a "careful review," these terse declarations are the only shred of sworn-to evidence in the record. There was essentially nothing for the district court to review—carefully or not. Although there was some discussion between counsel and the district court during the hearings on the settlement, this was nothing more than unsworn lawyer talk during an oral argument.[1]

I still have many questions surrounding how these universities were chosen, such as: What other institutions were considered? Why were the non-alma mater institutions rejected? What relationship have counsel had with these universities? Have counsel donated funds to their alma maters in the past? Do counsel serve on any alma mater committees or boards? Do counsel's family members? How often do counsel visit their alma maters? There are many questions still lingering that have not been answered under oath. Here, as we have directed before, "the district court should have pressed the parties to substantiate their bald assertions with corroborating evidence." *Id.* at 948.

Although I would vacate the parties' settlement, I express no opinion on the definitive fairness of the parties' agreement. It is not the province of appellate judges to "substitute our notions of fairness for those of the district judge." *Officers for Justice v. Civ. Serv. Commission of the City and County of San Francisco*, 688 F.2d 615, 626 (9th

---

[1] I disagree with the majority's assertion that "sworn testimony seems superfluous" because counsel submitted one-line boilerplate declarations and the district court heard some unsworn argument from the lawyers. My experience as a trial judge taught me to be skeptical of unsworn statements from lawyers, especially when it comes to conflict of interest issues. To me, there is a significant difference between sworn and unsworn testimony.

IN RE GOOGLE REFERRER HEADER PRIVACY LITIG.    27

Cir. 1982) (internal citations omitted). Instead, I would remand the case to the district court for further fact finding in accordance with the concerns I have expressed.