**MAYER BROWN LLP**
EDWARD D. JOHNSON (SBN 189475)
wjohnson@mayerbrown.com
DONALD M. FALK (SBN 150256)
dfalk@mayerbrown.com
ERIC B. EVANS (SBN 232476)
eevans@mayerbrown.com
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA  94306-2112
Telephone: (650) 331-2000
Facsimile:  (650) 331-2060

**O'MELVENY & MYERS LLP**
RANDALL W. EDWARDS (SBN 179053)
redwards@omm.com
Two Embarcadero Center, 28th Floor
San Francisco, California 94111-3823
Telephone: (415) 984-8700
Facsimile: (415) 984-8701

Attorneys for Plaintiff GOOGLE LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE GOOGLE REFERRER HEADER PRIVACY LITIGATION<br><br>This Document Relates to All Actions | Case No. 5:10-cv-4809-EJD<br><br>**DEFENDANT GOOGLE LLC'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**<br><br>Date: June 4, 2020<br>Time: 10:00 a.m.<br>Courtroom: 4, 5th Floor<br><br>Judge: Hon. Edward J. Davila |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

NOTICE OF MOTION ....................................................................................................... 1

STATEMENT OF ISSUE TO BE DECIDED ..................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................... 1

BACKGROUND ................................................................................................................. 3

    A. The Relevant Technology .......................................................................................... 3

        1.    How referrer headers, a standard technical feature of web browsing, were used in Google Search ................................................. 3

        2.    Referrer headers are not Internet "cookies" ................................................. 4

        3.    Referrer headers are not IP Addresses ........................................................ 5

    B.    The Allegations In The Operative Complaint ......................................................... 5

    C.    Procedural History ................................................................................................. 7

ARGUMENT ...................................................................................................................... 9

    A.    Plaintiffs Can Establish Standing Only By Plausibly Alleging An Actual Or Impending Concrete Injury Resulting From Their Asserted Legal Violations ............................................................................................................... 9

    B.    Plaintiffs Lack Standing To Bring Their SCA Claim ........................................... 10

        1.    The Disclosure of Search Terms Alone Is Not A Concrete Injury In Fact ............................................................................................................ 10

        2.    Plaintiffs' Allegations About The Risk of Reidentification Are Too Speculative To Establish Standing ......................................................... 19

        3.    Disclosure of the Specific Search Terms Alleged Could Not Create Harm or Sufficient Risk of Harm .............................................................. 21

    C.    Plaintiffs Lack Standing To Bring Their Common Law Claims ......................... 22

        1.    Plaintiff's Breach of Contract Claim Fails ................................................. 22

    D.    Plaintiffs' Unjust Enrichment Claim Fails ........................................................... 24

CONCLUSION ................................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..................................................................................................9

*Auer v. Trans Union, LLC,*
    902 F.3d 873 (8th Cir. 2018) ..................................................................................9

*Bassett v. ABM Parking Services, Inc.,*
    883 F.3d 776 (9th Cir. 2018) ..................................................................11, 17, 18

*Bell Atlantic Corporation v. Twombly,*
    550 U.S. 544 (2007)..................................................................................................9

*Cahen v. Toyota Motor Corp.,*
    717 F. App'x 720 (9th Cir. 2017) .......................................................................14, 23

*Campbell v. Facebook, Inc.,*
    --- F.3d ----, 2020 WL 1023350 (9th Cir. Mar. 3, 2020) ......................................13

*Carey v. Piphus,*
    435 U.S. 247 (1978)................................................................................................15

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013)...........................................................................................9, 20

*Clark v. City of Seattle,*
    899 F.3d 802 (9th Cir. 2018) ................................................................................21

*College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,*
    527 U.S. 666 (1999)................................................................................................15

*Dutta v. State Farm Mut. Auto. Ins. Co.,*
    895 F.3d 1166 (9th Cir. 2018) .........................................................................2, 9, 17

*Edwards v. First Am. Corp.,*
    610 F.3d 514 (9th Cir. 2010) .........................................................................8, 10, 16, 21

*Eichenberger v. ESPN, Inc.,*
    876 F.3d 979 (9th Cir. 2017) ...........................................................................12, 13

*FEC v. Akins,*
    524 U.S. 11 (1998)..................................................................................................17

*Feltner v. Columbia Pictures Television, Inc.,*
    523 U.S. 340 (1998)................................................................................................14

*Folsom* v. *Marsh*,
    9 F. Cas. 342 (C.C. D. Mass. 1841) ...................................................................14

*Fox Film Corp. v. Doyal*,
    286 U.S. 123 (1932)........................................................................................14

*Frank v. Gaos*,
    139 S. Ct. 1041 (2019) .....................................................................................8

*In re Google Referrer Header Privacy Litig.*,
    869 F.3d 737 (9th Cir. 2017) ............................................................................8

*In re Google, Inc. Privacy Policy Litig.*,
    2012 WL 6738343 (N.D. Cal. Dec. 28, 2012)..................................................23

*Hancock v. Urban Outfitters, Inc.*,
    830 F.3d 511 (D.C. Cir. 2016) .........................................................................17

*In re Hulu Privacy Litig.*,
    86 F. Supp. 3d 1090 (N.D. Cal. 2015) ..............................................................12

*Hutton v. National Bd. of Exam'rs in Optometry, Inc.*,
    892 F.3d 613 (4th Cir. 2018) ...........................................................................23

*Low v. LinkedIn Corp.*,
    2011 WL 5509848 (N.D. Cal. Nov. 11, 2011) ...................................................14

*Mays v. Wal-Mart Stores, Inc.*,
    __ Fed. Appx. __, 2020 WL 1277642 (9th Cir. Mar. 17, 2020)............................17

*Oasis West Realty, LLC* v. *Goldman*,
    51 Cal. 4th 811 (2011) ...................................................................................22

*Peabody v. Norfolk*,
    98 Mass. 452 (1868) ......................................................................................16

*Reilly v. Ceridian Corp.*,
    664 F.3d 38 (3d Cir. 2011)...............................................................................23

*Robins v. Spokeo, Inc.*,
    867 F.3d 1108 (9th Cir. 2017) ...............................................................2, 13, 17

*Rosenbach v. Six Flags Entmt. Corp.*,
    123 N.E.3d 1197 (Ill. 2019) ............................................................................18

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) .......................................................................... *passim*

iii

*Stone v. White*,
   301 U.S. 532 (1937) ................................................................................................... 23

*Teel v. Nolen Brown Motors, Inc.*,
   93 So.2d 874 (Fla. 1957) ............................................................................................. 21

*Thompson v. N. Am. Stainless, LP*,
   562 U.S. 170 (2011) ............................................................................................ 17, 18

*Town of Castle Rock v. Gonzales*,
   545 U.S. 748 (2005) ................................................................................................... 15

*United States v. Jacobsen*,
   466 U.S. 109 (1984) ................................................................................................... 16

*Wilcox v. Plummer's Ex'r*,
   29 U.S. (4 Pet.) 172 (1830) ....................................................................................... 22

*Woolsey v. Judd*,
   1855 WL 6410 (N.Y. Super. 1855) ........................................................................... 14

**Statutes**

11 U.S.C. § 107(a) ............................................................................................................ 21

15 U.S.C. § 1681n ............................................................................................................. 18

18 U.S.C. § 2707(a) .......................................................................................................... 17

18 U.S.C. § 2710(a)-(b) .................................................................................................... 12

Fair Credit Reporting Act ................................................................................... 11, 16, 18

Fla. Stat. §§ 695.22, 695.26 ............................................................................................. 21

Lanham Act ...................................................................................................................... 15

Stored Communications Act of 1986 ..................................................................... *passim*

Video Privacy Protection Act .......................................................................................... 12

1   **NOTICE OF MOTION**

2   Please take notice that on June 4, 2020 at 10:00 a.m., before the Honorable Edward J.

3   Davila, Defendant Google LLC will and hereby does move the Court for an order dismissing all

4   claims in the operative consolidated complaint (Dkt. No. 50) under Federal Rules of Civil

5   Procedure 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction over the pleaded claims.

6   The motion is based on this Notice, the accompanying Memorandum of Points and

7   Authorities, any reply memorandum that Google may file, Google's request for judicial notice,

8   any arguments of counsel, and any other matter that the Court deems appropriate.

9   **STATEMENT OF ISSUE TO BE DECIDED**

10   Whether plaintiffs can establish Article III standing without making a plausible allegation

11   of actual or imminent concrete harm.

12   **MEMORANDUM OF POINTS AND AUTHORITIES**

13   The Supreme Court remanded for this Court to determine whether any plaintiffs here

14   allege Article III standing in their consolidated complaint.  They do not.

15   To establish standing under *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), a plaintiff

16   must plausibly allege actual or imminent concrete harm.  Although the complaint scatters

17   speculation about conceivable harms through its 171 paragraphs, it does not plead that any harm

18   actually happened or imminently will.

19   Plaintiffs complain about the use of the Internet-standard "referrer header" in Google

20   Search.  The use of a "referrer header" is part of the normal operation of the Internet.  When an

21   Internet user clicks on a link to a website, the user's web browser transmits a "referrer header" to

22   that website.  That referrer header communicates the address of the webpage the user last visited,

23   informing the requested website how the user got to the page.  If a user clicked on a website from

24   Google's Search results page, the referrer header generated by the user's web browser

25   communicated the address of the Search results page.  At the time the complaint was originally

26   filed, the referrer header from the Search results page included the user's search terms.  Plaintiffs

27   allege that, by communicating search terms as part of referrer headers, Google violated Search

28   users' privacy giving rise to claims under the federal Stored Communications Act ("SCA") and

1

1 │ California common law.

2 │      But plaintiffs have not plausibly alleged what they need to establish standing here:
3 │ concrete injury, or a certainly impending risk of it, arising from disclosure of any personal
4 │ information.  No individual plaintiff alleges that he or she—or any other Google Search user—
5 │ was actually identified by any search term, let alone that any harm resulted.  Nor does the
6 │ complaint plausibly allege that any of the three named plaintiffs was imminently identifiable
7 │ through information in a referrer header.  No harm to a privacy interest can arise to a search user
8 │ who cannot plausibly allege that she was identified or is in imminent danger of being identified.

9 │      The complaint also does not allege any concrete injury arising from disclosure of the
10 │ search terms by themselves.  As the Court recognized in dismissing an earlier complaint,
11 │ plaintiffs do not "plead facts sufficient to show that the disseminated information"— anonymous
12 │ search terms—"places [them] in imminent danger of harm." Dkt. No. 38, at 4:3-4.  Because they
13 │ cannot allege concrete injury or a certainly impending risk of it, plaintiffs lack standing to sue.

14 │      Plaintiffs told the Supreme Court that *every* disclosure of search terms in referrer headers
15 │ *ipso facto* produces Article III injury so long as it is alleged to violate the SCA.  And that was the
16 │ basis of this Court's denial of the motion to dismiss the SCA claim in a prior complaint.  *See*
17 │ Dkt. No. 38, at 4-6.  But *Spokeo* held, to the contrary, that "Article III standing requires a
18 │ concrete injury in the context of a statutory violation."  136 S. Ct. at 1549.

19 │      As the United States explained to the Supreme Court in this case, there "is no historical
20 │ or other evidence that violations of the SCA categorically create concrete harm."  U.S. Supp. Br.
21 │ 19; *see also* Google Supp. Br. 17-24.[1]  And the Ninth Circuit's post-*Spokeo* precedents make
22 │ clear that a plaintiff must do more than allege the violation of a statute that arguably protects a
23 │ concrete interest; he "must also demonstrate how the 'specific' violation of [the statute] alleged
24 │ in the complaint actually harmed or 'present[ed] a material risk of harm' *to him*." *Dutta v. State*
25 │ *Farm Mut. Auto. Ins. Co.*, 895 F.3d 1166, 1174 (9th Cir. 2018) (emphasis added) (quoting
26 │ *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1113 (9th Cir. 2017)).

27 │
28 │ [1] Unless otherwise noted, citations to briefs identify the parties' supplemental opening and reply
    briefs on standing in the Supreme Court.

GOOGLE'S MOT.  TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION;
CASE NO.  5:10-CV-4809-EJD

1  That is where the complaint founders.  The analogies plaintiffs propose—to privacy torts

2  and cases protecting property interests in letters—do not fit the allegations here.  Plaintiffs'

3  common-law claims were dismissed for lack of Article III standing by both this Court and Chief

4  Judge Ware.  Nothing warrants a different result now.

5  **BACKGROUND**

6  **A.   The Relevant Technology**

7  **1.   How referrer headers, a standard technical feature of web browsing, were used in Google Search**

8  

9  Internet-connected devices exchange information through data transmissions formatted

10  according to industry-standard "protocols."  The hypertext transfer protocol ("HTTP") is the

11  generally applicable protocol that allows Internet users to access webpages through their web

12  browsers (such as Chrome, Internet Explorer and Safari).[2]  Under that protocol, when a user

13  clicks on a link to a webpage, the user sends a message through the browser to the server that

14  hosts the webpage, requesting access.[3]  That message contains a "request line" (which identifies

15  the webpage that the user is requesting) and "header fields" (which provide additional details

16  relevant to the request).  The server hosting the webpage then interprets the request and returns

17  the requested webpage to the user.  RFC 2616 §§ 5, 14 (published 1999).

18  One of the standard header fields is the "referrer header."  The referrer header conveys

19  the address of the "referring" webpage that contained the link to the requested webpage.  For

20  example, if a user visited the Northern District of California's webpage at

21  https://www.cand.uscourts.gov/, and clicked the "San Jose" link in the "About the Court" tab, the

22  user would cause the browser to send a message to the server that hosts this Court's webpage.

23  That request would include the following referrer header:

24  

25  [2]  The standards for HTTP transmissions are developed by the Internet Engineering Task Force. Although denominated "Requests for Comments" ("RFCs"), they are foundational standards. *See* RFC 2026, https://tools.ietf.org/html/rfc2026 (explaining the standard-setting process).  The HTTP standards are RFC 2616, https://tools.ietf.org/html/rfc2616.   *See* Google's Request for Judicial Notice.

26  

27  

28  [3] A request to the webpage's server is also sent when a user enters the address for that webpage into her browser (for example, typing "www.supremecourt.gov").

3

```
Referer: https://www.cand.uscourts.gov/
```

During the relevant period, this standard process worked the same way when a user entered a query in Google Search and then clicked on a link to a webpage listed in the Search results  And notably, the address of the Search results webpage, which would be included in the referrer header, contained the search terms in that query.  For example, if a user entered the query "Northern District of California" in Google Search and clicked on the link to the Northern District's website from the Search results page generated by that query, the user would cause the browser to send a message to the server that hosts the Court's webpage that included a referrer header that contained the address of the Google Search results webpage (with the search terms):

```
Referer: http://www.google.com/search/q=Northern+District+of+
         California
```

A referrer header is not disclosed to the general public; in the examples above, only the server hosting would receive the referrer header sent by the user.  The referrer header identifies only the immediately preceding website; it contains no other information about the user or her search history.  RFC 2616 § 14.36.

Nothing in the HTTP protocol requires the server receiving the request to review or retain the information in the referrer header.  But referrer headers can provide useful information.  For example, the referrer headers leading to a page-not-found error might identify webpages with outdated links.  RFC 2616 § 14.36.

### 2.      Referrer headers are not Internet "cookies"

This case is not about Internet "cookies" or online advertising.  A cookie—in the Internet sense—is a small data file inserted into and stored on a user's computer.  Third-party advertising servers will sometimes use cookies to determine which advertisements to display to an internet user, based on the user's browsing history.  *See generally* RFC 6265. A cookie is not the same thing as a referrer header.  Referrer headers do not modify, transmit, or control cookies; and no claim in this case relates to information stored in cookies, or to the serving of ads to users.

### 3.      Referrer headers are not IP Addresses

When a user clicks on a link to a webpage, the server hosting the user-requested webpage

receives not only the referrer header but also the user's Internet Protocol address ("IP address"). The IP address is a numerical identifier that enables a message sent over the Internet to reach its intended destination.  *See*, *e.g.*, RFC 791, https://tools.ietf.org/html/rfc791, § 2.3.  The server needs the user's IP address to send the webpage back to the right place. *See id.* § 2.2.

The IP address itself does not reveal the user or identify the device—it is only a string of numbers.  Moreover, an IP address is not necessarily static—mobile devices such as laptop computers and smartphones may use multiple IP addresses as they connect to the Internet from different locations, rather than having a fixed IP address as some stationary computers may have. In the consumer context, IP addresses are assigned by the consumer's Internet service provider ("ISP").  An ISP has a limited supply of IP addresses, and it can assign IP addresses to devices temporarily and change them at its discretion.  *See* RFC 2131 § 2 (defining widely adopted Dynamic Host Configuration Protocol for distributing IP addresses); RFC 6302 § 1 (noting that "[s]ervice providers will [as of 2011] have a hard time finding enough [IP] addresses to sustain product and subscriber growth").[4]

The IP address therefore does not identify what specific device or computer user is requesting the webpage.  For that reason, even where an IP address is passed along with a referrer header, it does not reveal the identity of the user who clicked on a link to a webpage (or, as is applicable here, who conducted a particular search).

## B.     The Allegations In The Operative Complaint

The consolidated complaint operative at the time of the settlement was brought on behalf of three named plaintiffs: Paloma Gaos, Anthony Italiano, and Gabriel Priyev.  Dkt. No. 50, ¶¶ 100-129.  Each plaintiff alleges that a web browser's disclosure of Google Search queries in the referrer header sent to third-party website servers violates the restrictions in the Stored Communications Act of 1986 ("SCA"), 18 U.S.C. §§ 2701 *et seq.*, on "knowingly divulg[ing] to any person the contents of a communication" in electronic storage or carried on a remote

---

[4] In addition, many computers often share the same public-facing IP address.  For example, an ISP or business may use Network Address Translator (see generally RFCs 1631, 2263, and 3022) or private IP networking (see generally RFC 1918) to share a single public-facing IP address among many computers.

computing service, *id.* § 2702(a)(1)-(2).  *See* Dkt. No. 50, ¶¶ 130-141.

The complaint does not identify any specific Google Search queries by plaintiffs Gaos or Priyev.  Gaos alleges only that she "conducted numerous searches, including 'vanity searches' for her actual name and the names of her family members."  *Id.* ¶ 101.  Priyev alleges that he "conducted numerous searches, including searches for financial and health information." *Id.* ¶ 115.

The third plaintiff, Italiano, does allege six specific Google Search queries, each a combination of his name and (a) "his home address"; (b) "bankruptcy"; (c) "foreclosure proceedings"; (d) "short sale proceedings"; (e) "Facebook"; and (f) "the name of his then soon-to-be ex-wife + forensic accounting."  *Id.*  ¶ 107.  Italiano alleges that these Search queries occurred during "the time period from July 2010 to August 2011," and that he was then "going through formal divorce proceedings."  *Id.* ¶¶ 107-108.

Each plaintiff claims to have somehow "suffered actual harm" from Google's "dissemination of . . . search queries, which sometimes contained sensitive personal information, to third parties."  Dkt. No. 50, ¶¶ 104, 111, 118.  But they do not say how.  And because there are (and can be) no allegations that a Search query by itself reveals a user's identity, Plaintiffs only offer conjecture to support their claim of harm.  In particular, they speculate that a hypothetical "adversary" could use the "Science of Reidentification" to "combine anonymized data" from referrer headers "with outside information to pry out obscured identities."  *Id.* ¶ 86.

Yet the complaint does not allege that any Plaintiff was, in fact, reidentified and tied to a particular Search query by a website operator combining a referrer header with outside information.  Rather, the allegations stop at the point that the plaintiffs clicked on a link displayed on a Google Search results page and a referrer header including Search terms was transmitted to a website operator.  See id. ¶¶ 101-104, 109-111, 115-117.  None of the plaintiffs identifies a single website to which they linked, or alleges which websites received referrer headers containing their Search queries, or that those unidentified websites did anything with the referrer header information.  The complaint also does not allege that anyone else has been reidentified and tied to a particular Search query by a website operator based on a referrer

6

header.

Rather, the complaint speculates about processes whereby some third party could cross-reference multiple databases of different types of information to somehow reidentify an individual.[5] But none of this speculation relates to referrer headers, Search terms, or the use of referrer headers by websites to which a user linked from a Search results page. *See id.* ¶ 83-92 (citing Paul Ohm, *Broken Promises of Privacy: Responding to the Surprising Failure of Anonymization*, 57 U.C.L.A. L. Rev. 1701 (2010), and articles about "data brokers"). The allegations expressly purporting to show a substantial risk of harm similarly focus on data other than Search terms that a third party—such as "an online ad serving company"—may obtain through means other than referrer headers. *See id.* ¶¶ 92-98. The complaint does not explain how or why an "ad serving company" would receive a referrer header that is provided to the operator of website linked from a Google Search result s page. *See id.* ¶ 98. And, as explained above (at p. 5), a major premise of the complaint's speculation—that "[a]n IP address is similar to a phone number in that it identifies the exact computer being used by the user to search and navigate the internet" (¶ 95)—is flat wrong.

## C.   Procedural History

Because this Court is aware of the long procedural history of this case, we recount only the history pertinent to this motion.

Plaintiff Paloma Gaos first filed a putative class action against Google in 2010. Dkt. No. 1. Judge Ware dismissed the initial complaint because Gaos "had failed to plead facts sufficient to establish Article III standing" for any of her claims. Dkt. No. 24.

In 2012, this Court dismissed the state-law claims in Gaos's amended complaint for lack of Article III standing, noting that she did "not identify what injury resulted from this dissemination" of search terms in referrer headers or "plead facts sufficient to show that the disseminated information is of a nature that places her in imminent harm." Dkt. No. 38, at 4. The Court allowed the federal SCA claim to go forward, however, based on now-abrogated Ninth

---

[5] The complaint suggests that Google could do this (¶96), but the complaint does not challenge how Google uses Search queries, only its alleged communication of queries to other websites.

Circuit authority holding that any alleged statutory violation established Article III injury.  *Id.* (citing *Edwards v. First Am. Corp.*, 610 F.3d 514, 517 (9th Cir. 2010)).

Gaos and Anthony Italiano filed a second amended complaint in 2012, and a similar action filed by Gabriel Priyev in the Northern District of Illinois was consolidated with this case in 2013. Dkt. No. 51.  The consolidated complaint naming all three plaintiffs (Dkt. No. 50) was operative when the case settled later that year.  The complaint asserts several state common-law claims—for breach of contract, breach of good faith and fair dealing, breach of implied contract, and unjust enrichment—based on the allegations described above.  *Id.* ¶¶ 142-171.

In 2015, this Court approved the settlement over the objections of Theodore Frank and Melissa Holyoak.  Dkt. Nos. 85, 87, 91. The objectors appealed, and the Ninth Circuit affirmed in 2017. *In re Google Referrer Header Privacy Litig.*, 869 F.3d 737 (9th Cir. 2017).  Objectors then petitioned the Supreme Court for certiorari, which was granted in 2018.

At the merits stage, the United States filed an amicus brief in support of neither party, arguing (among other things) that plaintiffs lacked standing under *Spokeo*.  Br. for the United States, 2019 WL 3456069, at 10 (U.S. July 16, 2018).  After oral argument in October 2018, the Supreme Court ordered all parties and the government "to file supplemental briefs addressing whether any named plaintiff has standing such that the federal courts have Article III jurisdiction over this dispute." 139 S. Ct. 475 (2018).  Google and the government contended that they did not; plaintiffs and objectors contended that they did.

The Supreme Court ultimately declined to address the standing issue.  Recognizing that its "decision in *Spokeo* abrogated the ruling in *Edwards* that the violation of a statutory right automatically satisfies the injury-in-fact requirement whenever a statute authorizes a person to sue to vindicate that right," the Court vacated the Ninth Circuit's decision approving the settlement and remanded the case "for the courts below to address the plaintiffs' standing in light of *Spokeo*." *Frank v. Gaos*, 139 S. Ct. 1041, 1046 (2019).  The Ninth Circuit, in turn, remanded to this Court "for further proceedings consistent with the Supreme Court's opinion, which remanded the case for the purpose of addressing the plaintiffs' standing in light of *Spokeo*." Dkt. No. 99.

1    This Court then set the briefing and hearing schedule for this motion.  Dkt. No. 106.

2                                      **ARGUMENT**

3  **A.    Plaintiffs Can Establish Standing Only By Plausibly Alleging An Actual Or**
       **Impending Concrete Injury Resulting From Their Asserted Legal Violations.**

4         To establish Article III standing, a plaintiff must "[f]irst and foremost" show that she

5    suffered "an injury in fact" that is both "concrete and particularized."  *Spokeo*, 136 S. Ct. at

6    1547-48 (quotation marks omitted).   The Constitution requires an injury that "actually

7    exist[s]"— that is "'real,' and not 'abstract.'"  *Spokeo*, 136 S. Ct. at 1548.  The Supreme Court

8    has cautioned that, while some "intangible injuries can nevertheless be concrete" enough to

9    support standing, *id.* at 1549, intangible harms must satisfy Article III's concreteness

10   requirement: they must be "*de facto*," not "conjectural" or "hypothetical," *id.* at 1548.

11        Although "the risk of real harm can[] satisfy the requirement of concreteness," *Spokeo*,

12   136 S. Ct. at 1549 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)), the Supreme

13   Court reiterated in *Clapper* "the well-established requirement that threatened injury must be

14   'certainly impending.'"  568 U.S. at 401 (citation omitted).   "'Allegations of *possible* future

15   injury' are not sufficient" to establish standing.  *Id.* at 409 (citation omitted).

16        "Where, as here, a case is at the pleading stage, the plaintiff must clearly allege facts

17   demonstrating each element" of Article III standing.  *Spokeo*, 136 S. Ct. at 1547 (alterations and

18   quotation marks omitted).  Allegations supporting standing must satisfy the plausibility standard

19   set forth in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corporation v. Twombly*,

20   550 U.S. 544 (2007).  In other words, allegations supporting standing, like those supporting the

21   elements of a plaintiff's claim, must contain sufficient factual support to "plausibly establish[]

22   injury."  *Auer v. Trans Union, LLC*, 902 F.3d 873, 878 (8th Cir. 2018) (citing *Iqbal*, 556 U.S. at

23   678; *Twombly*, 550 U.S. at 557).  As the Ninth Circuit has explained, the plaintiff must "not only

24   plausibly allege the violation" of a statute or legal norm, "but must also ***plausibly allege*** a

25   'concrete' injury causally connected to the violation."   *Dutta*, 895 F.3d at 1172 (emphasis

26   added).

27        The allegations in the complaint do not satisfy these standards.

28

9

**B.    Plaintiffs Lack Standing To Bring Their SCA Claim.**

The standing briefing in the Supreme Court focused on whether plaintiffs have standing to assert their statutory claim under the SCA.  *See* Class Supp. Br. 5-19; Pet. Supp. Br. 7-21. Plaintiffs asserted two distinct theories of harm.  First, they asserted that the disclosure of their search terms in alleged violation of the statute, standing alone, was enough to satisfy Article III. Second, they asserted a risk that their search terms could be used to "reidentify" them as the searchers.  Neither theory supports Article III standing.

**1.    The Disclosure of Search Terms Alone Is Not A Concrete Injury In Fact**

The Supreme Court identified two inquiries to aid in determining whether an intangible harm otherwise insufficient to confer standing has been elevated by Congress to the status of a concrete injury satisfying Article III.

*First*, "it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts."  *Spokeo*, 136 S. Ct. at 1549.

*Second*, if Congress tries to "identify intangible harms that meet minimum Article III requirements," Congress's judgment is "instructive and important."  *Id.*  But "Congress's role . . . ***does not mean*** that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right."  *Id.* (emphasis added).  Instead, "Article III standing requires a concrete injury even in the context of a statutory violation."  *Id.*

The disclosure of search terms alone fails both these tests.

**a.    Disclosure of a search term neither linked nor at imminent risk of being linked to the individual searcher is not analogous to any harm actionable at common law.**

Injury in fact may exist when "an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts."  *Spokeo*, 136 S. Ct. at 1549.  Disclosure of a search term, without more, does not have a "close relationship" to any harm recognized at common law.

Plaintiffs formerly analogized their SCA claim to common-law privacy torts and asserted

an alleged invasion of their "right[] to privacy."  Class S. Ct. Merits Br. 55-56.  But they largely abandoned that analogy in their Supreme Court supplemental briefs.  *E.g.*, Class Supp. Reply Br. 4, 7-9.  For good reason:  without plausible allegations that the disclosures identify plaintiffs, contain highly sensitive information, and were made public, the analogy falls apart.

> ### i. The violations that have conferred standing to pursue privacy-related statutory claims involve information identifying the plaintiffs

The Ninth Circuit's decision in *Bassett v. ABM Parking Services, Inc.*, 883 F.3d 776 (9th Cir. 2018), illustrates the missing step in plaintiffs' analogy.  There, plaintiff Bassett alleged that the defendant violated his privacy rights by printing a credit card receipt that contained information prohibited by the Fair Credit Reporting Act.  *Id.* at 777.  The Ninth Circuit recognized that the statute at issue "arguably creates a 'substantive right'" that "rests on nondisclosure of a consumer's private information to identify thieves."  *Id.* at 780, 782.  But the Ninth Circuit affirmed the dismissal of Bassett's claim for lack of Article III standing, holding that his allegations did not implicate that "substantive right" because his "private information was not disclosed."  *Id.* at 782-83.  As the Ninth Circuit summarized, "[w]ithout disclosure of *private* information to a third party, it hardly matters that actions to remedy invasions of privacy . . . have long been heard by American courts."  *Id.* at 783 (emphasis added).[6]

The same conclusion applies here.  Without allegations plausibly establishing that a searcher's identity has been or imminently will be linked to his or her search terms, disclosure of those terms rarely if ever could result in harm or certainly impending harm (sounding in privacy or otherwise) that could meet the Article III standard of injury in fact.

Plaintiffs allege that some searches included the name of the plaintiff conducting the search—often referred to as "vanity searches."  But a search for a person's name, if disclosed to a third-party website operator through a referrer header, reveals nothing about the searcher

---

[6] One allegation here quotes a Google employee about potential privacy risks associated with search terms.  But the quote addressed disclosing information "such as a credit card [or] social security number . . . that can only be tied to one person."  Dkt. No. 50, ¶ 42.  The search queries alleged here are nothing like that.  Just as in *Bassett*, the allegations here do not implicate any cognizable privacy interests.

GOOGLE'S MOT.  TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION;
CASE NO.  5:10-CV-4809-EJD

because the third party cannot possibly know who conducted the search.  It could be anyone; and so the referrer header with a vanity search query only reveals that *someone* is searching for information about that individual named in the search.  It reveals nothing about the person conducting the search or the individual whose name is searched.

Neither does including an individual's name as one of several terms in a search plausibly support a conclusion that the search terms reveal personal information about the individual.  Because the searcher could be anyone, there is no plausible inference that the search terms involve accurate information about the individual named in the search.  The searcher might be fishing for information, or seeking to confirm that the named individual does *not* have financial problems or another characteristic related to the search terms.  It is common knowledge that individuals often search names of potential employees, potential dates, and friends.  *See*, *e.g.*, Michael Fertik, "Your Future Employer Is Watching You Online," Harvard Business Review (Mar. 3, 2012)  https://hbr.org/2012/04/your-future-employer-is-watchi  (more than 75% of employers research prospective employees online).

In contrast with this case, *every* case in which the Ninth Circuit has upheld Article III standing for a statutory violation based on an asserted privacy harm has involved private information actually linked to the individual plaintiff—not search terms that may (and usually do) have no relation to the searcher.

For example, the Ninth Circuit found standing under the Video Privacy Protection Act ("VPPA") in *Eichenberger v. ESPN, Inc.*, 876 F.3d 979 (9th Cir. 2017), because, to plead a claim under the VPPA, unlike the SCA, a plaintiff must allege disclosure of "personally identifiable information," 18 U.S.C. § 2710(a)-(b), that is, "information *connecting a certain user to certain videos*."  *In re Hulu Privacy Litig.*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015); *see also Eichenberger*, 876 F.3d at 983 (noting an individual's "privacy interest in his or her video-viewing history," but concluding the disclosing a device identifier was insufficient to identify a specific person).

Likewise, the Ninth Circuit in *Patel v. Facebook, Inc.* cited *Eichenberger* in applying the same rationale to find standing for plaintiffs who claimed harm caused by Facebook's use of

12

"facial-recognition technology" to link users to Facebook-created "face templates" that enable Facebook to suggest "tags" expressly linking a users' photo to their identities.  932 F.3d 1264, 1268, 1273 (9th Cir. 2019).  The Ninth Circuit observed that "Facebook can use [a face template] to identify that individual in any of the other hundreds of millions of photos uploaded to Facebook each day, as well as determine when the individual was present at a specific location." *Id.*  In holding that "the development of a face template using facial-recognition technology … invades an individual's private affairs and concrete interests," the court of appeals equated privacy with "the individual's control of information ***concerning his or her person***," *id.* (quotation marks omitted; emphasis added)——*i.e.*, information linked to the individual.  In that light, the court concluded that "Facebook's alleged collection, use, and storage of plaintiffs' face templates" harmed or presented a material risk of harm to "the plaintiffs' concrete privacy interests." *Id.* at 1275. The key to standing was that the use of facial-recognition technology to create a facial template that could "***identify th[e] individual***.", *Id.* at 1273  (emphasis added).

The Ninth Circuit's recent decision in *Campbell v. Facebook, Inc.*, --- F.3d ----, 2020 WL 1023350 (9th Cir. Mar. 3, 2020), materially differs from the present case in the same way.  The court held that plaintiffs had a privacy interest in their "individual private messages," which the defendant had allegedly "identifie[d] and collect[ed]" without their consent in violation of that interest.  *Id.* at *8.  It did not matter that the defendant used the data from the intercepted messages in an "aggregated and anonymized" way because the intercepted data itself identified and was linked to the individual sending the message.  *Id.*  That link is what is lacking here—but what was alleged in *Eichenberger, Patel,* and *Campbell.*

Finally, the Ninth Circuit's opinion on remand on *Spokeo* involved allegedly inaccurate information tied to a specific person, and therefore implicated that individual's "reputational and privacy interests."  *Robins*, 867 F.3d at 1114, 1117.  The absence of any similar link between search queries and the identity of the searcher underscores that any relationship between the plaintiffs' alleged privacy injury and the harm that would support an action at common law is remote rather than "close," as *Spokeo* requires.  136 S. Ct. at 1549.

In contrast, the Ninth Circuit has concluded that standing is lacking when a plaintiff's

13

claims are based on "aggregate collection and storage of **non-individually identifiable**" information—in that case, "driving history and vehicle performance data." *Cahen v. Toyota Motor Corp.*, 717 F. App'x 720, 724 (9th Cir. 2017) (emphasis added); *see also Low v. LinkedIn Corp.*, 2011 WL 5509848, at *4 (N.D. Cal. Nov. 11, 2011) (no standing when "Plaintiff has not alleged that his browser history will be linked to his identity by LinkedIn" or by third parties).

In sum, disclosure of search terms to third-party websites through referrer headers alleged here does not resemble any cognizable privacy harms.

### ii. The disclosure of search terms in referrer headers is not analogous to claims addressing infringements of property interests in communications.

In the face of this Ninth Circuit authority, Plaintiffs have tried to analogize the claims here to cases prohibiting the interception and publication of a letter. Class Supp. Br. 5-10. As plaintiffs acknowledge, however, those cases rest on a property interest in the letters. *Id.* at 7-8, 10. For example, Justice Story's opinion in *Folsom* v. *Marsh*, 9 F. Cas. 342 (C.C. D. Mass. 1841), did not recognize an actionable interest against disclosure of every communication. *Folsom* holds only that George Washington's letters and other papers were entitled to **copyright** protection against unauthorized publication. *Id.* at 346-47; *see also* Samuel D. Warren and Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193, 211 (1890) (recognizing that *Folsom* is based on "the theory of property in the contents of letters"); *Woolsey v. Judd*, 1855 WL 6410 (N.Y. Super. 1855) (right to enjoin publication of letters based on writer's "right of property").

Copyright confers a concrete "property" interest—"the right to exclude others"—on which an infringer trespasses. *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932). And copyright's status as a protected property interest is well grounded in the common law. *See Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 348-55 (1998) (collecting English and early American cases). Thus, as the United States observed, all cases on which plaintiffs rely "are grounded in a specialized form of property—copyright or similar intellectual-property rights—that bears no resemblance to plaintiffs' claims." U.S. Supp. Reply Br. 7. The complaint says nothing about any harm to property interests, instead asserting an alleged but unarticulated "[p]rivacy [h]arm." Dkt. No. 50, at 31; *see also* U.S. Supp. Reply Br. 6, 8 (noting same).

1   Moreover, and especially relevant here, all the cases plaintiffs cite involved letters or

2   other communications identifying the author or speaker.   **None** involved anonymous

3   communications.  But the complaint here does not allege facts plausibly suggesting that search

4   terms or the referrer header as a whole are linked to the plaintiff who conducted the search.

5   Unlike letters, search terms are not signed and cannot be attributed to any particular searcher

6   based on the contents of a referrer header.  *See* pages 18-20, *infra*; pages 3-7, *supra*.

7   Certainly the SCA does not itself create a property interest that might sustain plaintiffs'

8   analogy.  None of the statutory language purports to do so.  As the government noted, the SCA

9   "focuses on protecting privacy rather than property."  U.S. Supp. Reply Br. 8 (citing S. Rep. No.

10  541, 99th Cong., 2d Sess. 5 (1986)).  The enactment of a statutory standard combined with a

11  cause of action for its violation does not itself create a property right.  The bare right to sue is "an

12  entitlement to nothing but procedure."  *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 764

13  (2005); *see also*, *e.g.*, *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*,

14  527 U.S. 666, 673-75 (1999) (Lanham Act false-advertising provisions do not create a property

15  interest).

16  *Spokeo* confirms the point.  If a statutory standard of conduct plus a private right of

17  action created an actionable property right, it would have made no sense for the Supreme Court

18  to hold that "Article III standing requires a concrete injury even in the context of a statutory

19  violation."  136 S. Ct. at 1549-50.  And it would have been meaningless and unnecessary for the

20  Court to remand for the lower courts to consider "whether the particular procedural violations

21  alleged . . . entail a degree of risk sufficient to meet the concreteness requirement."  *Id.*

22  Principles of statutory interpretation also weigh against inferring that the SCA created a

23  property right.  Congress properly may be reluctant to create property interests because of the

24  collateral consequences that accompany them, such as the protections of procedural due process

25  or the Takings Clause.  *See*, *e.g.*, *Carey v. Piphus*, 435 U.S. 247, 266 (1978).  That is why, if

26  Congress intended to create a property right, "we would expect to see some indication of that in

27  the statute itself."  *Gonzales*, 545 U.S. at 765.

28  Plaintiffs have identified no "indication" in the SCA that Congress intended to create a

15

property right in the information embedded in referrer headers.

### iii.    The disclosures alleged here bear no relation to the supposed "breach of confidence" tort.

Plaintiffs' Supreme Court briefing also invoked an analogy to early decisions discussing a "breach of confidence" tort. Class Supp. Br. 10-12. But the breach of confidence tort "has not fully penetrated into the culture of American privacy law." Neil M. Richards & Daniel J. Solove, *Privacy's Other Path: Recovering the Law of Confidentiality*, 96 Geo. L.J. 123, 156 (2007). Instead, the tort "applies only to a limited set of relationships, with most cases involving the patient-physician relationship." *Id.* at 158 (emphasis added). The analogy fails in any event, because (1) the early cases rest on a property interest absent here; and (2) the complaint does not allege a special relationship of confidence between plaintiffs and Google remotely similar to the kind needed to support a claim at common law. *E.g.*, *Morison v. Moat*, 68 Eng. Rep. 492, 493 (1851) (trade secret obtained through business partnership); *Yovatt v. Winyard*, 37 Eng. Rep. 425, 426 (1820) (medical recipes obtained through apprenticeship); *Peabody v. Norfolk*, 98 Mass. 452, 452 (1868) ("property interest" in manufacturing process obtained "while engaged in . . . service" of the inventor).[7]

### b.    Congress did not elevate every disclosure of every aspect of every electronic communication to an actionable intangible harm.

The SCA does not embody any "instructive" judgment by Congress (*Spokeo*, 136 S. Ct. at 1549) that all disclosures of communications should be actionable even if the plaintiff's allegations do not satisfy the ordinary standards of harm.

*First*, not all disclosures prohibited by the SCA cause harm or a risk of harm. Just as the Supreme Court in *Spokeo* held that the FCRA does not make all inaccuracies actionable because "not all inaccuracies cause harm or present any material risk of harm" (136 S. Ct. at 1550), the

---

[7] In the Supreme Court, Plaintiffs also invoked Fourth Amendment decisions. Class Supp. Br. 14-15. But the complaint does not allege any state action or governmental search and seizure that would support that analogy; the Fourth Amendment does not apply to private parties. *See*, *e.g.*, *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). *Patel* referred to the Fourth Amendment, not to provide a basis for standing, but only in passing while explaining why face templates allegedly could be used both "to identify th[e] individual" in uploaded photos, and to identify "when the individual was present at a specific location" and the "friends or acquaintances" that appear with the individual. 932 F.3d at 1273. Nothing of the sort is alleged here.

SCA cannot be read to make all disclosures actionable.  *See also Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511, 514 (D.C. Cir. 2016) (explaining that, under *Spokeo*, "some statutory violations could 'result in no harm,' even if they involved producing information in a way that violated the law").  Nothing in the SCA's text suggests that Congress intended to expand the class of intangible injuries sufficient to support a lawsuit.

The SCA's legislative history does refer to "privacy."  *See, e.g.*, S. Rep. No. 541, 99th Cong., 2d Sess. 5 (1986) ("Congress must act to protect the privacy of our citizens."); *see also* U.S. Supp. Reply Br. 8 (quoting same).  Under the Ninth Circuit's two-part post-*Spokeo* test, however, identifying a statute as protecting privacy or another intangible interest is not by itself enough to satisfy Article III.  The plaintiff also must plausibly allege that the specific violations at issue concretely harm or present a sufficient risk of concretely harming that interest.  *See Patel*, 932 F.3d at 1270; *Dutta*, 895 F.3d at 1174; *Bassett*, 883 F.3d at 783; *Robins*, 867 F.3d at 1113.  That is where Plaintiffs fail here.  Relying on implausible speculation, they do "not allege any real-world consequences flowing, or even potentially flowing, from the violation."  *Mays v. Wal-Mart Stores, Inc.*, __ Fed. Appx. __, 2020 WL 1277642, at *2 (9th Cir. Mar. 17, 2020).

*Second*, Congress explicitly limited the availability of a private cause of action to a "person ***aggrieved*** by any violation of this chapter."  18 U.S.C. § 2707(a) (emphasis added).  That additional requirement precludes any inference that Congress intended to expand the class of eligible plaintiffs beyond those concretely harmed.  Indeed, the Court has held that the statutory term "aggrieved" may be even more restrictive than the generally applicable Article III standard of injury—by requiring the plaintiff also to show that he "falls within the zone of interests sought to be protected by the statutory provision."  *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 176-78 (2011).  Thus, the SCA's text reflects a congressional judgment ***not*** to expand the class of persons entitled to sue.  *Accord* U.S. Supp. Br. 12-13.[8]

---

[8]  In rejecting a challenge to a plaintiff's "prudential standing" in an earlier case, the Supreme Court associated "the word 'aggrieved' with a congressional intent to cast the standing net broadly."  *FEC v. Akins*, 524 U.S. 11, 19 (1998).  That observation may not survive Justice Scalia's opinion for the Court in *Thompson*.  *See Akins*, 524 U.S. at 30 (Scalia, J., dissenting) (arguing that the *Akins* majority's interpretation of "aggrieved" "deprives it of almost all its limiting force").  But the word "aggrieved" certainly does not ***expand*** the category of injuries that confer standing.

1    Plaintiffs may point to the discussion in *Patel* of the **Illinois** legislature's use of the term

2    "aggrieved" in a state statute to refer to anyone who alleges a violation of a statutory right.

3    *Patel*, 932 F.3d at 1273-74 (citing *Rosenbach v. Six Flags Entmt. Corp.*, 123 N.E.3d 1197, 1206

4    (Ill. 2019)).   But whatever the merits of that interpretation under Illinois state law, *Thompson*

5    holds that it is not how **Congress** uses the term "aggrieved."

6    *Third*, the minimum damages provision in the SCA does not show that Congress intended

7    to create a new class of actionable harms.   The FCRA contains a statutory damages provision for

8    a willful violation of any of the statute's requirements.   15 U.S.C. § 1681n.   But "*Spokeo* laid to

9    rest the notion that because the FCRA authorizes citizen suits and statutory damages, it must

10   mean that allegations of a statutory violation meet the standing requirement."   *Bassett*, 883 F.3d

11   at 781.    The *Spokeo* Court recognized that "[a] violation of one of FCRA's procedural

12   requirements may result in no harm" and remanded for consideration of "whether the particular

13   procedural violations entail a degree of risk sufficient to meet the concreteness requirement"

14   (136 S. Ct. at 1550)—a remand that would have been unnecessary if the statutory damages

15   provision by itself satisfied Article III.

16       **2.    Plaintiffs' Allegations About The Risk of Reidentification Are Too
                  Speculative To Establish Standing.**

17   The complaint labors to create the impression that search terms can be used to

18   "reidentify" the searcher, asserting generally that there is a "Science of Reidentification," Compl.

19   ¶¶ 83-91.   But plaintiffs do not allege that this "science" was actually used to link their searches

20   to any plaintiff's identity.   Neither do plaintiffs plausibly allege a certainly impending risk that

21   someone could link any of their actual searches to their identity.

22   Plaintiffs' sole example of anyone tying search terms to a searcher's identity involves a

23   journalist's efforts based on the information revealed in an AOL data release.  Dkt. No. 50, ¶ 47.

24   But that release included much more information than the single search query provided to a

25   website owner through a referrer header.   The AOL release revealed an average of more than 30

26   searches per user in addition to cookie contents and "detailed records of searches" that AOL

27   maintained as a search provider.  Michael Barbaro and Tom Zeller Jr*., A Face is Exposed for*

28

*AOL Searcher No. 4417749*, N.Y. Times, August 9, 2006 (focusing on user who had records of hundreds of search queries released), available at http://www.nytimes.com/2006/08/09/technology/09aol.html, cited in Dkt. No. 50, ¶¶ 46-49 & nn. 27-30. Only by combining all that information was the journalist able to correlate dozens of each user's searches and identify some of them. *Id.*

To replicate the type of information revealed in the AOL data release in plaintiffs' hypothetical scenario, a web server operator would first have to obtain information regarding multiple searches by a plaintiff through referrer headers; and it could only do that if the plaintiff conducted different searches and each time clicked through to the same website over and over again from the same IP address, so that the website operator would receive multiple search queries from the same IP address.  With that information, the most the website operator could glean is that a single IP address was the source of multiple searches that resulted in requests for its website---but nothing else.  And plaintiffs don't even allege that any of those things happened to them (or to anyone else).

These (unalleged) initial steps are improbable enough (and far from enough to identify any plaintiff).  But they are only the first piece to the puzzle.  Having managed to somehow receive multiple searches from the same IP address resulting in requests for the same website, the unidentified website operator "adversary" (*not* Google) still would have to take at least four additional steps, as the complaint itself acknowledges (at ¶¶ 83-86):

(1)    identify "data fingerprints" in the multiple search queries from the same IP address;

(2)    combine those fingerprints with unspecified other data such as cookies, presumably from other websites but not from referrer headers;

(3)    discern individuals' identities and their personal information from this combined, unspecified data; and, finally,

(4)    exploit individuals' discovered identities to their detriment.  All of these steps are necessary for the "reidentification" that plaintiffs hypothesize about, yet they Plaintiffs do not allege that any of these things happened to any of them.  And even if they had, this long and

"highly attenuated chain of possibilities[] does not satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410.  Rather, this theory of injury "rest[s] on speculation about the [capabilities and] decisions of independent actors" who are not before the Court.  *Id.* at 414.  Plaintiffs acknowledge that steps 3 and 4 require "combin[ing]" the information from referrer headers "with outside information to pry out obscured identities."  Dkt. No. 50, ¶ 86.  But they do not allege any actual combination involving referrer headers from a Google search results page.

Nor does the complaint allege any facts that might support an inference that a referrer header was sent to a web server operated by an "adversary" willing to invest the substantial resources required to reidentify the plaintiffs or use the referrer information to harm them.  And the complaint alleges no facts explaining how any such outside "adversary" could aggregate referrer headers, or link that information to an individual without additional information from additional unnamed third parties.[9]

In short, as the government summarized, "Plaintiffs' allegations about reidentification are highly speculative."  U.S. Supp. Br. 21; *see also* U.S. Supp. Reply Br. 9-10.  They therefore supply no basis for Article III standing here under the standards of *Clapper* and *Spokeo*.

### 3. Disclosure of the Specific Search Terms Alleged Could Not Create Harm or Sufficient Risk of Harm.

Even if plaintiffs had plausibly alleged that their search terms could be linked to them, they have not plausibly alleged that any such link inflicted or could inflict concrete harm.

The complaint does not plausibly allege a disclosure of ***private*** information that could lead to injury.  Gaos and Priyev do not allege any specific searches at all, and most of Italiano's searches contain facts that are a matter of public record and therefore not actionable.  In the context of privacy torts, for example, "[t]here is no liability when the defendant merely gives further publicity to information about the individual that is already public."  Restatement (Second) of Torts § 652D cmt. B. For that reason, the Ninth Circuit has held that disclosing

---

[9]  Plaintiffs also do not plausibly allege that any website operator identified them or that they were at substantial risk of being identified from the potential disclosure of their IP addresses through means other than the search term disclosures they allege to be SCA violations here.

identifying information already available "in a public and searchable municipal database online" produces no concrete harm under Article III. *Clark v. City of Seattle*, 899 F.3d 802, 810 (9th Cir. 2018).

The complaint alleges that Italiano was in the midst of divorce proceedings when he conducted his searches. Dkt. No. 50, ¶¶ 107-108. But divorces are matters of public record in Italiano's home state of Florida, which maintains "well-kept public records covering vital statistics, such as . . . divorces." *Teel v. Nolen Brown Motors, Inc.*, 93 So.2d 874, 876 (Fla. 1957) (records at "State Bureau of Vital Statistics … reflect the granting of divorces in every county in Florida"); *see also* http://www.floridahealth.gov/certificates/certificates/index.html. The subjects of most of Italiano's other searches are also matters of public record, including addresses (Fla. Stat. §§ 695.22, 695.26), foreclosures (*id.* § 45.031), and bankruptcies (11 U.S.C. § 107(a)).

Italiano's remaining searches concern nothing that "would be highly offensive to a reasonable person" if disclosed. Restatement (Second) of Torts § 652D & cmt. c. Linking Italiano's name and the word "Facebook" can hardly be considered private. Nor can the names of Italiano and his now ex-wife and the term "forensic accounting."

## C.    Plaintiffs Lack Standing To Bring Their Common Law Claims

As this Court previously noted in dismissing Gaos's common-law claims for lack of Article III standing, plaintiffs must "plead facts sufficient to show that the disseminated information is of a nature that places [them] in imminent danger of harm." Dkt. No. 38, at 4. Nothing in *Spokeo* changes that conclusion—and for all the reasons above, plaintiffs have not plausibly alleged any "injury [that] resulted from th[e] dissemination" of their search terms in referrer headers. *Id.*

Even so, before the Supreme Court plaintiffs asserted that their breach of contract and unjust enrichment claims independently confer standing. That assertion was incorrect.

### 1.    Plaintiff's Breach of Contract Claim Fails

Plaintiffs' breach of contract claim does not create standing without concrete injury.

*First*, in the Supreme Court, plaintiffs tried to rest standing on an allegation of breach of contract without other alleged harm. Their lead authority did not support them, as the breach

21

warranting nominal damages in that case did involve concrete harm; the breach brought "discredit" on plaintiff and thus was "injurious in fact." *Marzetti v. Williams*, 109 Eng. Rep. 842, 845 (1830); *see also id.* at 846 (noting that "the credit of the plaintiff was likely to be injured"). That case, like others that plaintiffs cited to the Supreme Court, involved harm that might not be susceptible of reduction to money damages. *See Wilcox v. Plummer's Ex'r*, 29 U.S. (4 Pet.) 172, 182 (1830) (finding that statute of limitations began to run upon breach of duty although damages might not ripen until later). But even if plaintiffs' theory were sound, standing on that theory would require alleged facts plausibly demonstrating that a breach occurred. A contrary rule would yield the absurd result that any plaintiff who put the words "breach of contract" in a complaint would satisfy Article III—even without plausibly alleging a breach or even a contract.

Plaintiffs do not plead a plausible contract claim here. That claim rests on the assertion that the search terms in referrer headers constitute "personal information." Dkt. No. 50, ¶¶ 25, 29, 144. But that contract term was defined as information that "personally identifies you" or that "can be reasonably linked to such information *by Google*." *Id.* ¶ 26 (emphasis added). The complaint does not plausibly allege that plaintiffs' search terms met that definition—because, again, there are no plausible allegations that the disclosure of search terms in referrer headers can identify the individual searcher, let alone by Google rather than the website operator who receives that information.[10]

*Second*, California law requires "resulting damages to the plaintiff" to state a breach of contract claim. *Oasis West Realty, LLC* v. *Goldman*, 51 Cal. 4th 811, 821 (2011). Thus, California has determined—contrary to plaintiffs' theory—that a plaintiff may not plead a breach of contract claim without concrete harm or sufficient risk of harm resulting from the breach, even

---

[10] The complaint separately refers (¶ 144) to "personally-identifiable information," but if anything that term narrows "personal information," and certainly adds nothing to it.

At other points the complaint references a Google policy about users' Web History—a record some users keep of their activity on Google and information about the webpages they visit. But the complaint does not plausibly allege facts showing that any plaintiff's Web History was disclosed to third-party website operators through referrer headers, which identify only the immediately preceding website. *See* pages 3-7, *supra*.

1  if nominal damages might be available should damages not be proved.

2      *Third*, this Court's prior dismissal of the common-law claims was entirely consistent with

3  the above principles.  As the Court explained, dismissal was appropriate because "Gaos does not

4  identify what injury resulted from this dissemination" of her search terms or "plead facts

5  sufficient to show that the disseminated information is of a nature that places her in imminent

6  danger of harm."  Dkt. No. 38, at 4.  This Court's reasoning accords with dismissals of contract

7  claims by the Ninth Circuit and other courts for lack of Article III standing when the plaintiff

8  failed to allege the requisite harm or risk of harm.  *Cahen*, 717 F. App'x at 723; *see also, e.g.*,

9  *Hutton v. National Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 621 (4th Cir. 2018); *Reilly*

10 *v. Ceridian Corp.,* 664 F.3d 38, 41-46 (3d Cir. 2011); *In re Google, Inc. Privacy Policy Litig.,*

11 2012 WL 6738343, at *6 (N.D. Cal. Dec. 28, 2012).  And as the government points out, there is

12 no "reason to conclude plaintiffs could cure the absence of standing on their federal SCA claim

13 simply by pointing to the same asserted harms in service of their state-law contract claim."  U.S.

14 Supp. Reply Br. 11.

15 **D.    Plaintiffs' Unjust Enrichment Claim Fails**

16     Plaintiffs have also maintained that the availability of unjust enrichment as a remedy for

17 quasi-contract claims establishes injury in fact.  Class Supp. Br. 21-22.  But the law of unjust

18 enrichment creates a remedy only if the plaintiff is harmed by the misuse of his ***property***—a

19 property interest that is not alleged here.  Restatement (First) of Restitution § 1 cmt.  e (1937)

20 (restitution may be available when a defendant "wrongfully disposes of the property of another"

21 even if plaintiff suffered no economic loss).  The action lies against "unjust enrichment by the

22 defendant ***at the expense of the plaintiff***."  *Stone v. White*, 301 U.S. 532, 534 (1937) (emphasis

23 added); *see* Restatement (First) of Restitution § 1.

24     Whether a court ultimately chooses to ***quantify*** a remedy based on a defendant's gain

25 rather than a plaintiff's loss is therefore beside the point:  The plaintiff must show concrete harm

26 or impending risk of harm from the defendant's conduct.  The complaint does not plead facts

27 supporting a plausible inference that Google profited from the referrer header function.  All

28 Plaintiffs only come up with conclusory allegations that "Google is now ***effectively*** selling

23

1    search queries to payi[ng] advertisers" and "has increased its revenues and profits" (Dkt. No. 50,

2    ¶¶ 82 (emphasis added), 156), but they do not plead how or why these "effective[]" sales take

3    place, or who pays for the anonymous and untracked referrer headers that accompanied links

4    from search queries for many years.  They merely speculate that referrer headers somehow

5    increase the value to advertisers of user clicks to the advertised sites.  They plead no basis for a

6    plausible conclusion that referrer headers have any value to the recipient, much less that Google

7    is able to extract a premium for that value.

8                                  **CONCLUSION**

9        The complaint should be dismissed for lack of subject-matter jurisdiction.

10

11       Dated:  March 20, 2020                    Respectfully submitted,

12                                                **MAYER BROWN LLP**

13

14                                                */s/ Edward D. Johnson*
                                                 Edward D. Johnson

15
                                                 Counsel for Defendant
16                                               Google LLC

17

18

19

20

21

22

23

24

25

26

27

28