**MAYER BROWN LLP**
EDWARD D. JOHNSON (SBN 189475)
wjohnson@mayerbrown.com
DONALD M. FALK (SBN 150256)
dfalk@mayerbrown.com
ERIC B. EVANS (SBN 232476)
eevans@mayerbrown.com
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
Telephone: (650) 331-2000
Facsimile: (650) 331-2060

**O'MELVENY & MYERS LLP**
RANDALL W. EDWARDS (SBN 179053)
redwards@omm.com
Two Embarcadero Center, 28th Floor
San Francisco, California 94111-3823
Telephone: (415) 984-8700
Facsimile: (415) 984-8701

Attorneys for Plaintiff GOOGLE LLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE GOOGLE REFERRER HEADER PRIVACY LITIGATION<br><br>This Document Relates to All Actions | Case No. 5:10-cv-4809-EJD<br><br>**DEFENDANT GOOGLE LLC'S REPLY IN SUPPORT OF MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**<br><br>Date: June 4, 2020<br>Time: 10:00 a.m.<br>Courtroom: 4, 5th Floor<br><br>Judge: Hon. Edward J. Davila |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................................ ii

INTRODUCTION ............................................................................................................................... 1

ARGUMENT ....................................................................................................................................... 3

    A.    Plaintiffs Lack Standing To Bring Their SCA Claim ........................................... 3

        1.    Only Violations That Involve Information Identifying The Plaintiffs Confer Standing To Pursue Privacy-Related Statutory Claims ............................................................................................................. 3

        2.    Plaintiffs' Allegations About The Risk of Reidentification Are Too Speculative To Establish Standing .................................................................. 8

    B.    Plaintiffs Lack Standing to Bring Their Common Law Claims ........................... 9

        1.    Plaintiffs Lack Standing to Assert a Breach of Contract Claim .............. 10

        2.    Plaintiffs Lack Standing to Assert Unjust Enrichment ........................... 11

CONCLUSION ................................................................................................................................. 13

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

18 U.S.C. § 2707(a) ...................................................................................................................3

18 U.S.C. § 2710(a)-(b) .............................................................................................................6

Stored Communications Act ............................................................................................. *passim*

Video Privacy Protection Act .....................................................................................................5

**Other Authorities**

Restatement (First) of Restitution § 1 cmt. ...............................................................................12

**INTRODUCTION**

Plaintiffs' opposition insists that the mere disclosure of search terms—without identifying the person who entered them—concretely injures the searcher. Thus, they say, if a user enters "low carbohydrate diets," the disclosure of those words alone somehow hurts the unidentified user.

To defend this indefensible proposition, plaintiffs present a welter of details from materially different cases. But that discussion misses the point. Those cases involve the compilation of multiple data points linked to particular individuals. The complaint here does not plausibly allege facts to show that any plaintiff—or other Google Search user—has ever been identified through information in a referrer header. Nor do plaintiffs plausibly allege that any of them was imminently identifiable by any third-party website operator. Unless a user repeatedly visited the same website by clicking on links on Google search results pages, a website operator would have only a single set of search terms to work with.

Plaintiffs do not dispute how referrer headers operated during the relevant time period, or why they are different from cookies, which some website operators or advertising companies may use correlate browsing history with a specific browser or user account. *See* Mot. 3-5. Nor do they dispute that search engines conveyed referrer headers to website operators as a standard technical feature of web browsing for many years. Yet plaintiffs have not alleged a single instance in which a third-party website operator used search terms contained in referrer headers to identify and harm *anyone*—much less plaintiffs themselves.

Without that missing piece, plaintiffs have failed to assert constitutionally cognizable harm to their privacy interests. Alleged disclosure of anonymous search terms not linked to an individual is no injury at all.[1]

---

[1] Although plaintiffs use a declaration to smuggle in their entire Supreme Court brief (*see* Dkt. No. 109-1), they do not reprise that brief's brittle analogies to cases protecting a property interest in letters or intellectual property rights. For good reason: there is no indication in the SCA that Congress intended to create a property right in the information embedded in referrer headers. Mot. 14-16.

Far from supporting plaintiffs' principal argument that any alleged violation of the Stored Communications Act (SCA) confers Article III standing, the Ninth Circuit's recent decision in *In re Facebook, Inc. Internet Tracking Litigation* underscores what is lacking in plaintiffs' allegations here. The Ninth Circuit concluded that "Plaintiffs have adequately alleged harm to the[] privacy interests" protected by the SCA because the defendant allegedly used cookies "in order to receive *and compile* their *personally identifiable* browsing history." 956 F.3d 589, 598 (9th Cir. 2020) (emphasis added). The other recent Ninth Circuit decisions that plaintiffs cite likewise involved allegations of disclosure or collection of data linked to identified, individual plaintiffs. In contrast, courts have repeatedly rejected privacy theories of standing when the alleged information is not linked to any plaintiff. *See* Mot. 11-12, 13-14 and pages 6-7 below. This case falls squarely into the latter camp.

Plaintiffs barely defend the complaint's speculation that search terms embedded in referrer headers could be used to "reidentify" the searcher. The opposition merely repeats the complaint's allegations without trying to rebut Google's showing that those allegations fall far short of showing imminent concrete harm under the standards of *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), and *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013).

Finally, plaintiffs resort to misdirection in trying to prop the complaint up on their common-law claims for breach of contract and unjust enrichment, confusing the remedies theoretically available with the injury required to proceed at all.. Whether nominal damages are available without *proof* of actual damages and whether a remedy could be *measured* by a defendant's gain rather than a plaintiff's loss are beside the point: under Article III, a plaintiff must still plausibly allege actual or imminent concrete harm to open the federal courthouse doors. Both this Court and Chief Judge Ware were correct in dismissing these claims for lack of Article III standing.

## ARGUMENT

**A.     Plaintiffs Lack Standing To Bring Their SCA Claim.**

### 1.     Only violations that involve information identifying the plaintiffs confer standing to pursue privacy-related statutory claims.

Plaintiffs try to create the impression that the Ninth Circuit has held that any alleged violation of the SCA or other statutes arguably protecting privacy interests automatically confers Article III standing.  Plaintiffs are wrong.

As Plaintiffs acknowledge in passing (Opp. 2), the Ninth Circuit uses a *two*-part test to evaluate whether an alleged violation of a statute is sufficient to establish injury in fact: "(1) whether the statutory provisions at issue were established to protect [the plaintiff's] concrete interests (as opposed to purely procedural rights), and if so, (2) whether the specific procedural violations alleged in [the] case actually harm, or present a material risk of harm to, such interests." *Dutta v. State Farm Mut. Auto. Ins. Co.*, 895 F.3d 1166, 1174 (9th Cir. 2018) (quoting *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1113 (9th Cir. 2017)) (alterations in *Dutta*).  In other words, the plaintiff must not only allege the violation of a statute that protects a concrete interest but "must also demonstrate how the specific violation of [the statute] alleged in the complaint actually harmed or present[ed] a material risk of harm" to the individual plaintiff. *Id.* at 1175 (quotation marks omitted).

Indeed, the terms of the SCA compel a two-step analysis like the one the Ninth Circuit used in both Dutta and Facebook Internet Tracking, because Congress limited any action under the statute to persons "aggrieved" by a violation.  18 U.S.C. § 2707(a). Congress's use of the limiting term "aggrieved" repudiates plaintiffs' theory that every alleged violation of the SCA confers standing, because it reflects Congress's intent not to expand the class of persons who can sue beyond those who can otherwise satisfy the ordinary Article III requirements of actual concrete harm or risk of harm.  Mot. 17. As the government explained to the Supreme Court, the statutory reference to "person aggrieved" "incorporates the default Article III standing inquiry, which requires concrete harm." U.S. Supp. Reply Br. 3 (2018 WL 6788369).  Thus the term "aggrieved"

confirms the need to apply full Article III concrete injury analysis—the second step of the Ninth Circuit test—while also imposing an additional statutory pleading hurdle of pleading.

Yet plaintiffs never get to the second step. They argue instead that it is enough that the Ninth Circuit determined that the SCA "codif[ies] a substantive right to privacy." Opp. 3 (quoting *Facebook Internet Tracking*, 956 F.3d at 598). But the Ninth Circuit applied both steps of its analysis in *Facebook Internet Tracking* and the other cases on which plaintiffs rely, *see* 956 F.3d at 598 (citing *Dutta*). The court of appeals held the second step satisfied because in ***each*** of those cases—unlike this one—the plaintiffs had alleged the collection or disclosure of information actually linked to the individual plaintiff.

For example, the *Facebook Internet Tracking* plaintiffs alleged that Facebook used browser plug-ins "to track users' browsing histories when they visit third-party websites, and then compile[] these browsing histories into personal profiles" that Facebook "correlat[ed] … with users' personal Facebook profiles." 956 F.3d at 596, 598-99. The Ninth Circuit held that these specific allegations "adequately alleged harm to the[] privacy interests" protected by the SCA because Facebook was receiving and compiling plaintiffs' "*personally identifiable* browsing history." *Id.* at 598 (emphasis added). Noting that "the nature of the allegedly collected data is . . . important," *id.* at 603, the opinion repeatedly observed that the information at issue—unlike the single sets of anonymous search terms conveyed to a third party in referrer headers—was personal information tied to the specific user:

- "Plaintiffs allege that '[n]o matter how sensitive the website, the referral URL is acquired by Facebook *along with the cookies that precisely identify the [logged-out] user*' and that Facebook acquires an 'enormous amount of *individualized* data' through its use of cookies on the countless websites that incorporate Facebook plug-ins." *Id.* at 603 (emphasis added).

- "Here, Plaintiffs have adequately alleged that Facebook's tracking and collection practices would cause harm or a material risk of harm to their interest in controlling their *personal* information." *Id.* at 599 (emphasis added).

- "As alleged, Facebook's tracking practices allow it to amass a great degree of *personalized* information." *Id.* (emphasis added).

- "Facebook's user profiles would allegedly reveal *an individual's* likes, dislikes, interests, and habits over a significant amount of time." *Id.* (emphasis added).

- ". . . Plaintiffs must allege they retain a stake in the profits garnered from their *personal* browsing histories." Id. at 600 (emphasis added).

- ". . . Plaintiffs have adequately pleaded an entitlement to Facebook's profits from users' *personal data* sufficient to confer Article III standing." *Id.* (emphasis added).

- "Plaintiffs allegedly did not provide authorization for the use of their *personal* information." *Id.* at 601 (emphasis added).

- "[T]he allegations that Facebook allegedly compiled *highly personalized* profiles from sensitive browsing histories and habits prevent us from concluding that the Plaintiffs have no reasonable expectation of privacy." *Id.* at 604 (emphasis added).

Here, by contrast, plaintiffs have not plausibly alleged any link between search queries embedded in referrer headers and the identity of the searcher. *See* Mot. 11-12; pages 8-9, *infra*. Plaintiffs alleged neither of the key elements in *Facebook Internet Tracking*: the compilation of multiple data points for each user into personal profiles and the correlation to an identified user. Unlike the information allegedly collected in *Facebook Internet Tracking* that tracked a specific user's browsing history over time and linked it to a user ID and profile, the referrer header identifies only the immediately preceding website, one at a time, to websites accessed from a Search results page; the referrer header contains no other information about the user or her search history. *See* Mot. 4 (citing RFC 2616 § 14.36).

Plaintiffs also rely on *Campbell v. Facebook* and *Eichenberger v. ESPN, Inc.*, but we have explained (Mot. 12-13) that those cases differ from this case in the same dispositive way: the data in those was tied to a specific user, but the search terms at issue here were not. *Campbell* involved the alleged collection of the plaintiffs' "individual private messages" that were also linked to the specific Facebook user sending the message. 951 F.3d 1106, 1119 (9th Cir. 2020). And *Eichenberger* involved the Video Privacy Protection Act, which, unlike the SCA, explicitly

requires the disclosure of "personally identifiable information," 18 U.S.C. § 2710(a)-(b), that is, information that "readily permit[s] an ordinary person to identify a specific individual[]." 876 F.3d 979, 985 (9th Cir. 2017) (quotation marks omitted). Plaintiffs do not address our discussion of this fundamental distinction. Their silence speaks volumes.

Plaintiffs read far too much (Opp. 6-7) into a Ninth Circuit dictum suggesting that, "[u]nder some circumstances, a user's request to a search engine for specific information could constitute a communication" under the SCA. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108-09 (9th Cir. 2014). That discussion had nothing to do with standing; as the court of appeals acknowledged, standing was based on now-abrogated authority holding that any statutory violation automatically confers Article III standing. *Id.* at 1105 n.5 (citing *Edwards v. First Am. Corp.*, 610 F.3d 514, 517 (9th Cir. 2010)). More pertinent, and in contrast with this case, the plaintiffs in *Zynga* alleged disclosure of a Facebook ID or user name that identifies a particular Facebook user. *Id.* at 1107. So the Ninth Circuit had no occasion even to speculate whether there is a cognizable privacy harm in the disclosure of information not linked to the plaintiff. And the court did not even have to probe the plausibility of the allegation before it because, even assuming the disclosed information qualified as "personally identifiable information," it did not qualify as the "contents of a communication" under the SCA. *Id.* Here, in contrast, plaintiffs have not plausibly alleged that the disclosure of a set of search terms in a referrer header can identify the identity of the individual who entered the search.

Far more relevant are decisions cited in our opening brief (at 11, 14, 17) that plaintiffs fail to address. The Ninth Circuit has concluded that standing is lacking when a plaintiff's claims are based on "aggregate collection and storage of *non-individually identifiable*" information, and there are no plausible allegations that the information collected is "individually identifiable to particular drivers." *Cahen v. Toyota Motor Corp.*, 717 F. App'x 720, 724 (9th Cir. 2017) (distinguishing *Eichenberger* on that basis) (emphasis added). And other courts in this District have similarly held that plaintiffs asserting privacy-based claims lack standing unless they plausibly plead that the supposedly private information was or will be linked to the identities of individual users. *See, e.g.*, *Wheaton v. Apple Inc.*, 2019 WL 5536214, at *5 (N.D. Cal. Oct. 25, 2019) (dismissing for lack of

standing and on the merits claims that Apple disclosed customers' personal listening information to third-party developers because plaintiffs did not plausibly allege that the disclosed metadata and "tokens" "are capable of association with uniquely identifying information pertaining to individual users"); *Low v. LinkedIn Corp.*, 2011 WL 5509848, at *4 (N.D. Cal. Nov. 11, 2011) (no standing for SCA claim when "Plaintiff has not alleged that his browser history will be linked to his identity by LinkedIn" or third parties).  Lacking any response to these decisions, plaintiffs simply ignore them.

Indeed, Judge Koh rejected a vanity search theory in *Low* much like (but stronger than) the one plaintiffs advance here.  The plaintiff in *Low* alleged that he had conducted a "social search for his own name," and that as a result "his personal LinkedIn user identification number … was transmitted to third parties by LinkedIn." 2011 WL 5509848, at *3.  But the problem with that theory, the court explained, was that "Plaintiff has not alleged how third party advertisers would be able to infer Low's personal identity from LinkedIn's anonymous user ID combined with his browsing history." *Id.*  Similarly, a search for a person's name, if disclosed to a third-party website operator through a referrer header, reveals nothing about the searcher because the third party cannot possibly know who conducted the search.  *See* Mot. 11-12.  Yet the referrer headers here did not even transmit a "personal … identification number."

Plaintiffs reference their allegation that someone could search for "credit card numbers, social security numbers, [or] financial account numbers." Opp. 3 (citing Dkt. No. 50, ¶ 3). But the search queries alleged by the plaintiffs are nothing like that. In any event, plaintiffs do not plausibly allege how a third-party website operator would know the nature of the number being searched or the identity of the searcher and use it to commit "identity theft."  *Id*.  Indeed, a positive search result for a number of that type generally would already reflect the number itself, meaning that the website operator already had the number or other content.  The complaint does not allege facts to show that identity theft of that kind has ever occurred, let alone to any plaintiffs, and the opposition does not argue for standing based on an increased risk of identity theft—an argument that would be hopelessly speculative in any event. *See* pages 8-9, *infra*.

In short, plaintiffs' complaint founders on the second step of the Ninth Circuit's post-*Spokeo* framework. Without plausible allegations linking the search queries alleged in the complaint with the identity of the searcher, plaintiffs' claims "lack[] a meaningful nexus to the concrete interests safeguarded by" the SCA. *Mays v. Wal-Mart Stores, Inc.*, --- F. App'x ----, 2020 WL 1277642, at *2 (9th Cir. Mar. 17, 2020).

### 2. Plaintiffs' Allegations About The Risk of Reidentification Are Too Speculative To Establish Standing.

Plaintiffs half-heartedly defend the complaint's allegations about the "Science of Reidentification" (Dkt. No. 50, ¶¶ 83-91), instead confirming that they principally rely on the notion that disclosure of search terms, by themselves, always amounts to concrete harm. Opp. 8. That plaintiffs have gone nearly all-in on their erroneous theory of *ipso facto* standing under the SCA is unsurprising. As we detailed in our opening brief (at 18-20), to identify anyone a website operator would have to go through a convoluted series of highly improbable steps, including combining the referrer headers with outside information from unnamed third parties, that are necessary to the reidentification plaintiffs hypothesize—not to mention being willing to invest the substantial resources required to undertake these steps. And a website operator would have only one referrer header to work with at a time, except in the even more speculative scenario where the same website would appear as a search result for materially differing searches by the same user. Theories of standing based on this level of conjectural concatenation "do[] not satisfy the requirement that threatened injury must be certainly impending," or the requirement that any such injury be "fairly traceable" to the defendant's alleged conduct. *Clapper*, 568 U.S. at 410-11.

Plaintiffs do not dispute our showing about what would be required to reidentify the plaintiffs or any other Google Search user. What little they do say refers to the complaint's allegation about an AOL data release. As our opening brief explained, however, the data AOL released are nothing like the isolated search terms at issue here. *See* Mot. 18-19. AOL revealed an average of more than 30 searches per user (grouped by user), cookie contents, and other information. On plaintiffs' own theory, reidentification requires multiple data points that (unlike a single search term) permit narrowing the pool of possible users. But as the government pointed

out at the Supreme Court, the complaint does not allege that Google disclosed "multiple pieces of information from which a website operator could reconstruct [plaintiffs'] identities." U.S. Supp. Br. 21 (2018 WL 6304858). Rather, each website operator received only one search query at a time.

Plaintiffs mention IP addresses (Opp. 9), but as we have explained, there is no publicly available way to link an IP address to the specific device or computer user requesting the webpage, nor any allegation that any website operator even tried to do so. Mot. 4-5. Plaintiffs do not challenge that explanation, but simply ignore it.

The hypothetical possibility of harm based on the remote possibility of a result under highly controlled conditions is too speculative to support standing under the standards of *Clapper* and *Spokeo*. For example, in *Cahen*, the plaintiffs alleged that their vehicles were equipped with computer technology that was vulnerable to hacking. But those plaintiffs did "not allege that any of their vehicles have actually been hacked," or even that "they are aware of any vehicles that have been hacked outside of controlled environments," instead relying entirely on a report in Wired magazine that described a hack conducted in a controlled environment. 717 F. App'x at 723. The Ninth Circuit concluded that the plaintiffs lacked standing because "these alleged risks and defects are speculative." *Id.* Another court recently followed *Cahen* in dismissing "nearly identical" allegations for lack of standing because they were too speculative, noting that "Plaintiffs concede that only one hack of the 1.2 million subject vehicles with the purported defects has occurred, and that one occurrence took place when two highly trained researchers hacked a vehicle in a controlled setting." *Flynn v. FCA US LLC*, 2020 WL 1492687, at *1, *4 (S.D. Ill. Mar. 27, 2020).

Here, the lack of standing is still clearer. Plaintiffs do not allege that a third-party website operator has *ever* identified a Google Search user from search terms embedded in referrer headers—not even in a controlled setting. *Clapper* and *Spokeo* squarely foreclose plaintiffs' arguments for standing based on hypothetical future reidentification.

**B.     Plaintiffs Lack Standing to Bring Their Common Law Claims**

Plaintiffs lack standing to bring their common-law claims for the reason this Court previously identified: they do not "plead facts sufficient to show that the disseminated information

is of a nature that places [them] in imminent danger of harm." Dkt. No. 38, at 4.  For all the reasons detailed above and in our opening brief, there are no plausible allegations that the disclosure of search terms in referrer headers can identify the individual searcher.  Plaintiffs cannot manufacture standing by dressing up their flawed theory of alleged privacy injury in common-law garb.

### 1.     Plaintiffs Lack Standing to Assert a Breach of Contract Claim.

Although they accuse us of conflating the merits and standing, plaintiffs appear to concede that asserting a "concrete" injury supporting standing for a breach of contract claim requires them to allege facts that plausibly describe "the manner of breach."  Opp. 13.  They further assert that their claim of injury is sufficiently "particularized" because "it involves disclosure of Plaintiffs' own personal information."  *Id.*

But the complaint does not do that.  Plaintiffs do not dispute that their contract claim presumes that the search terms in referrer headers constitute "personal information" under the contract. Dkt. No. 50, ¶¶ 25, 29, 144.  And they acknowledge that this contract term was defined as information that "personally identifies you" or that "can be reasonably linked to such information *by Google*."  *Id.* ¶ 26 (emphasis added); *see* Opp. 12.

Plaintiffs argue that this standard was met because plaintiff Italiano searched for a combination of his own name and various other terms.  Opp. 13.  Again, however, including an individual's name as one of several terms in a search does plausibly support a conclusion that the search terms reveal personal information about the individual or suffice to identify the individual, because the searcher could be anyone.  Mot. 11-12.

Plaintiffs further muddy the waters by referencing a Google policy about users' Web History—a record some users keep of their activity on Google and information about the webpages they visit. Opp. 13 (citing Compl. ¶¶ 33-34).  But the complaint does not plausibly allege facts showing that any plaintiff's Web History was disclosed to third-party website operators through referrer headers, which identify only a single immediately preceding website.  *See* Mot. 3-7.

Because plaintiffs fail to plausibly allege a breach for the same reason that they fail to allege a privacy harm under the SCA, their extended discussion of nominal damages is a red herring.  That some courts permit a contract cause of action for nominal damages without proof of

actual damages does not eliminate the need to plausibly allege a concrete and particularized injury in fact under Article III. This Court confirmed the point in deciding *In re Facebook Privacy Litigation*, 192 F. Supp. 3d 1053 (N.D. Cal. 2016) (cited at Opp. 11). The Court did not hold that merely inserting a breach of contract claim into a complaint is enough to generate standing, but rather explained that "[t]he injury alleged is 'concrete' in that plaintiffs specify the contractual terms to which Ms. Marfeo agreed and the manner of breach by Facebook. The breach is 'particularized' in that it involves disclosure of Ms. Marfeo's own personal information and 'actual' in that plaintiffs claim the breach has already occurred." *Id.* at 1062. Those are the same standards that plaintiffs must meet here. Opp. 13.

Unlike *Facebook Privacy*, in which the defendant did not "challenge plaintiffs' evidence that Ms. Marfeo's personal information was transmitted to third parties," 192 F. Supp. 3d at 1062, Google is squarely challenging the plausibility of the complaint's allegations that search terms in referrer headers qualify as personal information that can be used to identify the user who performed the search. Moreover, this Court's observation about the concreteness of the injury alleged in *Facebook Privacy* would have been irrelevant if plaintiffs here were correct that inserting a breach of contract claim into a complaint is all that is required to satisfy Article III.

Finally, plaintiffs simply ignore the courts, including the Ninth Circuit in *Cahen*, that have dismissed breach of contract claims for lack of Article III standing when the plaintiff failed to allege the requisite harm or risk of harm. *See* Mot. 23. As the government has pointed out, these cases confirm that this Court "was ultimately correct" in previously dismissing plaintiff Gaos's common-law claims. U.S. Supp. Reply Br. 11.

### 2. Plaintiffs Lack Standing to Assert Unjust Enrichment.

Plaintiffs lack standing to pursue a claim for unjust enrichment for many of the same reasons. Plaintiffs appear to recognize that unjust enrichment requires a misuse of the plaintiff's property. *See* Mot. 23; Opp. 15. The cases they cite confirm as much. *See, e.g.*, *Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390 (1940) (unjust enrichment for profits attributable to use of plaintiff's copyrighted material); *Livingston v. Woodworth*, 56 U.S. 546 (1853) (patent infringement); *Root v. Lake Shore & M.S. Ry. Co.*, 105 U.S. 189 (1881) (same). The very section

and comment of the Restatement that plaintiffs cite likewise make clear that unjust enrichment may apply "where a person with knowledge of the facts wrongfully disposes of the ***property*** of another and makes a profit thereby" or profits from a "fiduciary relation" between the parties. Restatement (First) of Restitution § 1 cmt. e (1937).[2]

But plaintiffs have not plausibly alleged any property interest (or fiduciary relationship) here. Plaintiffs incorrectly assert (Opp. 16-17) that Google's Terms of Service create a property interest by clarifying that users "'retain ownership of any intellectual property rights'" they already hold in content submitted to Google. Compl. ¶ 35. But on its face, that language preserves existing property rights without creating new ones, and therefore does not plausibly allege the creation of a new property right. Nor do plaintiffs plausibly allege any basis for intellectual property rights in their search terms.

Plaintiffs also return to *Facebook Internet Tracking*. Opp. 15. But the Ninth Circuit's conclusion that the plaintiffs had standing to plead unjust enrichment centered on the allegations that the defendant profited from the plaintiffs' "*personal* browsing histories" in which plaintiffs had a property interest. 956 F.3d at 600 (emphasis added); *see also id.* ("Plaintiffs allege that their browsing histories carry financial value"). The lack of a similar plausibly alleged property interest here is fatal to plaintiffs' standing for their unjust enrichment claims.

Separately, plaintiffs fail to plausibly allege that Google profited from the referrer header function. *See* Mot. 23-24. Their series of bullet points (Opp. 15-16) doubles down on the complaint's speculation that referrer headers and search queries have value to advertisers and search engine optimization companies. But plaintiffs fail to explain who is paying for the anonymous and untracked referrer headers that accompanied links from search queries or how Google might extract a benefit from the industry-standard referrer header field.

In short, unjust enrichment quantifies a remedy based on a defendant's gain rather than a plaintiff's loss, but the plaintiff's property still must be misused in some way; a request for unjust

---

[2] Plaintiffs attack a strawman when they argue that unjust enrichment does not require the direct sale of the plaintiffs' property. Opp. 16. A sale is unnecessary, but a defendant cannot be unjustly enriched by the plaintiff's property unless the plaintiff has a property interest in the first place.

enrichment does not itself create an injury in fact that is otherwise absent. Because plaintiffs have failed to plausibly allege any concrete harm or risk of harm stemming from Google's use of the referrer header function, they lack standing to bring any of their claims—both statutory and common-law.

## CONCLUSION

The complaint should be dismissed for lack of subject-matter jurisdiction.

Dated: May 15, 2020                    Respectfully submitted,

**MAYER BROWN LLP**

*/s/ Edward D. Johnson*
Edward D. Johnson

Counsel for Defendant
Google LLC