# EXHIBIT 2
Proposed Order

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re GOOGLE REFERRER HEADER PRIVACY LITIGATION<br><br>This Document Relates To: All Actions | Case No. 5:10-CV-4809-EJD<br><br>CLASS ACTION<br><br>**[PROPOSED] ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND AWARD OF ATTORNEYS' FEES, COSTS, AND INCENTIVE AWARDS TO CLASS REPRESENTATIVES**<br><br>Date: October 12, 2023<br>Time: 9:00 a.m.<br>Place: Courtroom 4, 5th Floor<br>Judge: Hon. Edward J. Davila |

This consolidated internet privacy litigation against Defendant Google Inc. ("Google") returns for final approval of a class action settlement. Representatives Paloma Gaos, Anthony Italiano, and Gabriel Priyev ("Plaintiffs") also seek an order approving their request for attorneys' fees, costs, and incentive awards. In addition, former objectors Theodore Frank and Melissa Holyoak ("Frank & Holyoak") seek an order approving their request for attorneys' fees.

Federal jurisdiction arises pursuant to 28 U.S.C. § 1331. Having carefully considered the written briefing along with the arguments of counsel at the hearing on this matter, the Court has determined that the motions should be granted for the reasons explained below.

I.   **FACTUAL AND PROCEDURAL BACKGROUND**

The Court previously described the factual allegations underlying this lawsuit and repeats them again here. According to the Consolidated Class Action Complaint ("CCAC"), "searching" is one of the "most basic activities performed on the Internet," and Google's website offers "the most-used search engine in the world." See CCAC, Docket Item No. 50, at ¶¶ 15, 16. This case focuses on that proprietary search engine. Plaintiffs allege Google operated its search engine in a manner that violated their Internet privacy rights by disclosing personal information to third

parties.

Specifically, Plaintiffs allege that Google's search engine intentionally and by default included the user's search terms in the resulting URL of the search results page. Id. at ¶ 56. Thus, when a user of Google's search engine clicked on a link from the search results page, the owner of the website subject to the click receives the user's search terms in the "referrer header" from Google. Id. at ¶ 57. This information is then disseminated further, since several web analytics services parse search query information from web server logs, and otherwise collect the search query from the referrer header transmitted by each user's web browser. Id. at ¶ 58. Indeed, Google's own analytics product provides webmasters with this information in the aggregate. Id.

According to Plaintiffs, the problem with Google's disclosure of users' search information to the third parties is that the referrer header - which displays the user's search terms - can sometimes contain certain personal information often subject to search queries, including "users' real names, street addresses, phone numbers, credit card numbers, social security numbers, financial account numbers and more, all of which increases the risk of identity theft." Id. at ¶ 3. "User search queries can also contain highly-personal and sensitive issues, such as confidential medical information, racial or ethnic origins, political or religious beliefs or sexuality, which are often tied to the user's personal information. Id. at ¶ 3.

Based on these allegations, Plaintiffs assert the following causes of action against Google: (1) violation of the Stored Communications Act ("SCA"), 18 U.S.C. § 2701; (2) breach of contract; (3) breach of the covenant of good faith and fair dealing; (4) breach of implied contract; (5) unjust enrichment; and (6) declaratory and injunctive relief.

Gaos initiated an action in this court on October 25, 2010, and Priyev filed an action on February 29, 2012, in the Northern District of Illinois. On April 30, 2013, the cases were consolidated after the Priyev action was transferred to this court.

The Court previously granted final approval to an all-cy pres $8.5 million class action settlement in this case in March 2015. ECF 85. Frank & Holyoak appealed the Order (ECF 87) and the Ninth Circuit affirmed the grant of final approval. In re Google Referrer Header Privacy Litig., 869 F.3d 737 (9th Cir 2017). Frank & Holyoak then petitioned the U.S. Supreme Court for

Writ of Certiorari, which the Supreme Court granted. The Supreme Court then remanded the case for this Court to re-analyze standing in light of the Supreme Court's decision in Spokeo, Inc. v. Robins, 578 U.S. 330, 136 S. Ct. 1540 (2016). Frank v. Gaos, 139 S. Ct. 1041, 1043 (2019).

On May 25, 2023, the court granted the parties motion for preliminary approval of the settlement, certified a settlement class and appointed counsel. (ECF 177, 179.)

The Court received two written objections to the settlement—from Boyd Adams and Clifford Weiler.

## FINAL APPROVAL OF SETTLEMENT AGREEMENT

### II. LEGAL STANDARD

A class action may not be settled without court approval. Fed. R. Civ. P. 23(e). When the parties to a putative class action reach a settlement agreement prior to class certification, "courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." Staton v. Boeing Co., 327 F.3d 938, 952 (9th Cir. 2003).

"Approval under 23(e) involves a two-step process in which the Court first determines whether a proposed class action settlement deserves preliminary approval and then, after notice is given to class members, whether final approval is warranted." Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 525 (C.D. Cal. 2004). At the final approval stage, the primary inquiry is whether the proposed settlement "is fundamentally fair, adequate, and reasonable." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998). Having already completed a preliminary examination of the agreement, the court reviews it again, mindful that the law favors the compromise and settlement of class action suits but without providing any presumption that the settlement is fair. See, e.g., Churchill Village, LLC. v. Gen. Elec., 361 F.3d 566, 576 (9th Cir. 2004); Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1276 (9th Cir. 1992); Officers for Justice v. Civil Serv. Comm'n, 688 F.2d 615, 625 (9th Cir. 1982). Ultimately, "the decision to approve or reject a settlement is committed to the sound discretion of the trial judge because he is exposed to the litigants and their strategies, positions, and proof." Hanlon, 150 F.3d at 1026.

## III. DISCUSSION

### A. Continuing Certification of Settlement Class

This analysis begins with an examination of whether class treatment remains appropriate. The Court found at the preliminary approval stage that Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequate protection by the named representatives were satisfied. As to those issues, Plaintiffs anticipated a class comprised of approximately 193 million individuals who all share a common injury. The existence of this injury for each class member could be determined by resolving one question: whether Google's system-wide practice and policy of storage and disclosure of their search query information was unlawful. Plaintiffs' claims were also typical, if not identical, to that of other class members. For that reason, there was no indication that Plaintiffs' interests would conflict with that of the class, and Plaintiffs and their counsel had proven a desire to vigorously pursue class claims as evidenced by prior motion practice.

As to Rule 23(b), the court found that common questions predominate and that the class action mechanism was a superior process for this litigation, at least for settlement purposes. The alternatives to class certification - millions of separate, individual and time-consuming proceedings or a complete abandonment of claims by a majority of class members - were not preferable. Moreover, class treatment was appropriate because Defendant's policy was directed at all of its users as whole rather than at particular users of its search engine. Since an adequate showing was made as to all of the Rule 23 factors, the court conditionally certified the class for settlement purposes.

The class shall remain certified for settlement purposes.

### B. Appropriateness of the Notice Plan

Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." However, individual notice is not always practical. When that is the case, publication or some similar mechanism can be sufficient to provide notice to the individuals that will be bound by the class action judgment. Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 315 (1950).

On the issue of appropriate notice, the court previously approved the proposed notice plan

involving multiple media channels: (1) internet-based notice using paid banner ads targeted at potential class members; (2) Google keyword search advertising; (3) publication via Gmail ads; (4) publication via social media advertising through Facebook, Instagram, Twitter, and YouTube; (5) publication via specialty class action new websites; (6) publication in a nationally circulated print magazine; (7) a press release in English and in Spanish; (8) CAFA Notice; (9) a website decided solely to the settlement; and (10) a toll-free telephone number where class members can obtain additional information and request a class notice. In addition, the court approved the content and appearance of the class notice and related forms as consistent with Rule 23(c)(2)(B).

The court again finds that the notice plan and class notices are consistent with Rule 23, and that the plan has been fully and properly implemented by the parties and the class administrator.

### C. Fairness of the Settlement

The court now reexamines the fairness of the proposed settlement, this time with the benefit of notice having been provided to the class. The settlement agreement contains the following major components:

- Google will pay a total amount of $23 million, which will constitute the entirety of the settlement fund. All payments will be made from this fund, including: (1) pro rata distributions to Class members, (2) attorneys' fees and costs awards, (3) incentive awards to named plaintiffs, and (4) administration costs, including the costs due to the claims administrator. Any funds that remain after all payments are made will not revert to Google.

- Google will maintain information on its website under the "FAQ," "Key Terms," and "Privacy FAQ for Google Web History" webpages which discloses how information concerning users' search queries are shared with third parties. Specifically, the "FAQ" webpage will include an answer to the question "Are my search queries sent to websites when I click on Google Search results?" which notifies users that search terms may be disclosed to the destination webpage in the referrer header. In conjunction, the "Key Terms" webpage will include a definition of "HTTP Referrer," and the "Privacy

FAQ for Google Web History" webpage will direct users to the Privacy Policy FAQ for more information on how Google handles search queries generally. Google is not required to make changes to its homepage, www.google.com, or to practices or functionality of Google Search, Google AdWords, Google Analytics or Google Web History.

As to particular payments to be made from the settlement fund, Plaintiffs request that each of the three representative plaintiffs receive incentive awards $5,000, and anticipate up to $1 million in claims administration costs. They also request the Court approve their counsel's request for $5,750,000 in fees and $21,643.16 in costs. Frank & Holyoak also request $793,500 in attorneys' fees.

After all contemplated payments are made from the fund, any residual monies will be distributed to World Privacy Forum as a cy pres recipient.

To determine whether a class action settlement is fair, adequate and reasonable, the Court must balance a series of factors, including "the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement." Hanlon, 150 F.3d at 1026. "It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness." Id.

When, as here, settlement occurs before formal class certification approval requires a higher standard of fairness in order to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the class. Lane v. Facebook, 696 F.3d 811, 819 (2012).

### 1. *Strength of Plaintiffs' Case*

To assess strength of the case, "the district court's determination is nothing more than an amalgam of delicate balancing, gross approximations and rough justice." Officers for Justice, 688 F.2d at 625 (internal quotations omitted). There is no "particular formula by which that outcome

must be tested," (Rodriguez v. West Publ'g Corp., 563 F.3d 948, 965 (9th Cir. 2009)), and the district court is not required to render specific findings on the strength of all claims. Lane, 696 F.3d at 823.

Here, Plaintiffs readily state that the alleged privacy violation underlying all of their claims is novel and was potentially one of first impression in this circuit. Thus, from the outset, there was no guarantee that any claims would survive pre-trial challenges if adversarial litigation had continued. Indeed, by the time the parties reached a settlement, some of the claims were facing a third motion to dismiss and the one claim that had survived the second dismissal motion, the SCA claim, was subsequently invalidated by the Ninth Circuit in a case presenting a similar theory. See In re Zynga Privacy Litig., 750 F.3d 1098, 1107 (9th Cir. 2014) (rejecting a claim under the SCA based on webpage disclosures in a referrer header).

Plaintiffs also faced challenges had the case proceeded to trial. In light of the technology involved, the jury would have been required to review complex technical evidence about the inner-workings of Google's search engine, leaving significant opportunity for misunderstanding. Furthermore, success at trial would not have equated to an ultimate success for the class. This is because the calculation of damages based on a potentially unquantifiable privacy injury would have posed a serious challenge to Plaintiffs in obtaining some type of valuable relief, and any meaningful monetary amount awarded to each class member would have resulted in an astronomical judgment far exceeding the value of Google, given the size of the class. For that reason, the judgment would undoubtedly have been met with a remittitur motion and an appeal.

This factor weighs strongly in favor of the settlement. Without a compromise, there was little guarantee of any benefit to the class without a substantial amount of further litigation.

### 2. *The Risk, Expense, Complexity, and Likely Duration of Further Litigation*

This case was a particularly risky one for counsel because the type of privacy injury asserted by Plaintiffs is legally unproven, technically complex and potentially of little value. It also would have been expensive to litigate and try since expert testimony would be necessary to explain the referrer header technology and establish a basis for damages in an untested area.

[PROPOSED] ORDER GRANTING FINAL APPROVAL OF SETTLEMENT & ATTORNEYS' FEES, COSTS, & INCENTIVE AWARDS

7

5:10-cv-4089-EJD

Moreover, Google's denial of liability means Plaintiffs would continue to face "serious hurdles," including a motion for summary judgment, Daubert challenges, and inevitable appeals that would "likely prolong the litigation, and any recovery by class members, for years." Rodriguez, 563 F.3d at 966. Because a negotiated resolution provides for a certain recovery in the face of an uncertain legal theory, this factor favors the settlement. Curtis-Bauer v. Morgan Stanley & Co., Inc., No. 06-C-3903 TEH, 2008 U.S. Dist. LEXIS 85028, at *13, 2008 WL 4667090 (N.D. Cal. Oct. 22, 2008) ("Settlement avoids the complexity, delay, risk and expense of continuing with the litigation and will produce a prompt, certain, and substantial recovery for the Plaintiff class.").

### *3.  The Risk of Maintaining Class Action Status*

Although a class can be certified for settlement purposes, the notion that a district court could decertify a class at any time is an inescapable and weighty risk that weighs in favor of a settlement. See Rodriguez, 563 F.3d at 966 (citing Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160 (1982)). Here, there is little doubt that Google would have vigorously opposed class certification at every opportunity before the district and appellate courts. In addition, the sheer size of the class - essentially covering all persons in the United States who submitted a search query to Google for a period of years - all but invites challenges to class certification based on overbreadth or management difficulties, some of which could be considered meritorious. Thus, the very real risk of never obtaining or losing class status in the absence of settlement weighs in favor of approval.

### *4.  The Amount Offered in Settlement*

This settlement has a monetary component requiring Google to pay $23 million into a common fund and an injunctive component obligating certain disclosures on the Google website. After court-approved payments, the remainder of the fund will be distributed pro rata to valid Claimants.

In support of final approval, Plaintiffs point out that the amount of the agreed-upon settlement fund compares favorably to that of other similar class actions. See, e.g., In re Google Buzz Privacy Litig., 2011 WL 7460099, at *3-4 (N.D. Cal. June 2, 2011) (approving $8.5 million settlement fund for unauthorized disclosure of email contact lists; Lane, 696 F.3d at 818

(approving $9.5 million settlement fund for unauthorized disclosure of online behavior); In re Netflix Privacy Litig., No. 5:11-CV-00379 EJD, 2013 U.S. Dist. LEXIS 372862013, at *16-18, WL 1120801 (N.D. Cal. March 18, 2013) (approving $ 9 million settlement fund for unauthorized storage of personal information). This comparison is instructive because, like those cases, the potential value of this case far exceeds that of the settlement fund. But also like those cases, a theoretical value in the trillions of dollars does not preclude approval here since a fund of $23 million is significant given the substantial legal obstacles to a recovery through litigation.

Aside from the monetary portion of the settlement, the Court must also comment on the fact that Google's allegedly unlawful practice will not change as a result of this case. The Court notes that Google changed its search technology in 2013, ending the transmission of referrer headers as to the vast majority, and perhaps the entirety, of searchers. But that is not a change mandated by this settlement. Instead, Google will be obligated to make certain "agreed-upon disclosures," or changes to certain portions of its website, the purpose of which is to better inform users how their search terms could be disclosed to third parties through a referrer header. It was noted previously that this relief is not the best result for Plaintiffs when compared to that sought in the CCAC, since the order contemplated by that pleading would have required Google to stop disclosing search queries altogether.

At the same time, Google has credible defenses to this claim, and a class action settlement does not need to embody the best possible result for Plaintiffs to be approved. The court's role is not to advocate for any particular relief, but instead to determine whether the settlement terms fall within a reasonable range of possible settlements. Considering all of the circumstances which led to a compromise here, the relief obtained for the class falls within a reasonable range of possible settlements since it was entirely possible that nothing would be obtained if the case were to proceed further. Under the terms of the parties' agreement, future users of Google's website will receive something from the injunctive relief: the capability to better understand Google's disclosure practices before conducting a search on its website, and the ability to make a better informed choice based on that information.

In sum, this factor favors settlement.

### 5. The Extent of Discovery Completed and the Stage of the Proceedings

Prior to reaching a settlement, the parties had engaged in extensive discovery and had fully briefed four motions to dismiss. They also met in person numerous times and engaged an experienced neutral to assist them in reaching a negotiated resolution. The extent of Plaintiffs' counsel factual investigation and the amount of pre-compromise litigation shows they "had a good grasp on the merits of their case before settlement talks began." Rodriguez, 563 F.3d at 967. As such, this factor weighs in favor of the settlement.

### 6. The Experience and View of Counsel

"Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." Id. Given the extensive experience of Plaintiffs' counsel with complex class action lawsuits of a similar size to the instant case, this factor favors approval of the settlement.

### 7. The Presence of a Governmental Participant

The Class Action Fairness Act, or "CAFA," requires that notice of a settlement be given to state and federal officials and provides those officials a window of time to comment. 28 U.S.C. § 1715(b). "Although CAFA does not create an affirmative duty for either state or federal officials to take any action in response to a class action settlement, CAFA presumes that, once put on notice, state or federal officials will raise any concerns that they may have during the normal course of the class action settlement procedures." Garner, 2010 U.S. Dist. LEXIS 49477, at *37. Here, the Class Administrator complied with the CAFA notice requirement on January 13, 2023. No objections from a government official have been received. Thus, this factor favors the settlement.

### 8. The Reaction of Class Members

A low number of opt-outs and objections in comparison to class size is typically a factor that supports settlement approval. See Hanlon, 150 F.3d at 1027 ("[T]he fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness."); see also Nat'l Rural Telecomms. Coop., 221 F.R.D. at 529 ("It is established that the absence of a large number of objections to a

proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members."). Here, out of a class of 193 million individuals, the Class Administrator received 5,044 requests for exclusion and two written objections from two class members. These low rates of exclusion and objection can be characterized as, at most, a favorable reaction by the class, or at least, as an absence of an overwhelming negative reaction. This factor does weigh in favor of approval.

In sum, all of the applicable factors weigh in favor of finally approving the settlement.

### D. Absence of Collusion.

Because collusion is not always evident on the face of a settlement, the Ninth Circuit has instructed courts to carefully scrutinize cases that are settled without adversarial certification for possible collusion. Hanlon, 150 F.3d at 1026. In particular, courts are to be aware of certain signs that warrant heightened scrutiny of the negotiation process, including: (1) where class counsel receives a disproportionate distribution of the settlement or when the class receives no monetary distribution; (2) where unawarded attorneys' fees revert to defendants rather than the settlement fund for the class; and, (3) where there is a "clear sailing" fee arrangement. Laguna v. Coverall N. Am., Inc., 2014 WL 2465049, *5 (9th Cir. June 3, 2014).

Here, the Class was certified for purposes of settlement only, and therefore was not the product of adversarial certification. (ECF 177.) Nonetheless, even when examined under heightened scrutiny, this Settlement is wholly free of collusion. First, the terms of the Settlement do not raise the concern that counsel is receiving a disproportionate distribution of the settlement. Here, Class Counsel seek the Ninth Circuit's "benchmark" twenty-five percent (25%) fee award of the $23 million common fund. See Powers v. Eichen, 229 F.3d 1249, 1256 (9th Cir. 2000) ("We have . . . established twenty-five percent of the recovery as a 'benchmark' for attorneys' fees calculations under the percentage-of-recovery approach").

Second, this Settlement does not provide for payment of attorneys' fees separate and apart from funds paid to the Class. Rather Class Counsel seek a percentage of the common fund – and any funds not awarded in fees will simply be distributed to Claimants rather than reverting to Google. Compare In re HP Laser Printer Litig., 2011 WL 3861703, at *4 (C.D. Cal. Aug. 31,

2011) (It is a sign of collusion "when the parties arrange for fees to revert to the defendant instead of to the class fund or a *cy pres* fund.").

Third, this Settlement does not contain a "clear sailing" provision.[1] The absence of a "clear sailing" provision supports a finding of non-collusion. In fact, the Settlement is not contingent on the Court awarding a specific fee to Class Counsel. Rather, the Parties have agreed to an overall Settlement Fund and have left the division of that fund as between the Class and counsel to the district court, as is usual in common fund cases. See Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1047 (9th Cir. 2002); In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig., 109 F.3d 602, 607 (9th Cir. 1997).

Finally, although not dispositive, the presence of a mediator supports a finding of non-collusion. Vincent v. Reser, 2013 WL 621865 at *4 (N.D. Cal. Feb. 19, 2013). As described *supra*, the complete process resulting in the Settlement was done at arms-length, by well-represented parties, and under the supervision of a neutral mediator. Accordingly, the non-collusive nature of this Settlement, reached after a series of arms-length negotiations and a contested mediation should dispel any concern of the signs of collusion that appear in some class actions but are completely absent here.

## IV.     ATTORNEYS' FEES, COSTS, AND INCENTIVE AWARDS

When attorneys' fees and costs are requested by counsel for the class, "courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 941 (9th Cir. 2011).

"Where a settlement produces a common fund for the benefit of the entire class, courts have discretion to employ either the lodestar method or the percentage-of-recovery method." Id. at 942. The former method is routinely used when "the relief sought - and obtained - is often primarily injunctive in nature and thus not easily monetized." Id. The figure is calculated "by multiplying the number of hours the prevailing party reasonably expended on the litigation (as

---

[1] A "clear sailing" provision refers to a settlement term in which a defendant agrees not to challenge class counsels' fee request up to an agreed amount.

supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." Id. The court can "adjust [the figure] upward or downward by an appropriate positive or negative multiplier reflecting a host of 'reasonableness' factors, including the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." Id. at 941-42 (internal quotations omitted). "Foremost among these considerations, however, is the benefit obtained for the class." Id. at 942.

Under the latter method, the court awards as fees a percentage of the common fund in lieu of the lodestar amount. Id. "[C]ourts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a departure." Id. Relevant factors to a determination of the percentage ultimately awarded include: "(1) the results achieved; (2) the risk of litigation; (3) the skill required and quality of work; (4) the contingent nature of the fee and the financial burden carried by the plaintiffs; and (5) awards made in similar cases." Tarlecki v. bebe Stores, Inc., No. C 05-1777 MHP, 2009 U.S. Dist. LEXIS 102531, at *10, 2009 WL 3720872 (N.D. Cal. Nov. 3, 2009).

"Though courts have discretion to choose which calculation method they use, their discretion must be exercised so as to achieve a reasonable result." Id.

### A. Percentage of the Fund

Plaintiffs' counsel seek a fee award of $5.75 million, which is equal to 25% of the settlement fund. According to counsel, the combination of monetary distributions and injunctive relief obtained in the settlement is an excellent result for the class because they "work in concert . . . . reshape the landscape of Internet privacy protections" and "enact a regime of informed consent for Google Search users, who can now access complete and truthful information about the ways Google handles user search queries before deciding whether to use Google Search, Google Encrypted Search, or a competing search engine."

Plaintiffs' counsel also believe they undertook substantial risk by agreeing to litigate this case on a purely contingent basis given the unsettled legal issues, and, for that reason, spent considerable time—more than twelve years—and money with no guarantee of payment. In addition, they assert that the novel nature of this case, coupled with an opponent armed with

substantial defenses and resources, required sophisticated litigation and negotiation skills. Finally, counsel points out that the award requested is consistent with that awarded in other similar cases.

Having considered the relevant factors, the court agrees with Plaintiffs' counsel that this action posed a substantial risk and required significant time and skill to obtain a result for the class. This case was not one where settlement was easily secured; to the contrary, Plaintiffs' counsel was required to defend their claims against four motions to dismiss, plus trips to the Ninth Circuit and the U.S. Supreme Court. An agreement only materialized after extensive in-person negotiations, first without and then including a professional neutral. Moreover, counsel's request is not disproportionate to the class benefit and is comparable to awards approved in other similar internet privacy class actions, including one previously approved by this court. See In re Netflix Privacy Litig., 2013 U.S. Dist. LEXIS 372862013, at *29 (approving benchmark award of 25%). Accordingly, a benchmark fee award of amounting to 25% of the settlement fund is appropriate.

Former Objectors Frank and Holyoak also seek an award of attorneys' fees in the amount of $793,500. Frank and Holyoak objected to the first settlement in this case to which the Court granted Final Approval in 2015 on the basis that the cy pres component of that settlement was improper. The Ninth Circuit affirmed this Court's grant of Final Approval. Frank and Holyoak then successfully petitioned the U.S. Supreme Court for a Writ of Certiorari. The Supreme Court did not rule on the merits of Frank and Holyoak's petition, but instead remanded the case for this Court to re-examine standing in light of the Supreme Court's decision in Spokeo.

Plaintiffs do not oppose Frank and Holyoak's request for fees in the amount of $793,500 because they feel it is in the best interest of the class to achieve finality. The Court agrees with Plaintiffs that concluding this now 13-year-old case is in the best interests of the class. When awarding fees to objectors from the common fund, the Court is "bound by traditional principles of equity." Rodriguez v. Disner, 688 F.3d 645, 660 (9th Cir. 2012). As a matter of equity, the Court finds that Frank and Holyoak's request for $793,500 is reasonable, as it constitutes only 4.6% of the settlement fund.

### B.     Lodestar Comparison

The Ninth Circuit encourages district courts "to guard against an unreasonable result" by

cross-checking attorneys' fees calculations against a second method. In re Bluetooth, 654 F.3d at 944. Since a 25% benchmark award might be reasonable in some cases but arbitrary in cases involving an extremely large settlement fund, the purpose of the comparison is to ensure counsel is not overcompensated. In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig., 103 F.3d 602, 607 (9th Cir. 1997).

Here, Plaintiff's counsel calculates a lodestar figure of $3,107,295.25 for 4,014.4 billing hours from four law firms, to which they apply a 1.85 multiplier for a total amount of $5,750,000. They also seek compensation for total costs of $43,634.69. These amounts are attributable to each firm as follows:

| Firm | Fees | Expenses | Total Cost |
|---|---|---|---|
| KamberLaw, LLC[2] | $1,298,395 | $29,099 | $1,327,494.00 |
| Nassiri & Jung LLP | $1,213,364 | $6,199.24 | $1,219,563.24 |
| Progressive Law Group | $595,536.25 | $8,336.45 | $603,872.70 |
| **Totals** | $3,107,295.25 | $43,634.69 | $3,150,929.94 |

Among the participating law firms, the hourly rates charged by attorneys range from $320 to $950. The hourly rate for law clerks is $75, and for paralegals is $125 to $285. Altogether, the average hourly rate for all work performed is $774.

Plaintiff's counsel has provided sufficient support for its proposed lodestar calculation. The amount of hours and other costs attributed to this case are reasonable in light of the efforts required to litigate and ultimately engage in a lengthy settlement process. In addition, the hourly rates charged fall within the range of those approved in other similar cases, and the suggested lodestar multiplier of 1.85 is comparable to that previously permitted by other courts in similar internet privacy cases. Accordingly, the lodestar cross-check confirms the reasonableness of the percentage-based calculation.

Frank and Holyoak have also provided sufficient support for their proposed lodestar calculation of $526,196. Their fee request of $793,500 represents a multiplier of 1.5, which is

---

[2] Includes time for Aschenbrener Law, P.C. and Edelson P.C.—the firms at which Michael Aschenbrener worked prior to KamberLaw, LLC.

comparable to that previously permitted in similar cases.

**C.      Incentive Awards**

"[N]amed plaintiffs, as opposed to designated class members who are not named plaintiffs, are eligible for reasonable incentive payments." Staton, 327 F.3d at 977. To determine the appropriateness of incentive awards a district court should use "relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions . . . the amount of time and effort the plaintiff expended in pursuing the litigation . . . and reasonabl[e] fear[s of] workplace retaliation." Id. (internal quotation marks omitted).

The Settlement Agreement provides that the named Plaintiffs may receive incentive awards of up to $5,000 each. In this district, that amount is presumptively reasonable. Jacobs v. Cal. State Auto. Ass'n Inter-Ins. Bureau, No. C 07-00362 MHP, 2009 U.S. Dist. LEXIS 101586, at *13-14, 2009 WL 3562871 (N.D. Cal. Oct. 27, 2009). Since the named plaintiffs assumed the responsibilities and burdens of acting as representatives in this lawsuit for more than twelve years, including providing documents, verifying allegations, and consulting with counsel, the court finds the incentive awards reasonable in light of the eligibility factors set forth in Staton.

**V.      OBJECTIONS**

The court now addresses the points raised in the two written objections, keeping in mind that objectors to a class action settlement bear the burden of proving any assertions they raise challenging the reasonableness of a class action settlement. United States v. Oregon, 913 F.2d 576, 581 (9th Cir. 1990).

The objectors have not satisfied this burden. The objectors argue that the size of the settlement is insufficient in comparison to the value of the case. This contention is misguided, however, because the objectors do not account for the significant and potentially case-ending weakness in the SCA claim, including those discussed above as well as those brought about by the Ninth Circuit's decision in Zynga Privacy Litigation. In light of these risks, whether or not Google's practice of disclosing search queries can actually be characterized as unlawful is questionable. In the end, the parties fashioned a settlement in consideration of the favorable and

unfavorable aspects of each side's case. And it is the parties themselves, as opposed to the Court or the objectors, who are in the best position to assess whether a settlement "fairly reflects" their "expected outcome in litigation." In re Pac. Ents. Sec. Litig., 47 F.3d 373, 378 (9th Cir. 1995). Just because a settlement could be improved does not mean it is not fair, reasonable or adequate. Hanlon, 150 F.3d at 1027. Here, there is no reason to believe the settlement is inadequate when viewed against the diminished strength of the claims.

Objectors also argue that the claims process was too cumbersome. But over 2.5 million class members filed claims with only one person (who himself filed a claim) objecting on the basis that filing a claim was too difficult. The claims process was done entirely online with a backup process for paper claims (of which over 2,000 individuals availed themselves). Making a claim required only that the claimant check a box affirming that they performed a Google search during the Class period—no further proof of claim was required. Claimants were required to create an account, which necessitated the sending of an email that prompted the user to click a link in the email to verify the claimant was a natural person and not a bot or computer program designed to file claims *en masse*. This was necessary because of the lack of proof required to file a claim. Absent this requirement, bots could have filed countless fraudulent claims. The Court disagrees that the claims process was too cumbersome.

For these reasons, the Court is unpersuaded by the objections. They are each overruled.

**CONCLUSION AND ORDER**

Based on the preceding discussion, the Court finds that the terms of the settlement, including the awards of attorneys' fees, costs, and incentive awards, is fair, adequate, and reasonable; that is satisfies Federal Rule of Civil Procedure 23(e) and the fairness and adequacy factors; and that it should be approved and implemented.

The Motion for Final Approval (ECF 186), Plaintiffs' Motion for Attorneys' Fees and Costs (ECF 181), and Frank and Holyoak's Motion for Attorneys' Fees (ECF 182) are therefore GRANTED for the reasons stated herein. The Clerk shall close this file upon entry of Judgment.

**IT IS SO ORDERED.**

Dated:

_____

EDWARD J. DAVILA

UNITED STATES DISTRICT JUDGE